UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

In re:  FLONASE ANTITRUST            )        Case No. 2:08-cv-3301
LITIGATION                           )
                                     )
_____)
                                     )
                                     )        Hon. Anita B. Brody
THIS DOCUMENT RELATES TO:            )
                                     )
Indirect Purchaser Actions           )
_____)

**PLAINTIFFS' OPPOSITION TO DEFENDANT
SMITHKLINE BEECHAM CORPORATION'S MOTION TO
DISMISS THE CORRECTED SECOND AMENDED CLASS ACTION COMPLAINT**

Marvin A. Miller                        Michael M. Buchman
Lori A. Fanning
**MILLER LAW LLC**                      **POMERANTZ HAUDEK
115 South LaSalle Street                GROSSMAN & GROSS LLP**
Suite 2910                              100 Park Avenue
Chicago, IL 60603                       New York, NY 10017
T:  (312) 332-3400                      T:  (212) 661-1100

*Interim Co-Lead Counsel for Indirect Purchasers*

Anthony J. Bolognese
Joshua H. Grabar (JG-1707)
**BOLOGNESE & ASSOCIATES**
Two Penn Center
1500 JFK Boulevard, Suite 320
Philadelphia, PA 19102
T:  (215) 814-6750

*Interim Liaison Counsel for Indirect Purchasers*

Additional counsel listed on signature page

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... iii

INTRODUCTION ..................................................................................................... 1

STATEMENT OF FACTS ........................................................................................ 3

ARGUMENT ............................................................................................................. 7

I.      GSK'S STANDING ARGUMENT FAILS ...................................................... 7

      A.      Because Plaintiffs Purchased Flonase and/or Reimbursed for Flonase During the Class Period in the States Identified in the Complaint, Plaintiffs Have Standing to Sue Under Those States' Laws. ................................................................................................ 7

            1.      Defendant's Standing Argument Is Factually Misplaced. ............. 8

            2.      Defendant's Standing Argument Ignores Settled Case Law ........ 12

II.     PLAINTIFFS' COMPLAINT STATES CLAIMS UNDER THE SUBSTANTIVE STATE LAWS IDENTIFIED THEREIN .............................. 15

      A.      The Arizona Consumer Protection Claim Is Actionable. ....................... 15

      B.      The Florida Consumer Protection Claim Is Actionable. .......................... 18

      C.      The Illinois Consumer Protection Claim Is Actionable .......................... 19

      D.      The Massachusetts Consumer Protection Claim Is Actionable .............. 20

      E.      The North Carolina Consumer Protection Claim Is Actionable ............. 22

            1.      The IABORI Plan Is Not a Business, and It Engaged in Consumer Transactions ............................................................... 25

            2.      Under the UDTPA, Defendant's Sham Petitions Constitute an "Unfair Act," and Detrimental Reliance Is Not Required ....... 26

      F.      The Wisconsin Antitrust Claim is Viable ............................................... 28

III.    PLAINTIFFS' UNJUST ENRICHMENT CLAIMS CAN AND SHOULD PROCEED ..................................................................................................... 29

      A.      Plaintiffs' Unjust Enrichment Claims Are Independent of Their Antitrust Claims. .................................................................................. 30

      B.      Plaintiffs Adequately Plead Unjust Enrichment Under Florida, Illinois, North Carolina, and Massachusetts Law .................................. 32

            1.      Florida and North Carolina ...................................................... 32

            2.      Florida and Massachusetts ........................................................ 33

            3.      Illinois ...................................................................................... 33

i

IV.     PLAINTIFFS CAN SEEK A NATIONWIDE INDIRECT PURCHASER
        CLASS UNDER NORTH CAROLINA LAW ................................................... 35

        A.     North Carolina Antitrust Law Applies to This Nationwide Class ........... 36

        B.     North Carolina's Antitrust Law and the Antitrust Laws of Other
               Indirect Purchaser States Are Sufficiently Similar .................................. 37

        C.     North Carolina's Consumer Protection Law and Other Consumer
               Protection Laws Are Sufficiently Similar ................................................ 39

        D.     The Unjust Enrichment Laws Are Sufficiently Similar ........................... 40

        E.     North Carolina Has Significant Contacts With This Case – GSK Is
               Headquartered in North Carolina. ............................................................ 41

CONCLUSION ....................................................................................................................... 42

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*Allstate Ins. Co. v. Hague*, 449 U.S. 302 (1981) ........................................................ 41

*Alston v. Parker*, 363 F.3d 229 (3d Cir. 2004) ........................................................ 43

*Amchem Prods., Inc. v. Windsor,* 521 U.S. 591 (1997) ........................................................ 40

*American Agr. Chemical Co. v. Jankowski*, 19 F. Supp. 509 (S.D.N.Y. 1937) ........................ 22

*American Rockwool, Inc., v. Owens-Corning Fiberglass Corp.*,
    640 F. Supp. 1411 (E.D.N.C. 1986) ........................................................ 25, 37

*Bell Atlantic Corp., v. Twombly*, 550 U.S. 544 (2007) ........................................................ 9

*Beneficial Corp. v. FTC*, 542 F.2d 611 (3d Cir. 1976),
    *cert. denied*, 430 U.S. 983 (1977) ........................................................ 16

*Bennett v. Smith*, 05-10041, 2006 Bankr. LEXIS 3196 (M.D.N.C. 2006) ........................ 27

*Bober v. Glaxo Wellcome Plc*, 246 F.3d 934 (7th Cir. 2001) ........................................ 34

*Bunnion v. CONRAIL*, No. 97-4877, 1998 U.S. Dist. LEXIS 7727
    (E.D. Pa. May 14, 1998) ........................................................ 41

*California v. ARC America Corp.*, 490 U.S. 93 (1989) ........................................................ 38

*Callaway Golf Co. v. Dunlop Slazenger Group Americas, Inc.*,
    295 F. Supp. 2d 430, 437 (D. Del. 2003) ........................................................ 29

*Chamber of Commerce of Minneapolis v. FTC*, 13, F.2d 673, 686 (8th Cir. 1926) .............. 2, 16

*Cirone-Shadow v. Union Nissan of Waukegan,* No. 94-C-6723,
    1995 WL 238680 (N.D. Ill. Apr. 20, 1995) ........................................................ 12

*D.D.D. Corp., v. F.T.C.*, 125 F.2d 679 (7th Cir. 1942) ........................................................ 16

*Davis v. Ampthill Rayon Workers, Inc.*, 446 F. Supp. 681 (E.D. Va. 1978)
    *aff'd*, 594 F.2d 856 (4th Cir. 1979) ........................................................ 42

*D.R. Ward Const. Co. v. Rohm and Haas Co.*, 470 F.Supp.2d 485 (E.D.Pa. 2006) ....... 14, 30, 31

*Drury v. County of McLean*, 433 N.E.2d 666 (1982) ........................................................ 34

*Erickson v. Pardus*, 551 U.S. 89 (2007) ............................................................... 10, 29

*Ferrell v. Wyeth-Ayerst Labs, Inc.*, No. C-1-01-447, 2004 U.S. Dist.
   LEXIS 15127 (S.D. Ohio June 20, 2004) .............................................. 12, 13

*Ferrell v. Wyeth-Ayerst Labs, Inc.*, No. C-1-01-447, 2007 U.S. Dist.
   LEXIS 44391 (S.D. Ohio June 19, 2007…………….………………………….13

*Fisher v. Knight*, 61 F. 491 (3d Cir. 1984) ................................................................. 9

*Ford v. Williams,* 62 U.S. 287 (1858) ....................................................................... 9

*FTC v. Mylan Laboratories, Inc.*, 62 F. Supp. 2d 25 (D.D.C. 1996) ........................ 31

*FTC v. R.F. Keppel & Bro, Inc.*, 291 U.S. 304 (1934) .............................................. 16

*FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233 (1972) .................................... 2, 16, 20

*Garner v. Healy*, 184 F.R.D. 598 (N.D. Ill. 1999) ............................................... 36, 42

*Grace v. Perception Tech. Corp.*, 128 F.R.D. 165 (D. Mass. 1989) ......................... 42

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) ........................................ 31

*Hill v. Gateway 2000, Inc.*, 1996 WL 650631 (N.D. Ill. Nov. 7, 1996) .................... 42

*Illinois Brick v. Illinois*, 431 U.S. 720 (1977) .......................................................... 38

*Jacobs v. Central Transport, Inc.*, 891 F. Supp. 1088 (E.D.N.C. 1995) ................... 23

*Johnson v. Microsoft Corp.,* 834 N.E.2d 791 (Ohio 2005) ........................................ 32

*In re Abbott Labs. Norvir Antitrust Litig*., Nos. C 04-1511 & 04-4203,
   2007 WL 1689899 (N.D. Cal. June 11, 2007) .................................. 30, 31, 41

*In re Activision Sec. Litig.*, 621 F. Supp. 415 (N.D. Cal. 1985) ............................... 42

*In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, 288 F.3d 1012
   (7th Cir. 2002) ........................................................................................... 40

*In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618 (E.D. Mich. 2000) .............. 30, 31, 32

*In re Cardizem Antitrust Litig.*, 200 F.R.D. 326 (E.D. Mich. 2001)…………………………… 40

*In re Crazy Eddie Sec. Litig.*, 135 F.R.D. 39 (E.D.N.Y. 1991) ................................ 36

*In re Ditropan XL Antitrust Litigation*, 529 F. Supp. 2d 1098 (N.D. Cal. 2007) ..................... 14

iv

*In re Flonase Antitrust Litig.*, 610 F. Supp. 2d 409 (E.D. Pa. 2009) ................................ *passim*

*In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011
(N.D. Cal. 2007) ................................................................................................. 30

*In re K-Dur Antitrust Litig.*, MDL No. 1419, 2008 WL 2660783
(D.N.J. Mar. 19, 2008) ...................................................................................... 13

*In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d. 517 (D.N.J. 2004) ....................... 30, 32

*In re Kirschner Med. Corp. Sec. Litig.*, 139 F.R.D. 74 (D. Md. 1991) ................................ 35, 42

*In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369 (D.D.C. 2002) ..................... 13

*In re Lorazepam & Clorazepate Antitrust Litig.*, 295 F. Supp. 2d 30 (D.D.C. 2003) ......... 14, 32

*In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46 (D.N.J. 2009) .......................... 39

*In re Pharm Indus. Average Wholesale Price Litig.*, 252 F.R.D. 83 (D. Mass. 2008 ) ................2

*In re Pharm Indus. Average Wholesale Price Litig.*, 491 F. Supp. 2d 20 (D. Mass. 2007) ...... 10

*In re Pizza Time Theatre Sec. Litig.*, 112 F.R.D. 15 (N.D. Cal. 1986) ....................................... 42

*In re Rezulin Prods. Liab. Litig.*, 392 F. Supp. 2d 597 (S.D.N.Y. 2005) .................................. 14

*In re Relafen Antitrust Litig.*, Civil Action No. 01-12222-WGY (D. Mass) ............................ 10

*In re Seagate Techs. Sec. Litig.*, 115 F.R.D. 264 (N.D. Cal. 1987) ........................................... 42

*In re Synthroid Mktg. Litig.*, 188 F.R.D. 295 (N.D. Ill. 1999) .................................................. 35

*In re Terazosin Hydrochloride Antitrust Litig.*, 160 F. Supp. 2d 1365 (S.D. Fla. 2001) ........... 31

*In re Terazosin Hydrochloride Antitrust Litigation*, 220 F.R.D. 672 (S.D. Fla. 2004) ........13, 40

*In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231 (D. Del. 2002) .................................... 31

*In re Zyprexa Products Liability Litig.*, 253 F.R.D. 69 (E.D.N.Y. 2008) .................................... 9

*L.C. Williams Oil Co., v. Exxon Corp.*, 625 F. Supp. 477 (M.D.N.C. 1985) ............................ 38

*Lippa's, Inc., v. Lenox, Inc.*, 305 F. Supp. 182 (D. Vt. 1969) .................................................... 16

*Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598 (6th Cir. 2007) .............................. 10

*Lyons v. Caterpillar, Inc.*, 194 F.R.D. 206 (E.D. Pa. 2000) ...................................... 36

*Marcella v. ARP Films, Inc.*, 778 F.2d 112 (2d Cir. 1985)...................................... 29

*Marlen C. Robb & Son Boatyard & Marina, Inc. v. Vessel Bristol*,
    893 F. Supp. 526 (E.D.N.C. 1994).............................................................. 27

*Martin v. U.S.*, 37 Ct. Cl. 527 (1902)...................................................................... 22

*Maywalt v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51 (S.D.N.Y. 1993)....................... 35

*Mazza v. American Honda Motor Co.*, 254 F.R.D. 610 (C.D. Cal. 2008)........................... 40, 42

*Merck & Co. v. Lyon*, 941 F. Supp. 1443, 1463 (M.D.N.C. 1996).............................................23

*Mlynek v. Household Fin. Corp.*, No. 00 C 2998, 2000 U.S. Dist. LEXIS 13783
    (N.D. Ill. Sept. 13, 2000) ........................................................................ 19

*New Motor Vehicles Canadian Export Antitrust Litig.*, 350 F. Supp.
    2d 160 (D. Me. 2004)................................................................................ 34

*O'Keefe v. Mercedes-Benz USA, LLC*, 214 F.R.D. 266 (E.D. Pa. 2003)................................... 39

*ORFA Sec. Litig.*, 654 F. Supp. 1449 (D.N.J. 1987).................................................... 42

*Phillips Petroleum Co v. Shutts*, 472 U.S. 797 (1985) ...................................... *passim*

*Powers v. Lycoming Engines*, 245 F.R.D. 226 (E.D. Pa. 2007),
    rev'd on other grounds, 2009 U.S. Ap. LEXIS 6785 (3d Cir. 2009)............................ 41

*Randall v. Lady of Am. Franchise Corp.*, No. 04-3394 (JRT/FLN),
    2005 U.S. Dist. LEXIS 26543 (D. Minn. Oct. 21, 2005) .............................................. 19

*Republic of Turkey v. OKS Partners*, 797 F. Supp. 64 (D. Mass 1992) ...................................11

*Scott v. GlaxoSmithKline Consumer Healthcare, L.P.*,
    No. 05 C 3004, 2006 WL 952032 (N.D. Ill. Apr. 12, 2006).......................................... 34

*Schumacher v. Tyson Fresh Meats, Inc.*, 221 F.R.D. 605 (D.S.D. 2004)...................................32

*Seals v. Delta Air Lines*, 924 F. Supp. 854, 859 (E.D. Tenn. 1996) ........................................... 38

*Serna on Behalf of Estate of Serna v. Ymker*, 100 F.3d 957 (6th Cir. 1996) ............................ 22

*Siegel v. Shell Oil Co.*, 480 F. Supp. 2d 1034 (N.D.Ill. 2007)............................................. 20, 34

*Singer v. AT & T Corp.*, 185 F.R.D. 681 (S.D. Fla. 1988) .................................................. 35, 40

*Somerville v. Major Exploration, Inc.*, 102 F.R.D. 500 (S.D.N.Y. 1984) ................................ 36

*Strategic Reimbursements, Inc. v. HCA, Inc.*, No. 06 C 6501,
    2007 WL 2274709 (N.D. Ill. Aug. 2, 2007) ................................................................ 33

*Taylor v. Home Ins. Co.*, 777 F.2d 849 (4th Cir. 1985) .......................................................... 41

*The In Porters, S.A. v. Hanes Printables, Inc.* 663 F. Supp. 494 (M.D.N.C. 1987) .................. 23

*Trans World Accounts, Inc., v. FTC*, 594 F.2d 212 (C.D. Cal. 1979) ...................................... 16

*Truillo v. Apple Computer, Inc.*, 581 F. Supp. 2d 935 (N.D. Ill. 2008) .................................... 34

*Umland v. Planco Fin. Serv., Inc.*, 542 F.3d 59 (3d Cir. 2008) ................................................ 8

*U.S. v. Kensington Hosp.*, 760 F. Supp. 1120 (E.D. Pa. 1991) ................................................ 29

*Westways World Travel, Inc. v. AMR Corp.*, 218 F.R.D. 223 (C.D. Cal. 2003) ....................... 31

*Zinberg v. Wash. Bancorp, Inc.*, 138 F.R.D. 397 (D.N.J. 1990) ............................................. 42

**State Cases**

*Abernathy v. Ralph Squires Realty Co., Inc.*, 285 S.E.2d 325 (N.C. App. 1982) ...................... 27

*Blanchar v. Lake Land Builders, Inc.,* 2009 WI App 21, 763 N.W.2d 249,
    (Wis. Ct. App. 2009) ................................................................................................ 12

*Booher v. Frue*, 358 S.E.2d 127, 129 (N.C. App. 1987) ........................................................ 33

*Burnham v. Mark IV Homes, Inc.*, 441 N.E.2d 1027 (Mass. 1982) .......................................... 21

*Clark v. TAP Pharmaceutical Products, Inc.*, 798 N.E.2d 123 (Ill. App. Ct 2003) ................. 39

*Clothesrigger, Inc. v. GTE Corp.*, 236 Cal. Rptr. 605 (Cal. Ct. App. 1987) ........................... 42

*Coastal Physician Services of Broward County v. Ortiz*, 764 So. 2d 7
    (Fla. App. 1999) ...................................................................................................... 18

*Comes v. Microsoft Corp.*, 646 N.W.2d 440 (Iowa 2002) ....................................................... 38

*Cox v. Microsoft Corp.*, 8 A.D.3d 39, 778 N.Y.S.2d 147 (1st Dep't 2004) ............................. 31

*Doe v. S.C. Med. Malpractice Liab. Joint Underwriting Ass'n*,
    557 S.E.2d 670 (S.C. 2001) ................................................................. 41

*Edwards v. West*, 495 S.E.2d 920 (N.C. App. 1998) ................................................ 27

*Emerine v. Yancey*, 680 A.2d 1380 (D.C. 1996)....................................................... 33

*Gordon v. Boden*, 586 N.E.2d 461 (Ill. App. Ct. 1991).......................................... 42

*Guthrie v. Northwestern Mutual Life Ins. Co.*, 208 S.E.2d 60 (W. Va. 1974) .......... 22

*Hajmm v. House of Raeford Farms, Inc.*, 328 N.C. 578 (N.C. 1991) ...................... 25

*Hardy v. Toler*, 288 N.C. 303 (1975)....................................................................... 26

*Henderson v. United States Fidelity & Guaranty Co.*, 346 N.C. 741,
    488 S.E.2d 234 (N.C. 1997)................................................................. 39

*Hollowell v. Career Decisions, Inc.*, 298 N.W.2d 915 (Mich. App. 1980) ............... 33

*HPI Health Care Servs., Inc. v. Mt. Vernon Hosp.*, 545 N.E.2d 672 (Ill. 1989) ....... 34

*K&S Tool & Die Corp. v. Perfection Mach. Sales, Inc.*, 301 Wis. 2d 109,
    732 N.W.2d 792 (Wis. 2007)................................................................11

*Lawrence v. UMLIC-Five Corp.*, 06 CVS 20643, 2007 WL 2570256,
    (N.C. Super. Jun. 18, 2007) ............................................................ 22, 24

*Lobo Exploration Co. v. Amoco Prod. Co.*, 991 P.2d 1048
    (Okla. Civ. App. 1999) ................................................................... 36, 42

*Mack v. Bristol-Myers Squibb Co.*, 673 So.2d 100 (Fla. Ct. App. 1997) ...................11

*Martin v. Heinhold Commodities, Inc.*, 117 Ill. 2d 67, 510 N.E.2d 840 (Ill. 1987) ................. 39

*Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Chipetine*,
    634 N.Y.S.2d 469 (1st Dep't 1995) ........................................................33

*Meyers v. Bayer AG*, 735 N.W.2d 448 (Wis. 2007) ................................................. 28

*Millennium Communs. & Fulfillment, Inc. v. Office of the AG, Dep't of
    Legal Affairs*, 761 So. 2d 1256 (Fla. App. 3 Dist. 2000)........................ 11, 18

*Miller AG v New Womyn, Inc.*, 679 N.W. 593 (Iowa 2004)................................. 11

*Oce Printing Systems USA, Inc. v. Mailers Data Services, Inc.*, 760 So. 2d
    1037 (Fla. App. 2000) ................................................................................ 18

*Olstad v. Microsoft Corp.*, 700 N.W.2d 139 (Wis. 2005)......................................... 28

*Purcell & Wardrope Chartered v. Hertz Corp.*, 530 N.E.2d 994
    (Ill. App. Ct. 1988)................................................................................... 42

*Renaissance Cruise, Inc., v. Glassman*, 738 So. 2d 436 (Fla. 4th DCA 1999) ....................... 19

*S.B. Simmons Landscaping & Excavating, Inc. v. Boggs*, 665 S.E.2d 147
    (N.C. App. 2008) ..................................................................................... 26

*Slaney v. Westwood Auto, Inc.*, 366 Mass. 688 (1975) .............................................. 21

*State ex rel. Corbin v. Pickrell,* 667 P.2d 1304 (Ariz. 1983).................................... 11

*Stetszer v. TAP Pharmaceuticals*, 165 N.C. App. 1,  598 S.E.2d 570
    (N.C. App. 2004) ........................................................................... 12, 37, 39

*Tarpey v. Crescent Ridge Dairy, Inc.*, 47 Mass. App. Ct 380 (1999)....................... 21

*Union Carbide Corp. v. Super. Ct.*, 679 P.2d 14 (Cal. 1984)................................... 38

*Watts v. Watts*, 137 Wis.2d 506 (1987) .................................................................. 31

*York v. Sullivan*, 369 Mass. 157, 383 N.E. 2d 341 (1975)........................................ 21

*Ysbrand v. DaimlerChrysler Corp.*, 81 P.3d 618 (Okla. 2003) ............................... 42

**Docketed Cases**

*In re Wellbutrin SR Antitrust Litigation*, Civil Action No. 2:04-cv-5525 (BWK) ................... 10

*In re Wellbutrin XL Indirect Purchaser Antitrust Litigation*, No. 2:08:cv-2433...................... 17

**Federal Statutes**

Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1002(1), 1002(37)……...8

The Federal Trade Commission Act, 15 U.S.C. § 45, *et seq.*,……..…………………….....15

**State Statutes**

Ariz. Rev. Stat. § 44-1522, *et seq*...………………………………………………………15

Fla. Stat. § 501.201, *et seq*………………………………………………………………18

Iowa Code § 714.16, *et seq*………………………………………………………...1, 15

MASS. GEN. LAWS Ch. 93A, §9(3)……………………………………...…..21

N.C. Gen Stat. § 75 1.1, *et seq*.,……………………………….………………22, 24

Wis. Stat. § 133.01. …………………………………….……………..…28

**Miscellaneous**

Federal Rule of Civil Procedure 15(a)…………………………………………….43

Daniel R. Karon, "Undoing the Otherwise Perfect Crime,"
        108 W. Va. L. Rev. 395, 421-28 (2005)……………………………………..33

## INTRODUCTION

Pursuant to the Court's May 15, 2009 Order ("Order"), the Corrected Second Amended ("Complaint" or "SAC") identifies the state(s) in which a third-party payor Plaintiff was injured when it participated in a "co-pay" transaction by paying a majority of the purchase price for Flonase by a member in that state.  In addition, the Complaint further identifies the states in which a respective third-party payor Plaintiff paid a co-pay or provided reimbursements to their members for Flonase purchases.  These states include Arizona, Florida, Iowa,[1] Illinois, North Carolina and Wisconsin.  The individual Plaintiff identifies that she was injured when purchasing Flonase in Massachusetts.  Plaintiffs allege state antitrust, consumer protection and unjust enrichment claims for injuries resulting from purchases *in* the respective states.  In short, the SAC complies in all respects with what the Court requested in the Order.

Notwithstanding Plaintiffs' adherence to the Court's Order, Defendant has filed another motion to dismiss. Defendant now contends these clear allegations that a Plaintiff sustained injury at the point of purchasing and/or reimbursing for Flonase in a particular state is "vague and conclusory" and "cannot support a reasonable inference of injury."  Defendant SmithKline Beecham Corporation D/B/A/ GlaxSmithKline's Motion to Dismiss the Second Amended Complaint ("Def. Mem.") at 8.  Without citing authority directly on point, Defendant cobbles together strained readings of the case law in order to make this argument.  Defendant's position has been expressly rejected in at least two other drug cases.

Defendant also contends that Plaintiffs have not alleged consumer fraud violations under these state statutes because they do not allege deception or fraud.  Again, Defendant attempts to confuse the issue.  Plaintiffs have alleged a viable cause of action under the consumer protection

---

[1]     Plaintiffs withdraw their Iowa Consumer Fraud Act claim under Iowa Code § 714.16, *et seq*., but continue to pursue their Iowa antitrust claim.

statutes because they allege antitrust violations which are violations of the consumer fraud acts. *See FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244-45 n.5 (1972) (antitrust violations constitute a violation of the FTC Act and the state consumer protection statutes modeled off the FTC Act.)   In addition, Plaintiffs' detailed Complaint lays bare Defendant's anticompetitive intent when filing four Citizen's Petitions with the Food & Drug Administration ("FDA"). Petitions which the FDA concluded were specifically designed to prevent generic entry. Vexatious acts or practices, such as GSK's filing of multiple frivolous Citizens Petitions in order to monopolize a market – which the FDA determined were intended to prevent generic market entry – constitute a violation of the Federal Trade Commission Act, 15 U.S.C. 45,[2] and, as a result, the respective state consumer protection statutes modeled from the FTC Act.  *See In re Pharm Indus. Average Wholesale Price Litig.*, 252 F.R.D. 83 (D. Mass. 2008) (Under the "Little FTC Act", states which statutorily or judicially recognize a federal deference obligation to FTC and federal court interpretation of the FTC Act include Arizona, Florida, Illinois, Massachusetts and North Carolina.).  These acts also constitute "unfair practices" under Florida, Illinois and North Carolina consumer protection statutes.

Defendant's efforts to dismiss the unjust enrichment claims are equally unavailing. Moreover, Defendant's unusual request to strike Plaintiffs' first proposed class definition which concerns a nationwide class of indirect purchasers in the indirect purchaser states under the law of North Carolina should be rejected.  The application of North Carolina law in this case is most appropriate since the conduct emanated from that State where GSK is primarlily located. Moreover, application of North Carolina law to all class members will make this case even more

---

[2]      *Chamber of Commerce of Minneapolis v. FTC*, 13 F.2d 673, 686 (8th Cir. 1926) (initiation of vexatious proceeding condemned under the Act).

manageable then having seven exemplar states.   For these and the reasons stated below, Defendant's second motion to dismiss should be denied in its entirety.

## STATEMENT OF FACTS

The named Plaintiffs, Taft-Hartley Health and Welfare Funds, ("TPPs" or "Plans") and one individual, pursue damages claims against "GSK", both individually and on behalf of all End-Payors who purchased Flonase during the Class Period, under various States' antitrust laws, consumer protection laws, and common law doctrines of unjust enrichment.   Complaints similar to that which Plaintiffs' have brought have been repeatedly sustained in courts around the country.

Plaintiffs' Complaint alleges that Defendant engaged in conduct which unlawfully precluded generic drug companies from entering the market for Flonase (fluticasone propionate), a prescription corticosteroid nasal spray that alleviates nasal allergies and nonallergic rhinitis.[3]  SAC ¶ 46.   As this Court has recognized, citizens petitions to the FDA "were often abused by pharmaceutical companies attempting to prolong their monopoly in the market."   *In re Flonase Antitrust Litig*., 610 F. Supp. 2d 409, 412 (E.D. Pa. 2009). The Complaint alleges precisely this claim under certain state competition laws.

Defendant's successive filing of four citizens petitions was intended to and did, in fact, delay generic entry in the Flonase market. SAC ¶¶ 2-3.   Had Defendant not submitted its fraudulent petitions, consumers would have had access to generic Flonase by May 19, 2004, at the latest.   *Id*. ¶ 94.   Because of Defendant's actions, however, generic Flonase did not come onto the market until March 6, 2006.   *Id*. ¶ 91.   Thus, as a result of Defendant's misconduct in filing repeatedly frivolous citizens petitions, these End-Payor Plaintiffs paid more for Flonase

---

[3]     The Second Amended Complaint was corrected to list the formal name of the individual plaintiff.

during the period between May 19, 2004, and March 6, 2006, than they would have otherwise. Notably, the generic entrant, Roxane Laboratories, Inc., has now also commenced an action in this Court for the damages it incurred in connection with the delayed entry caused by Defendant and Defendant's motion to dismiss the case was denied as moot on July 6, 2009

On October 3, 2002, Roxane filed an Amended New Drug Application ("ANDA")[4] with the FDA seeking approval to sell an AB-rated generic version of Flonase in the United States once GSK's patent expired, on November 14, 2003.[5]  *Id.* ¶ 63.  GSK, which maintains a "life cycle management" group for its drugs and monitors exclusivity periods, knew that generic manufacturers would be filing ANDAs before GSK's market exclusivity period expired.  *Id.* ¶ 62.  For the sole purpose of forestalling such action and unlawfully extending its monopoly, GSK filed its four petitions, each of which lacked any reasonable chance of being granted.[6]  *Id.* ¶¶ 2, 93.

GSK's first petition, filed on May 19, 2004, asked the FDA not to approve any ANDAs for Flonase generics until after the FDA issued a final guidance document setting forth a scientifically valid methodology for determining the bioequivalence of the generic drugs.  The

---

[4]     "A prospective manufacturer of a generic drug must demonstrate to the FDA that the generic version is the 'bioequivalent' of the brand name drug before the generic version is approved for sale.  In other words, the generic version must contain the same active ingredient(s), dosage form, route of administration, and strength."  *Flonase*, 610 F. Supp. 2d at 412.

[5]     Because it fulfilled certain requirements regarding pediatric studies, GSK received a six-month extension of market exclusivity from the FDA, so that GSK's exclusive right to sell Flonase in the United States expired on May 14, 2004.  *Id.* ¶ 51.  Section 505(A) of the FDCA provides for a six-month extension beyond the expiration of the relevant patent during which time an ANDA may not be approved if the FDA decides to collect information about the drug in pediatric populations, and if certain conditions regarding studies of the drug in those populations are met.

[6]     Partly in response to the unlawful conduct at issue here, Congress in 2007 "passed a law that allows the FDA to dismiss citizens petitions summarily in order to prevent pharmaceutical companies from using this process to unlawfully extend their monopolies."  *Flonase*, 610 F. Supp. 2d at 412 n.2; *see also* SAC ¶¶ 39-45.

FDA rejected the petition because no law or regulation *required* the FDA to finalize existing guidance documents before approving a pending ANDA, nor was it the FDA's standard practice to do so.  GSK's first petition did not address the adequacy of Roxane's application, suggest that Roxane's generic version was not bioequivalent to Flonase, or raise public health concerns – the intended purposes of citizens petitions.  *Id.* ¶ 67.

GSK's second petition, filed November 23, 2004, asked the FDA to impose on any Flonase ANDA filer the identical set of product quality standards that the agency had imposed on GSK in October 2004.  The FDA rejected the petition because product quality can be measured in different ways, and "it is virtually impossible for a generic manufacturer to perform the exact same tests that GSK used for Flonase approval. . . ."  *Id.* ¶ 77.  The second petition, like the first, failed to address the adequacy of Roxane's application, suggest that Roxane's drug was not bioequivalent to Flonase, nor did it raise a single public health concern.  *Id.* ¶ 71.

GSK's third petition, filed March 25, 2005, asked the FDA to stay the effective date of generic Flonase approvals for three business days after the date on which GSK would be notified of the approvals.  *Id.* ¶ 79.  Federal regulations provide that such a stay may only be granted if the petitioner demonstrates that:  (1) it will suffer irreparable harm; (2) its case is not frivolous and is being pursued in good faith; (3) sound public policy reasons support the stay; and (4) the delay resulting from the stay is not outweighed by public health or other public interests.  21 C.F.R. § 10.35(e).  Once again, the FDA rejected the third petition, stating:

> An assumption underlying GSK's argument is that the Agency's approval standards will, upon further examination, be found inadequate.  This assumption is too speculative and too unlikely . . . One of the purposes of the Hatch-Waxman Amendments is to foster the availability of low-cost generic drugs. This important public policy would be frustrated if FDA were to grant the stay.

> The policies behind Hatch-Waxman dictate that GSK should not be permitted to shield its market share when the Agency has reasonably determined that competing generic drug products may be approved . . .

SAC ¶¶ 82-84.

GSK's fourth petition, filed June 16, 2005, asked the FDA not to approve any ANDAs for generic versions of Flonase on the basis of an expert declaration that questioned the statistical methods in FDA's bioequivalence reviews.  The FDA rejected the petition because the expert's analysis addressed nasal *solutions*, not nasal suspensions like Flonase.  The FDA noted that the issues raised in GSK's fourth petition bore no relevance to the FDA's evaluation of fluticasone propionate nasal spray based on the statistical method it had already disclosed: "GSK's arguments . . . are not relevant to the fluticasone propionate nasal spray suspension products evaluated under the PBE method."  *Id.* ¶ 87.

On February 22, 2006, the FDA found that all of GSK's various petitions were devoid of merit:  "GSK is not permitted to shield its market share when the Agency has reasonably determined that competing generic drug products may be approved."  *Id.* ¶ 88.  Also on February 22, 2006, the FDA finally approved Roxane's ANDA for generic Flonase.  *Id.* ¶ 89.  After GSK unsuccessfully attempted to obtain a preliminary injunction overturning the FDA's approval of Roxane's ANDA, Roxane began selling generic Flonase in the United States on March 6, 2006—approximately 22 months after GSK's market exclusivity should have expired.  *Id.* ¶ 91.

As this Court observed, "[o]nce a generic drug enters the market, the price of the name-brand drug and the sales volume typically drop."  *Flonase*, 610 F. Supp. 2d at 412.  While this indeed happened with Flonase, the complaint alleges it would have happened 22 months sooner absent GSK's repeated filing of sham citizens petitions.  SAC ¶ 109, 112-115.  All four petitions

lacked any legitimate basis, and GSK filed them with the wrongful motive of prolonging its Flonase monopoly. *Id.* ¶ 93. GSK's employees and agents knew that the FDA would reject the petitions. Nevertheless, GSK filed the petitions knowing they would trigger the FDA's review process which would provide GSK with an additional period of time to maintain its monopoly and sell Flonase unhindered by competition. *Id.* ¶¶ 92-93. GSK's actions had their desired effect – they delayed generic competition for Flonase and increased GSK's profits to the detriment of consumers. *Id.* ¶¶ 2-3, 92-93, 115-116.

## ARGUMENT

## I.   GSK'S STANDING ARGUMENT FAILS

### A.   Because Plaintiffs Purchased Flonase and/or Reimbursed for Flonase During the Class Period in the States Identified in the Complaint, Plaintiffs Have Standing to Sue Under Those States' Laws.

Plaintiffs allege that "they sustained injury when [they] *purchased* and/or provided reimbursement for Flonase" in the States of Arizona, Florida, Illinois, Iowa, North Carolina, Virginia, and Wisconsin. SAC ¶¶ 5-9 (emphasis added). In an attempt to cast doubt on this statement, Defendant contends that the Alabama Plans and other putative class third-party payor representatives ("Plans") lack standing because they "did not 'purchase' Flonase from pharmacies or other entities in these states. . . ." Def. Mem. at 9. Defendant ignores the transactional data Plaintiffs produced months ago which demonstrates the TPP Plaintiffs actually purchased Flonase in the relevant States when their members used the "co-pay" option of their prescription drug plan. Instead, Defendant focuses on another purchase option, the reimbursement mechanism, in order to contend – without citing a single authority directly on point – that the Plan's injuries were localized in the States from which they reimbursed members for Flonase purchases. For the reasons explained below, Defendant's standing argument is misplaced and should be summarily denied.

### 1.      __Defendant's Standing Argument Is Factually Misplaced.__

Defendant's standing/injury argument is factually misplaced for the following three reasons.  *First*, the plans have commenced suit and allege injury based upon *their* purchases – not their members' purchases.  See Def's Mem. at 9.  Plaintiffs are not seeking recovery based upon *their members'* out of pocket payments, but rather the Plans' actual "co-pay" purchases to the pharmacies **in** the respective States or "reimbursements" for purchases made by their members **in** those States. This allegation must be accepted as true and all inferences drawn in a light most favorable to Plaintiffs. *Umland v. Planco Fin. Serv., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008)   The Plans are "employee welfare benefit plans" and "multiemployer plans" governed by the Employee Retirement Income Security Act ["ERISA"].  29 U.S.C. §§ 1002(1), 1002(37).  As such, they are required by law to hold their assets in trust by one or more trustees.  29 U.S.C. §§ 1102, 1103.  The trustees, as fiduciaries, must discharge their duties with respect to the Plans solely in the interest of the participants and beneficiaries, and for the exclusive purpose of providing benefits and defraying the reasonable expenses of administration.   29 U.S.C. § 1104(a)(1)(A).  The ERISA fiduciaries of these Plans are the Boards of Trustees.  The Trustees are pursuing this litigation to recoup Plan assets (separate and apart from the damages incurred by the individual members), which include monies unnecessarily expended to pay for Flonase purchased by Plan members or participants in the relevant States.  This action, therefore, is *not* a suit to recover money paid by *individual plan members* as Defendant suggests, but an action to recover *Plan assets* that are held and administered in trust and were improperly paid as a result of Defendant's violation of the relevant States' laws.

*Second*, Defendant's strained argument is inconsistent with notice pleading requirements. The underlying factual basis for the Plans' injury is well recognized, so there is no need to plead in detail the mechanics of the prescription drug plans for each Plaintiff.  *Bell Atlantic Corp., v.*

- 8 -

*Twombly*, 550 U.S. 544, 556 (2007) (all that is required is to "give the defendant fair notice of what the claim is and the grounds upon which it rests."). Insured consumers use the "co-pay" and "reimbursement" mechanisms to purchase prescription drugs across the country every single day.

"Co-payments," or "co-pays," are joint purchases by the member *and the Plan*. A member with a co-pay benefit pays a small portion of the purchase price – *i.e.*, $25 – and the plan automatically pays the balance of the purchase through a pharmacy benefits manager or third-party administrator, which serve as agents for the Plan.[7] The Plan in this situation actually pays the majority of the price for Flonase. Thus, in satisfying the balances of co-pay transactions, Plans – through an agent tasked with administering the prescription drug benefits plans – made actual purchases of Flonase in all the relevant States. *See In re Zyprexa Products Liability Litig.*, 253 F.R.D. 69, 78 (E.D.N.Y. 2008) ("Third-party payors pay the remainder for their covered members, typically via pharmaceutical benefits managers,[] *which act as TPP agents in administering their prescription drug programs.*") (emphasis added).

Under the reimbursement scenario, a member pays 100% of the cost of the prescription drug at the time of the transaction and seeks re-payment from the Plan. If the drug price contains an illegal overcharge, the Plan suffers injury because it must reimburse the member, through its

---

[7]      Under longstanding agency law doctrine, a principal is entitled to pursue the same remedies against third parties with regard to the authorized acts of its agent as if the principal had personally taken those acts. In vindicating its rights the principal stands in the shoes of its agent. *Ford v. Williams*, 62 U.S. 287, 289 (1858) ("Where a contract is made by an agent, the principal whom he represents may maintain an action upon it in his own name, although the name of the principal was not disclosed at the time of making the contract; and, although the contract be in writing, parol evidence is admissible to show that the agent was acting for his principal."); *Fisher v. Knight*, 61 F. 491, 494 (3d Cir. 1894) ("Now, it is firmly settled that the contract of an agent is the contract of his principal, for whom he acted, and that the undisclosed principal may sue thereon at law in his own name, and this even where the contract is in writing, and the principal is not mentioned therein.").

agent, as a guaranteed benefit. *See In re Pharm Indus. Average Wholesale Price Litig.*, 491 F. Supp. 2d 20, 79 (D. Mass. 2007) (finding that the "Taft-Hartley funds" who were class representatives "hired third parties to handle their medical benefits, including drug reimbursement," and that these third parties were the funds' agents).

Either way, the Plans are the actual purchasers of Flonase as alleged in the Complaint. Defendant's argument to the contrary is specious.  Notably, Defendant concedes that reliance on agents to administer the "co-pay" and "reimbursement" mechanisms of Taft-Hartley plans is commonplace. Def. Mem, at 9 n.4. The Court can take judicial notice of this everyday occurrence in society *via* the caselaw referenced by Defendant. *Id*.[8]  Contrary to Defendant's assertion, pleading the obvious concerning these everyday transactions is not necessary. *Erickson v. Pardus*, 551 U.S. 89, 127 S.Ct. 2197 (2007). It is disconcerting that Defendant makes this argument with regard to the Alabama Plans because it has now deposed these Plans in at least two other generic drug cases[9] and has learned how they operate.  Defendant knows quite well that the IBEW-NECA Local 505 Health and Welfare Plan is a "co-pay" Plan and the A.G.C. Building Trades Welfare Plan is a point of sale "reimbursement" plan.  Moreover, Defendant, which possesses each Alabama Plan's actual Flonase transaction data, can easily gleen this from the data that the Plans were injured.

*Third*, the antitrust and consumer protection laws identified in the Complaint make clear

---

[8]     *See also Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 602 (6th Cir. 2007) ("Insurance companies . . . often act as third-party administrators to carry out the daily operations of employers' self-funded plans, since insurance companies already have operations in place to process claims, collect employee premiums, and manage enrollment.  In practice, health care providers bill the administrator for the health care services, and the administrator then collects the full payment from the employer, along with a processing fee.").

[9]     The two cases are:  *In re Relafen Antitrust Litig.*, Civil Action No. 01-12222-WGY (D. Mass) ($75 million settlement); and *In re Wellbutrin SR Antitrust Litigation*, Civil Action No. 2:04-cv-5525 (BWK) (pending).  With that knowledge, Defendant's argument on this point borders on a violation of Rule 11.

- 10 -

that the Plans and their members have been injured, and are entitled to maintain a cause of action where the transaction was consummated.  For example, the Alabama Plans allege they were injured as a result of purchases they made in the State of Florida.  They allege an antitrust violation that is appropriate to pursue in Florida under the Florida Deceptive Unfair Trade Practices Act ("FDUTPA").  *Mack v. Bristol-Myers Squibb Co.*, 673 So.2d 100, 104, 108 (Fla. Dist. Ct. App. 1997) (finding that FDUTPA is "a clear statement of legislative policy to protect consumers through the authorization of such indirect purchaser actions" based on anticompetitive conduct, and that, with respect to the FDUTPA's enumerated list of unfair business practices, "the legislature did not intend this list to be exclusive.").  The FDUTPA covers a Florida transaction by out-of-state residents.  *See*, *e.g.*, *Millennium Communs. & Fulfillment, Inc. v. Office of the AG, Dep't of Legal Affairs*, 761 So. 2d 1256, 1261-62 (Fla. App.3 Dist. 2000) (holding that the Florida consumer protection statute applies to "both in-state and out-of-state residents in a class action").  Other state consumer protection statutes alleged in the Complaint cover in-state transactions by out-of state persons or injuries sustained by conduct emanating from the state.[10]

---

[10]     The relevant statutes extend to out-of-state residents in Arizona, Iowa, Illinois, Massachusetts and North Carolina, *State ex rel. Corbin v. Pickrell*, 667 P.2d 1304, 1312 (Ariz. 1983) (Arizona consumer protection and civil RICO statute applied to protect both in-state residents and out-of-state residents); *State ex rel. Miller AG v. New Womyn, Inc.*, 679 N.W.2d 593, 597 (Iowa 2004) ("The [Iowa] consumer fraud statute is not limited to residents of Iowa; in fact, it suggests the contrary. . . . We conclude that our civil fraud statute provides for restitution on behalf of all consumers, including nonresidents."); *Republic of Turkey v. OKS Partners*, 797 F. Supp. 64, 68 (D. Mass 1992) (The plain language of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A [Chapter 93A], §§ 1 defines (a) "persons" broad enough to include not only out of state residents but also plaintiff the Republic of Turkey and (b) "any trade or commerce directly or indirectly affecting the people of this commonwealth" broad enough to include defendants possession of products in Massachusetts that were offered for sale to the public and allegedly sold to a dealer in England.); *K&S Tool & Die Corp. v. Perfection Mach. Sales, Inc.*, 301 Wis. 2d 109, 732 N.W.2d 792, 799-801 (Wis. 2007) (The Wisconsin Deceptive Trade Practice Act (DTPA), Wisc. Stat. § 100.18(1), applies to protect all members of "the

### 2.   Defendant's Standing Argument Ignores Settled Case Law.

Defendant fails to cite – or distinguish in any meaningful way – decisions by federal courts which have held that "co-pay" purchases and "reimbursements" *are* actionable under the law of the State where those transactions occurred.   Defendant's argument misstates the law and ignores established precedent.   For example, in *Ferrell v. Wyeth-Ayerst Labs, Inc.*, No. C-1-01-447, 2004 U.S. Dist. LEXIS 15127 (S.D. Ohio June 20, 2004), the defendants sought dismissal on the grounds that the plaintiffs could not assert claims under the laws of States in which they did not reside.   The *Ferrell* court rejected Defendant's standing argument and denied the motion to dismiss stating:

> Here, the Complaint alleges that the Funds have paid (or co-paid) for Premarin on behalf of their members residing in various states. *The Court rejects Wyeth's argument that they lack standing to prosecute claims anywhere but in their "home" states, because the purchases of Premarin – the critical event causing the alleged antitrust injury – did not take place in Illinois or Minnesota. The actual purchase took place in the various states where the fund members reside.*
>
> The Court finds that the Funds have alleged sufficient facts to establish their Article III standing to pursue state law claims in the "Indirect Purchaser State" where their members purchase Premarin.   Thus, UFCW Fund has standing to prosecute state law claims in Arizona, Florida, Kansas, Louisiana, Minnesota, Michigan, Nevada, North Carolina, New York, Tennessee and

---

public," which has been interpreted broadly to include even one person.   There is no geographic or state resident requirement as to who is a member of the public.   However, a plaintiff is not a member of the public only if there is "some particular relationship between the parties," that would distinguish the consumer from other members of the public, such as where there is a specific contractual relationship between the parties.); *Blanchar v. Lake Land Builders, Inc.,* 763 N.W.2d 249, (Wis. Ct. App. 2008) (same; "To hold otherwise would contravene the purpose of the statute, namely, to provide broad protections to consumers and others from misrepresentations that induce sales."); *Cirone-Shadow v. Union Nissan of Waukegan,* No. 94-C-6723, 1995 WL 238680 (N.D. Ill. Apr. 20, 1995) (holding that the scope of the Illinois consumer protection statute is not limited to Illinois residents); *see Stetszer v. TAP Pharmaceuticals*, 165 N.C. App. 1, 598 S.E.2d 570 (N.C. App. 2004) (outlining under *Shutts* that North Carolina law can be applied to a nationwide class of consumers.)

> Wisconsin. TCBW has standing to prosecute state law claims in Minnesota, North Dakota, South Dakota and Wisconsin.

*Id.* (emphasis added).

The court adopted the following class definition:

> The Third-Party Payor subclass consists of entities that paid for or reimbursed for all or part of the cost of a member's Premarin® prescription in Arizona, Florida, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, New Mexico, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin at anytime from March 24, 1999 to the Court's entry of the Preliminary Approval Order, or in Nevada at any time from October 1, 1999 to the Court's entry of the Preliminary Approval Order (the "Third-Party Payor Subclass").

*Ferrell v. Wyeth-Ayerst Labs, Inc.*, 2007 U.S. Dist. LEXIS 44391, at *6-7. (emphasis added).

Similarly, in *In re Terazosin Hydrochloride Antitrust Litigation*, 220 F.R.D. 672, 681 (S.D. Fla. 2004), the court upheld an indirect purchaser class definition based in part on the location of the transactions in question:

> Indeed, other courts have recognized the propriety of basing class eligibility on *the state where the patient resides*, as opposed to the state where the pharmacy or insurance company is located. Accordingly, the Court concludes that [plaintiff] has standing to assert the claims of the class members in [listed states]

and approved a class of:

> All persons or entities who or which have at any time from October 15, 1995 to June 30, 2002, paid all or part of the purchase price of Hytrin or its AB-rated generic bioequivalents other than for resale, in [state] or via mail *for residents of* [state] . . .

*Id.* at 703 (emphasis added).  Granting final approval in the *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369 (D.D.C. 2002), the court found the "plaintiffs choice to base class eligibility upon the *class members' plan members' states of residence* fair and reasonable because it generally comports with the purposes of the states' antitrust laws."  *Id.* at 396. (emphasis added)

- 13 -

*In re K-Dur Antitrust Litigation*, MDL No. 1419, 2008 WL 2660783 (D.N.J. Mar. 19, 2008), and *In re Ditropan XL Antitrust Litigation*, 529 F. Supp. 2d 1098 (N.D. Cal. 2007), cases cited by Defendant, are not on point.  *K-Dur* involved a choice of law determination on a motion for summary judgment.  It did not hold that plaintiffs lacked standing to sue under the laws of the States in which the purchases occurred.[11]   In *Ditropan*, none of the plaintiffs were alleged to have purchased the drug at issue in the States under whose laws the complaint asserted claims. 529 F. Supp. 2d at 1107.[12]  Here, in contrast, the Complaint alleges that each Plaintiff "purchased and/or provided reimbursement for Flonase" in each State under whose laws the Complaint asserts claims.  SAC ¶¶ 5-9.  Lastly, on a motion to dismiss, this allegation must be accepted as true and in a light most favorable to plaintiffs. *D.R. Ward Const. Co. v. Rohm and Haas Co.*, 470 F.Supp.2d 485 (E.D.Pa. 2006) (court must "consider the allegations in the light most favorable to the nonmoving party . . . and take all well pleaded facts and allegations as true").

---

[11]     The *K-Dur* court cited two other decisions that did not address standing.  The first case was *In re Rezulin Prods. Liab. Litig.*, 392 F. Supp. 2d 597, 611 n.85 (S.D.N.Y. 2005), which addressed choice of law on a motion for summary judgment.  In the other case, *Lorazepam and Clorazepate Antitrust Litig.*, 295 F. Supp. 2d 30, 50 (D.D.C. 2003), the court rejected the defendants' argument that the plaintiff could not state a claim under the Illinois Antitrust Act because the plaintiff had divisions in Texas, New Mexico, and Illinois.  The decision concerned the scope of the Illinois Antitrust Act, not standing.

[12]     GSK also cites to *In re OSB Antitrust Litig.*, No. 06-826, 2007 WL 2253425 (E.D.Pa. Aug. 3, 2007) to support this assertion.  However, in *OSB*, plaintiffs asked the court to certify two classes under the antitrust and consumer protection statutes of  21 states.  The court held that it would not certify the claims under Arizona, New Mexico or South Dakota law because no plaintiffs resided in those states.  However, this was an *adequacy* determination made in the context of a certification motion; it was not a *standing* determination.

## II.   PLAINTIFFS' COMPLAINT STATES CLAIMS UNDER THE SUBSTANTIVE STATE LAWS IDENTIFIED THEREIN

Plaintiffs allege antitrust and consumer protection claims under the laws of Arizona, Florida, Illinois, Iowa,[13] Massachusetts, North Carolina and Wisconsin.  Plaintiffs paid all or nearly all of the payments on behalf of their members who purchased Flonase in a respective state.  For that reason, and in light of GSK's plainly anticompetitive and unfair business conduct, the claims are sufficiently pled.

### A.   The Arizona Consumer Protection Claim Is Actionable.

Defendant concedes the Arizona antitrust claim can proceed, but contends the Arizona Consumer Fraud Act, Ariz. Rev. Stat. § 44-1522, *et seq.* ("ACFA") claim should be dismissed because Plaintiffs do not allege deception or fraud in the complaint. The ACFA makes unlawful the "act, use or employment by any person of any deception, deceptive act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely . . ."  Ariz. Rev. Stat. § 44-1522(A).  "It is the intent of the legislature, in construing subsection A, that the courts may use as a guide interpretations given by the Federal Trade Commission and the federal courts to 15 United States Code §§ 45, 52 and 55(a)(1)."  Ariz. Rev. Stat. § 44-1522(C).  The FTC Act, 15 U.S.C. § 45, *et seq.*, prohibits "unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices . . ."  The unfair or deceptive acts defined under the FTC Act need not be such as would

---

[13]     Plaintiffs concede that there is no private right of action under the Iowa Consumer Fraud Act, Iowa Code § 714.16, *et seq.*  Notably, Defendants concede that the Iowa antitrust claim can and should proceed.

constitute deception[14] or fraud as these terms are ordinarily understood.  *D.D.D. Corp., v. F.T.C.*, 125 F.2d 679 (7th Cir. 1942).

The FTC Act is designed to protect the general public, that is, "the vast multitude which includes the ignorant and unthinking and the credulous, who, in making purchases, do not stop to analyze but too often are governed by appearances and general impressions." *Beneficial Corp. v. FTC*, 542 F.2d 611, 618 n.11 (3d Cir. 1976), *cert. denied*, 430 U.S. 983 (1977).  Antitrust violations, such as those alleged in the Complaint, constitute deceptive acts and practices under the FTC Act.  *Sperry & Hutchison*, 405 U.S. at 244-45 n.5.  Thus, any activity that violates either the Sherman Act or the Clayton Act also violates the FTC Act.  *Id.*  Furthermore, the scope of the FTC Act is much broader than the Sherman Act or the Clayton Act.  The FTC Act is designed to stop in their incipiency bad faith or oppressive acts that are antithetical to ethical business dealings.[15]  *Lippa's, Inc., v. Lenox, Inc.*, 305 F. Supp. 182, 186-87 (D. Vt. 1969).

It is well settled under the FTC Act that engaging in vexatious acts or practices, such as GSK's filing of multiple frivolous citizens petitions – which the FDA determined were intended to prevent generic market entry – constitute a violation of the FTC Act.  *Minneapolis v. FTC*, 13 F.2d 673, 686 (8th Cir. 1926) (initiation of vexatious proceeding condemned under the Act); *FTC v. R.F. Keppel & Bro, Inc.*, 291 U.S. 304, 310 n.1, 314 (1934) (condemned practices were contrary to public policy and morals).  Moreover, the act of offering Flonase for sale in Arizona at prices much higher than would have been charged by a generic, while simultaneously taking improper steps to prevent generic entry, constitutes deception or fraud under both the FTC Act

---

[14]     A violation can be established by showing that an act or practice had a tendency to deceive. *Trans World Accounts, Inc., v. FTC*, 594 F.2d 212, 214 (C.D. Cal. 1979)

[15]     Defendant may contend Plaintiffs have not alleged a Sherman Act claim, but rather a claim under the Arizona Antitrust Act. The Arizona Antitrust Act is to be applied and construed in harmony with federal antitrust law.  Ariz. Rev. Stat. § 44-1412.

and the ACFA.  Indeed, these are precisely the types of acts the ACFA was designed to prevent.

Contrary to Defendant's argument, the ACFA seeks to ensure that products placed in the stream

of commerce and sold in Arizona by companies headquartered in other States, like GSK, are

offered at reasonable prices within the sphere of free competition.  In addition, the ACFA seeks

to ensure that the business dealings surrounding these products remain honest.  *See* Def. Mem. at

21.  Because the course of conduct described in the Complaint violated both of these basic rules,

Plaintiffs have stated a claim under the ACFA.[16]  This logic applies equally to the Florida,

Illinois, Massachusetts, North Carolina and Wisconsin consumer protection statutes regardless of

whether they require deception or unfair business practices.

---

[16]      On page 21 of its brief, GSK represents that the indirect purchaser plaintiffs in *In re Wellbutrin XL Indirect Purchaser Antitrust Litigation* ("Wellbutrin XL"), No. 2:08:cv-2433, currently pending before Judge McLaughlin of this Court, conceded their ACFA claim in the face of the same arguments GSK makes here.  Def. Mem. at 21.  As GSK is well aware, that is simply not true.  GSK may be referring to a brief responding to the defendants' motions to dismiss the initial complaint in *Welbutrin XL*, where the plaintiffs emphasized the strength of their claim under the Arizona antitrust statute.  *See id*., Docket No. 52, at 30 n.15 and 42.  Before Judge McLaughlin even ruled on the motions, however, the plaintiffs in *Wellbutrin XL* filed an amended complaint.  *See id*., Docket No. 70.  On April 30, 2009, the defendants moved to dismiss the plaintiffs' claims, including their ACFA claim.  *Id.*, Docket Nos. 77 and 78.  The plaintiffs filed their response to the defendants' motions on May 15, 2009, more than a month before GSK filed the instant motion to dismiss, on June 19, 2009.  In their response, currently under consideration by Judge McLaughlin, the *Wellbutrin XL* plaintiffs contested ***all*** of the defendants' ACFA arguments – including the same arguments GSK makes here.  *See id*., Docket No. 81-7, at 10, 52, and 114.  GSK's selective citation to the *Wellbutrin XL* plaintiffs' response to the initial – now moot – motions to dismiss, omitting any reference to their response to the motions to dismiss the amended complaint, is disingenuous at best.  At worst, it is intentionally misleading.  Either way, the assertion should be rejected.

**B.     The Florida Consumer Protection Claim Is Actionable.**

Defendant seeks dismissal of the Florida Deceptive Trade Practices Act, Fla. Stat. § 501.201, *et seq.* ("FDUTPA") claim on the ground it only applies to in-state consumers.  Def. Mem. at 22.[17]  Defendant's argument fails for at least two reasons.

*First*, the Alabama Plans and Painters District Council No. 30 have alleged that they sustained injury when *they purchased* Flonase in Florida or provided reimbursement to members who purchased Flonase in Florida.  The data in Defendant's possession demonstrates this.

*Second*, Defendant presents an incomplete discussion of the law in Florida.  There is currently a split among the Florida appellate courts concerning this issue.  Tellingly, Defendant cites two earlier cases in support of its position, the first of which provided *no reasoning* for its conclusion.  *Coastal Physician Services of Broward County v. Ortiz*, 764 So. 2d 7, 8 (Fla. App. 1999).  The second acknowledged that "nothing in the plain language of the Unfair Trade Act limits its application to injuries in Florida," yet blindly follows the earlier decision.  *Oce Printing Systems USA, Inc. v. Mailers Data Services, Inc.*, 760 So. 2d 1037, 1042 (Fla. App. 2000).

In a more recent, better-reasoned decision, *Millennium Communs. & Fulfillment, Inc. v. Office of the AG, Dep't of Legal Affairs*, the court concluded that the FDUTPA applies to in-state transactions by any person, whether an in-state or out-of-state resident.  761 So. 2d 1256 at 1261-62 (Fla. App. 2000).  The decision in *Millennium* is instructive because, unlike the two earlier cases relied on by Defendant, the court in *Millennium* strictly construed the FDUTPA language, holding:

> The language [of the FDUTPA] statute and its defined terms, *see* §§ 501.203(6) [interested party or person] (7) [consumer] (8) [trade or commerce], do not limit the FDUTPA to transactions involving only Florida residents.  As a result, where

---

[17]     The Alabama Plaintiffs allege that they sustained injury when [they] purchased and/or provided reimbursement for Flonase in the State of Florida.  SAC ¶¶ 5, 7, 9.

the offending transaction occurred in the State, the FDUTPA applies even where those persons affected by the conduct reside outside of the state.

*Id.* at 1262.  Departing from the two earlier decisions, the Third Appellate District stated:

> With due respect to our sister court, we are not persuaded by this holding as it applies to FDUTPA because we have earlier noted, there are no geographical or residential restrictions contained in the express language of section 501.202. Moreover, in its later decision of *Renaissance Cruise, Inc., v. Glassman*, 738 So. 2d 436 (Fla. 4th DCA 1999), wherein the same court found that FDUTPA had applicability to both in-state and out-of-state residents in a class action, it appears to us that the Fourth district has receded, *sub silentio*, from its earlier holding in *Ortiz.*
>
> * * * *
>
> As we read FDUTPA, it seeks to prohibit unfair, deceptive and/or unconscionable practices which have transpired within the territorial boundaries of this state without limitation.

*Id.* at 1261-62.

Two additional courts have followed *Millennium*, declining to follow *Coastal Physician* and *Oce Printing.  See Mlynek v. Household Fin. Corp.*, No. 00 C 2998, 2000 U.S. Dist. LEXIS 13783, at *12 (N.D. Ill. Sept. 13, 2000) ("Applying the same reasoning as the *Millennium* court, this court finds no basis to follow *Coastal*'s holding"); *Randall v. Lady of Am. Franchise Corp*., No. 04-3394 (JRT/FLN), 2005 U.S. Dist. LEXIS 26543, at *12-13 (D. Minn. Oct. 21, 2005) (following the reasoning of *Millennium*). Accordingly, Plaintiffs respectfully submit that *Millennium* controls.

### C.    The Illinois Consumer Protection Claim Is Actionable.

Defendant contends that Plaintiffs do not allege the requisite unfair conduct required by the Illinois Consumer Fraud Act ("ICFA").   Def. Mem. at 17.   Defendant ignores the particularized allegations set forth in Plaintiffs' Complaint which demonstrate the manner and the means by which Defendant's misconduct forced Plaintiffs to pay artificially inflated prices for Flonase during the Class Period.  *See* SAC ¶¶ 110-116.

Defendant further ignores Plaintiffs' allegations of unfair conduct that violated the relevant consumer protection statutes, mischaracterizing the claims as *only* antitrust allegations. While Defendant's conduct did violate antitrust statutes, it also violated consumer protection statutes which are modeled off the FTC Act.  *See FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244-45 n.5 (1972) (antitrust violations constitute a violation of the FTC Act and the state consumer protection statutes modeled off the FTC Act). Plaintiffs allege that Defendants filed four citizens petitions for the purpose of delaying generic entry.  *See*, *e.g.*, SAC ¶¶ 2, 62-87. This unfair conduct was designed to help GSK maintain its monopoly in the Flonase market. *See*, *e.g.*, SAC ¶¶ 94, 110-116.

Numerous cases demonstrate that antitrust violations, including Defendant's unfair and deceptive conduct as alleged in the Complaint, are exactly the type of conduct that consumer protection statutes, such as Illinois', prohibit.  The Supreme Court has defined "unfair acts" in Section 5 of the FTC Act as conduct that is "immoral, unethical, oppressive, or unscrupulous . . . [or] causes substantial injury to consumers . . . "  *FTC v. Sperry & Hutchinson Co.*, 405 U.S. at 244-45 n.5 (1972) (internal quotation marks and citation omitted).  State courts have adopted similar definitions of "unfair acts" for purposes of enforcing state consumer protection statutes.

In interpreting an ICFA claim under circumstances substantially similar to those here, the district court in Illinois sustained an ICFA claim against a defendant whose unfair conduct caused, *inter alia*, the price of gasoline to remain artificially high.  *Siegel v. Shell Oil Co.,* 480 F. Supp. 2d 1034, 1047 (N.D.Ill. 2007)(J. St. Eve)(The court disagreed with the contention that Plaintiffs cannot bring an antitrust theory under their ICFA claim.)   Accordingly, the Court should sustain the ICFA claim.

### D.    The Massachusetts Consumer Protection Claim Is Actionable.

Defendant contends that Plaintiff Andrea Kehoe's claim under Chapter 93A of the

Massachusetts General Laws should be dismissed for failure to serve a "written demand for relief at least 30 days prior to the filing of the action." Def. Mem. at 18.  Under Chapter 93A, a written demand listing the unfair and deceptive practices complained of must be served in order: "(1) to encourage negotiation and settlement by notifying the prospective defendants of claims arising from allegedly unlawful conduct; and (2) to operate as a control on the amount of damages which complainant can ultimately recover." *Slaney v. Westwood Auto, Inc.*, 366 Mass. 688, 704, 322 N.E.2d 768,779 (1975).  Defendant's argument fails for at least four independent reasons.

*First*, the Massachusetts pre-filing notice requirement does not apply since GSK does not maintain a place of business in Massachusetts. MASS. GEN. LAWS Ch. 93A, §9(3); (2009); *Burnham v. Mark IV Homes, Inc*., 441N.E.2d 1027, 1033, n. 13 (Mass. 1982) (noting that a demand letter was not necessary where the defendant *neither maintained a place of business nor kept assets in Massachusetts*).

*Second,* even if a demand letter were required, Defendant conveniently overlooks that prior to serving the Complaint Plaintiffs served their own individual complaints as well as a consolidated complaint, all of which carefully described in comprehensive terms the events giving rise to the class claims under Chapter 93A and the other state antitrust and consumer protection statutes.  Notably, many months have passed with absolutely no effort by Defendant to negotiate or settle the Massachusetts or any other claim, thereby making clear in this as in other cases that "[d]emand before suit is a fruitless ceremony."  *York v. Sullivan* 369 Mass. 157, 163, 383 N.E. 2d 341 (1975); *see also Tarpey v. Crescent Ridge Dairy, Inc.*, 47 Mass. App. Ct 380, 391-92 (1999) (a written demand made before the filing of an amended complaint complied with the Chapter 93A statutory requirement.).

*Third*, Defendant ignores that Plaintiffs could not have complied with the 30-day demand

requirement before filing the Complaint since they were required by this Court to file this Complaint within 30 days.  Impossibility is an excuse for noncompliance with a statutory duty. *See*, *e.g.*, *Martin v. U.S.*, 37 Ct. Cl. 527 (1902) ("the law requires no impossibilities"); *Guthrie v. Northwestern Mutual Life Ins. Co.*, 208 S.E.2d 60, 63 (W. Va. 1974) (failure to comply with notice provision of insurance policy may be excused by inability to comply); *American Agr. Chemical Co. v. Jankowski*, 19 F. Supp. 509, 510 (S.D.N.Y. 1937) ("the impossibility, impractibility or futility of exhausting the remedy at law has been held to be a sufficient excuse for not doing so."); *Serna on Behalf of Estate of Serna v. Ymker*, 100 F.3d 957 (6th Cir. 1996) (jury instructed "regarding impossibility of compliance with a statute as an excuse for noncompliance.").

*Fourth*, without waiving the attorney-client privilege, Plaintiffs' counsel were not retained by a Massachusetts client until May 8, 2009, seven days before the filing deadline set by the Court, when they were retained by Ms. Kehoe.[18]  In order to put this issue to rest, Plaintiffs sent Defendant another formal written demand on July 20, during the pendency of this motion, to cure any purported defect.

### E.    The North Carolina Consumer Protection Claim Is Actionable.

To state a claim under the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen Stat. § 75 1.1, *et seq*., Plaintiffs must allege that:  (i) Defendant committed an unfair or deceptive act or practice; (ii) in or affecting commerce; and (iii) Plaintiffs were injured as a result.  *Lawrence v. UMLIC-Five Corp.*, 06 CVS 20643, 2007 WL 2570256, at *5 (N.C. Super. Jun. 18, 2007) ("*Lawrence*").  It is well settled that "a foreign plaintiff" can maintain a UDTPA claim against "a resident defendant over alleged foreign injuries having a

---

[18]     Plaintiffs' counsel will submit a copy of the retainer agreement *in camera* if the Court so desires.

substantial in-state effect on North Carolina trade or commerce." *Id.*

Plaintiffs allege injury resulting from the purchase of Flonase from Defendant indirectly. Plaintiff International Association of Bridge, Structural, Ornamental and Reinforcing Ironworkers Local No. 79 Health Fund ("IABORI") specifically alleges it "sustained injury [in North Carolina] when it purchased and/or provided reimbursement for Flonase purchase in the States of North Carolina and Virginia." SAC ¶ 6.

Defendant contends the UDTPA claim cannot be pursued because "GSK's actionable conduct is not alleged to have occurred in North Carolina." Def. Mem. 20.[19]   Defendant's argument is belied by the plain language of the Complaint which outline significant "actionable conduct" emanating from North Carolina:

- Defendant maintains major research, development and production facilities in North Carolina, including Research Triangle Park, North Carolina and Greenville, North Carolina. SAC ¶ 11.

- GSK marketed and sold Flonase in the U.S., yielding annual sales of approximately $930 million in 2004 and over a billion dollars in 2005. SAC ¶ 52.

- At all material times, GSK manufactured, promoted, distributed, and sold substantial amounts of Flonase in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States. *Id.* ¶ 116.

If the development, manufacturing, promotion, distribution and sale of a billion-dollar-a-year drug like Flonase *from not one, but two locations in North Carolina* is not "in or affecting [North Carolina] commerce," and doesn't constitute "actionable conduct" which "substantially

---

[19]   The North Carolina UDTPA does not require that the illegal conduct take place within the state but only that the conduct has a substantial effect in North Carolina. *See Merck & Co. v. Lyon*, 941 F. Supp. 1443, 1463 (M.D.N.C. 1996) (citing *The In Porters, S.A. v. Hanes Printables, Inc.* 663 F. Supp. 494, 501-502 (M.D.N.C. 1987)); *see also, Jacobs v. Central Transport, Inc.*, 891 F. Supp. 1088, 1111 (E.D.N.C. 1995)

affects" residents of North Carolina – some of whom, like IABORI, purchased the drug at artificially inflated prices in North Carolina – then no case could ever satisfy Defendant's interpretation of the UDTPA statute.[20]

Defendant's suggestion that the UDTPA statute only governs dealings between persons within North Carolina is in error. *See* N.C. Gen. Stat. § 1-75.4(1)(d) (authorizing state court jurisdiction over individuals and businesses, like GSK, "engaged in substantial activity within this State, whether such activity is wholly interstate, intrastate, or otherwise."). Furthermore, the complaint does allege that GSK's misconduct had substantial in-state effects on North Carolina commerce. *Compare* Def. Mem. at 23 ("the plans have not alleged and cannot allege that GSK's alleged conduct caused a 'substantial in-state effect'"), *with* SAC ¶ 102 ("At all material times, GSK manufactured, promoted, distributed, and sold substantial amounts of Flonase in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States."), *and* SAC ¶ 116 ("By blocking or preventing generic competitors from entering the market, GSK injured Plaintiffs and the other members of the End-Payor Class in their business or property by causing them to pay more for fluticasone propionate products that they otherwise would have paid.").

Defendant's reliance on *Lawrence* is clearly misplaced because *Lawrence actually supports* Plaintiffs' position. The claims in *Lawrence* were dismissed only because the plaintiffs alleged the defendant wrongfully attempted to foreclose on their property *in Texas*. 2007 WL 2570256, at *7. That case is much different from this case, which involves the "consumption of goods and services in this state" by IABORI and other class members who purchased Flonase in

---

[20]    Even if this Court determines that the injury occurred in IABORI's home state and not in North Carolina where the purchase occurred, a claim under the North Carolina statute is actionable.

North Carolina.  Flonase was manufactured, marketed, and sold by Defendant from its two North Carolina facilities.  In *Lawrence* there was no real nexus with North Carolina.  The "actionable conduct" and injury in this case, (i.e., manufacturing of Flonase and purchase of Flonase by IABORI) as alleged in the Complaint, *occurred* in North Carolina.  Even if the Court finds otherwise, the statute is still applicable because the "actionable conduct" of manufacturing, marketing and sale of Flonase in the 50 states at artificially inflated prices emanated from North Carolina.  Thus, the UDTPA statute can be applied extraterritorially to IABORI and to all other Plaintiffs. *American Rockwool, Inc., v. Owens-Corning Fiberglass Corp.*, 640 F. Supp. 1411, 1435-36 (E.D.N.C. 1986) (extraterritorial application of North Carolina consumer fraud statute).

Defendant fails to recognize that the IABORI plan itself paid for Flonase purchases in North Carolina at the time the transaction actually occurred.  Defendant seeks dismissal of the UDTPA claim on two additional grounds, both of which fail: (1) Plaintiffs have not pled that they are businesses which had commercial dealings with Defendant; and (2) Plaintiffs have not alleged detrimental reliance.

### 1.    The IABORI Plan Is Not a Business, and It Engaged in Consumer Transactions.

Defendant elects to mischaracterize the consumer transaction at the point of sale in a pharmacy as one involving a "commercial dealing" between two businesses.  Defendant seeks to create a red-herring by characterizing the transaction in this fashion in order to contend that under North Carolina law Plaintiffs have failed to plead a "commercial dealing" with GSK in accordance with *Hajmm v. House of Raeford Farms, Inc.*, 328 N.C. 578, 592-93 (1991).

Under federal law, a Taft-Hartley plan is unique. It is neither a corporation nor a partnership.  Rather, it is a membership organization created for the benefit of its members. The plan, therefore, is not a business.  More importantly, Flonase purchases in North Carolina were

purely consumer transactions.   The IABORI Plan did not pay a wholesale price, nor did it attempt to resell the product.   Instead, it acted as part of the consuming public, paying the full retail price for Flonase as an end-user for the benefit of its Plan members.   Indeed, the artificially inflated full retail price is the basis for suit in this case.   The Plan's Flonase transactions were *not* commercial transactions between businesses involving a "revolving fund certificate" or securities transactions as in *Hajmm* – these were *consumer* transactions involving a *consumer* prescription drug product sold to an individual *not* for resale purposes.   Under these circumstances, Plaintiffs were not obligated under North Carolina law to plead that they are businesses engaged in a commercial dealing with Defendant.

### 2. Under the UDTPA, Defendant's Sham Petitions Constitute an "Unfair Act," and Detrimental Reliance Is Not Required.

Defendant claims that Plaintiffs must prove detrimental reliance because they are purportedly alleging a deceptive act under the North Carolina statute.   Defendant misconstrues Plaintiffs' North Carolina claim.   The statute prohibits "unfair methods of competition in or affecting commerce, and unfair or deceptive acts in or affecting commerce . . ." N.C. Gen. Stat § 75-1.1.   The language of the statute closely parallels the FTC Act, 15 U.S.C. § 45, which, as discussed above, prohibits "unfair or deceptive acts or practices in commerce."   *See Hardy v. Toler*, 288 N.C. 303, 308 (1975).   North Carolina does not require a showing of reliance for such a claim.   *Stetsler v. Tap Pharmceuticals, Inc.*, 598 S.E.2d 570, 584 (N.C. Ct. App. 2004) ("North Carolina's law does not require reliance by the plaintiff in order to successfully pursue a claim under G.S. § 75-1.1").   Plaintiffs' claim falls under the unfair acts prong of the statute, which does not require reliance.   The reliance requirement pertains to classic misrepresentation and deceptive acts cases.   *See*, *e.g.*, *S.B. Simmons Landscaping & Excavating, Inc. v. Boggs*, 665 S.E.2d 147, 151 (N.C. App. 2008).

A practice is "unfair" within the meaning of the UDTPA if it offends established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. *Id.* The plaintiff need not show fraud, bad faith, or intentional misrepresentation." *Bennett v. Smith*, 05-10041, 2006 Bankr. LEXIS 3196 (M.D.N.C. 2006). Courts need not resolve whether the defendant intended certain consequences or acted in good or bad faith; what is relevant is the impact on the marketplace and the consuming public. *Abernathy v. Ralph Squires Realty Co., Inc.*, 285 S.E.2d 325, 327 (N.C. App. 1982). A party is guilty of an unfair act or practice when it engages in conduct that amounts to an inequitable assertion of its power or position. *Edwards v. West*, 495 S.E.2d 920, 924 (N.C. App. 1998). Further, to show a "practice," the plaintiff must show a series or pattern of acts. *Marlen C. Robb & Son Boatyard & Marina, Inc. v. Vessel Bristol*, 893 F. Supp. 526, 539 (E.D.N.C. 1994).

Plaintiffs allege that Defendant filed four citizens petitions with the FDA in order to delay competitive entry by the generic manufacturer Roxane. Plaintiffs further allege that Defendant submitted these petitions as part of a corporate strategy to extend its monopoly and maximize profits at the expense of consumers. SAC ¶ 2. The FDA specifically recognized Defendant's naked attempt to monopolize the market and reprimanded GSK, stating: "The policies behind Hatch-Waxman dictate that GSK should not be permitted to shield its market share when the Agency has reasonably determined that competing generic drug products may be approved under section 505(j) of the Act." SAC ¶ 84. GSK's filing of four baseless citizens petitions, in succession, constituted "unfair practices" under the North Carolina UDTPA because the petitions were filed as part of an effort to foreclose generic entry in the Flonase market in order to force consumers to purchase the brand name Flonase product at supracompetitive prices. Defendant's transparent effort to improperly impose a reliance requirement should be rejected.

This alleged inequitable assertion of power or position by GSK properly pleads and constitutes a violation of the UDTPA.

**F.**     **The Wisconsin Antitrust Claim is Viable.**

The Wisconsin antitrust statute prohibits "unfair and discriminatory business practices which destroy or hamper competition." Wis. Stat. § 133.01. The statute provides, "[i]t is the intent of the legislature that this chapter be interpreted in a manner which gives the most liberal construction to achieve the aim of competition." *Id.* Recent Wisconsin Supreme Court decisions have held that plaintiffs may sue for antitrust violations under Wisconsin's antitrust law if the illicit conduct had substantial effects in Wisconsin, even if it occurred "predominantly or exclusively outside" Wisconsin. *Olstad v. Microsoft Corp.*, 700 N.W.2d 139, 141 (Wis. 2005). In *Meyers v. Bayer AG*, 735 N.W.2d 448 (Wis. 2007), the Wisconsin Supreme Court affirmed *Olstad*, holding that "plaintiffs need not allege that the challenged conduct disproportionately affected Wisconsin, only that the challenged conduct substantially affected the people of Wisconsin and had impacts in this state."[21] *Id.* at 463.

Here, Plaintiffs allege that "GSK's objectively baseless [citizen] petitions served to block the introduction of cheaper generic versions of Flonase into the U.S. market at an earlier date," and that "by blocking or preventing generic competitors from entering the market . . . GSK injured Plaintiffs and the other members of the End-Payor Class . . . causing them to pay more

---

[21]     The court rejected the notion that plaintiffs must plead more specific allegations as "plainly contrary" to the Wisconsin Antitrust Act." 735 N.W.2d at 461. As the court explained, "requiring greater specificity than the notice pleading statute demands would create a heightened pleading standard for [antitrust] actions that would bar otherwise legitimate suits, thus undermining the Act's purposes of fostering competition and prohibiting unfair and discriminatory business practices." *Id.*

for fluticasone propionate products that they would otherwise have paid."   SAC ¶¶ 3, 116.[22]

Because this language necessarily includes the people of Wisconsin as injured parties, Plaintiffs'

allegations are sufficient to state a Wisconsin antitrust claim under the "substantial effects"

standard.

## III.   PLAINTIFFS' UNJUST ENRICHMENT CLAIMS CAN AND SHOULD PROCEED

Plaintiffs' unjust enrichment counts meet the Fed. R. Civ. P. 8 requirements of a "short

and plain statement of the claim showing that the pleader is entitled to relief. . . . Each allegation

must be simple, concise, and direct.  No technical form is required."  Fed. R. Civ. P. 8(a), (d).  In

short, plaintiffs need only "give the defendant fair notice of what [their] claim is" – unjust

enrichment – "and the grounds upon which it rests" – the overpayments.  *Erickson*, 551 U.S. at

__ , 127 S.Ct. at 2200 (internal quotation marks and citation omitted).   Plaintiffs' unjust

enrichment claims meet all of the pleading requirements of the federal rules and therefore,

Defendant's motion to dismiss the unjust enrichment counts fails.[23]

---

[22]   *See also* SAC ¶ 52 ("GSK marketed and sold Flonase in the U.S., yielding annual sales of approximately $930 million in 2004 and over a billion dollars in 2005."); *id.* ¶ 102 ("At all material times, GSK manufactured, promoted, distributed, and sold substantial amounts of Flonase in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States."); *id.* ¶ 116 ("By blocking or preventing generic competitors from entering the market, GSK injured Plaintiffs and the other members of the End-Payor Class in their business or property by causing them to pay more for fluticasone propionate products that they otherwise would have paid.").

[23]   Defendant ignores that Plaintiffs may properly plead unjust enrichment as an alternative theory of recovery.  *See* Fed. R. Civ. P. 8(e)(2)(2007) ("A party may … state as many separate claims or defenses as the party has, regardless of consistency.").  Since Plaintiffs are clearly permitted to plead alternative theories of recovery, it would be premature at this stage of the proceedings to dismiss the Indirect Purchasers' unjust enrichment claims on this basis.  *See In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 544 (D.N.J. 2004) (*citing U.S. v. Kensington Hosp.*, 760 F. Supp. 1120, 1135 (E.D. Pa. 1991) (finding dismissal of unjust enrichment claim premature because Federal Rules allow pleading alternative theories of recovery) (citing *Marcella v. ARP Films, Inc.*, 778 F.2d 112, 117 (2d Cir. 1985)); *Callaway Golf Co. v. Dunlop Slazenger Group Americas, Inc.*, 295 F. Supp. 2d 430, 437 (D. Del. 2003) (finding that even if

A.     **Plaintiffs' Unjust Enrichment Claims Are Independent of Their Antitrust Claims.**

Defendant asserts that Indirect Purchaser Plaintiffs' unjust enrichment claims should be dismissed on the grounds that they constitute an attempt to "circumvent" *Illinois Brick*.  Def. Mem. at 24-27.  This argument fails.  Defendant's approach does not view Plaintiffs' unjust enrichment claims in the light most favorable to Plaintiffs.  *D.R. Ward Const. Co.*, 470 F.Supp.2d 485 (E.D. Pa. 2006) (court must "consider the allegations in the light most favorable to the nonmoving party . . . and take all well pleaded facts and allegations as true").  Moreover, Defendant conflates Plaintiffs' "right to recover an equitable remedy under a claim based upon principles of unjust enrichment with [their] right to recover a remedy at law for an alleged violation of a state's antitrust laws."  *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 669 (E.D. Mich. 2000); *accord*, *D.R. Ward Const. Co.*, 470 F. Supp. 2d at 507.

Courts routinely affirm the sufficiency of unjust enrichment claims asserted on behalf of a nationwide class.  The same result is required here.  *See*, *e.g.*, *In re Abbott Labs. Norvir Antitrust Litig.*, Nos. C 04-1511 & 04-4203, 2007 WL 1689899, at *10 (N.D. Cal. June 11, 2007) ("a class action is the superior method of resolving the unjust enrichment claims" in all states except for Ohio and Indiana); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1020, 1029 (N.D. Cal. 2007) (refusing to dismiss nationwide class claim for unjust enrichment, rejecting same argument made by Defendant here – that the claim "should be dismissed as an attempt to circumvent the holding of *Illinois Brick*"); *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 543-46 (D.N.J. 2004) (refusing to dismiss unjust enrichment claims under the laws of all 50 states, the District of Columbia, and Puerto Rico); *Cox v. Microsoft*

---

unjust enrichment claim was preempted by plaintiff's federal causes of action, claim would stand as an alternative basis for relief).

*Corp.,* 8 A.D.3d 39, 40, 778 N.Y.S.2d 147, 149 (1st Dep't 2004).[24]

Ignoring its burden under Rule 12(b)(6), Defendant contends that Plaintiffs' unjust enrichment claim is tethered to the success of the state antitrust claims. Plaintiffs' unjust enrichment claims, however, do not depend upon proof of the elements necessary for their antitrust claims. Instead, the unjust enrichment claims rest upon the allegations and proof that defendant "unjustly retained a benefit to the plaintiff's detriment, and that [their] retention of the benefit violates the fundamental principals of justice, equity, and good conscience." *Cardizem*, 105 F. Supp. 2d at 669 (internal quotation marks and citations omitted); *see also D.R. Ward Construction Co.*, 470 F. Supp. 2d at 506 (E.D. Pa. 2006) ("plaintiffs may bring independent unjust enrichment claims under Arizona, Tennessee and Vermont law and . . . the viability of these claims does not hinge upon the success of state statutory antitrust claims").[25] Thus, Plaintiffs may pursue their unjust enrichment claims as an alternative to their antitrust and

---

[24]     Defendant relies on *In re Terazosin Hydrochloride Antitrust Litig.*, 160 F. Supp. 2d 1365 (S.D. Fla. 2001), where the district court disagreed with the court in *Cardizem*. *See id.* at 1380 & n.12; Def. Mem. at 28.  *Terazosin*, however, does not reflect the majority position.  In *K-Dur Antitrust Litigation*, for instance, the court allowed unjust enrichment claims to proceed under the laws of all 50 states even though some of those states do not allow indirect purchasers to sue for antitrust violations.  338 F. Supp. 2d at 543-46; *see also In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 248 & n.15 (D. Del. 2002) (court certified settlement class with respect to claims for unjust enrichment under the laws of 50 states and the District of Columbia); *see Westways World Travel, Inc. v. AMR Corp.*, 218 F.R.D. 223, 240 (C.D. Cal. 2003) (certifying nationwide class of unjust enrichment claimants); *Shumacher*, 221 F.R.D. at 613 (same); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022-23 (same); *Norvir*, 2007 WL 1689899, at *9-10 (same with exception of Ohio and Indiana).

[25]     *See also FTC v. Mylan Laboratories, Inc.*, 62 F. Supp. 2d 25, 46, 49, 56 (D.D.C. 1996) (restitutionary claims held ripe for adjudication even though state antitrust claims dismissed); *Watts v. Watts*, 137 Wis.2d 506, 530 (1987) (explaining that "a claim of unjust enrichment does not arise out of an agreement entered into by the parties.  Rather, an action for recovery based upon unjust enrichment is grounded on the moral principle that one who has received a benefit has a duty to make restitution where retaining such a benefit would be unjust.").

consumer protection claims.[26]

   **B.     Plaintiffs Adequately Plead Unjust Enrichment Under Florida, Illinois,
           North Carolina, and Massachusetts Law**

       **1.     Florida and North Carolina**

   According to Defendant, Plaintiffs do not allege that they conferred a benefit upon

Defendant for which restitution might be provided under Florida and North Carolina law.  Def.

Mem. at 27 and 29.  Defendants regularly rely upon this defense in antitrust cases, and courts just

as regularly reject it.  *See In re K-Dur*, 338 F. Supp. 2d. at 544 ("Defendant's argument fails

because a benefit conferred need not mirror the actual loss of the plaintiff. . . . The critical

inquiry is whether the plaintiff's detriment and the defendants benefit are related to and flow

from, the challenged conduct."); *In re Lorazepam & Clorazepate Antitrust Litig.*, 295 F. Supp.

2d 30, 50-52 (D.D.C. 2003) ("A plaintiff alleging an unjust enrichment may be seeking to

recover a benefit which he gave directly to defendant, or on which was transferred to the

defendant by a third party.") (internal quotation marks and citation omitted); *see also*

*Schumacher v. Tyson Fresh Meats, Inc.*, 221 F.R.D. 605, 612 (D.S.D. 2004) ("In looking at

---

[26]     GSK also asserts – in just one sentence of its Brief – that antitrust statutes are exclusive remedies.  Def. Mem. at 26.  However, simply because a statute grants a right of recovery to a claimant does not mean that all other causes of action or forms of recovery are denied.  *See, Cardizem* 105 F. Supp. 2d at 669.  GSK incorrectly assumes that state legislatures intended to preempt all common law claims by enacting antitrust legislation.  Indeed, GSK does not cite to one state antitrust statute that expressly states it is the exclusive remedy for all wrongful conduct that may *potentially* fall within its scope or that common law claims cannot be brought, in the alternative, in relation to a defendant's conduct.  Moreover, GSK finds no support for its assertion by citing to *Johnson v. Microsoft Corp.,* 834 N.E.2d 791 (Ohio 2005).  In *Johnson,* the court there did *not* dismiss the plaintiff's unjust enrichment claims on the grounds that the state antitrust statute was the exclusive remedy - the court dismissed the plaintiff's unjust enrichment claims because the plaintiff failed to establish standing.  *Id.* at 801 ("Moreover, to establish a claim for restitution, a plaintiff must demonstrate that he or she conferred a benefit on a defendant without compensation, and since Johnson has not engaged in any transaction with Microsoft, she cannot establish such a claim.").

claims for unjust enrichment, we must keep in mind that the very nature of such claims requires a focus on the gains of the defendants, not the losses of the plaintiffs."); *Booher v. Frue*, 358 S.E.2d 127, 129 (N.C. App. 1987) (North Carolina law distinguishes between damages recovery and restitutionary recovery; the damage award is designed to compensate a plaintiff for his loss, whereas "[t]he principle of restitution is to deprive the defendant of benefits that in equity and good conscience he ought not to keep . . . even though plaintiff may have suffered no demonstrable losses.") (internal quotation marks and citation omitted). That is a universal thread common throughout all common law causes of action for unjust enrichment.[27]

### 2.    Florida and Massachusetts

GSK also argues that because Plaintiffs cannot bring an indirect purchaser action under Florida and Massachusetts antitrust law they cannot bring a claim for unjust enrichment. Def. Mem. at 27 and 30.   As demonstrated in Section III.A, *supra*, however, Plaintiffs have an independent right to bring an unjust enrichment claim.  Accordingly, Defendant's argument fails.

### 3.    Illinois

Plaintiffs' unjust enrichment claim based upon Illinois law does not depend on their Illinois Consumer Fraud Act claim.  *Strategic Reimbursements, Inc. v. HCA, Inc.*, No. 06 C

---

[27]    *See also* Daniel R. Karon, "Undoing the Otherwise Perfect Crime," 108 W. Va. L. Rev. 395, 421-28 (2005) (collecting state authorities showing that "directness" or privity is not a valid defense to an unjust enrichment claim); *Hollowell v. Career Decisions, Inc.*, 298 N.W.2d 915, 920 (Mich. App. 1980) ("The essential elements of such a claim are (1) receipt of a benefit by the defendant from the plaintiff and (2) which benefit it is inequitable that the defendant retain."); *Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Chipetine*, 634 N.Y.S.2d 469, 471 (1st Dep't 1995) (proof of unjust enrichment claim "requires the court to determine whether it is against equity and good conscience to permit defendant to retain what is sought to be recovered.") (internal quotation marks and citation omitted); *Emerine v. Yancey*, 680 A.2d 1380, 1383 (D.C. 1996) ("to recover on a theory of unjust enrichment, . . . the plaintiff must show that [the defendant] was unjust enriched at his expense and that the circumstances were such that in good conscience [defendant] should make restitution.") (internal quotation marks and citation omitted).

6501, 2007 WL 2274709 (N.D. Ill. Aug. 2, 2007) (unjust enrichment claim survived despite dismissal of ICFA claim). Unless a specific statutory provision expressly displaces legal or equitable common law doctrines in Illinois, such doctrines *supplement* statutory provisions. *Siegel v. Shell Oil Co.*, 480 F. Supp. 2d 1034, 1046 n.9 (N.D. Ill. 2007).

Defendant improperly relies on *Scott v. GlaxoSmithKline Consumer Healthcare, L.P.*, No. 05 C 3004, 2006 WL 952032 (N.D. Ill. Apr. 12, 2006), *Bober v. Glaxo Wellcome Plc*, 246 F.3d 934, 943 (7th Cir. 2001), and *Truillo v. Apple Computer, Inc.*, 581 F. Supp. 2d 935, 941 (N.D. Ill. 2008), to contend that "Plaintiffs may not use an unjust enrichment claim to evade the requirements of the ICFA." Def. Mem. at 29. *First*, Plaintiffs are not trying to evade anything. Moreover, contrary to Defendant's suggestion, the unjust enrichment claims in the cases it cites did not fail on the basis of defective statutory claims. Instead, the claims were dismissed because the courts found no deception on the part of the defendants, and therefore the requisite violation of "fundamental principles of justice, equity, and good conscience" was simply not present. *See*, *e.g.*, *Bober v. Glaxo Wellcome Plc*, 246 F.3d 934, 943 (7th Cir. 2001). Plaintiffs need not point to a specific Illinois statute that Defendant violated in order to maintain their unjust enrichment claim.[28] Even so, Plaintiffs' ICFA claim is properly pled. *See* Section II.B.1, *supra*.

Under Illinois law, recovery for unjust enrichment is available when the plaintiff has no adequate remedy at law, the defendant has unjustly retained a benefit to plaintiff's detriment, and that retention violates fundamental principles of justice, equity, and good conscience. *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp.*, 545 N.E.2d 672, 679 (1989) (citing *Drury v.*

---

[28]    Under appropriate circumstances, the violation of another state's laws may support an unjust enrichment claim. *See In re New Motor Vehicles Canadian Export Antitrust Litig.*, 350 F. Supp. 2d 160, 213 (D. Me. 2004) (denying motion to dismiss unjust enrichment claims in part because profits unlawfully obtained for all sales connected with violation of another state's antitrust restrictions may give rise to an unjust enrichment claim).

*County of McLean*, 433 N.E.2d 666, 670 (1982)).  All three elements are satisfied in light of GSK's abusive filing of multiple baseless citizens petitions with the purpose and effect of derailing generic competition for Flonase.  Plaintiffs thus state a claim for unjust enrichment in Illinois.

## IV.   PLAINTIFFS CAN SEEK A NATIONWIDE INDIRECT PURCHASER CLASS UNDER NORTH CAROLINA LAW

GSK makes the unusual request that the Court strike the first class definition seeking a nationwide class of indirect purchasers in the indirect-purchaser states under North Carolina law. However, contrary to Defendant's assertion, Plaintiffs can seek certification of a nationwide class of indirect purchasers from the indirect purchaser states and apply North Carolina law to the class as a whole.

Citing *only one case* to support its position, GSK states "this issue [of applying North Carolina law nationwide] can and should be decided at this early stage, *as other courts have done,* and the first proposed class definition should accordingly be struck. " Def. Mem. at 32 (emphasis added).   The fact is, however, while it appears that *only one* court has granted this relief, *numerous* courts generally agree that it is premature to consider choice-of-law issues at this early stage.  *See Maywalt v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51, 58 (S.D.N.Y. 1993) ("At the present stage of this litigation [class certification], there is no need to determine which substantive law will govern the adjudication of the pendant state law claims."); *In re Kirschner Med. Corp. Sec. Litig.*, 139 F.R.D. 74, 84 (D. Md. 1991) (finding it "inappropriate to decide choice of law issues incident to a motion for class certification"); *Singer v. AT & T Corp.*, 185 F.R.D. 681, 691 (S.D. Fla. 1988).  It is thus inappropriate to decide choice of law issues on a motion for class certification – much less an earlier-filed motion to dismiss.  *See In re Synthroid Mktg. Litig.*, 188 F.R.D. 295, 302 (N.D. Ill. 1999) ("It is impossible at this stage of the

proceeding, relying only on allegations in the class certification briefs, to resolve the choice of law issues.").

These authorities reflect the view that such a decision is best left for summary judgment. *Garner v. Healy*, 184 F.R.D. 598, 605 (N.D. Ill. 1999) ("The Court will address choice of law issues again when and if it becomes necessary – *e.g.*, on motions for summary judgment."); *Lobo Exploration Co. v. Amoco Prod. Co.*, 991 P.2d 1048, 1051 (Okla. Civ. App. 1999). This Court need not anticipate that variance may exist between the laws of the various States involved, nor hypothesize about what state law will be relevant on this motion to dismiss. *See Somerville v. Major Exploration, Inc.*, 102 F.R.D. 500, 504 (S.D.N.Y. 1984); *accord*, *In re Crazy Eddie Sec. Litig.*, 135 F.R.D. 39, 41 (E.D.N.Y. 1991). *See also Phillips Petroleum Co v. Shutts*, 472 U.S. 797 (1985) where the Supreme Court remanded the case without disturbing the class action status noting that there is no requirement to resolve conflict of laws questions prior to certifying a class.

## A.    North Carolina Antitrust Law Applies To This Nationwide Class.

To the extent that this Court wishes to address the issue now, Plaintiffs submit that this Court can apply North Carolina antitrust law to a nationwide class. *See Flonase*, 610 F. Supp. 2d at 415 (a nationwide class can be certified under the law of a single State when that State has "significant contact or significant aggregation of contacts."); *Lyons v. Caterpillar, Inc.*, 194 F.R.D. 206 (E.D. Pa. 2000) (Brody, J.) (same). The injuries involved in this case are economic rather than personal and stem from the manufacturing, marketing and sale of Flonase from North Carolina – the state in which Defendant engaged in this scheme. As Defendant concedes, a nationwide class can be certified if the two *Shutts* conditions are satisfied. Def. Mem. at 33 ("*Shutts* teaches that plaintiffs may assert a nationwide class under the law of a single state only if two conditions are satisfied.").

In *Shutts*, the Supreme Court developed a two-part analysis to determine when a court may apply one state's law to all class members. 472 U.S. 797.  A court may apply the law of one state if that law does not materially conflict with the laws of the jurisdictions of the non-resident class members. *Id.* at 816.  If there is a material conflict between the laws – there is none here – then the law of a single state may be applied if the law of the state to be applied has significant contacts with the case such that the choice of law is neither arbitrary nor fundamentally unfair. *Id.* at 818.

Here, the Court may constitutionally apply North Carolina law to the claims of all Class members, including those who do not reside in North Carolina.[29]  As set forth in detail below, this case meets both *Shutts* prongs.  Thus, the Court may apply North Carolina law to the claims of all Class members, and may certify a national indirect purchaser class under North Carolina law.  *See*, *e.g.*, *American Rockwool, Inc., v. Owens-Corning Fiberglass Corp.*, 640 F. Supp. at 1435-36 (extraterritorial application of North Carolina consumer fraud statute); *Stetszer*, 165 N.C. App. 1, 598 S.E.2d 570.

**B.      North Carolina's Antitrust Law and the Antitrust Laws of Other Indirect Purchaser States Are Sufficiently Similar**

Under *Shutts*, this Court may apply the substantive law of North Carolina to the claims of non-resident class members if the North Carolina's antitrust law does not "conflict[] in any material way with any other law which could apply."  *Shutts*, 472 U.S. at 816.  If it does not, "[t]here can be no injury in applying [North Carolina] law," and therefore no constitutional

---

[29]      The Supreme Court has confirmed that where, as here, there are no material conflicts between the laws of the resident and non-resident class members, it is constitutional for a court to certify and adjudicate the claims of a national class under the law of a single state.  *Shutts*, 472 U.S. at 812.  This Court may constitutionally exercise jurisdiction over the non-resident class members.    It is enough that class members receive notice plus an opportunity to be heard and to participate in the litigation, are provided the opportunity to opt-out of the class, and are adequately represented by the named plaintiffs.  *Id.* at 812.

obstacle to applying North Carolina law would preclude its application to the claims of all the

Class members.  *Id.*  Likewise, under North Carolina choice of law rules, as long as North

Carolina antitrust law does not conflict with the antitrust laws of the other indirect purchaser

states, the rule permitting the application of North Carolina law will prevail.  The court need not

conduct the rest of the choice of law analysis.  *See Seals v. Delta Air Lines*, 924 F. Supp. 854,

859 (E.D. Tenn. 1996) (preliminary issue in choice of law inquiry is whether material conflict

exists); *see also Owens-Corning*, 640 F. Supp. at 1435-36.

Here, violations of identical antitrust laws are alleged, based on an identical nucleus of

fact.  The state antitrust laws, including the North Carolina law, are Little Sherman Acts. All

follow the elements and policies of the Sherman Act.  All should be interpreted, therefore, in

accordance with federal Sherman Act precedent. *L.C. Williams Oil Co., v. Exxon Corp*., 625 F.

Supp. 477 (M.D.N.C. 1985).   Minor variations, if any, in state antitrust law of the twenty-three

*Illinois Brick* "repealer" States[30] do not affect the nationwide application of North Carolina's

antitrust law to this Class.[31]   *See* Twenty-Three Jurisdiction Survey of Statutory Claims for

---

[30]      *Illinois Brick v. Illinois*, 431 U.S. 720 (1977), held that only direct purchasers could pursue an overcharge claim arising from an antitrust violation.  Following this decision, numerous states adopted *Illinois Brick* "repealer" statutes which specifically permit indirect purchaser standing.  *See*, *e.g.*, *Union Carbide Corp. v. Super. Ct.*, 679 P.2d 14, 17 (Cal. 1984); *Comes v. Microsoft Corp*., 646 N.W.2d 440, 448 (Iowa 2002).  Rejecting a challenge to these "repealer" statutes, the Supreme Court held that federal antitrust laws do not preempt state antitrust laws, and that state laws permitting indirect purchasers to recover antitrust damages do not conflict with federal antitrust laws.  *California v. ARC America Corp.*, 490 U.S. 93 (1989).

[31]      GSK quotes the Court's previous language that "state laws clearly conflict whether indirect purchasers can bring antitrust claims." Def. Mem. at 33.  However, the Court's language was in relation to the conflict between *Illinois Brick* "repealer" states and the states that follow the holding in *Illinois Brick.  See, Flonase Antitrust Litig.,* 610 F.Supp.2d at 414.  Here, Plaintiffs bring antitrust claims in only the Illinois Brick "repealer" states.  As such, no conflict exists.

Indirect Purchaser Recovery of Damages for Antitrust Injuries, Joshua Grabar Declaration dated July 20, 2009, Ex. A.[32]

   **C.     North Carolina's Consumer Protection Law and Other Consumer Protection Laws Are Sufficiently Similar**

   As noted above, the North Carolina consumer protection statute is based upon the FTC Act.  *Henderson v. United States Fidelity & Guaranty Co.*, 488 S.E.2d 234, 239, 346 N.C. 741, 749 (N.C. 1997).  Other States have adopted a similar version of the FTC Act or the Uniform Commission on State Laws.  Minor variations in the consumer protection laws identified in Plaintiffs' complaint do not present an obstacle to the application of North Carolina's consumer protection law to this nationwide Class.  *Stetszer*, 165 N.C. App. 1, 598 S.E.2d 570; *Clark v. TAP Pharmaceutical Products, Inc.*, 343 Ill. App. 3d 538, 798 N.E.2d 123 (Ill. App. Ct 2003); *see* Forty-Three Jurisdiction Survey of Consumer Protection Statutes, Grabar Decl., Ex. B; *O'Keefe v. Mercedes-Benz USA, LLC*, 214 F.R.D. 266, 291 n.19 (E.D. Pa. 2003) ("In practice, the court will seldom have to deal with more than three or four formulations") (quoting Larry Kramer, "Choice of Law in Complex Litigation," 71 N.Y.U. L. REV. 574, 583 (1986)); *Martin v. Heinhold Commodities, Inc.*, 117 Ill. 2d 67, 510 N.E.2d 840 (Ill. 1987)(applying Illinois law to a multistate class because Defendants' principle place of business was in Chicago, Illinois and plaintiffs' allegations implicate the legitimate interests of Illinois, applying *Phillips Petroleum Co. v. Shutts*, 472 U.S. 792 (1987).  This Court need not find that there is a complete uniformity of state law in order to apply North Carolina law nationally since North Carolina has the greatest interest in this litigation. *In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46 (D.N.J.

---

[32]     The only conflict which could arguably arise is a difference with California monopolization law which requires a "combination" or joint conduct while other states, excluding New York, follow the federal statute which allows monopolization claims to proceed based upon single firm conduct.

2009) (applying New Jersey law to a nationwide class because Defendant was headquartered in New Jersey and the actions in question emanated from New Jersey).  Common issues of law and fact remain the predominant focus of this litigation, notwithstanding the possible application of multiple States' laws.[33]   North Carolina law can be constitutionally applied to Defendant's conduct which was uniform in all fifty states and emanated from North Carolina. *Mazza v. American Honda Motor Co.*, 254 F.R.D. 610 (C.D. Cal. 2008) (applying California law to unfair competition, false advertising and unjust enrichment concerning misrepresentations in connection with a vehicle braking system.).

### D.     The Unjust Enrichment Laws Are Sufficiently Similar

The unjust enrichment laws of the indirect purchaser States are sufficiently similar to render appropriate the nationwide application of the common law doctrine of unjust enrichment as articulated by the courts of North Carolina.  When it comes to unjust enrichment, every State has accepted and follows the same general principle. *See* Jurisdiction Survey of Unjust Enrichment, Grabar Decl., Ex. C.  The elements of proof are materially identical in all of the jurisdictions at issue. *Terazosin*, 220 F.R.D. at 697 n.40 ("state claims of unjust enrichment 'are universally recognized causes of action that are materially the same throughout the United States'") (quoting *Singer*, 185 F.R.D. at 692).  As many courts have observed, any differences in the way various state courts have described the common law doctrine of unjust enrichment are

---

[33]     In contrast to cases such as *In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, 288 F.3d 1012 (7th Cir. 2002), Plaintiffs do not seek redress for an allegedly defective product – Plaintiffs do not suggest that *Flonase* is defective or unsafe.  Instead, this litigation focuses exclusively on whether end-payors paid too much because of the wrongful foreclosure of generic competition.  Claims arising from antitrust violations are far more amenable to class treatment than claims arising from a defective product.  *See Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 625 (1997) ("Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws."); *In re Cardizem Antitrust Litig.*, 200 F.R.D. 326, 337 (E.D. Mich. 2001).

inconsequential. *Powers v. Lycoming Engines*, 245 F.R.D. 226, 231 (E.D. Pa. 2007), *rev'd on other grounds*, 2009 U.S. App. LEXIS 6785 (3d Cir. 2009). ("Although there are numerous permutations of the elements of the [unjust enrichment] cause of action in the various states, there are few real differences . . . In other words, regardless of which state's unjust enrichment elements are applied, the result is the same. Thus, there is no real conflict surrounding the elements of the cause of action."); *see Norvir*, 2007 WL 1689899, at *9 (finding variance in description of unjust enrichment "idiosyncratic" and insufficient to "alter the central issue or the manner of proof."); *see also Taylor v. Home Ins. Co.*, 777 F.2d 849, 859 (4th Cir. 1985); *Davis v. Ampthill Rayon Workers, Inc.*, 446 F. Supp. 681, 684 (E.D. Va. 1978) *aff'd*, 594 F.2d 856 (4th Cir. 1979); *Doe v. S.C. Med. Malpractice Liab. Joint Underwriting Ass'n*, 557 S.E.2d 670, 672 (S.C. 2001).

**E.     North Carolina Has Significant Contacts With This Case – GSK Is Headquartered in North Carolina.**

North Carolina law should be applied to non-resident class members because GSK has significant contacts with North Carolina, creating an important state interest in this action that makes the choice of North Carolina law neither arbitrary nor fundamentally unfair. *Shutts*, 472 U.S. at 818 (quoting *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312-313 (1981)); *see also Flonase*, 610 F. Supp. 2d at 415 (a nationwide class can be certified under the law of a single State when that State has "significant contact or significant aggregation of contacts.").

Numerous courts across the country have certified nationwide classes and held that it was constitutional to apply a single State's law to all class member claims where significant contacts existed because the defendant's principal place of business was located in that State or significant conduct related to the claims emanated from the state. For example, in *Bunnion v. CONRAIL*, No. 97-4877, 1998 U.S. Dist. LEXIS 7727 (E.D. Pa. May 14, 1998), the district court

determined that the selection of the forum State's law to govern a nationwide class was constitutional because the defendant, Consolidated Rail, was incorporated and maintained its principal place of business in Pennsylvania.  *See also Garner*, 184 F.R.D. 598; *Mazza v. American Honda Motor Co.*, 254 F.R.D. 610, 620-24 (C.D. Cal. 2008); *Hill v. Gateway 2000, Inc.*, No. 96 C 4086, 1996 WL 650631 (N.D. Ill. Nov. 7, 1996); *Kirschner*, 139 F.R.D. at 84; *Zinberg v. Wash. Bancorp, Inc.*, 138 F.R.D. 397, 411-12 (D.N.J. 1990); *Grace v. Perception Tech. Corp.*, 128 F.R.D. 165, 171-72 (D. Mass. 1989); *In re Seagate Techs. Sec. Litig.*, 115 F.R.D. 264, 270-72 (N.D. Cal. 1987); *In re ORFA Sec. Litig.*, 654 F. Supp. 1449, 1463 (D.N.J. 1987); *In re Pizza Time Theatre Sec. Litig.*, 112 F.R.D. 15, 17-18 (N.D. Cal. 1986); *In re Activision Sec. Litig.*, 621 F. Supp. 415, 430-31 (N.D. Cal. 1985).[34]

Significant contacts exist here because GSK maintains its principal research and manufacturing facilities in Research Triangle Park, North Carolina and Greenville, North Carolina. It appears this is where Flonase was developed, manufactured and sold.  It also appears that North Carolina, is the state from which the alleged actionable conduct emanated. North Carolina, rherefore, has significant contacts with this litigation, and a far greater interest in its outcome, than any other State.  Thus, this Court may constitutionally apply North Carolina law to the claims of all the Class members.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss should be denied.  Should the Court decide to dismiss some or all of their claims, Plaintiffs respectfully request leave to amend,

---

[34]     State courts have also certified nationwide classes for the same reason.  *See*, *e.g.*, *Ysbrand v. DaimlerChrysler Corp.*, 81 P.3d 618, 625-26 (Okla. 2003); *Lobo Exploration*, 991 P.2d at 1048; *Gordon v. Boden*, 586 N.E.2d 461, 467 (Ill. App. Ct. 1991); *Purcell & Wardrope Chartered v. Hertz Corp.*, 530 N.E.2d 994, 996 n.1 (Ill. App. Ct. 1988); *Clothesrigger, Inc. v. GTE Corp.*, 236 Cal. Rptr. 605 (Cal. Ct. App. 1987).

as amendment would not be futile.  *See* Fed. R. Civ. P. 15(a); *Alston v. Parker*, 363 F.3d 229,

235-36 (3d Cir. 2004).

**Dated:** July 20, 2009                                      **BOLOGNESE & ASSOCIATES, LLC**


By:     */s/ Joshua Grabar*_____
      Joshua H. Grabar (JG-1707)

Anthony J. Bolognese
Two Penn Center
1500 JFK Boulevard, Suite 320
Philadelphia, PA 19102
Telephone:  (215) 814-6750

*Interim Liaison Counsel for Indirect*
*Purchasers*

**MILLER LAW LLC**                                    **POMERANTZ HAUDEK GROSSMAN**
Marvin A. Miller                                         **& GROSS LLP**
Lori A. Fanning                                         Michael M. Buchman
115 South LaSalle Street                             100 Park Avenue
Suite 2910                                              New York, NY 10017
Chicago, IL 60603                                      Telephone:  (212) 661-1100
Telephone:  (312) 332-3400

*Interim Co-Lead Counsel for Indirect Purchasers*

Kenneth A. Wexler                                    Joseph R. Saveri
Jennifer Fountain Connolly                          Eric Fastiff
**WEXLER WALLACE LLP**                          **LIEFF CABRESER HEIMANN &**
55 West Monroe Street                               **BERSTEIN, LLP**
Suite 3300                                              Embarcadero Center West
Chicago, IL 60603                                      275 Battery Street, Suite 3000
Telephone:  (312) 346-2222                          San Francisco, California 94111-3339
                                                        Telephone: (415) 956-1000


*Executive Committee for the Indirect*
*Purchaser Actions*

<u>CERTIFICATE OF SERVICE</u>

I, Joshua H. Grabar, hereby certify that on July 20, 2009, a true and correct copy of the

foregoing was filed electronically and is available for viewing and downloading from the Court's

ECF System and that Notice was sent to all attorneys of record by operation of the Court's ECF

System.

<u>/s/ Joshua H. Grabar</u>
Joshua H. Grabar
