# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE FLONASE ANTITRUST LITIGATION | CIVIL ACTION |
| THIS DOCUMENT RELATES TO: | No. 08-3301 |
| Indirect Purchaser Actions | **Hon. Anita B. Brody** |

| | |
|---|---|
| MEDICAL MUTUAL OF OHIO, on behalf of itself and all others similarly situated, | |
| Plaintiff, | CIVIL ACTION |
| v. | NO. 12-4212 |
| SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE plc, | **Hon. Anita B. Brody** |
| Defendant. | |

## PLAINTIFFS' UNOPPOSED MOTION FOR
## PRELIMINARY APPROVAL OF THE CLASS ACTION SETTLEMENT

Pursuant to Federal Rule of Civil Procedure 23(e), Plaintiffs A.F. of L.-A.G.C Building Trades Welfare Plan ("AFL"), IBEW-NECA Local 505 Health & Welfare Plan ("IBEW"), Painters District Council No. 30 Health and Welfare Plan ("Painters"), Medical Mutual of Ohio, Inc. ("MMOH"), and Andrea Kehoe ("Kehoe") move for the entry of the Proposed Preliminary Approval Order attached as <u>Exhibit 6</u>, which seeks the preliminarily approval of a proposed class action settlement (the "Settlement") and certification of A proposed settlement class (the "Settlement Class") as explained therein.

1.      The terms of the Settlement are set forth in the Settlement Agreement dated December 6, 2012 attached as <u>Exhibit 1</u>.

2.     The relief sought in this Motion is supported by the Declaration of Marvin A. Miller In Support of Indirect-Purchaser Plaintiffs' Motion For Preliminary Approval of Settlement attached as <u>Exhibit 2</u>, the Joint Declaration of Deborah R. Gross and Kimberly R. West In Support of End-Payor Plaintiffs' Motion For Preliminary Approval of Settlement attached as <u>Exhibit 3</u>,  the Declaration of Katherine Kinsella attached as <u>Exhibit 4</u> (which includes as exhibits the proposed Postcard Notice, Publication Notice, and Long Form Notice), the Plan Of Allocation attached as <u>Exhibit 5</u>, and by Plaintiffs' Memorandum of Law In Support of Their Unopposed Motion for Preliminary Approval of The Class Action Settlement filed contemporaneously herewith.

3.     Defendant SmithKline Beecham Corporation d/b/a GlaxoSmithKline, including GlaxoSmithKline LLC and GlaxoSmithKline plc, does not oppose the relief requested in this motion.

WHEREFORE, Plaintiffs request that the Court enter the proposed Preliminary Approval Order.

Dated: December 14, 2012

By: s/*Marvin A. Miller*
   Marvin A. Miller
   Lori A. Fanning
   MILLER LAW LLC
   115 S. LaSalle St., Ste. 2910
   Chicago, IL  60603
   (312) 332-3400

By: s/*Michael M. Buchman*
   Michael M. Buchman
   600 Third Avenue
   New York, NY  10016
   (212) 661-1100

Co-Lead Counsel For The Indirect Purchaser Plaintiffs

# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE FLONASE ANTITRUST LITIGATION | CIVIL ACTION |
| THIS DOCUMENT RELATES TO: | No. 08-3301 |
| Indirect Purchaser Actions | **Hon. Anita B. Brody** |

| | |
|---|---|
| MEDICAL MUTUAL OF OHIO, on behalf of itself and all others similarly situated, | CIVIL ACTION |
| Plaintiff, | NO. 12-4212 |
| v. | **Hon. Anita B. Brody** |
| SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE plc, | |
| Defendant. | |

## SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (the "Settlement Agreement") is made and entered

into on December 6, 2012, by and between (a) Defendant SmithKline Beecham Corporation

d/b/a GlaxoSmithKline, including GlaxoSmithKline LLC and GlaxoSmithKline plc ("GSK" or

"Defendant"); and (b) Plaintiffs A.F. of L.-A.G.C Building Trades Welfare Plan ("AFL"),

IBEW-NECA Local 505 Health & Welfare Plan ("IBEW"), Painters District Council No. 30

Health and Welfare Plan ("Painters"), Medical Mutual of Ohio, Inc. ("MMOH"), and Andrea

Kehoe ("Kehoe"), individually and on behalf of a class and/or proposed class (collectively

"Plaintiffs"); in IBEW–NECA Local 505 Health & Welfare Plan v. SmithKline Beecham Corp.,

No. 08–3301 (E.D. Pa.), and Medical Mutual of Ohio, Inc. v. SmithKline Beecham Corp., No.

12-cv-4212 (E.D. Pa.) (the "Actions") (GSK and Plaintiffs are collectively referred to as the "Parties").

WHEREAS, Plaintiffs brought the original Class Action Complaint against Defendant in the United States District Court for the Eastern District of Pennsylvania (the "Court") on July 14, 2008.  Plaintiffs recently filed the Fourth Amended Consolidated Class Action Complaint on February 24, 2012.  Most recently, Medical Mutual of Ohio v. SmithKline Beecham Corp., 12-04212 was filed on July 24, 2012 in the Court.  Collectively, the Actions allege, among other things, that GSK violated various state antitrust and consumer protection laws, that GSK has been unjustly enriched in connection with the sales of the drug Flonase, and that Plaintiffs and the Settlement Class (as further defined in paragraph 1 below) suffered injury and calculable damages as a result;

WHEREAS, GSK denies each and every one of Plaintiffs' allegations of unlawful or wrongful conduct, denies that any conduct challenged by Plaintiffs caused any damage whatsoever, and has asserted a number of defenses to Plaintiffs' claims;

WHEREAS, Plaintiffs and GSK agree that this Settlement Agreement shall not be deemed or construed to be an admission or evidence of any violation of any statute or law or of any liability or wrongdoing by GSK or of the truth of any claim or allegation or a waiver of any defenses thereto;

WHEREAS, arm's length settlement negotiations have taken place between counsel for Plaintiffs and counsel for GSK for an extended period of months, and this Settlement Agreement, which embodies all of the terms and conditions of the settlement (the "Settlement") between GSK and Plaintiffs, both individually and on behalf of the Settlement Class (as defined in paragraph 1 below), has been reached, subject to final approval of the Court;

WHEREAS, Plaintiffs and their counsel have concluded, after extensive discovery, investigation, and motion practice and after carefully considering all of the circumstances of the Actions, and despite their belief in the validity of Plaintiffs' claims, that it would be in the best interests of Plaintiffs and the Settlement Class to enter into this Settlement Agreement in order to avoid the uncertainties of, and risks and delays associated with, the outcome of GSK's and Plaintiffs' anticipated or pending motions and/or a trial and any subsequent appeals, and risks and delays, and other uncertainties, related to the litigation of the Actions, and to assure a benefit to Plaintiffs and the Settlement Class and further, that Plaintiffs and their counsel consider the Settlement to be fair, reasonable, and adequate and in the best interests of Plaintiffs and the Settlement Class; and

WHEREAS, GSK has concluded, despite its belief that it is not liable for the claims asserted and that it has good defenses thereto, that it would be in its best interests to enter into this Settlement to avoid further expense, inconvenience, uncertainties of, and risks and delays associated with, the outcome of GSK's and Plaintiffs' anticipated or pending motions and/or a trial and any subsequent appeals, and the distraction of burdensome and protracted litigation and thereby to resolve this controversy;

NOW THEREFORE, it is agreed by the Parties, through their respective authorized representatives who have signed below, that the Actions and all claims made or that could have been made against Defendant by Plaintiffs and the Settlement Class be settled, compromised, and dismissed on the merits and with prejudice and, except as hereinafter provided, without costs as to Plaintiffs, the Settlement Class or Defendant, subject to the approval of the Court, on the following terms and conditions:

1.    Settlement Class.  The Parties stipulate to Court approval, in the form of a

proposed order acceptable to all Parties, of the certification of a class in light of the fact of

settlement (the "Settlement Class"), defined as follows:

> All persons throughout the United States and its territories who
> purchased and/or paid for, in whole or in part, fluticasone
> propionate nasal spray, whether branded Flonase or its AB-rated
> generic equivalents, intended for the consumption of themselves, their
> family members and/or household members, and all Third Party
> Payor entities throughout the United States and its territories that
> purchased, paid for, administered and/or reimbursed for fluticasone
> propionate nasal spray, whether branded Flonase or its generic
> equivalents, intended for consumption by their members, employees,
> plan participants, beneficiaries or insureds.
>
> The applicable time period for the Settlement Class is May 19, 2004
> through March 31, 2009.
>
> Third Party Payors are all health insurance companies, healthcare
> benefit providers, health maintenance organizations, self-funded
> health and welfare plans, and any other health benefit provider and/or
> entity that contracts with a health insurer acting as a third party
> administrator to administer their prescription drug benefits.  These
> payors include such entities that may provide prescription drug
> benefits for current or former public employees and/or retirees, but
> only to the extent that such entity was at risk for the cost of the
> payment(s).  For purposes of this definition, an entity "paid for"
> fluticasone propionate nasal spray (branded Flonase and/or its
> equivalents) if it paid some or all of the purchase price, or reimbursed
> any part of the purchase price paid by their members, employees,
> insureds, participants or beneficiaries.

Excluded from the Settlement Class are: (1) Defendant and its officers, directors, management,

employees, predecessors-in-interest, successors-in-interest, assignees or affiliates, and subsidiaries;

(2) the United States and/or State governments and their agencies and departments, except to the

extent they purchased fluticasone propionate nasal spray (branded Flonase and/or its generic

equivalents) for their employees or others covered by a government employee health plan; (3) all

entities who purchased fluticasone propionate nasal spray (branded Flonase and/or its generic

equivalents) directly from Defendant or its affiliates or purchased fluticasone propionate nasal spray (branded Flonase and/or its generic equivalents) for resale, to the extent and solely to the extent of such purchase as a direct purchaser or for resale; (4) any judge or special master who has presided over the Actions; and (5) the health benefit plans listed in Exhibit A hereto ("Settling Health Plans" or "SHPs").

The Parties' stipulation to Court approval of certification of the Settlement Class is only for purposes of effectuating the Settlement, and for no other purpose. The Parties retain all of their respective objections, arguments and/or defenses with respect to class certification, including of a nationwide class, should there be no settlement of the Actions. The Parties acknowledge that there has been no stipulation to a class as defined above for any purposes other than effectuating the Settlement, and that if the Settlement Agreement does not become final and effective pursuant to the terms of paragraph 5 herein, the stipulation as to the settlement class shall be null and void.

2.     Best Efforts to Effectuate This Settlement. Counsel for the undersigned agree to recommend approval of this Settlement Agreement by the Court and to undertake their best efforts, including all steps and efforts contemplated by this Settlement Agreement and any other steps and efforts that may be necessary or appropriate, by order of the Court or otherwise, to carry out the terms of this Settlement Agreement. Counsel for the undersigned as well as the Parties to this Settlement Agreement further agree, consistent with their obligations in this paragraph, not to do anything to encourage any member of the Settlement Class to oppose or obstruct the Settlement, or to do anything to encourage any member of the Settlement Class to opt out.

3.     Motion for Preliminary Approval. Plaintiffs, through their counsel Marvin A. Miller, Lori A. Fanning, and Michael Buchman ("Class Counsel"), shall file with the Court,

5

promptly after the execution of this Settlement Agreement, a motion for preliminary approval of the Settlement, which will contain a proposed preliminary approval order in a form agreed upon by Class Counsel and GSK, substantially in the form attached as Exhibit B hereto. In the event that the Court preliminarily approves the Settlement, Class Counsel shall, in accordance with Rule 23 of the Federal Rules of Civil Procedure and the preliminary approval order, direct the Claims Administrator, to be approved by the Court, to provide the Settlement Class with settlement notice as ordered by the Court ("Settlement Notice"). All costs of Settlement Notice shall be paid exclusively from the Settlement Fund (as defined in paragraph 6 herein) as provided in this Settlement Agreement, without recourse to the Plaintiffs or GSK. Settlement Notice does not include notice that may be required under the Class Action Fairness Act, 28 U.S.C. § 1711-1715, the cost of which shall be borne solely by GSK.

    4.    <u>Motion for Final Approval and Entry of Final Judgment</u>. If the Court preliminarily approves the Settlement, Plaintiffs, through Class Counsel, after Settlement Notice, shall submit a motion for final approval by the Court, and shall seek entry of an order and final judgment:

    a.    finding the Settlement and its terms to be fair, reasonable and adequate within the meaning of Rule 23 of the Federal Rules of Civil Procedure and directing its consummation pursuant to its terms;

    b.    providing for incentive payments from the Settlement Fund (as defined in paragraph 6 herein) to the Plaintiffs in addition to whatever monies each will receive from the Settlement Fund pursuant to the Court-approved plan of allocation;

    c.    providing for payment of reasonable attorneys' fees and reimbursement of expenses from the Settlement Fund (as defined in paragraph 6 herein);

d.     setting forth the method for allocating the Settlement Fund (as defined in paragraph 6 herein);

e.     directing that the Actions, <u>IBEW–NECA Local 505 Health & Welfare Plan v. SmithKline Beecham Corp.</u>, No. 08–3301 (E.D. Pa.), and <u>Medical Mutual of Ohio, Inc. v. SmithKline Beecham Corp.</u>, No. 12-cv-4212 (E.D. Pa.), be dismissed with prejudice and, except as provided for herein, without costs;

f.     approving the release of claims specified herein as binding and effective as to all Settlement Class members and permanently barring and enjoining such Settlement Class members from asserting any Released Claims (as defined in paragraph 11 herein);

g.     reserving exclusive and continuing jurisdiction over the Settlement and this Settlement Agreement, including the Settlement Fund (as defined in paragraph 6 herein) and the administration, consummation and interpretation of this Settlement and Settlement Agreement; and

h.     directing that order and final judgment of dismissal be entered in the Actions.

5.     <u>Effective Date of Settlement</u>.  The Settlement and Settlement Agreement shall become final and effective upon the occurrence of all of the following ("Effective Date"):

a.     Neither Plaintiffs nor Defendant have/has availed themselves/itself of any right to terminate the Settlement pursuant to paragraph 12 or 13 herein;

b.     the Settlement is approved by the Court as required by Rule 23(e) of the Federal Rules of Civil Procedure;

c.     entry, as provided for in paragraph 4 herein, is made of the order and final judgment with prejudice against Plaintiffs and the members of the Settlement Class; and

d.    the time for appeal from the Court's approval of the Settlement as described in subparagraph (b) hereof and entry of an order and final judgment as described in subparagraph (c) hereof has expired or, if an appeal has been filed, either all such appeals shall have been dismissed prior to resolution by the appellate court or approval of this Settlement Agreement and final judgment has been affirmed in its entirety by the court of last resort to which such appeal has been taken and such affirmance is no longer subject to further appeal or review, by certiorari or otherwise, provided, however, a modification or reversal on appeal of any amount of the fees and expenses awarded by the Court from the Settlement Fund, the amount of payments to the Plaintiffs or the Plan of Allocation shall not by itself prevent this Settlement Agreement from becoming final and effective if all other aspects of the final judgment have been affirmed.

6.    <u>Settlement Consideration: Cash</u>. Subject to the provisions hereof, and in full, complete, and final settlement of the Actions, Defendant shall pay thirty-five million dollars ($35,000,000.00), by the later of either twenty (20) calendar days of GSK's receipt of the Court's order preliminarily approving the Settlement, a properly completed W-9 form from the Escrow Agent identified in writing by Class Counsel, and a fully executed Escrow Agreement (as defined below) or January 7, 2013, into an escrow account (the "Settlement Fund"), held and administered by an escrow agent to be selected by Class Counsel with consent of GSK and approval of the Court.  The escrow account shall be established and administered pursuant to an escrow agreement in a form satisfactory to Class Counsel and GSK ("Escrow Agreement").  Defendant shall have no liability, obligation or responsibility with respect to the investment, disbursement, or other administration or oversight of the Settlement Fund.  The Settlement Fund is the total amount that Defendant will pay under this Settlement Agreement in exchange for the

Released Claims (as defined in paragraph 11 herein), including without limitation funds to satisfy claims by Plaintiffs, Settlement Class members attorneys' fees and costs, any Court-approved payments to Plaintiffs, and payment of any and all administrative and notice expenses associated with the Actions or this Settlement. It is intended that the escrow account shall be at all times a "qualified settlement fund" for federal income tax purposes pursuant to Treas. Reg. § 1.468B-1, and that the "administrator" of the Settlement Fund, within the meaning of Treas. Reg. § 1.468B-2(k), shall comply with all applicable requirements, which shall include, without limitation, (a) preparing a "Regulation Section 1.468B-3 Statement" pursuant to Treas. Reg. § 1.468B-3(e) on behalf of Defendant and providing copies to Defendant's counsel for review and approval; and (b) preparing and timely filing on behalf of the Settlement Fund (i) such income tax and other returns and statements as are required to comply with Treas. Reg. § 1.468B-2 and the other applicable provisions of the Internal Revenue Code of 1986, as amended (the "Code"), and (ii) all necessary state, local and foreign tax returns. Any taxes due as a result of income earned by the Settlement Fund will be imposed upon and paid from the Settlement Fund. Interest earned by the Settlement Fund (less any tax imposed upon such interest) shall be for the benefit of the Settlement Class, less reasonable attorneys' fees and expenses approved by the Court (and any interest awarded thereon), any Court-approved award to Plaintiffs and payment of any and all administrative and notice expenses associated with the Actions or Settlement. Defendant shall have no liability, obligation or responsibility for any such taxes, costs, expenses, or for any reporting requirements relating thereto. Defendant's transfer of the Settlement Fund to the escrow account described above shall constitute full and complete satisfaction of its obligations under this paragraph. Defendant shall not have any liabilities, obligations or responsibilities with respect to the payment, disbursement, disposition or distribution of the

Settlement Fund after such transfer.  Notwithstanding any effort, or failure, of the administrator of the Settlement Fund and the parties to treat the Settlement Fund as a "qualified settlement fund" within the meaning of Section 1.468B-1 of the Treasury Regulations effective as of the date hereof, any tax liability, interest or penalties incurred by Defendant resulting from income earned by the Settlement Fund (or the receipt of any payment under this paragraph) shall be reimbursed from the Settlement Fund in the amount of such tax liability, interest or penalties upon Defendant's written request to the administrator of the Settlement Fund.

     7.     <u>Full Satisfaction: Limitation of Interest and Liability</u>. Plaintiffs and members of the Settlement Class shall look solely to the Settlement Fund for settlement and satisfaction against Defendant of all claims that are released herein.  Plaintiffs and members of the Settlement Class shall not under any circumstances be entitled to any further compensation from Defendant with respect to any claims released herein.  In the event that the Settlement becomes final and effective pursuant to paragraph 5 herein, the Settlement Fund will fully satisfy any and all Released Claims as defined in paragraph 11 herein. Except as provided by order of the Court, no Settlement Class member shall have any interest in the Settlement Fund or any portion thereof.

     8.     <u>Reimbursement of Costs, Fees and Expenses</u>.  Plaintiffs and their counsel will be reimbursed and indemnified solely out of the Settlement Fund for all costs, fees and expenses under this Settlement including, but not limited to, the costs of Settlement Notice and administration of the Settlement Fund.  Defendant shall not be liable for any costs, fees or expenses of any Settlement Class members, Plaintiffs, or of any Settlement Class members' or Plaintiffs' attorneys, experts, consultants, advisors, agents and representatives.  Any such costs,

fees and expenses, to the extent approved and awarded by the Court, shall be paid out of the Settlement Fund.

     9.    <u>Disbursement of the Settlement Fund</u>.  If the Settlement becomes final and effective pursuant to the provisions of paragraph 5 herein, the Settlement Fund shall be disbursed as follows or as otherwise ordered by the Court.  GSK shall, as set forth in paragraph 6 above, have no liability or responsibility with respect to disbursement or distribution from the Settlement Fund.

     a.    <u>Prior to the Effective Date of this Settlement Agreement</u>.

     i.    Any fees and expenses incurred in administering the escrow account and the Settlement Fund shall be paid pursuant to the Escrow Agreement from the Settlement Fund.  The Costs of Notice and Administration of the Settlement shall be paid by the Escrow Agent to the Claims Administrator with notice of such payments provided to counsel for the Parties; and

     ii.    Disbursements for the payment of any taxes (including any estimated taxes, interest or penalties) due, as a result of income earned by the Settlement Fund, shall be made promptly by the Escrow Agent pursuant to the Escrow Agreement with notice of such disbursements provided to counsel for the Parties.

     b.    <u>After the Effective Date of this Settlement Agreement</u>.

     i.    The attorneys' fees and costs approved by the Court shall be distributed to Class Counsel from the Settlement Fund within ten (10) days of the Effective Date of this Settlement Agreement;

ii.      The remaining fees or expenses incurred in connection with the administration of the escrow account and the Settlement Fund shall be paid pursuant to the Escrow Agreement, and to the extent, if any, the reasonable remaining fees and expenses incurred as part of notice and claims administration, shall be paid from the Settlement Fund by the Escrow Agent with notice of such disbursements provided to Plaintiffs' counsel;

iii.     Disbursements for the payment of any taxes (including any estimated taxes, interest or penalties) due as a result of income earned by the Settlement Fund shall be made promptly by the Escrow Agent pursuant to the Escrow Agreement with notice of such disbursements provided to counsel for the Parties;

iv.     Any incentive awards determined by the Court for services rendered to the Settlement Class by Plaintiffs as set forth in the proposed notice forms ordered by the Court, shall be distributed to Plaintiffs from the Settlement Fund after the Effective Date of the Settlement; and

v.      The balance of the Settlement Fund after the payment of attorneys' fees, costs, and expenses, taxes, incentive awards, costs of notice and administration of the Settlement and Settlement Fund, and any payments to or from the SHPs pursuant to the procedures set forth in a plan of allocation ("Plan of Allocation"), shall be distributed to Settlement Class members who submit timely claims that are accepted by the Claims Administrator and approved by the Court ("Authorized Claimants") in accordance with the applicable procedures as approved by the Court.  No funds will be disbursed to any Authorized Claimant

until the claims of all Authorized Claimants have been submitted and verified by the Claims Administrator. The Claims Administrator shall make periodic reports to the Parties describing the status of the claims administration process, the number and amount of claims received, and any amounts disbursed.

10. <u>Attorneys' Fees, Expenses and Costs.</u> Class Counsel intend to seek for distribution to Plaintiffs' counsel, attorneys' fees and reimbursement of reasonable costs and expenses incurred in the prosecution of the Actions. Class Counsel may further seek payment of reasonable incentive awards for Plaintiffs, as noted in Paragraph 4(b) above. Plaintiffs and members of the Settlement Class shall look solely to the Settlement Fund for the satisfaction against Defendant of any distribution to Plaintiffs' counsel, including for attorneys' fees, reimbursement of reasonable costs and expenses incurred in the prosecution of the Actions, and payment of incentive awards for Plaintiffs.

11. <u>Releases.</u>

a. As used throughout this Settlement Agreement and specifically in this paragraph 11, references to the "Settlement Class," "members of the Settlement Class," or "Settlement Class members" refer to members of the Settlement Class and include any of their past, present or future officers, directors, stockholders, attorneys, employees, legal representatives, trustees, agents, parents, subsidiaries, general and limited partners, heirs, executors, administrators, purchasers, predecessors, successors and assigns, acting in their capacity as such.

b. Upon the Settlement Agreement becoming effective in accordance with paragraph 5 herein, Defendant and its past, present and future parents, subsidiaries, divisions, affiliates, stockholders, officers, directors, insurers, general or limited partners, employees,

13

agents, attorneys, and any of their legal representatives (and the predecessors, heirs, executors, administrators, successors, purchasers, and assigns of each of the foregoing) (the "Released Party" or "Released Parties") are and shall be released and forever discharged from all manner of claims, demands, actions, suits, causes of action, damages whenever incurred, and liabilities of any nature whatsoever (whether such claims, demands, actions, suits, causes of action, damages or liabilities arise or are incurred before, during or after the date hereof), including costs, expenses, penalties and attorneys' fees known or unknown, suspected or unsuspected, in law or equity, that Plaintiffs or any member or members of the Settlement Class, whether or not they object to the Settlement and whether or not they make a claim upon or participate in the Settlement Fund, ever had, now has, or hereafter can, shall or may have, directly, indirectly, representatively, derivatively or in any other capacity, relating to any conduct, events or transactions, prior to the date hereof, alleged or which could have been alleged in the Actions, relating to fluticasone propionate nasal sprays (branded Flonase and/or its generic equivalents) (the "Released Claims"). Except for enforcing this Settlement Agreement, each member of the Settlement Class hereby covenants and agrees that he, she or it shall not, hereafter, seek to establish liability against any Released Party based, in whole or in part, on any of the Released Claims. Without in any way limiting the definition of Released Parties, the following specific entities are Released Parties: SmithKline Beecham Corporation d/b/a GlaxoSmithKline; GlaxoSmithKline LLC; GlaxoSmithKline Holdings (America) Inc.; GlaxoSmithKline plc; Smith Kline Beecham plc; Glaxo Wellcome plc.; GlaxoSmithKline Finance plc.; GlaxoSmithKline Services Unlimited; and Smith Kline Beecham Limited.

    c.  In addition, Plaintiffs and each Settlement Class member hereby expressly waives and releases, upon the Settlement becoming effective pursuant to paragraph 5 herein, any

and all provisions, rights and benefits conferred by § 1542 of the California Civil Code, which

reads:

> Section 1542. General Release -- Claims Extinguished. A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor;

or rights and benefits conferred by any law of any state or territory of the United States or any

other jurisdiction or principle of common law, which is similar, comparable or equivalent to §

1542 of the California Civil Code.  Plaintiffs and each Settlement Class member may hereafter

discover facts other than or different from those which he, she or it knows or believes to be true

with respect to the claims which are the subject matter of this paragraph, but each Plaintiff and

each Settlement Class member hereby expressly waives and fully, finally and forever settles and

releases, upon the Settlement Agreement becoming final, any known or unknown, suspected or

unsuspected, contingent or non-contingent claim that would otherwise fall within the definition

of Released Claims, whether or not concealed or hidden, without regard to the subsequent

discovery or existence of such different or additional facts.  Plaintiffs and each Settlement Class

member also hereby expressly waives and fully, finally and forever settles and releases any and

all claims it may have against any Released Party under §17200, et seq., of the California

Business and Professions Code, or any similar, comparable or equivalent provision of the law of

any other state or territory of the United States or other jurisdiction or principle of common law,

which claims are hereby expressly incorporated into the definition of Released Claims.

        d.     Plaintiffs' counsel and the Claims Administrator will ensure that each

claim form contains a copy of the of the release set forth in paragraph 11(a) through (c) hereof,

which shall be signed by each member of the Settlement Class or its authorized representative as a precondition to receiving any portion of the Settlement Fund.

       e.    The releases set forth above shall not release any claims arising in the ordinary course of business among Plaintiffs, Settlement Class members and the Released Parties concerning product liability, breach of warranty or contract (other than breach of warranty or contract based in whole or in part on any conduct challenged in the Actions), and/or personal or bodily injury, and/or any claims for costs of providing medical care for individuals allegedly injured by fluticasone propionate nasal spray products.

    12.    <u>Withdrawal from Settlement</u>.  GSK, in its sole and complete discretion, shall have the right to withdraw from this settlement on those terms contained in the submission filed under seal and solely for *in camera* review.  If GSK withdraws from this Settlement, the Settlement Agreement shall be cancelled and terminated.

    13.    <u>Effect of Disapproval</u>.  If the Court declines to finally approve the Settlement, or if such approval is reversed, vacated, or otherwise modified on appeal, or if the Court does not enter the final judgment in substantially the form provided for in paragraph 4, or if the Court enters the final judgment and appellate review is sought, and on such review, such final judgment is reversed, vacated or modified, then this Settlement Agreement shall be terminated upon the election of either (a) Class Counsel, or (b) GSK; provided however that any reversal, vacating, or modification on appeal of any amount of the fees and expenses awarded by the Court from the Settlement Fund, or any amount of payments to any Plaintiff, or any determination by the Court to award less than the amount requested in attorneys' fees or costs or awards to Plaintiffs, or any determination by the Court to modify the Plan of Allocation of the

Settlement Fund, shall not give rise to any right of termination or otherwise serve as a basis for termination of this Settlement Agreement.

14.     Termination. In the event that the Settlement is terminated pursuant to paragraph 12 or 13 herein, or for any other reason does not become effective in accordance with the terms of paragraph 5 herein, then (a) this Settlement Agreement shall be of no force or effect, except for payment of notice and settlement administration costs from the Settlement Fund, (b) the Settlement Fund, including any and all interest earned thereon, shall be returned to GSK less only the amount validly disbursed for the costs incurred in giving notice to the Settlement Class and administering the Settlement Fund during the interim period, and (c) any release pursuant to paragraph 11 herein shall be of no force or effect.

15.     Preservation of Rights. The Parties agree that this Settlement Agreement, whether or not it shall become effective pursuant to paragraph 5 herein, and any and all negotiations, documents and discussions associated with it shall be without prejudice to the rights of any party, shall not be deemed or construed to be an admission or evidence of any violation of any statute or law, of any liability or wrongdoing by the Defendant, or of the truth of any of the claims or allegations contained in the complaints in the Actions or any other pleading or document, and evidence thereof shall not be discoverable or used directly or indirectly, in any way, whether in this case or any other action or proceeding.  The Parties expressly reserve all of their rights and defenses if the Settlement Agreement does not become final and effective in accordance with the terms of this Settlement Agreement.

16.     Binding Effect. This Settlement Agreement shall be binding upon, and inure to the benefit of, the successors and assigns of the Parties and to the Released Parties. Without

limiting the generality of the foregoing, each and every covenant and agreement herein by the Plaintiffs and their counsel shall be binding upon all members of the Settlement Class.

17. <u>Integrated Agreement</u>. This Settlement Agreement (including all exhibits hereto and the submission referenced in paragraph 12) contains the entire, complete, and integrated statement of each and every term and provision of the Settlement Agreement agreed to by and among the Parties. This Settlement Agreement shall not be modified in any respect except by a writing executed by the undersigned in the representative capacities specified, or others who are authorized to act in such representative capacities.

18. <u>Headings</u>. The headings used in this Settlement Agreement are intended for the convenience of the reader only and shall not affect the meaning or interpretation of this Settlement Agreement.

19. <u>No Party is the Drafter</u>. All counsel to all Parties hereto have materially participated in the drafting of this Settlement Agreement. None of the Parties hereto shall be considered to be the drafter of this Settlement Agreement or any provision hereof for the purpose of any statute, case law or rule of interpretation or construction that would or might cause any provision to be construed against the drafter hereof.

20. <u>Choice of Law</u>. All terms of this Settlement Agreement shall be governed by and interpreted according to the substantive laws of the Commonwealth of Pennsylvania without regard to its choice of law or conflict of laws principles.

21. <u>Consent to Jurisdiction and Choice of Exclusive Forum</u>. Any and all disputes arising out of or related to the Settlement, the Settlement Agreement, or claims administration, including attorneys' fees, must be brought by Defendant, Plaintiffs, each member of the Settlement Class, and/ or each Settling Health Plan, exclusively in this Court. Defendant,

Plaintiffs and each member of the Settlement Class hereby irrevocably submit to the exclusive

and continuing jurisdiction of the Court for any suit, action, proceeding or dispute arising out of

or relating to this Settlement or the Settlement Agreement or the applicability or interpretation of

this Settlement Agreement, including, without limitation any suit, action, proceeding or dispute

relating to the release provisions herein, except that this paragraph shall not prohibit (a) any

Released Party from asserting in the forum in which a claim is brought that the release herein is a

defense, in whole or in part, to such claim or, (b) in the event that such a defense is asserted in

that forum and this Court determines that it cannot bar the claim, the determination of the merits

of the defense in that forum.

      22.    Enforcement of Settlement. Nothing in this Settlement Agreement prevents

Defendant from enforcing or asserting any release herein, subject to the provisions of paragraph

13 and 14 herein.  Notwithstanding any other provision of this Settlement Agreement, this

Settlement Agreement and the releases contained herein may be pleaded as a full and complete

defense to any action, suit or other proceeding that has been or may be instituted, prosecuted or

attempted by Plaintiffs and each member of the Settlement Class with respect to any Released

Claims and may be filed, offered and received into evidence and otherwise used for such

defense.

      23.    Authorization to Act on Behalf of Plaintiffs and Settlement Class. The

undersigned counsel to Plaintiffs represent that they have been and are fully authorized to

conduct settlement negotiations with Defendant's counsel on behalf of Plaintiffs and the

Settlement Class and to enter into, and execute, this Settlement Agreement on behalf of Plaintiffs

and the Settlement Class, subject to Court approval pursuant to Fed. R. Civ. P. 23(e).

24.     <u>Severability</u>.  In the event any one or more of the provisions of this Settlement Agreement shall for any reason be held to be illegal, invalid or unenforceable in any respect, such illegality, invalidity or unenforceability shall not affect any other provision if Defendant's counsel and Plaintiffs' counsel mutually agree to proceed as if such illegal, invalid, or unenforceable provision had never been included in the Settlement Agreement.

25.     <u>No Admission</u>.  Nothing in this Settlement Agreement shall be construed as an admission in any action or proceeding, of any kind whatsoever, civil, criminal or otherwise, before any court, administrative agency, regulatory body or any other body or authority, present or future, by Defendant or Plaintiffs, or any of them, including without limitation that Defendant has engaged in any conduct or practices that violate any antitrust statute or other law.

26.     <u>Execution in Counterparts</u>. This Settlement Agreement may be executed in counterparts. Facsimile or PDF'd signatures shall be considered as valid signatures as of the date hereof, although the original signature pages shall thereafter be appended to this Settlement Agreement and filed with the Court.

27.     <u>Failure to Follow Procedures and Requirements.</u>  The agreed-upon procedures and requirements regarding Settlement Class members' rights and options, including for opting out of the Settlement Class, filing objections in connection with and/or appearing at the final approval hearing are intended to ensure the efficient administration of justice and the orderly presentation of any Settlement Class members' objections to the Settlement Agreement, in accordance with such Settlement Class member's due process rights.  The preliminary approval order will further provide that objectors that fail to properly or timely file their objections, along with the required information and documentation set forth above, or to serve them as provided

above shall not be heard during the final approval hearing, nor shall their objections be considered by the Court.

28.     Appeals.  The proposed order and final judgment shall provide that any Settlement Class member that wishes to appeal the order and final judgment, which appeal will delay the distribution of the Settlement to the Settlement Class, shall post a bond with this Court in an amount to be determined by the Court as a condition of prosecuting such appeal.

IN WITNESS WHEREOF, the Parties hereto through their fully authorized representatives have agreed to this Settlement Agreement on the date first herein above written.

FOR PLAINTIFFS:

_____

Nicholas E. Chimicles
CHIMICLES & TIKELLIS LLP
One Haverford Centre
3 61 West Lancaster A venue
Haverford, Pennsylvania 19041

*Counsel for Indirect Purchaser Plaintiffs Class*

_____

Marvin A. Miller
Lori A. Fanning
MILLER LAW LLC
115 South LaSalle Street
Suite 2910
Chicago, IL 60603

*Counsel for Indirect Purchaser Plaintiffs
Class*

_____

Michael M. Buchman
600 Third Avenue
New York, NY 10016

*Counsel for Indirect Purchaser Plaintiffs
Class*

FOR DEFENDANT:

_____

Stephen J. Kastenberg
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA  19103

*Counsel for Defendant SmithKline Beecham Corporation d/b/a GlaxoSmithKline*

IN WITNESS WHEREOF, the Parties hereto through their fully authorized

representatives have agreed to this Settlement Agreement on the date first herein above written.

FOR PLAINTIFFS:

Nicholas E. Chimicles
CHIMICLES & TIKELLIS LLP
One Haverford Centre
3 61 West Lancaster A venue
Haverford, Pennsylvania 19041

*Counsel for Indirect Purchaser Plaintiffs Class*

Marvin A. Miller
Lori A. Fanning
MILLER LAW LLC
115 South LaSalle Street
Suite 2910
Chicago, IL 60603

*Counsel for Indirect Purchaser Plaintiffs
Class*

Michael M. Buchman
600 Third Avenue
New York, NY 10016

*Counsel for Indirect Purchaser Plaintiffs
Class*

FOR DEFENDANT:

Stephen J. Kastenberg
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA  19103

*Counsel for Defendant SmithKline Beecham Corporation d/b/a GlaxoSmithKline*

**Exhibit A**
**Flonase Settling Health Plans**

Aetna, Inc.
AmeriGroup/HMS
Arcadian Health
Assurant Health
Avmed Health Plans
Blue Cross and Blue Shield of Florida, Inc.
Blue Cross and Blue Shield of Kansas City
Blue Cross Blue Shield of North Carolina
Blue Cross and Blue Shield of Vermont
Blue Cross Blue Shield Association
Blue Cross Blue Shield of Minnesota
Blue Cross Blue Shield of Nebraska
Blue Cross Blue Shield of Rhode Island
Blue Cross Blue Shield of Tennessee
Blue Cross Northeastern Pennsylvania
Cambia Health Solutions*
CareFirst Blue Cross Blue Shield
Connecticut General Life Insurance Company a/k/a Cigna
Coventry Health Care of Florida, Inc. f/k/a Vista HealthPlan, Inc.
Coventry Health Care, Inc.
Coventry Health Plan
Coventry Health Plan of Florida, Inc. f/k/a Vista HealthPlan of South Florida, Inc.
Coventry Summit Health Plan, Inc. f/k/a Summit Health Care, Inc.
EmblemHealth
Excellus Blue Cross Blue Shield
Government Employees Health Association
Harvard Pilgrim Health Care, Inc.
Hawaii Medical Service Association
Health Care Services Corporation
Health Net, Inc.
HealthNow New York
HealthPartners, Inc.
Humana Insurance Company
Johns Hopkins Health Care LLC
Kaiser Foundation Health Plan**
Lovelace Health Plan
Mutual of Omaha
MVP Health Care
Noridian d/b/a Blue Cross Blue Shield of North Dakota
Premera Blue Cross
Priority Health
Tufts Associated Health Plans, Inc.
United Healthcare Services, Inc.
Wellpoint, Inc.

*Cambia Health Solutions includes:
Regence Blue Shield
Regence Blue Cross Blue Shield of Oregon
Regence Blue Cross Blue Shield of Utah
Regence Blue Shield of Idaho
Asuris Northwest Health
Regence Life and Health Insurance Co.

**Kaiser Foundation Health Plan includes:
Kaiser Foundation Hospitals
Kaiser Foundation Health Plan of Colorado, Inc.
Kaiser Foundation Health Plan of Georgia, Inc.
Kaiser Foundation Health Plan of Hawaii, Inc.
Kaiser Foundation Health Plan of Ohio, Inc.
Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.
Kaiser Foundation Health Plan of the Northwest, Inc.

# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE FLONASE ANTITRUST LITIGATION | CIVIL ACTION |
| THIS DOCUMENT RELATES TO: | No. 08-3301 |
| Indirect Purchaser Actions | **Hon. Anita B. Brody** |

| | |
|---|---|
| MEDICAL MUTUAL OF OHIO, on behalf of itself and all others similarly situated, | |
| Plaintiff, | CIVIL ACTION |
| v. | NO. 12-4212 |
| SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE plc, | **Hon. Anita B. Brody** |
| Defendant. | |

**DECLARATION OF MARVIN A. MILLER IN**
**SUPPORT OF INDIRECT-PURCHASER PLAINTIFFS'**
**MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT**

I, Marvin A. Miller, pursuant to 28 U.S.C. §1746, declare as follows:

      1.     I am an attorney licensed to practice in the States of Illinois and New York and a Member of Miller Law LLC. I am the Co-Lead Counsel for the Indirect Purchaser Class in the above-captioned action, *In re Flonase Antitrust Litig.,* 08-3301 (E.D.Pa). I make this Declaration in Support of Indirect-Purchaser Plaintiffs' Motion for Preliminary Approval of Settlement (the "Motion"). I have personal knowledge of the facts stated in this Declaration and, if called as a witness, I could and would testify competently to them.

      2.     I have been a practicing attorney for over 40 years and have been handling complex class actions, including, antitrust, securities, commodities and multi-district matters for over 32 years.

3.     This Court appointed me, Lori A. Fanning and Michael Buchman as Plaintiffs' Interim Class Counsel and, later, certified this action as a class action and again approved us as Co-Lead Counsel. *In re Flonase Antitrust Litig.*, 284 F.R.D.207 (E.D. Pa. June 18, 2012). I am also one of the counsel for Medical Mutual of Ohio in *Medical Mutual of Ohio v. SmithKline Beecham Corp. d/b/a Glaxosmithkline*, 12-cv-4212 (E.D.Pa.)("Medical Mutual").

### A.     NO COLLUSION; ARMS' LENGTH SETTLEMENT

4.     I personally conducted and led the Plaintiffs' settlement negotiation team in all the negotiations for Plaintiffs which produced the Settlement Agreement which is attached as Exhibit 1 to the Motion and the SHP-Class Allocation Agreement.

5.     All settlement negotiations were strictly at arms' length, in good faith, and absolutely free of any collusion. The negotiations began in January 2010 but fell flat and nothing further transpired on that front until on June 6, 2012, when the parties agreed to mediate with an independent mediator. Those efforts too failed. Then, with a trial date set for the Fall 2012, the parties began protracted and persistent negotiations for more than 2 months in the Fall 2012 while the trial date loomed and as both sides were actively preparing for trial that had since been postponed to commence in January 2013.

6.     The settlement negotiations resulted in the Defendant agreeing as a part of a comprehensive settlement to pay $35,000,000 to the Indirect Purchaser Class, from which attorneys' fees, incentive awards to Class Representatives and expenses will be deducted.

7.     The Settlement was agreed to in principle on November 14, 2012. But the negotiations did not stop at that point. The Settlement Agreement document was then negotiated with fervor, but ultimately on December 6, 2012, the parties were able to execute the final Settlement Agreement.

8.    In addition to discussions with Defendant, Class Counsel concurrently initiated discussions with counsel for more than 30 large commercial health insurers, including more than 25 insurers that had filed a Writ of Summons against GSK in the Philadelphia Court of Common Pleas in August 2012.  These large health insurers generally have separate representation and usually opt out of class settlements in pharmaceutical class actions and reach separate direct (or non-class) settlements with defendants in cases similar to the case at hand.  These entities are generally referred to as "Individually Represented Settling Health Plans" or "SHPs," and are entities that would be members of the Settlement Class, but for their decision to exclude themselves from the Settlement Class.

9.    Class Counsel here have substantial experience in the negotiation of pharmaceutical industry class settlements, including settlements involving SHPs.  I advised Defendant of our communications with the SHPs.  Defendant and its counsel understood from their participation in other pharmaceutical industry class action settlements the dynamics of this organization and that involving this group would promote settlement.  The SHPs were directly involved in or informed promptly of all discussions with Defendant and with this Court.

10.    Concurrent with the settlement negotiations with GSK, Class Counsel negotiated with counsel for the SHPs, concerning the SHPs' share of the allocation to Third-Party Payors ("TPPs").  The SHPs represented that, in the aggregate, they provide or administer prescription drug and health benefits to at least 60 percent of the covered lives privately insured in the United States.  Based on this representation, Class Plaintiffs, through Class Counsel, and the SHPs, through SHP counsel, after vigorous arm's-length negotiations, agreed to an initial payment to the SHPs from GSK and a reconciliation process which is set forth in the Plan of Allocation.  A copy of the Plan of Allocation is attached as Exhibit 2 to the Motion.

11.    The SHPs also entered into a separate, private agreement with Defendant for settlement.   In the SHP-Class Allocation Agreement, SHPs represented that the amount Defendant is to pay to them is $11 million, and SHPs have agreed that $1 million of that amount would be available for fees to Class Counsel for having created the benefits to be received by the SHPs (and/or, under certain conditions, for payment to the Class), leaving $10 million as the SHP Group Initial Payment.

12.    In part, the Plan of Allocation provides a mechanism for a reconciliation to insure that class TPPs' and SHPs' recovery is approximately proportionate net of attorneys' fees. Although the SHPs are participants in the private SHP Agreement, SHPs must submit their claims information to the Claims Administrator.   After all class members' and SHPs' claims are submitted, a formula will be applied to determine whether the SHPs must pay any of the SHP Group Initial Payment back to the Class, or whether the SHPs may receive a distribution from the Class.   The formula takes into account the amount SHPs have already received and the percentage of claims they represent, and allocates to them their share of attorneys' fees, expenses, incentive awards, and notice and administration costs associated with the settlement.

13.    The record demonstrates that proposed Settlement and Plan of Allocation were negotiated at arm's-length, by counsel experienced in similar litigation, and that sufficient discovery enabled all counsel to have an adequate appreciation of the merits.   All Class Counsel believe that the proposed Settlement and Plan of Allocation are fair, reasonable, adequate and in the best interests of all Class members.

B.    **ALLOCATION COUNSEL**

14.    In *In re: Warfarin Sodium Antitrust Litigation*, the seminal case in this Circuit addressing a structure for allocating settlement funds between consumers and TPPs in a class

4

action, the Third Circuit Court of Appeals endorsed the use of separate counsel (apart from Class

Counsel) to negotiate the allocation:

> [W]e agree with the District Court that any potential for conflicts of interest between and among consumers and TPPs that may have arisen prior to and during the settlement negotiations were adequately represented by the presence of separate counsel for consumers and TPPs. The existence of separate counsel, as well as the operation of the Executive Committee, provided adequate "structural protections to assure that differently situated plaintiffs negotiate for their own unique interests." *Georgine*, 83 F.3d at 631 (finding inadequate representation of different groups of plaintiffs where no such structural protections existed); *see also Amchem*, 521 U.S. at 627-28, 117 S.Ct. 2231. Accordingly, we find that the District Court did not abuse its discretion in finding that the class satisfied the adequacy of representation requirement of Rule 23.

*Warfarin Sodium*, 391 F.3d 516, 533 (3d Cir. 2004) (footnote omitted).

15.     Plaintiffs here have opted to follow the structure approved in *Warfarin*. In that

regard, separate and independent counsel for consumers and TPPs were appointed by Co-Lead

Counsel. Each has the impeccable credentials and requisite experience to undertake the task and

has been recognized for her skills and abilities in handling complex class action matters such as

this. They have not previously appeared in this action, have recently filed their appearances on

behalf of their respective constituent group, and did independent analysis to decide allocation of

the Settlement Fund.

16.     Immediately after agreeing upon the amount GSK would pay to settle all indirect

purchaser claims, Class Counsel engaged allocation counsel to determine the best method for

allocating the Settlement Fund between consumers and TPPs. It was determined that the

settlement fund for all indirect purchasers will be *pro rata* based on purchases of Flonase and its

generic equivalents during the relevant time period except for the brand loyalists and flat co-pay

purchasers as detailed in paragraph 16. A copy of the Joint Declaration of Deborah R. Gross and

Kimberly R. West In Support of End-Payor Plaintiffs' Motion For Preliminary Approval of Settlement ("Allocation Counsel Declaration") is attached as Exhibit 3 to the Motion.

17.     Allocation Counsel have submitted their joint declaration on how the Settlement Fund should be allocated.  We have evaluated the recommendation of Allocation Counsel to set up a single pool of funds for TPPs and consumers, net of attorneys fees and costs, and incentive awards, if any, with all class members taking a *pro rata* share and believe that it is meritorious. Moreover, the recommendation allows all members of the Class to participate in the Settlement Fund while also recognizing that there are certain issues relating to brand loyalists who purchased branded Flonase sold by GSK after a generic was available, and those with a flat co-pay, meaning that whether they purchased the brand or its generic equivalent, their out-of-pocket expense was the same.  To address those issues, Allocation Counsel negotiated a weighted *pro rata* allowance to take into account the relative weakness of the brand-loyalists and flat co-payor class members' damages claims,  and concluded that only 25% of their claim amounts will be used for the calculation of their *pro rata* share of the net Settlement Fund.  Therefore, all class members providing releases will be eligible to file a claim and receive a share of the Settlement Fund, even those members of the Class who were brand loyalists or flat co-payers.  Accordingly, we adopt the recommendation of Allocation Counsel.

## C.     THE STRENGTH OF PLAINTIFFS' CASE ON THE MERITS MEASURED AGAINST THE TERMS OF THE SETTLEMENT

18.     This case has been litigated since July 2008 and Defendant has vigorously denied liability, GSK twice moved to dismiss the claims and moved for summary judgment four times on the following separate grounds:   causation; *Noerr-Pennington* immunity; and state law specific grounds pertaining to choice of law and standing.  Defendant also thoroughly disputed Plaintiffs' damages estimates.  While Plaintiffs prevailed on the summary judgment motions,

sufficient to proceed to class certification and trial, in preparation for trial, Defendant filed an additional motion to limit the damages period. That motion and the Parties combined fourteen motions *in limine* were pending before this Court when the parties settled, but those motions created significant risk for the parties.

19.    A four-state indirect purchaser class was certified on June 18, 2012 for Arizona, Florida, Massachusetts and Wisconsin. Subsequently on July 24, 2012, a national health plan, Medical Mutual of Ohio, filed a complaint as a named plaintiff seeking to represent a nationwide class of all TPP entities that had purchases of Flonase and its generic equivalents, asserting claims under the antitrust, consumer protection and unjust enrichment laws of 27 states.

20.    No one can predict what the rate of claims by Class members will be in this particular case. Although it is certainly probable that Class members will receive less than all of their estimated damages, it is also probable, based upon my experience, that the amount Class members will receive will be substantial and, in all events, fair and reasonable compensation in light of the remaining risks of prosecution of the claims.

21.    As also described in our accompanying brief, those risks include the following:

        a.    The additional motion limiting the damages period could be upheld, depriving Plaintiffs of significant recovery;

        b.    The possibility that the Court would deny certification of a nationwide class in the *Medical Mutual* case, rendering improbable any recovery for Class members in states other than the four states certified in the litigated class.

        c.    Some or all of Defendant's pending motions *in limine* could be granted, thus limiting evidence regarding the USP Fluticasone Propionate Nasal Spray Product Monograph; Overcharges for Damages Paid For Generic Versions of Flonase; Evidence that Contradicts the Corporate Designee; Other Citizen Petitions Filed By GSK And Other Persons; Painters District Council No. 30's Purchase Data; and/or GSK's Role in Development of USP Fluticasone Propionate Drug Substance Monograph;

d.     Plaintiffs could lose at trial, or, if successful at trial, could lose on a motion for judgment notwithstanding the verdict, or on appeals. In any of these events, there would be no recovery for the Class.

e.     Even if the Plaintiffs survived all of the foregoing risks, the amount of damages awarded and sustained post-trial and on appeals, could be less than that provided by this Settlement.

22.     Class Counsel would have tried to overcome all the foregoing risks. I believe that Plaintiffs would have prevailed against the motion to limit the damages period and on their objection to the motions *in limine*. But I acknowledge that there were significant risks for Plaintiffs arising from each of these motions and if these risks materialized, especially cumulatively, their impact would have been substantial and perhaps virtually dispositive.

23.     There were also risks for Plaintiffs arising from any trial on the merits, as well as post-trial motions and appeals. This includes risks that the amount of damages awarded to the Class (or actually received by claiming Class members) could be less than that provided by this Settlement and the Settlement Fund.

24.     The foregoing risks of continued litigation strongly indicated to me that the provision of substantial compensation by this Settlement was, at the very least, a reasonable and adequate settlement of Class members' claims.

## D.     THE COMPLEXITY, LENGTH AND EXPENSE OF CONTINUED LITIGATION

25.     Antitrust cases involve a complex area of law. The proposed six-week trial and potential appeals would each involve complex issues and prolong the litigation for years.

26.     For example, Plaintiffs would have had to prove to the jury that 1) GSK possessed sufficient market power, or that the relevant product market consists only of generic and brand name Flonase, while GSK claimed that the relevant market included many other anti-allergy medications; 2) that GSK's citizen petitions to the FDA were completely a sham or were

objectively baseless; and 3) that GSK's sham citizen petitions delayed Roxane Laboratories, Inc.'s generic entry as opposed to Roxane's own missteps.

27.     An estimate of the anticipated duration of continued litigation in the absence of this Settlement should take account of resolution of the pending motions; further preparation for the impending trial; the proposed six-week trial; post-trial motions; appeals; and post-appellate proceedings on remand in the District Court.  The remaining time in the District Court, including post-trial motions, could involve additional years.  There is no assurance that the Class would achieve a better result than the benefits of this Settlement provides to the Class.

28.     After all that, the same claims process that will, if the Court approves the Settlement, begin early next year, would still remain. Accordingly, if this proposed Settlement is approved, it will save this Court substantial time and it will likely avoid years of delays before Class members would receive their monies in the absence of a Settlement.

**E.     THE STAGE OF THE PROCEEDINGS SO NEAR TRIAL AND THE AMOUNT OF DISCOVERY SHOW THAT CLASS COUNSEL WAS WELL-INFORMED DURING THE SETTLEMENT NEGOTIATIONS**

29.     At the time that Co-Lead Counsel and I exercised the judgment to agree to the Settlement, Class Counsel had completed all fact and expert discovery, including, *inter alia*, having  reviewed and analyzed  over 75,000 documents (2,676,608 pages of documents), taken or defended over 50 depositions, and  reviewed and either supported or deconstructed nineteen expert reports.

30.     Class Counsel had also completed full briefing on three motions for class certification, all of the motions for summary judgment, *Daubert* motions and the then-pending motions in limine.

31.     In order to adhere to the Court's rigorous schedule, Class Counsel prepared for trial which was to begin January 10, 2013.  In that regard, Class Counsel prepared an extensive pre-trial memorandum which included, among other materials, deposition designations, evidence lists of documents, witnesses, jury voir dire and jury instructions.

32.     Class Counsel had also prepared mediation briefs on multiple issues.  Class Counsel had also engaged in literally dozens of settlement arguments and negotiations with the Defendant.

33.     In sum, all fact and expert discovery had been completed and substantial preparations had been made for the impending trial when Class Counsel exercised their judgment to settle.

34.     I respectfully submit that Class Counsel was well informed of the facts and risks in this litigation throughout the settlement negotiations and when the Settlement was made.

35.     As mentioned above, the negotiations for the settlement amount were prolonged and arduous, spanning many months.  I believe that no further increase in what Defendant would pay could have been obtained.  Further proceedings and negotiations could only have gone forward at the risk of losing on the motion to limit the damages period, some or all of the motions *in limine* and/or at trial.

### F.     SELECTION OF CLAIMS ADMINISTRATOR

36.     Co-Lead Counsel, in order to obtain for the benefit of the Class a qualified Claims Administrator, requested competitive bids from four firms with which they have had prior experience, and recommendations from co-counsel as to firms which have, in other complex class actions, served in that capacity.  All of the firms from which we sought competitive bids were provided with the same information regarding the structure of the proposed settlement and

administrative tasks so that all were on an equal footing when they prepared and submitted their respective bids.

37.     Co-Lead Counsel received and analyzed those competitive bids, not only in terms of which submitted the best value to the Class but also compared the services and capabilities of each firm to perform the tasks required to efficiently and effectively complete the tasks within a reasonable time to expeditiously have distribution made to the members of the Class who file timely claims which this Court approves for payment.

38.     Based on the criteria and our analysis and evaluation, Co-Lead Counsel believe that Rust Consulting should be approved by this Court to serve as Claims Administrator.

### G.     NOTICE TO THE CLASS

39.     In order to provide adequate notice of the Settlement to the Class, Co-Lead Counsel retained the services of Katherine Kinsella of Kinsella Media, LLC, a well recognized class notice expert.  Working closely with Co-Lead Counsel, Ms. Kinsella developed the forms of notice and a comprehensive Notice Plan which, when implemented, will provide notice to the vast majority of the Class, whose members reside in all states and U.S. Territories.   The accompanying Declaration of Ms. Kinsella is attached as Exhibit 4 to the Motion.

40.     In connection with the preparation of class notices, Class Counsel prepared proposed claim forms to be used by consumer and TPP Class members to submit their claims. The consumer and TPP claim forms provide class members with explicit instructions on claims submission.  The TPP claim form further provides that TPPs with a small volume of claims (less than $300,000.00) will be required to identify only the amount they paid for Flonase and its generic equivalents, and will have no other data submission requirements, subject to review by the Claims Administrator.  The TPP and Consumer claim forms have been prepared under the

supervision of notice expert Kinsella Media, LLC and conform to Fed. R. Civ. P. 23 plain English requirements.  Copies of the TPP and consumer claim forms are annexed as Exhibits 4, 5 and 6 to Exhibit C, the Notice Program, to the Kinsella Declaration.

## H.   CONCLUSION

41.   For the reasons stated herein, in Plaintiffs' Motion for Preliminary Approval, and in the accompanying papers, I respectfully submit that the Court should enter the scheduling order and grant preliminary approval of the proposed class action Settlement.

I declare under penalty of perjury pursuant to the laws of the United States that the foregoing is true and correct.

Executed this 14th day of December, 2012, in Chicago, Illinois.

Marvin A. Miller

# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE FLONASE ANTITRUST LITIGATION | CIVIL ACTION |
| THIS DOCUMENT RELATES TO: | No. 08-3301 |
| Indirect Purchaser Actions | **Hon. Anita B. Brody** |
| MEDICAL MUTUAL OF OHIO, on behalf of itself and all others similarly situated, | |
| Plaintiff, | CIVIL ACTION |
| v. | NO. 12-4212 |
| SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE plc, | **Hon. Anita B. Brody** |
| Defendant. | |

**JOINT DECLARATION OF DEBORAH R. GROSS AND KIMBERLY R. WEST IN SUPPORT OF END-PAYOR PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT**

DEBORAH R. GROSS and KIMBERLY R. WEST hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1.     We respectfully submit this declaration in support of the settlement of the end-payor plaintiffs in the above captioned litigation, *In re Flonase Antitrust Litigation* (the "Flonase Litigation").

**BACKGROUND AND EXPERIENCE**

2.     I, Deborah R. Gross, am a shareholder in the Law Offices of Bernard M. Gross, P.C., and an attorney licensed to practice law in all state courts in Pennsylvania and Massachusetts and the United States District Courts for the Eastern District of Pennsylvania, the

1

District of Colorado, the Western District of Wisconsin, the United States Courts of Appeal for the Second, Third and Tenth Circuits, and the United States Supreme Court.. My firm resume is attached as Exhibit A hereto.

3.      I concentrate my practice in the area of securities, antitrust and complex litigation. My focus is on representation of individual clients, such as the consumer end-payor plaintiffs in this case. I have represented and represent individuals who have lost money in the stock market arising from broker misconduct as well. I have not previously been involved in any third-party payor litigation.

4.      Since 1998, I have been a lecturer in the Federal Securities Law at the PBI Annual Federal Securities Law Forum. I have also taught various Continuing Legal Education seminars including Oral Advocacy in the Federal Courts, Changes to Rule 23 of the Federal Rules of Civil Procedure, Attorney's Fees in Class Actions, M & A Litigation involving Pennsylvania Corporations and Current topics in the securities laws. In 2002, I was a guest panelist at the University Of Chicago Graduate School Of Business, 50th Annual Management Conference, speaking on the topic of "Accounting in Crisis - Who Watches the Watchdogs?" In 2003, I also spoke at The Directors' Conference, a three-day intensive program for directors and senior executives to explore the fundamentals of corporate governance and board service offered by the University Of Chicago Graduate School Of Business, Stanford Law School and the Wharton School of the University of Pennsylvania, discussing the legal issues surrounding audit committee qualifications, responsibility and content. I also spoke at the 2006 ABA Section of Business Law Annual Meeting on Controlling Restatement Chaos. I was on the Attorney Advisory Committee to the Pennsylvania Securities Commission in 2006 and 2007.

5.      I was chair of the Federal Courts Committee of the Philadelphia Bar Association

and was responsible for organizing the June 1998 Bench Bar Conference of the Philadelphia Bar Association. I am presently President-Elect of the Philadelphia Bar Foundation, and have been a trustee of the Philadelphia Bar Foundation for over six years.  I am a member of the Philadelphia Bar Association.

6.       I, Kimberly R. West, have been a partner in the law firm of Wallace, Jordan, Ratliff & Brandt, LLC, located in Birmingham, Alabama, for the past fifteen years.  Beginning with *In re Breast Implant Litigation*, I have represented third-party payors, specifically Blue Cross Blue Shield entities, in mass tort, antitrust, and complex litigation.  Since 1997, my practice area has been third-party payor complex litigation -- primarily handling federal multi-district cases involving pharmaceutical, mass tort and antitrust issues.

7.       I serve and have served as lead counsel to Blue Cross and Blue Shield plans across the country in federal multi-district pharmaceutical and mass tort litigation, including breast implant, Factor VIII, pedicle bone screw (E.D. Pa.), Sulzer hip implants, Fen-Phen (E.D. Pa.), Rezulin, Vioxx, Guidant and Medtronic heart defibrillators, Neurontin, Oxycontin, Ovcon, Tricor, Paxil (E.D. Pa.), AWP, Temodar (E.D. Pa.), Intron (E.D. Pa.), and other products.  I have been appointed national class counsel for end-payors and third-party payors in antitrust and overpricing litigation, including cases involving the drugs Hytrin and Duract.

8.       I am admitted to practice in all Alabama state courts, all Alabama federal district courts, the United States Court of Appeals for the Third Circuit, the United States Court of Appeals for the Eleventh Circuit, and the United States Supreme Court.  I am a member of the American Bar, the Alabama State Bar and the Birmingham Bar Association.  I have served on numerous committees for the Alabama and Birmingham Bar Associations.  My resume is attached hereto as Exhibit B.

## WORK AS ALLOCATION COUNSEL

9.      On November 14, 2012, Ms. West was contacted by Counsel Pamela B. Slate, one

of the attorneys who represents Medical Mutual of Ohio, regarding representation of the third-

party payor members of an end-payor class and Ms. Gross was contacted by Class Counsel

Marvin A. Miller to represent consumer members of an end-payor class in a negotiation to

allocate the proceeds of a settlement of the end-payor litigation involving branded and generic

Flonase.

10.     Following a conference call with Ms. Slate and Mr. Miller on November 15,

2012, regarding the background and status of the case, the settlement negotiations, the duties

expected of them, and the available information, Ms. Gross and Ms. West provided counsel with

our firm and individual resumes and agreed to undertake to represent, respectively, consumers

and third-party payors as allocation counsel.  We understood that time was of the essence in

regards to the main settlement, the court deadlines, and our negotiation.

11.     We have never previously worked together on a matter, nor referred business to

each other, and this call was the first time we had met each other.   We understood from this

initial conference call that the structure being put into place by the end-payor class counsel was

to have independent allocation counsel with undivided duties of loyalty to the consumer and

third-party payor portions of the class.  Mr. Miller and Ms. Slate cited us to and provided us with

copies of the Third Circuit's *In re Warfarin Sodium Antitrust Litigation*, 391 F.3d 533 (2004) – a

case in which Ms. West represented third-party payors.  We understood our duties to be to

review and assess the nature and strength of the legal claims made by the class, the experts'

opinions as to damages in various scenarios and a breakdown of damages between the consumer

and third-party payor portions of the class, and engage in an arms'- length negotiation as to how

4

the settlement funds should be allocated between consumer and third-party payor class members.

12.      During this call, we requested the various pleadings in both the direct and end-payor cases: 1) End Payor Plaintiffs' Fourth Amended Consolidated Complaint; 2) 1/20/10 Flonase II Opinion on Motion to Dismiss; 3) 6-2-11 Memorandum Opinion Denying GSK's Motion for Summary Judgment on Noerr-Pennington grounds; 4) 9/26/2011 Summary Judgment Opinion on Standing.  We also requested the transcript of three days of hearing on class certification.   All of our requests were promptly fulfilled.   We immediately began the work of reviewing these pleadings, among others we obtained from the PACER docket.

13.      Upon requesting the expert reports in this case, we were advised by Mr. Miller that there was a protective order with the defendants regarding information contained in these reports in place.  We reviewed the order, agreed to its terms, which defined parties to whom this information could be revealed as, among others, attorneys in the case and, accordingly,  filed notices of appearance in the case.  Mr. Miller provided us with the order for the caption of the case, consolidating all cases, which we used in filing our appearances.

14.      Shortly thereafter, Mr. Van Tine in Mr. Miller's office provided us with the following materials: 1)  November 15, 2012 report prepared by Dr. Rausser's office, OnPoint;  2) January  26, 2010 Dr. Rausser's Report with Exhibits;  3) May 20, 2010 Dr. Rausser's Rebuttal Declaration with Exhibits; and 4) Dr. Rausser's October 25, 2010 Rebuttal Declaration with Exhibits.

15.      In addition, Mr. Van Tine provided us OnPoint's damages breakdowns as set forth in the following materials:  1) Flonase Damages Breakdown – WISCONSIN – rev1 – 9-20-2012; 2) Memo – Flonase Damages Revised 2012 – 10- 4; and 3) Memo – Flonase Damages rev'd 2012-09-21.  We promptly began review of these documents, including the exhibits.

16.     Beginning November 15, 2012, we reviewed the literally thousands of pages of transcripts and expert reports referenced above.  Until this information was reviewed and the settlement negotiations between the main parties were concluded, however, we agreed to negotiate the allocation model in hopes of an imminent settlement which would have a structure in which we could finalize negotiations for allocation.

17.     To this end, we researched, reviewed and discussed the allocation structure and results found in other indirect purchaser actions including, among others:  *In re Warfarin Sodium Antitrust Litigation, supra*; *In re Terazosin Hydrochloride Antitrust Litigation*, 2005 WL 2415960 (S.D. Fla. 2005);  *Nichols v. SmithKline Beecham,* 2005 WL 950616 (E.D. Pa. 2005); *Sullivan v. DB Investments,* 667 F.3d 273 (3rd Cir. 2011) (en banc*); In re Relafen Antitrust Litigation,* Civ. 01-12239, D. Mass; *In re TFT-LCD (Flat Panel) Antitrust Litigation, 2011 U.S. Dist. LEXIS  154288* (N.D. CA.  Dec. 27, 2011).

18.     Mr. Miller and Ms. Slate duly and timely kept us apprised of the status of the settlement negotiations and the parties' reports to this Court in the case as they were relevant to our work and our deadlines.  On November 21, 2012, a week after we had begun our work, Mr. Miller informed us that a settlement had been reached in principle but negotiations were continuing regarding the language for a settlement agreement.

19.     We continued our negotiations over the holiday weekend.  Mr. Miller apprised us that the parties were working on the specific terms of the settlement agreement and as soon as it was available, on Sunday November 25th, provided us with the class definition.   This definition was different in several respects from the class definitions in the materials we had reviewed and based on our previous negotiations.

20.     We agreed that we needed further clarification of the experts' reports and

opinions, and asked Mr. Miller to make Dr. Rausser available to us. He introduced us by email to Laura Craft from OnPoint, Dr. Rausser's offices. We set up a call with Ms. Craft and Mr. Kovach from OnPoint, and spoke with them on November 27, 2012. In preparation for this call, we took extensive notes from the previous expert's reports, and following that call, reviewed sections of the reports again.

21.     Throughout this time, we had calls with Mr. Miller regarding the status of the final class papers, the timing of our work, and any additional information we might need. As part of these procedural calls, Mr. Miller informed us that there was a delay in final resolution due to the SHP negotiations. We requested and received clarification from Mr. Miller and Ms. Slate regarding the SHP progress to confirm that it had no impact on our negotiations. We continued our negotiations.

22.     Following the call with OnPoint, we also received and reviewed additional information from Mr. Miller's office and OnPoint, including Dr. Cremieux's reports. We reviewed those reports as well as the materials discussed above.

23.     We negotiated at length from December 1-3, 2012, and arrived at a settlement allocation. Our negotiations were vigorous, at arm's length, and complicated due to the change in class definitions over time. During the negotiations, we reviewed additional caselaw, expert calculations, testimony from both the plaintiffs' and defense economic damages experts, and the Court's decision on class certification. Having reviewed and discussed the pleadings, the class certification transcript, the expert reports, the various class definitions in this case, including the new settlement class definition and the unique market for Flonase, we agreed to an allocation that we believe to be fair and reasonable in this case for these class members for this product. The interests of consumers and TPPs were vigorously represented by Ms. Gross and Ms. West,

respectively.  All of our negotiations were independent of class counsel and counsel for *Medical Mutual Ohio*, and the allocation decision was ours alone.

## ALLOCATION DETERMINATION

24.     As is the case with all negotiations, both sides made concessions to arrive at the end result.  One example reflects the inclusion of brand-loyalists and flat co-payors in the settlement class definition.   Our negotiations involved whether or not to permit these class members an award or not.  Eventually, we agreed to allow a weighted allocation for them to reflect the relative weakness of their liability position and their small percentage of total damages as calculated by the experts' based on their methodology.

25.     Further, after exhaustive discussion of the two pool methodology for allocation, and the net recognized loss calculations, we decided not to apply the expert's previous breakdowns of damages between consumers and TPPs to permit such an allocation.  For example, initially the class damages expert's opinion favored an allocation of damages to TPPs based on a restrictive class definition, expansion of the class seemingly altered this equation. The settlement class definition was even more expansive; however, Ms. West argued that factors not considered by the experts with the more restrictive class definitions, especially the failure to account for a branded preference for Flonase resulting in a reduced co-pay on almost all TPP tier formularies, made the lower TPP percentage based on the more expansive class definitions suspect.  Ms. Gross argued that the damages timeframe pre-generic injury altered the analysis to favor consumers to a degree not reflected in the experts' average damage breakdown analyses. While both scenarios were plausible, the result was ultimately unknown.  Rather than set up two pools based on uncertain assumptions, Ms. Gross and Ms. West conceded that a single pool of funds, net of attorneys fees and costs, and incentive awards, if any, ("the net settlement fund")

8

with all class members taking pro rata was the best model to reflect actual damages payments.

26.     In addition, the settlement class definition added to the previous class period, now extending from May 19, 2004, to March 31, 2009.  The settlement class definition includes brand-loyalists and flat co-payors, consumers who had previously been excluded from the four state certified litigation class.

27.     Further, the market for Flonase and its generics was completely dissimilar from the products in the caselaw we reviewed which were primarily for chronic conditions, rather than the episodic nature of Flonase treatment.  And once the intial generic hit the market there was an almost immediate change from branded Flonase to the generic; reflecting a market change not noted with the other drugs.

28.     We were also confronted with the class damages experts' testimony that the class membership could swing by as much as 22% based on assumptions regarding "switchers." Switchers consisted of those consumers who had purchased branded Flonase before generic entry and simply did not show up in the data afterwards.  Extending the class period by approximately three months would presumably add to the percentage of "switchers," adding more uncertainty into the damages calculations based on the previous class definitions.

29.     Given these factors, among others, including the give and take which arose in the course of our negotiations, we concluded that our allocation should be based on actual payments by class members during the class period for Flonase and its generics.  Such a methodology would reflect the actual market and would self-correct many of the issues we had each raised with the assumptions underlying the very different analyses undertaken with the previous class definitions.  Because the damages under any scenario are larger than the settlement fund, a distribution of the net settlement fund pro rata is appropriate.

30.     As to brand-loyalists and flat co-payor class members, we negotiated a weighted pro rata allowance to take into account the weakness of their damages claim, both legally and factually; concluding that they should be allocated 25% of their claim for the net settlement fund.

31.     In conclusion, it is our considered opinion that a pro rata distribution of the net settlement fund based on class members' payments for Flonase and its generics during the class period is a fair and reasonable allocation of the settlement funds.

Dated: December 13, 2012

**LAW OFFICES BERNARD M. GROSS, P.C.**
**BY:**

_____
**DEBORAH R. GROSS, Atty. No.: 44542**
Wanamaker Building, Suite 450
100 Penn Square East
Philadelphia, Pennsylvania 19107
Telephone:  215-561-3600

**WALLACE, JORDAN, RATLIFF & BRANDT, LLC**

_____
**KIMBERLY R. WEST, Atty. No.:**
First Commercial Bank Building
800 Shades Creek Parkway, Suite 400
Birmingham, Alabama 35209
Telephone: 205-870-0555

10

# EXHIBIT A

**LAW OFFICES BERNARD M. GROSS, P.C.** (the "Firm"), is committed to providing professional, efficient, and attentive legal services.  We are nationally recognized lawyers concentrating on helping individuals, classes of individuals, or businesses who have been injured as a result of violations of antitrust laws, securities laws, ERISA laws, or consumer protection laws or another's negligence and fraud in federal and state courts throughout the country.  The Firm has also represented shareholders in their fight for changes in corporate governance.

We take our cases on a contingent fee basis.  Our attorneys are strong believers in the contingent fee as a socially useful, productive, and satisfying basis for compensation of legal services, particularly in litigation.  It is not the number of hours that determines our fee, rather it is the result achieved for our clients.

We value practicing in a small environment where professional and personal interaction, among all, is essential for a team approach to cases.  The Firm's structure allows for a far greater degree of independence, flexibility, and satisfaction than a large firm environment without sacrificing the quality and sophistication of representation necessary to litigate complex civil actions successfully throughout the United States.

Judges throughout the country have recognized contributions of the Firm in class action cases. Recently, in approving an $82.5 million settlement of a securities fraud lawsuit against Aetna, Inc. in the United States District Court for the Eastern District of Pennsylvania, in which the Firm was co-lead counsel, Judge Padova stated:

> "Furthermore, class counsel is of high caliber with extensive experience in similar class action litigation . . . consistently submitted documents of superb quality, and were very diligent in preparing filings in a timely manner under tight deadlines . . . .  This Court has made special note of the efficiency and professionalism of counsel in completing discovery and resolving discovery disputes with little court intervention."

I*n re Aetna Inc. Securities Litigation*, MDL No. 1219 (E.D.Pa. January 5, 2001).  Similarly, in approving a settlement of $106 million in the United States District Court for the Eastern District of Pennsylvania, in *In re Automotive Refinishing Paint Antitrust Litigation*, MDL 1426, Judge Surrick commented on Law Offices Bernard M. Gross, P.C., noting:

> I want to commend counsel on both sides of this litigation.  I think that the representation on both sides of this litigation is as good as I've ever seen in my entire professional career.  Counsel worked together in this case.   They frankly made the job of this Court very easy and I commend all of you for what you've done in this litigation.

pp. 18-19 of transcript of August 9, 2007 hearing.

In *Cortese v. Radian*, Civil Action No. 07-3375 (E.D.Pa. January 30, 2008), Judge McLaughlin stated:

"Bernard Gross has been active in securities litigation for 30 years. The Court is familiar with the firm and is confident that it is qualified to serve as liaison counsel."

The Firm is a strong supporter of the Philadelphia Museum of Art, having been a corporate sponsor for many years, the Free Library of Philadelphia, the University of Pennsylvania and Central High School, having assisted in raising moneys to build a new library. The Firm has recently donated three Harley Davidson police motorcycles to the City for the Philadelphia Police Highway Patrol.

## PRACTICE AREAS

### SECURITIES FRAUD CLASS ACTION LAWSUITS

The Securities Fraud Class Actions which the Firm prosecutes are designed to recover monies for investors in domestic and foreign publicly traded corporations based primarily on allegations that the corporation, through its officers or directors, disseminated materially false and misleading statements to the investment community concerning the corporation's financial condition or products, services, and business. The materially false and misleading statements resulted in the artificial inflation of the price of the company's stock or bonds. As a result, investors unwittingly paid too much for their stock or bonds. Under federal law, the investors are entitled to compensation. Often these false and misleading statements are disseminated through press releases issued by the company, filings with the SEC, and company annual and quarterly reports.

### CURRENT CASES

**ADVANTA** (2:09cv04730-CMR)(E.D. Pa.) The Firm is local counsel, representing investors who purchased or otherwise acquired the Class A and/or Class B common stock of Advanta Corp. between November 27, 2007 and May 11, 2009, inclusive. The complaint alleges that Advanta and certain of its officers and/or directors  issued materially false and misleading statements regarding the Company's business and financial results during the class period in violations of the Securities Exchange Act of 1934 (the "1934 Act").

**PARKSIDE CAPITAL LLC v. CONSTAR INTERNATIONAL, INC. et al.**, (2:03cv05020-EL)(E.D. Pa.). The Firm is co- lead counsel, representing investors who purchased Constar common stock shares pursuant or traceable to Constar's November 14, 2002 initial public offering. The Complaint alleges that Constar, certain of its officers and directors, the co-lead underwriters of the IPO, and Constar's former parent company, Crown Holdings, Inc., formerly known as Crown Cork & Seal Company, Inc. violated of Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77k and 77o.

**IN RE DEUTSCHE BANK AG SECURITIES LITIGATION** (09cv01714-DAB)(S.D.N.Y.). The Firm is co-lead, representing all persons who purchased or acquired securities issued by Deutsche Bank AG ("DB" or the "Company"), pursuant or traceable to the registration statement, prospectus, and prospectus supplements referred to as the October 2006,

May 2007 and June 2007 Offering Materials.   The Complaint alleges that the Offering Materials used were false and/or misleading in violation of §§11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§77k, 77l, and 77o.  This action is brought against DB, its senior insiders and the investment banks that underwrote the Offerings (collectively, "defendants").

**MARSHALL FREIDUS AND EDWARD P. ZEMPRELLI  v.  ING GROUP, et al**. (09cv1049-LAP)(S.D.N.Y.).  The Firm is co-lead counsel, representing investors who acquired the 6.375% ING Perpetual Hybrid Capital Securities ("6.375% Securities"), 7.375% ING Perpetual Hybrid Capital Securities ("7.375% Securities") and the 8.50% ING Perpetual Hybrid Capital Securities ("8.50% Securities") (collectively, the "Securities") of ING Groep N.V. ("ING" or the "Company") pursuant or traceable to a false registration statement and three separate prospectuses (collectively, the "Registration Statements") issued in connection with the Company's June 2007, September 2007 and June 2008 Offerings of the Securities, respectively (the "Offerings").  This action asserts strict liability and negligence claims under the Securities Act of 1933 ("1933 Act") against ING, its senior insiders, the investment banks that underwrote the Offerings, and ING's auditor (collectively, "defendants").

**CHEN v.  NORTEL, et al.,** (09cv04691-SAS)(S.D.N.Y.)The Firm is co-lead counsel, representing investors who purchase Nortel securities between may 2, 2008 and September 17, 2008.  The claims asserted in the action arise under Section 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.10b-5].

**BELMONT HOLDINGS CORP. v. SUNTRUST BANKS, INC., et al.,** (1:09cv01185-WSD)(N.D. Ga.). The Firm is co-lead counsel, representing all persons who acquired the 6.375% ING Perpetual Hybrid Capital Securities ("6.375% Securities"), 7.375% ING Perpetual Hybrid Capital Securities ("7.375% Securities") and the 8.50% ING Perpetual Hybrid Capital Securities ("8.50% Securities") (collectively, the "Securities") of ING Groep N.V. ("ING" or the "Company") pursuant or traceable to a false registration statement and three separate prospectuses (collectively, the "Registration Statements") issued in connection with the Company's June 2007, September 2007 and June 2008 Offerings of the Securities, respectively (the "Offerings").  This action asserts violations of the Securities Act of 1933 ("1933 Act") based on theories of strict liability and negligence – but not fraud – against SunTrust, certain of its subsidiaries, its senior insiders, its auditors and the investment banks that underwrote the Offering (collectively, "defendants").

**WADE v. WELLPOINT, INC., et al.,** (1:08cv00357-SEB-DML)(S.D. Ind.). The Firm is co-lead counsel, representing all persons who purchased or acquired the common stock of defendant WellPoint between January 23, 2008 and March 10, 2008, inclusive (the "Class Period"). The claims asserted in the action arise under Section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act"), Rule 10b-5 promulgated thereunder by the SEC, and Section 20(a) of the Exchange Act

## SETTLEMENTS

**AETNA** (E.D. Pa.) – The Firm was co-lead counsel, representing investors who purchased Aetna Inc. common stock between May 6, 1997 through September 29, 1997. The complaint alleged that defendants, through a series of accounting and actuarial manipulations, falsified Aetna's publicly filed financial statement by reporting materially understated medical expenses and artificially inflated operating earnings. A settlement was achieved on behalf of the class for $82.5 million.

**ALLEGHENY ENERGY** (D. Md.) – The Firm was co-lead counsel on behalf of a class of investors who purchased Allegheny Energy Securities between April 23, 2001 and October 8, 2002. The action alleged that defendants concealed a chronic and systematic breakdown of the company's internal accounting controls at Global Energy Markets, the company's newly acquired energy trading subsidiary. A settlement was achieved for $15.05 million.

**AMF BOWLING** (S.D.N.Y.) - The Firm was co-lead counsel on behalf of purchasers of AMF common stock in the Initial Public Offering on November 19, 1997 through and including February 26, 1999. Plaintiffs alleged that the Registration Statement and Prospectus failed to disclose the serious risks posed by the continuing decline in lead participation at AMF Bowling Centers and the risk that AMF reported financial results were not false and misleading. During the course of the litigation, the company filed for bankruptcy protection. The case settled for $20 million comprised of two settlements, $12 million from the Investment Bank Defendants and $8 million from the Individual Defendants.

**COREL CORPORATION** (E.D. Pa.) – The Firm was co-lead counsel on behalf of purchasers of Corel common stock between December 7, 1999 and March 20, 2000. Plaintiffs alleged that defendants did not disclose the truth about the company's business prospects and earnings. A settlement was achieved for $7 million.

**HUNTSMAN** (E.D. Pa.) – The Firm was lead counsel on behalf of all persons or entities who purchased the common stock or call options or sold put options, of Huntsman between May 14, 2008 and June 18, 200. The case concerned defendants' false and misleading statements and omissions of material facts concerning the proposed merger between Hexion and Huntsman ("the Proposed Merger") pursuant a merger agreement, signed on July 12, 2007, between Hexion, as the buyer, and Huntsman, as the seller, in which Hexion would purchase all of the common stock of Huntsman for $28 per share, in cash ("the Merger Agreement"). A settlement was achieved for $18 million.

**MOTOROLA** (N.D. Ill.) – The Firm was co-lead counsel on behalf of purchasers of Motorola's common stock from November 4, 1994 to February 17, 1995. The case concerned allegations that defendants knew but did not disclose material information concerning excess inventory of Motorola cell phones held by Motorola's domestic customers. A settlement was achieved for $25 million.

**RAVISENT TECHNOLOGIES INC.** (E.D. Pa.) – The Firm was co-lead counsel on behalf of purchasers of Ravisent stock between July 15, 1999 and April 27, 2000. Plaintiffs

alleged that Ravisent failed to disclose that the company was recognizing revenue from software licensing agreements in violation of its own internal accounting procedures.  As a result of the improper revenue recognition, plaintiffs alleged that the company's financial statements contained material overstatements of revenue.  A settlement was achieved for $7 million.

**UNIVERSAL ACCESS INC.** (E.D. Tx.) – The Firm was co-lead counsel on behalf of purchasers of Universal Access common stock from May 10, 2001 through March 22, 2002. Plaintiffs alleged that defendants made misrepresentations about Universal Access' financial statements.  A settlement was achieved for $11 million.

**VERISIGN INC.** (N.D. Cal.) – The Firm represented investors in Verisign Inc. who purchased their stock between January 25, 2001 and April 25, 2002.  Plaintiffs alleged that defendants made false and misleading statements about the company's business and financial results.  A settlement was achieved for $78 million.

## DERIVATIVE LAWSUITS

The Firm also has aggressively pursued cases brought by shareholders on behalf of publicly traded corporations injured by the breach of fiduciary duty or waste of corporate assets by its officers and directors.  As a result, the Firm has successfully implemented remedial recoveries which also improve shareholder value and prevent corporate future mismanagement, including the adoption of corporate therapeutic measures, corporate governance policies and procedures, and the hiring of audit committee consultants to redress alleged inadequacies.

**ABBOTT LABORATORIES** (N.D. Ill.) - The Firm, as co-lead counsel, filed a derivative action against the directors of Abbott for their breach of their fiduciary duties by allowing the Company to violate FDA quality rules dating back to 1993 and resulting in a consent decree that Abbott entered into with the federal government on November 2, 1999, requiring the Company to pay a $100 million fine and make corrective changes at its manufacturing facilities.   A settlement was reached in 2004 which required the Company to implement measures to strengthen the Board of Directors' oversight of regulatory compliance, and to pay $27 million for new compliance and regulatory measures.

**SCHERING-PLOUGH CORP.** (D.N.J.) **-** The Firm, as co-lead counsel, brought litigation against current and former directors alleging that they breached their fiduciary duties with respect to their oversight of Schering's manufacturing and quality control practices, as well as medical marketing and sales practices, certain of which had become issues in two then on-going (and since resolved) investigations by the United States Attorneys' Offices in Boston and Philadelphia.  Plaintiffs contended that the alleged wrongdoing in these areas occurred over a period of years, and resulted in financial, operational and reputational damage to the company. A settlement was reached in which the company agreed to change its global compliance and audit functions, fund these changes for five years, enhance communication between the board and management, and change the way board members are elected and paid.

**BOEING COMPANY** (Dela. and Ill. State Court) – The Firm, as co-lead counsel, filed a derivative action against current and former directors for breach of their fiduciary duties of care,

good faith and loyalty by failing to take proper steps to prevent or remedy ethical and legal violations by the company and its employees, thereby exposing the company to substantial fines, liabilities, loss of contracts and other business.  A settlement was reached which provided for the adoption and implementation of significant corporate governance and compliance measures and the commitment of substantial treasury funds, in the amount of $29 million above 2004 expenditures, to implement and support those governance and compliance measures and to fund further enhancements to Boeing's ethics and compliance program.


## ERISA LAWSUITS

Law Offices Bernard M. Gross, P.C., litigates claims on behalf of employees and/or retirees alleging interference with their interests under the Federal Employee Retirement Income Security Act (ERISA).  Among its provisions, ERISA recognizes that the pension and 401(K) plan trustees owe fiduciary duties to the participants and beneficiaries in these plans.  This duty is sometimes breached, particularly where a company deems investment in its own equities appropriate, despite having access to information that clearly indicates otherwise.  This conflict of interest and the resultant losses can be devastating to employees who often depend on their 401(K) accounts as a principal source of retirement income.

**CVS CORPORATION** (D. Mass.) -  The Firm, as co-lead counsel, represented all persons who were participants or beneficiaries in the CVS 401(K) Profit Sharing Plan (the "401(K) Plan), the CVS Corp. and Subsidiaries Employee Stock Ownership Plan (the "CVS ESOP"), and who held, acquired, purchased or had contributed common stock and/or CVS preference stock (collectively "CVS stock") to his or her account in either plan at any time from December 1, 2000 to October 31, 2001 (the "Class Period").  A settlement was achieved for $3 million.

**NUI CORPORATION** (D.N.J.) – The Firm, as co-lead counsel, represented individuals who were participants or beneficiaries of the (i) NUI Corp. Savings and Investment Plan and/or (ii) NUI Corp. Savings and Investment Plan for Collective Bargaining Employees during any portion of November 8, 2001 through and including September 26, 2003.  A settlement was achieved for $850,000.00.

## ANTITRUST CLASS ACTION LAWSUITS

The Antitrust Practice of the Firm focuses primarily on the representation of plaintiffs who have been the victims of price fixing, unfair trade practices, or other anti-competitive conduct.  The firm has taken a leading role in many of the largest price fixing and price discrimination cases throughout the United States, which have, after either trials or settlements, led to recovery for the injured parties, of hundreds of millions of dollars.

**AUTO PAINT REFINISHING** (E.D.Pa.) – The Firm served as co-lead counsel for the class in an antitrust action on behalf of direct purchasers of automotive refinishing paint from defendants during the period January 1, 1993 to December 31, 2000.  Defendants included PPG Industries, E.I. DuPont de Numours, Sherwin-Williams, BASF and Akzo Nobel Coatings.  .  A

settlement has been reached with all defendants totaling $106 million. This was the largest private antitrust settlement ever achieved in which the federal government empanelled a grand jury and, eventually, closed the investigation without bringing any charges brought against any of the paint manufacturers

**CARBON BRUSHES** (N.D.J.) – The Firm served as co-lead counsel for the class in an antitrust action that accused a group of manufacturers of electrical carbon products of engaging in a decade long conspiracy to fix prices. Defendants included Morgan Crucible, Carbone of America Industries, Schunk GmBH and SGL Carbon. A settlement was reached for $21.9 million.

**FLAT GLASS** - (M.D.L. 1200) (W.D. Pa.) - Horizontal price fixing. This was an antitrust action brought on behalf of purchasers of flat glass products alleging that the principal manufacturers of such products colluded to fix prices at artificially inflated levels. Settlements were reached with four of the five defendants totaling over $60 million.

**MEDICAL X-RAY FILM** (E.D.N.Y.) – The Firm was co-lead for the class of purchasers from the manufacturers of x-ray film and recovered $24 million on behalf of the class by settlement.

**OLIN SKI LITIGATION** (E.D. Pa.) – The Firm was co-lead counsel alleging price fixing by Olin Ski Company and its distributors in the United States. The case was tried and the jury returned a verdict in favor of the class. This was the first time that a class action vertical price fixing case was successfully tried before a jury. The case was eventually settled for more than $7 million.

## EMPLOYEE WAGE CLAIM CLASS ACTION LAWSUITS

Overtime lawsuits can be pursued by workers who have been denied overtime wages in direct violation of the U.S. Fair Labor Standards Act of 1938. The act is a federal law which governs not only pay practices, but also the minimum wage and child labor practices.

## UNFAIR MERGERS

Takeover proposals are often approved by board of directors without the board properly shopping these proposals for the best price or providing shareholders with adequate information to make an informed decision.

**NETSMART** - Recently, the Firm on behalf of shareholders of Netsmart achieved a noted victory where the board only looked at private equity buyers and refused to look at strategic buyers. The court imposed a temporary injunction on the Merger until the proxy materials were amended to include further information on the expected future cash flow projections, as well a "fuller, more balanced" description of the Board's actions in canvassing potential strategic buyers.

## CONSUMER FRAUD LAWSUITS

Consumer fraud describes a wide range of improper practices that may involve advertising, marketing and/or the sale of goods or services. Consumer fraud class actions are initiated, for example when a company overcharges or improperly charges consumers for goods and services, or runs deceptive or misleading ads for its products. Companies also commit consumer fraud when they interpret a contract or agreement in a manner that unfairly disadvantages consumers. The Firm specializes in litigation on behalf of consumers. These types of class actions have resulted in significant monetary recoveries for consumers and changes in corporate policies on a class-wide basis.

**BERKHEIMER** (Ct. of Common Pleas, Pa.) **-** The Firm, as lead counsel, represented all Pennsylvania taxpayers who paid costs to Berkheimer in connection with the collection of delinquent local Earned Income Taxes ("EIT") for tax years 1995 through 2001. Te court approved the settlement of the action for total consideration of $2 million.

### ATTORNEYS

**BERNARD M. GROSS** is a graduate of Central High School of Philadelphia (B.A. 1952), the University of Pennsylvania Wharton School (B.S. 1956), and the University of Pennsylvania School of Law (L.L.B. 1959). He founded the Law Offices Bernard M. Gross, P.C., over forty years ago. He is a former Assistant City Solicitor in charge of bonds and contracts for the City of Philadelphia (1961-64). He was a member of the Pennsylvania General Assembly from 1967-70. He is admitted to practice before the United States Supreme Court, United States Court of Appeals for the Third Circuit and the United States District Court for the Eastern District of Pennsylvania and the Supreme Court of Pennsylvania.

Bernard M. Gross has been an active member of The American Association for Justice since 1960. In 1990, he received the "Stalwart" award from The Association of Trial Lawyers of America. Mr. Gross was a member of the House of Delegates of the Pennsylvania Bar Association (1988-93). He is a former member of the Board of Governors of the Pennsylvania Association for Justice and currently a member of the Legislative Policy Committee of the Pennsylvania Association for Justice. Mr. Gross was a member of the Board of Governors of the Philadelphia Bar Association, a past President of the Philadelphia Trial Lawyers Association, past Chairman of the Philadelphia Bar Association Committee on Judicial Compensation and former Chairman of its Civil Legislative Committee. He is formerly Chancellor of the Tau Epsilon Rho Law Fraternity Philadelphia Graduate Chapter.

Mr. Gross has lectured on behalf of the Philadelphia Trial Lawyers Association and the Pennsylvania Trial Lawyers Association. He has participated in many complex federal and class actions, including antitrust, consumer fraud and corporate securities litigation.

**DEBORAH R. GROSS** is a graduate of the University of Pennsylvania Wharton School (B.S. 1982) and Boston University School of Law (J.D. 1985). She is a graduate of the Cheltenham High School. She is admitted to practice before the Supreme Court of Pennsylvania, the Supreme Court of Massachusetts, the United States District Courts for the Eastern District of

Pennsylvania, for the District of Massachusetts, and for the District of Colorado, the United States Court of Appeals for the Third Circuit and for the Tenth Circuit, and the United States Supreme Court.

Since 1998, Ms. Gross has been a lecturer in the Federal Securities Law at the PBI Annual Federal Securities Law Forum. She has also taught various Continuing Legal Education seminars including Oral Advocacy in the Federal Courts, Changes to Rule 23 of the Federal Rules of Civil Procedure, Attorney's Fees in Class Actions and current topics in the securities laws. In 2002, Ms. Gross was a guest panelist at the University Of Chicago Graduate School Of Business, 50th Annual Management Conference. She spoke on the topic of "Accounting in Crisis - Who Watches the Watchdogs?" In 2003, Ms. Gross also spoke at The Directors' Conference, a three-day intensive program for directors and senior executives to explore the fundamentals of corporate governance and board service offered by the University Of Chicago Graduate School Of Business, Stanford Law School and the Wharton School of the University of Pennsylvania. She discussed the legal issues surrounding audit committee qualifications, responsibility and content. She spoke at the 2006 ABA Section of Business Law Annual Meeting on Controlling Restatement Chaos. Ms. Gross was on the Attorney Advisory Committee to the Pennsylvania Securities Commission in 2006 and 2007.

Ms. Gross was chair of the Federal Courts Committee of the Philadelphia Bar Association and was responsible for organizing the June 1998 Bench Bar Conference of the Philadelphia Bar Association. She was a member of the Third Circuit Judicial Council Bench Bar Relations Committee. She is a member of the Philadelphia Federal Court Historical Society and chaired the annual dinner where Justice Scirica spoke. She was on the Friends Committee for the 29th Annual Conference of the National Association of Women Judges.

For the past four years, Ms. Gross has been a trustee of the Philadelphia Bar Foundation, the Charitable Arm of the Philadelphia Bar Association. The Foundation's mission is to promote access to justice for all people in the community, particularly those struggling with poverty, abuse and discrimination. The Foundation provides funding to over 30 grantee organizations. She is responsible for the establishment of the cy pres committee of the Foundation which requests courts to award the residual moneys from class action lawsuits. She also assisted in the reinvigoration of the Andrew Hamilton Gala co-chairing for the past two years the premier event of the Philadelphia Legal Community which raises moneys for the Foundation.

Ms. Gross is involved in many other nonprofit and educational organizations including Temple Adath Israel where she is a member of the Executive Committee, First Vice President. Previously, she was Vice President of Education, responsible for education at the preschool and religious school. She has also been heard of the education committees of the religious school and preschool as well as a member of the Board of Directors. Her children attend the William Penn Charter School where she is a class parent. She has also organized a program to bring the third and eighth grade students from William Penn Charter to the federal courthouse to observe a naturalization ceremony. She co-chaired and raised moneys for the University of Pennsylvania Class of 1982 25th year reunion which had a record number of attendees and raised a record number of donations. She has supported numerous charitable organizations including Hazon, Jaffa Institute. She participated in the first Three Day Walk in Philadelphia to raise moneys for

breast cancer.

**ROBERT P. FRUTKIN** is a 1971 graduate of the University of Rochester and a 1975 *cum laude* graduate of the School of Law of Temple University, where he was a member of the Staff of the Temple Law Quarterly.  Mr. Frutkin is admitted to practice before the Supreme Court of Pennsylvania, the United States Court of Appeals for the Third, Fourth, Seventh, Eighth, Ninth and Eleventh Circuits, and the United States District Court for the Eastern District of Pennsylvania.  Prior to this becoming Of Counsel to the Firm, Mr. Frutkin formed his own firm of Savett Frutkin Podell & Ryan.  Prior to the formation of his firm on October 1, 1991, Mr. Frutkin had been a shareholder of Berger & Montague, P.C., in Philadelphia.  Mr. Frutkin worked in the Peace Corps.

In *In re U.S. Bioscience Securities Litigation*, 92-CV-678 (E.D. Pa.) (April 14, 1994 Hearing Transcript at pp. 38-39), the Court commented favorably on Mr. Frutkin's performance as co-lead counsel:

> Since I've been down here, the quality of lawyering on both sides, but I'm going to stress now on the plaintiffs' side, simply has not been exceeded in any case and we've had some marvelous counsel appear before us and make superb arguments, but they really don't come any better than...Mr. Frutkin, and the argument we had on the Motion to Dismiss, for example, Motions to Dismiss, both sides were fabulous, but plaintiffs' counsel were as good as they come.

Mr. Frutkin successfully argued before the 7th Circuit Court of Appeals the landmark decision in *In re Abbott Laboratories Deriv. Litig.*, 325 F.3d 795 (7th Cir. 2003), as well as before Delaware Chancery Court, the landmark decision in *In re Netsmart Technologies Inc. Shs. Litig.*, where the Court faulted Netsmart for excluding strategic buyers from its sales process and ordered the company to delay a vote on a proposed acquisition.

**SUSAN R. GROSS** is a graduate of Hofstra University in Hempstead, New York (B.A. 1985) and Suffolk University School of Law (J.D. 1989).  She graduated from Cheltenham High School.  She is admitted to practice before the Supreme Court of Pennsylvania, the Supreme Court of Florida, the United States District Court for the Eastern District of Pennsylvania and the United States Court of Appeals for the Third Circuit.  She is a member of the Philadelphia Bar Association and Pennsylvania Association for Justice.  Ms. Gross also sits as an arbitrator for the Court of Common Pleas, Philadelphia County, First Judicial District.

Besides her involvement in the law and legal community, Ms. Gross is active at the William Penn Charter School in East Falls, Pennsylvania as a class parent.  She was formerly Co-Chair of the Temple Adath Israel Parent Teacher Association for three years.  Ms. Gross is also an active supporter of the Cystic Fibrosis Foundation, Angelman Syndrome Foundation, Susan B. Komen Breast Cancer Foundation and the Career Wardrobe, a non-profit organization that provides free professional clothing and educational opportunities to women in the Philadelphia region.

She concentrates her practice in securities fraud litigation.  Ms. Gross serves in the Firm's

lead plaintiff department which involves working with clients, litigation strategy and lead plaintiff issues, as well as in the shareholder relations department.

**TINA MOUKOULIS** is a graduate of Ursinus College (B.A. 1993) and Pennsylvania State University at the Dickinson School of Law (J.D. 1998). During law school, Ms. Moukoulis was a member of the *Dickinson Law Review* and served as a Student Attorney representing indigent clients in domestic matters through the Dickinson Family Law Clinic. Ms. Moukoulis also served as a judicial intern in the Superior Court of Pennsylvania (1996). Since joining the Firm in 1998, she concentrates her practice in the area of antitrust and securities fraud litigation.

Ms. Moukoulis is admitted to practice in the Supreme Court of Pennsylvania, theSupreme Court of New Jersey, The United States District Courts for the Eastern District of Pennsylvania and the District of New Jersey , and the United States Court of Appeals for the Third Circuit Court, and is a member of the Pennsylvania Bar Association.

In addition to being an active steward of her parish, Ms. Moukoulis also supports events and organizations focused on promoting medical research for breast cancer as well as the education and social awareness of breast cancer issues. She also supports The Career Wardrobe, a nonprofit organization that provides free professional clothing and educational opportunities to women in the Philadelphia region.

**KAY E. SICKLES** is a graduate of Colgate University (B.S. 1991) and University of Pennsylvania School of Law (J.D. 1994). She is admitted to practice before the Supreme Court of Pennsylvania, the Supreme Court of New Jersey, the United States District Court for the Eastern District of Pennsylvania, the United States District Court for the District of New Jersey, the United States Court of Appeals for the Seventh Circuit and the United States Court of Appeals for the Ninth Circuit.

Ms. Sickles has been a member of the class action bar since 1998. From 1998-2002, Ms. Sickles litigated ERISA, consumer and antitrust class actions as an associate with Sandals & Langer, LLP. During those years, Ms. Sickles worked on a variety of complex and often times precedent-setting litigation, including such cases *as In re Unisys Corp. Retiree Medical Benefits ERISA Litigation*, *McHenry v. Bell Atlantic Corp.*, *Holmes v. Pension Plan of Bethlehem Steel Corp.*, *Harley v. Minnesota Min. and Mfg. Co.*, *Cullen v. Whitman Med. Corp.* and *In re Linerboard Antitrust Litigation*. Ms. Sickles joined Barroway Topaz Kessler Meltzer & Check (then Schiffrin & Barroway, LLP) in 2002. There, she was a Partner/Department Head in charge of its securities settlements. In that capacity, Ms. Sickles was one of a handful of attorneys across the country specializing in the settlement process for class action litigation and handled more than 75 settlements, including *In re Tyco International Ltd. Securities Litigation*, *In re Delphi Securities Derivative and ERISA Litigation*, and *In re Tenet Healthcare Corporation Securities Litigation*. From June 2008 to May 2010, Ms. Sickles held the position of Associate General Counsel with The Garden City Group, Inc., one of the largest claims administrators in the nation.

Ms. Sickles has had a long-standing commitment to Philadelphia's public interest community, volunteering for many years with the Support Center for Children Advocates, and

more recently being admitted to the Pro Bono Roll of Honor for her work in the Court of Common Pleas Foreclosure program.  Ms. Sickles was also recognized in 2005, 2006 and 2007 as a "Pennsylvania Rising Star" by Pennsylvania Super Lawyers and Philadelphia Magazine.

# EXHIBIT B

KIMBERLY REDMAN WEST
Wallace, Jordan, Ratliff & Brandt, LLC
P.O. Box 530910
Birmingham, Alabama 35253
Voice 205.874.0352   Cell 205.915.9521
Fax 205.871.7534
kwest@wallacejordan.com

Kimberly Redman West, a native of Huntsville, Alabama, was born in 1957. She attended the University of the South in Sewanee, Tennessee, in 1975, and graduated from the University of Alabama in Huntsville in 1979 with a Bachelor of Arts degree in English. After teaching for a year in the Alabama public school system, she attended the University of Alabama, where she received her law degree in 1983. While at the law school, Ms. West served on the editorial board of the Alabama Law Review, received several book awards, and graduated first in her class.  After graduation, Ms. West served one year as a law clerk to The Honorable Frank M. Johnson, Jr., United States Circuit Court Judge for the Eleventh Circuit Court of Appeals. From 1984 to 1986, she practiced general civil law as an associate with the Birmingham law firm of Thomas, Taliaferro, Foreman, Burr & Murray as well as general civil and criminal law with Parker & Dawson.  In 1986, she left Parker & Dawson to engage in a general solo practice, with an emphasis on federal and state appellate litigation. She also served as a Medicare Hearing Officer. She formed the partnership of Scofield, West & French in 1991, where she remained until joining Wallace, Jordan, Ratliff & Brandt in October 1997. Ms. West currently practices in the area of complex litigation -- primarily handling federal multi-district cases involving pharmaceutical, mass tort and antitrust issues.

She serves or has served as lead counsel to Blue Cross and Blue Shield plans across the country in federal multi-district pharmaceutical and mass tort litigation, including breast implant, Factor VIII, pedicle bone screw, Sulzer hip implants, Fen-Phen, Rezulin, Vioxx, Guidant and Medtronic heart defibrillators, Neurontin, Oxycontin, Ovcon, Tricor, Paxil, AWP, Temodar, Intron, and other products. Ms. West has been appointed  national class counsel and co-lead counsel for third-party payors in antitrust and overpricing litigation in cases involving the drugs Hytrin and Duract. Ms. West is admitted to practice in all Alabama state courts, all Alabama federal district courts, the United States Court of Appeals for the Third Circuit, the United States Court of Appeals for the Eleventh Circuit, and the United States Supreme Court. She is a member of the American Bar, the Alabama State Bar and the Birmingham Bar Association.  She has served on numerous committees for the Alabama and Birmingham Bar Associations.

As a pioneer and specialist in third-party payor complex litigation, Ms. West often speaks and writes on pharmaceutical and mass tort litigation. She recently presented a paper at the 36th Annual National Blue Cross Lawyers' Meeting, "Show Me the Money: Theories of Recovery in Mass Tort and Pharmaceutical Overpricing Cases."  Ms. West was one of two third-party payor attorneys invited to speak at the 2009 National Association of In-House Pharmaceutical Counsel at

Pfizer, Inc.'s headquarters in New York. Ms. West has served for fifteen years as a judge for the Cumberland Law School National Trial Advocacy and Moot Court teams.

In addition, she has attended the Sewanee School of Letters pursuing a master's degree in English Literature, which she received in the spring of 2011. She has studied under Dr. Ann Jennalie Cook, Professor Emerita, Vanderbilt University, whose performance-based studies re-kindled Ms. West's long interest in Shakespeare, the law, and trial advocacy. Her thesis, under the direction of Professor Cook, is entitled, "The Law Whistles: A Case Study of the Trials of Hermione and Perdita in *The Winter's Tale*.." Ms. West is a member of the Shakespeare Association of America, the International Shakespeare Association, and an attendee in 2008 and 2010 at the International Conference of the Shakespeare Institute in Stratford-upon-Avon. She participated in the World Shakespeare Congress in Prague during the summer of 2011. Her seminar paper, "A Legal Assessment of the Circumstantial Evidence in *The Winter's Tale*" has been accepted for publication, and will appear in the *Proceedings of the Ninth Shakespeare World Congress.*

Ms. West has presented many scholarly papers, including "Chanting Faint Hymns to the Cold Moon: Elizabethan Matrimonial Law and *Midsummer Night's Dream*" (Shakespeare Symposium, Samford Univ. 2009); "I Crave the Law: The Impact of the Law, Common and Eccelesiastical, on Early Modern Performance"(American Shakespeare Center's Blackfriars Conference, Staunton, VA. 2009); "Senex Iratus or Loving Father: The Character of Old Capulet."(Shakespeare Symposium, Samford Univ. 2010);  "Marriage is a Matter of More Worth than Mere Attorneyship: Marriage Contracts in *2 Henry VI* and in Elizabethan and American Common Law"(Shakespeare Assoc. of America Annual Conference Chicago, Ill. 2010); "The Trials of *The Winter's Tale*" (American Shakespeare Center's Blackfriars Conference, Staunton, VA. 2011). Ms. West teaches Shakespeare and Trial Advocacy at the Cumberland Law School in Birmingham, Alabama.

# EXHIBIT 4

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE FLONASE ANTITRUST LITIGATION | CIVIL ACTION NO. 08-CV-3301 |

THIS DOCUMENT RELATES TO:
ALL ACTIONS

<u>DECLARATION OF KATHERINE KINSELLA</u>

I, Katherine Kinsella, being duly sworn, hereby declare as follows:

1.      I am President of Kinsella Media, LLC ("KM"), an advertising and legal notification firm in Washington, D.C. specializing in the design and implementation of class action and bankruptcy notification programs to reach unidentified putative class members and claimants.  My business address is 2120 L Street, NW, Suite 860, Washington, D.C. 20037.  My telephone number is (202) 686-4111.

2.      I submit this declaration at the request of Class Counsel in connection with *In Re Flonase Antitrust Litigation*, No. 08-cv-3301, pending in the United States District Court for the Eastern District of Pennsylvania.

3.      This declaration is based upon my personal knowledge and upon information provided by Class Counsel, my associates, and staff.  The information is of a type reasonably relied upon in the fields of advertising, media and communications.

4.      KM has developed and directed some of the largest and most complex national notification programs in the country.  The scope of the firm's work includes notification programs in antitrust, bankruptcy, consumer fraud, mass tort and product liability litigation. Specific cases have involved, among others, asbestos, breast implants, home siding and roofing products, infant formula, pharmaceuticals, polybutylene plumbing, tobacco and Holocaust

claims.  The firm has developed or consulted on over 700 notification programs and has placed over $300 million in media notice.  Selected cases are attached hereto as Exhibit A.

5.     Courts have commented favorably, on the record, regarding the effectiveness of notice programs prepared by KM.  Selected Judicial Comments are attached hereto as Exhibit B.

6.     I have testified as an expert at trial and in a deposition in *Engle v. R. J. Reynolds Tobacco*, No. 94-08273 (Fla. Cir. Ct., Dade County).  I have been deposed as an expert in *In re NASDAQ Market-Makers Antitrust Litigation*, (M21-68 RWS), 94-CIV. 3994 (RWS), M.D.L. No. 123 (S.D.N.Y.), *In re Dow Corning*, No. 95-20512 (Bankr. E.D. Mich.), *Georgine v. Amchem, Inc. et al.,* C.A. No. 93-CV-0215 (E.D. Pa.), *In re W. R. Grace & Co.*, Chapter 11, No.01-01139 (JJF) (Bankr. D. Del.) and *Gross v. Chrysler Corp.,* No. 061170 (Md. Cir. Ct., Montgomery County).  I have testified in court in *In re Swan Transportation Company*, Chapter 11, Case No. 01-11690, *Cox v. Shell Oil Co.,* No. 18,844 (Tenn. Ch. Ct., Obion County), *Ahearn v. Fibreboard Corporation*, C.A. No. 6: 93cv526 (E.D. Tex.) and Continental Casualty Co. v. Rudd, C.A. No. 6:94cv458 (E.D. Tex.).

7.     I am a co-author of *Class Notice and Claims* Administration, published in 2010 in The International Handbook on Private Enforcement of Competition Law, *The Plain Language Tool Kit for Class Action Notice* published in the October 25, 2002 issue of Class Action Litigation Report and the author of *Quantifying Notice Results in Class Actions – the Daubert/Kumho Mandate* published in the July 27, 2001 issue of Class Action Litigation Report and the August 7, 2001 issue of The United States Law Week, both publications of the Bureau of National Affairs, Inc.  I am also the author of *The Ten Commandments of Class Action Notice* published in the September 24, 1997 issue of the Toxics Law Reporter and co-author of *How Viable Is the Internet for Class Action Notice* published in the March 25, 2005 issue of Class Action Litigation Report, both also publications of the Bureau of National Affairs, Inc.

8.     KM was retained to design and implement the Proposed Class Action Settlement Notice Program in this litigation.  I submit this declaration to describe the elements of the Notice Program.

## NOTICE PROGRAM OVERVIEW

9.     The proposed Notice Program was designed to reach the greatest practicable number of Class Members, who are Third-Party Payors ("TPPs") and Consumers, ensuring that they will be exposed to the Notice, to see, review, and understand it.

10.     In developing the Notice Program, it was determined that the most practicable way to reach TPP Class Members is through direct notice with some supplemental notice in a widely-read insurance industry trade publication.  It was also determined that the most practicable way to reach Consumer Class Members, who are unidentifiable, is through the use of paid media.

11.     The Notice Program consists of direct notice, paid media, and an online informational website.  A copy of KM's proposed Notice Program is attached as Exhibit C.

### *Third-Party Payors*

12.     We propose that Direct Mail Notice, in the form of a Postcard be sent to all entities included in a proprietary TPP database developed and maintained by class action notice and administration firm Rust Consulting, Inc. ("Rust").  Rust's database was developed based on publicly available indexes of health insurers and other TPPs, and has been refined over many years based on responses from notice programs and TPP class action settlements administered by Rust.

13.     The database contains approximately 39,495 names and mailing addresses of insurance companies, healthcare and welfare funds, employee benefit funds, third-party administrators, pharmacy benefit managers, and other record keepers, as well as their lawyers, accountants, and other representatives.

14.     In addition to Direct Mail Notice, KM recommends that selected supplemental paid media be used to reach TPP Class Members who do not receive direct notice.  KM recommends publication in a widely-read trade publication, as follows:

     a.     *National Underwriter: Life & Health*.  Billing itself as "the total news source for the life, health and financial services industry," this is the only weekly magazine focused on this profession.  This journal has an estimated circulation of 50,550.  KM recommends running a full-page ad (7" x 10") one time.

### *Consumers*

15.     Because Direct Notice in this case will not reach all potential Class Members, a paid media Notice Program targeted at unidentified Consumer Class Members is necessary.

16.     To design a paid media program to reach Consumer Class Members, KM analyzed syndicated data available from the 2011 Doublebase Survey[1] from GfK MediaMark Research, Inc. ("GfK MRI").  GfK MRI is a nationally accredited media and marketing research firm that provides syndicated data on audience size, composition, and other relevant factors pertaining to major media including broadcast, magazines, newspapers, and outdoor advertising.  MRI provides a single-source measurement of major media, products, services, and in-depth consumer demographic and lifestyle/psychographic characteristics.

17.     To design GfK MRI, KM selected demographics that encompass the characteristics of Consumer Class Members.  Media vehicles were then analyzed and selected for their strength and efficiency in reaching these demographic targets.

18.     Since it is not possible to measure Internet against the target audience "Flonase Users," KM selected the age and gender targets available for all media that are most representative of Flonase user demographics.  "Flonase Users" skew women with an index of 116.  This means that "Flonase Users" are 16% more likely than the average adult to be women.

---

[1] Since 1979, GfK MRI's *Survey of the American Consumer* has conducted detailed polling of a large sample of U.S. adults about the media they see and hear and about the products they use.  Participants in the survey are identified by age, occupation, income, education and residence, among other things.  They are asked what magazines and newspapers they read, what TV shows and cable channels they watch, and about Internet access and radio formats.  Survey data indicate the brands and products they use from among 500 categories and 6,000 consumer brands.  The data from this survey is used by media practitioners industry-wide to characterize media and product users by demographics and to account for and compare the size and make-up of media audiences.   The *Doublebase Study* consists of two years of *Survey of the American Consumer* data.  (GfK MRI was known until mid-2010 as Mediamark Research & Intelligence, or MRI).

Of "Flonase Users," 47.9 percent are 45 to 64 years old.  Given this information, the measured delivery of media to women 45 to 64 years old will be representative of delivery to Class Members.

19.     To effectively reach Consumer Class Members, KM recommends a Notice Program that utilizes national consumer magazines, widely distributed newspaper supplements, local newspaper in U.S. territories and possessions, and Internet ad networks.

20.     The Consumer Publication Notice will appear in consumer magazines as follows:

a.      A full-page ad (5.75" x 9") one time in *National Geographic* with an estimated circulation of 4,100,000.

b.      A half-page ad (3.375" x 10") two times in *People* with an estimated circulation of 3,450,000.

21.     The Consumer Publication Notice will appear in newspaper supplements as follows:

a.      A Digest-page ad (4.75" x 6.625") one time in *American Profile* with an estimated circulation of 10,250,000.

b.      A two-fifths-page ad (5.25" x 6.75") one time in *American Profile* with an estimated circulation of 33,000,000.

c.      A two-fifths-page ad (5." x 6.43755") one time in *USA Weekend* with an estimated circulation of 22,250,000.

22.     The Consumer Publication Notice will appear, as a one-quarter page ad or equivalent, translated into Spanish as necessary, in local newspapers in U.S. territories and possessions as follows:

a.      American Samoa, *Samoa News*.

b.      Guam, *Pacific Daily News*.

c.      Northern Mariana Islands, *Saipan Tribune*.

d.      Puerto Rico, *El Nuevo Dia*.

e.      Puerto Rico, *El Vocero*.

      f.      Puerto Rico, *Primera Hora*.

      g.      St. Croix (U.S.V.I.), *St. Croix Avis*.

      h.      St. John (U.S.V.I.), *St. Johns Trade Winds*.

      i.      St. John (U.S.V.I.), *Virgin Islands Daily News*.

23.      Internet advertising will include the following placements for a 30-day period:

      a.      Banner advertisements will appear, on a rotating basis, on websites that are part of the 24/7 Real Media Network.

      b.      Banner advertisements will appear, on a rotating basis, on websites that are part of the AOL Advertising Network.

      c.      Banner advertisements will appear, on a rotating basis, on websites that are part of the Yahoo! Network.

24.      For the purpose of evaluating the strength and efficiency of the media, the national newspaper supplements, national consumer magazines, and Internet[2] were measured against the target audience to establish the estimated *reach*[3] of the media program and the estimated *frequency*[4] of exposure to the media vehicles.

      a.      An estimated 80% of women 45 to 64 years old will be reached with an average estimated frequency of 2 times.

25.      All print advertising will carry a toll-free number and a website address for potential Class Members to request more information.

26.      Based on the length of time that is required to accrue the reach of the media, the opt out and objection date should not occur before April 12th, 2013.

---

[2] MRI does not measure the U.S. territories and possessions newspapers or the trade publications.  Therefore, their contribution to the overall reach of the media is not calculated.

[3] Reach is the estimated percentage of a target audience reached through a specific media vehicle or combination of media vehicles.

[4] Frequency is the estimated average number of opportunities an audience member has to see the notice.

### *Informational Website*

27.     A website will be established at the URL www.Website.com to enable Class Members to get information on the Settlement.

### *Other*

28.     A toll-free phone number will be established allowing Class Members to call and request that a Notice be mailed to them or listen to frequently asked questions.

29.     A post office box will be established allowing Class Members to contact Settlement Class Counsel by mail with any specific requests or questions.

## THE FORM AND CONTENT OF THE NOTICES

30.     Attached as Exhibits 4, 5, and 6 to the Notice Program are copies of the Detailed Notices, Postcard Notice, and Publication Notices.

31.     The Notices effectively communicate information about the Settlement.

32.     Rule 23(c)(2) of the Federal Rules of Civil Procedure requires class action notices to be written in "plain, easily understood language."  KM applies the plain language requirement in drafting notices in federal and state class actions.  The firm maintains a strong commitment to adhering to the plain language requirement, while drawing on its experience and expertise to draft notices that effectively convey the necessary information to Class Members.

33.     The Summary Notices (Postcard and Publication Notices) are designed to capture the Class Member's attention with clear, concise, plain language.  They direct readers to the case website for more information.  The plain language text provides important information regarding the subject of the litigation, the Settlement Class definition, and the legal rights available to Class Members.

34.     The Summary Notices are designed to get the reader's attention.  These Notices concisely and clearly state, in plain easily understandable language, all required information, without omitting significant facts that Class Members need to understand their rights.  The Notices refer readers to the case website and the toll-free number for more information.

35.     The Detailed Notice will be available at the website or by calling the toll-free number.  The Detailed Notice provides substantial information, including all specific instructions Class Members need to follow to properly exercise their rights, and background on the issues in the case.  It is designed to encourage readership and understanding, in a well- organized and reader-friendly format.

## CONCLUSION

36.     It is my opinion that the Notice Program is adequate and reasonable under the circumstances, and it is consistent with the standards employed by KM in notification programs designed to reach members of settlement groups or classes.  The Notice Program as designed is fully compliant with Rule 23 of the Federal Rules of Civil Procedure.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

*Katherine Kinsella*

_____

Katherine Kinsella


Executed in Washington, D.C. this 14th day of December 2012.

# EXHIBIT A



# Kinsella Media, LLC

## Relevant Case Experience

### Antitrust

*Big Valley Milling, Inc. v. Archer Daniels Midland Co.,* No. 65-C2-96-000215 (Minn. Dist. Ct. Renville County) (lysine).

*Carlson v. Abbott Laboratories*, No. 94-CV-002608 (Wis. Cir. Ct. Milwaukee County) (infant formula).

*Comes v. Microsoft Corp.,* No. CL8231 (Iowa Dist. Ct. Polk County

*Connecticut v. Mylan Laboratories, Inc.,* No. 99-276, MDL No. 1290 (D.D.C.)  (pharmaceutical).

*Conroy v. 3M Corp.*, No. C-00-2810 CW (N.D. Cal.) (invisible tape).

*Copper Antitrust Litigation,* MDL 1303 (W.D. Wis.) (physical copper).

*Cox v. Microsoft Corp.,* No. 105193/00 (N.Y. Sup. Ct. N.Y. County) (software).

*D.C. 37 Health  & Security Plan v. Medi-Span*, No. 07-cv-10988 (D.Mass.); *New England  Carpenters Health Benefits Fund v. First DataBank, Inc.,* No. 1:05-CV-11148 (D. Mass.) (pharmaceutical).

*Giral v. Hoffman-LaRoche Ltd.*, C.A. No. 98 CA 7467 (W. Va. Cir. Ct., Kanawha County) (vitamins).

*In re Buspirone Antitrust Litigation*, MDL No. 1413 (S.D.N.Y.) (pharmaceutical).

*In re Cardizem Antitrust Litigation*, 200 F.R.D. 326 (E.D. Mich.) (pharmaceutical).

*In re Compact Disc Minimum Price Antitrust Litigation*, MDL No. 1361 (D. Me.) (compact discs).

*In re Insurance Brokerage Antitrust Litig.*, MDL No. 1663 Civil No. 04-5184 (FSH) (D.N.J.) (insurance).

*In re International Air Transportation Surcharge Antitrust Litigation*, No. M 06-1793, MDL No. 1793 (N.D. Cal.) (airline fuel surcharges).

*In re Monosodium Glutamate Antitrust Litig.,* D-0202-CV-0200306168, D-202-CV-200306168 (N.M. Dist. Ct., Bernalillo County) (MSG).

*In re Motorsports Merchandise Antitrust Litigation,* No. 1:97-CV-2314-TWT (N.D. Ga.) (merchandise).

*In re Nasdaq Market-Makers Antitrust Litigation*, MDL No. 1023 (S.D.N.Y.) (securities).

*In re Pharmaceutical Industry Average Wholesale Price Litigation*, No. CA:01-CV-12257, MDL No. 1456 (D. Mass.) (pharmaceutical).

*In re Toys "R" Us Antitrust Litigation*, No. CV-97-5750, MDL No. 1211, (E.D.N.Y.)  (toys and other products).

*In re Western States Wholesale Natural Gas Antitrust Litigation*, No. CV-03-1431, MDL No. 1566, (D. Nev) (natural gas).

*Kelley Supply, Inc. v. Eastman Chemical Co*., No. 99CV001528 (Wis. Cir. Ct., Dane County) (Sorbates).

*Ohio vs. Bristol-Myers Squibb, Co*., No. 1:02-cv-01080 (D.D.C.) (pharmaceutical).

*Raz v. Archer Daniels Midland Co.,* Inc., No. 96-CV-009729 (Wis. Cir. Ct. Milwaukee County) (citric acid).

## Consumer and Product Liability

*Azizian v. Federated Department Stores, Inc.,* No. 4:03 CV-03359 (N.D. Cal.)  (cosmetics).

*Baird v. Thomson Consumer Elecs.,* No. 00-L-000761 (Ill. Cir. Ct., Madison County) (television).

*Bonilla v. Trebol Motors Corp.,* No. 92-1795 (D.P.R.) (automobiles).

*Burch v. American Home Products Corp.,* No. 97-C-204 (1-11) (W. Va. Cir. Ct., Brooke County) (Fen Phen).

*Cosby v. Masonite Corp., No.* CV-97-3408 (Ala. Cir. Ct. Mobile County) (siding product); *Quin v. Masonite Corp.,* No. CV-97-3313 (Ala. Cir. Ct. Mobile County) (roofing product).

*Cox v. Shell Oil Co.,* No. 18,844 (Tenn. Ch. Ct. Obion County) (polybutylene pipe).

*Daniel v. AON Corp.,* No. 99 CH 11893 (Ill. Cir. Ct. Cook County) (insurance).

*Fettke v. McDonald's Corp.,* No. 044109 (Cal. Super Ct. Marin County) (trans fatty acids).



*Florida v. Nine West Group, Inc.,* No. 00 CIV 1707 (S.D.N.Y.) (shoes).

*Foothill/De Anza Community College Dist. v. Northwest Pipe Co.,* No. 00-20749-JF (N.D. Cal.) (fire sprinklers).

*Galanti v. The Goodyear Tire & Rubber Company,*  No. 03-209 (D.N.J.) (radiant heating)  (2002).

*Garza v. Sporting Goods Properties, Inc.,* No. SA 93-CA-1082 (W.D. Tex.) (gun ammunition).

*Hoorman v. GlaxoSmithKline,* No. 04-L-715 (Ill. Cir. Ct., Madison Cty.) (Paxil pharmaceutical*).*

*In re Louisiana Pacific Corp. Inner Seal OSB Trade Practices Litigation,* MDL No. 1114 (N.D. Cal.) (oriented strand board).

*In re Tri-State Crematory Litig,* MDL 1467 (N.D. Ga.) (improper burial).

*Lebrilla v. Farmers Group Inc.,* No. 00-CC-07185 (Cal. Super. Ct., Orange County) (auto insurance).

*Lovelis v. Titflex,* No. 04-211 (Ak. Cir. Ct., Clark County)  (gas transmission pipe).

*Naef v. Masonite Corp.,* No. CV-94-4033 (Ala. Cir. Ct. Mobile County) (hardboard siding product).

*Peterson v. BASF Corp.,* No. C2-97-295 (D. Minn.) (herbicide).

*Posey v. Dryvit Sys., Inc.* No. 17,715-IV (Tenn. Cir. Ct., Jefferson County) (EIFS stucco).

*Reiff v. Epson America, Inc. and Latham v. Epson Am., Inc.,* J.C.C.P. No. 4347 (Cal. Super. Ct., L.A. County) (ink jet printers).

*Richison v. Weyerhaeuser Company Limited,* No. 05532 (Cal. Super. Ct. San Joaquin County) (roofing product).

*Ruff v. Parex, Inc.,* No. 96-CvS 0059 (N.C. Super. Ct. Hanover County) (synthetic stucco product).

*Shah v. Re-Con Building Products, Inc.,* No. C99-02919 (Cal. Super. Ct. Contra Costa County) (roofing product).

*Shields vs. Bridgestone/Firestone, Inc., Bridgestone Corp.,* No. E-167.637 (D. Tex.) (tires).

*Smith v. Behr Process Corp.,* No. 98-2-00635 (Wash. Super. Ct., Gray Harbor County) (stain product).



*Weiner v. Cal-Shake, Inc., J.*C.C.P. No. 4208 (Cal. Super. Ct., Contra Costa County) (roofing product).

*Wholesale Elec. Antitrust Cases I & II,* J.C.C.P. Nos. 4204 & 4205 (Cal. Super. Ct., San Diego County) (energy).

*Woosley v. State of California,* No. CA 000499 (Cal. Super. Ct., Los Angeles County) (automobiles).


## Mass Tort

*Ahearn v. Fibreboard Corp.,* No. 6:93cv526 (E.D. Tex); *Continental Casualty Co. v. Rudd*, No. 6:94cv458 (E.D. Tex) (asbestos injury).

*Backstrom v. The Methodist Hospital,* No. H.-94-1877 (S.D. Tex.) (TMJ injury).

*Engle v. RJ Reynolds Tobacco Co.,* No. 94-08273 (Fla. Cir. Ct. Dade County) (tobacco injury).

*Georgine v. Amchem, Inc.,* No. 93-CV-0215 (E.D. Pa.) (asbestos injury).


## Bankruptcies

*In re Armstrong World Industries, Inc.,* No. 00-4471 (Bankr. D. Del.).

*In re Dow Corning,* No. 95-20512 (Bankr. E.D. Mich.) (breast implants).

*In re Johns-Manville Corp.,* 68 B.R. 618, 626 (Bankr. S.D.N.Y.) (asbestos).

*In re Kaiser Aluminum Corp.,* No. 02-10429 (JFK) (D. Del).

*In re Owens Corning,* No. 00-03837 (Bankr. D. Del.).

*In re Raytech Corp.,* No. 5-89-00293 (Bankr. D. Conn.) (asbestos).

*In re The Celotex Corp.,* Nos. 90-10016-8B1 and 90-10017-8B1 (Bankr. M.D. Fla.) (asbestos).

*In re U.S. Brass Corp.,* No.94-40823S (Bankr. E.D. Tex.) (polybutylene).

*In re USG Corp.,* Nos. 01-2094 - 01-2104 (Bankr. D. Del.).

*In re W.R. Grace & Co.,* No. 01-01139 (Bankr. D. Del.).



## Insurance

*McNeil v. American General Life and Accident Insurance Co.,* No. 8-99-1157 (M.D. Tenn.) (insurance).

*Nealy v. Woodmen of the World Life Insurance Co.,* No. 3:93 CV-536 (S.D. Miss.) (insurance).

## Holocaust Victims Reparations

*In re Holocaust Victim Assets Litigation,* Nos. CV 96-4849, CV-5161 and CV 97-461 (E.D.N.Y.) (Holocaust).

The International Commission on Holocaust Era Insurance Claims Outreach

## Pension Benefits

*Collins v. Pension Benefit Guarantee Corp.,* No. 88-3406 (D.D.C.); Page v. Pension Benefit Guarantee Corp., No. 89-2997 (D.D.C.).

*Forbush v. J. C. Penney Co., Inc.,* Nos. 3:90-2719 and 3:92-0109 (N.D. Tex.).

## International

*Ahearn v. Fiberboard Corporation,* No. 6:93cv526 (E.D. Tex) and *Continental Casualty Co. v. Rudd,* No. 6:94cv458 (E.D. Tex.) (asbestos injury) (1993).

*Galanti v. The Goodyear Tire & Rubber Company,* No. 03-209 (D.N.J.) (radiant heating) (2002).

*In re Holocaust Victims Assets Litigation,* No. CV 96-4849 (ERK) (MDG) (Consolidated with CV-5161 and CV 97461) (E.D.N.Y.) (2003).

*In re Owens Corning, Chapter 11,* No. 00-03837 (MFW) (Bankr. D. Del.) (2006).

*In re The Celotex Corporation, Chapter 11,* Nos. 90-10016-8B1 and 90-10017-8B1 (Bankr. M.D. Fla.) (1996).

*In re USG Corporation, Chapter 11,* Nos. 01-2094 (RJN) through 01-2104(RJN) (Bankr. D. Del.) (2006).

*In re Western Union Money Transfer Litigation,* No. 01 0335 (CPS) (VVP) (E.D.N.Y.) (wire transactions) (2004).

*In re W.R. Grace & Co., Chapter 11,* No. 01-01139 (Bankr. D. Del.) (bankruptcy) (2001).



International Committee on Holocaust Era Insurance Claims (1999).

## Product Recall

Central Sprinkler Voluntary Omega Sprinkler Replacement Program

*Hart v. Central Sprinkler Corp.,* No. BC17627 (Cal. Super. Ct. Los Angeles County) & *County of Santa Clara v. Central Sprinkler Corp., No.* CV 17710119 (Cal. Super. Ct. Santa Clara County)

## Telecom

*Bidner, et al. v. LCI International Telecom Corp d/b/a Qwest Communications.*

*Community Health Association v. Lucent Technologies, Inc.,* No. 99-C-237, (W.Va. Cir. Ct., Kanawha County).

*Cundiff et al. v. Verizon California, Inc.,* No. 237806 (Cal. Super Ct., Los Angeles County).

*Kushner v. AT&T Corporation,* No. GIC 795315 (Cal. Super. Ct., San Diego County).

*Rish Enterprise v. Verizon New Jersey,* No. MID-L-8946-02 (N.J. Super. Ct.).

*Sonnier, et. al. v. Radiofone, Inc.,* No. 44-844, (L.A. Jud. Dist. Ct., Plaquemines Parish County).

*State of Louisiana v. Sprint Communications Company L.P.,* No. 26,334 (Jud. Dis. Ct., Parish of West Baton Rouge) and *State of Louisiana v. WilTel, Inc.,* No. 26,304 (Jud. Dis. Ct., Parish of West Baton Rouge).



# EXHIBIT B



# Kinsella Media, LLC

## Judicial Comments

*In re Compact Disc Minimum Advertised Price Antitrust Litigation*, MDL No. 1361 (D. Me.).

In approving the notice plan for implementation in the Compact Disc Minimum Advertised Price Antitrust Litigation, Judge D. Brock Hornby stated, "(the plan) provided the best practicable notice under the circumstances and complied with the requirements of both 15 U.S.C. 15c(b) (1) . . . the notice distribution was excellently designed, reasonably calculated to reach potential class members, and ultimately highly successful in doing so." - Hon. D. Brock Hornby  (2002/2003)

*In re International Air Transportation Surcharge Antitrust Litigation*, No. M 06-1793, MDL No. 1793 (N.D. Cal.).

In approving the notice plan in this litigation that involved a proposed settlement of more than $200 million for U.S. and U.K. class members, U.S. District Judge Charles Breyer repeatedly praised KNC: "I think the notice is remarkable in this case. . . . This is brilliant.  This is the best notice I've seen since I've been on the bench. . . . Turning back to the settlement, again I want to applaud the parties for the notice.  I mean it's amazing.  You know, it really is good.  And I don't know where this person practices, I don't even know that she's a lawyer.  But she really did a good job on this announcement, this notice. So thank you very much. . . . And I once again want to express my sincere appreciation of the notice.  I mean, I was just extraordinarily impressed.  Extraordinarily impressed." – Hon. Charles Breyer  (2008)

*Cox v. Shell Oil Co.,* No. 95-CV-2 (Tenn. Ch. Ct. Obion County)

In the order approving the settlement of the polybutylene pipe class action, Judge Maloan stated, "The Court finds the notice program is excellent.  As specified in the findings below, the evidence supports the conclusion that the notice program is one of the most comprehensive class notice campaigns ever undertaken."  (1995)

*Galanti v. The Goodyear Tire & Rubber Co.,* No. 03-209 (D.N.J.)

"The published notice, direct notice and Internet posting constituted the best practicable notice of the Fairness Hearing, the proposed Amended Agreement, Class Counsels' application for fees, expenses and costs, and other matters set forth in the Class Notice and the Summary Notice.  The notice constituted valid, due and sufficient notice to all members of the Settlement Classes, and complied fully with the requirements of Rule 23 of the Federal Rules of Civil Procedure, the Constitution of the United States, the laws of New Jersey and any other applicable law." – Hon. Stanley R. Chesler   (2004)

*Azizian v. Federated Department Stores, Inc.,* No. 3:03 CV-03359  (N.D. Cal.).

"The notice was reasonable and the best notice practicable under the circumstances; was due, adequate and sufficient notice to all class members; and complied fully with the laws of the United States and of the Federal Rules for Civil Procedure, due process and any other applicable rules of court."  - Hon. Sandra Brown Armstrong  (2004)

*Collins v. Pension Benefit Guarantee Corp.,* No. 88-3406 (D.D.C.).

"The notice provided was the best notice practicable under the circumstances.  Indeed, the record shows that the notice given was consistent with the highest standards of compliance with Rule 23(e)." (1996)

*Cox v. Microsoft Corporation,* No. 105193/00 (N.Y. Sup. Ct. N.Y. County).

"The court finds that the combination of individual mailing, e-mail, website and publication notice in this action is the most effective and best notice practicable under all the circumstances, constitutes due, adequate and reasonable notice to all Class members and otherwise satisfies the requirements of CPLR 904, 908 and other applicable rules.   The Settlement meets the due process requirement for class actions by providing Class members an opportunity either to be heard and participate in the litigation or to remove themselves from the Class." - Hon. Karla Moskowitz  (2006)

*Foothill/De Anza Community College District v. Northwest Pipe Co.,* No. CV-00-20749 (N.D. Cal.)

"The Court finds that the settling parties undertook a thorough and extensive notice campaign designed by Kinsella/Novak Communications, Ltd., a nationally-recognized expert in this specialized field.  The Court finds and concludes that the Notice Program as designed and implemented provides the best practicable notice to the Class, and satisfied requirements of due process." - Hon. Jeremy Fogel (2004)

*Georgine v. Amchem,* 158 F.R.D. 314, 326 (E.D. Pa.).

Judge Reed explained that the notice program developed by Kinsella "goes beyond that provided in [previous cases]" and "the efforts here are more than adequate to meet the requirements of Rule 23(c)(2)." (1993)

*Higgins v. Archer-Daniels Midland Co.,* Second Judicial District Court, County of Bernalillo C-202-CV-200306168 (N.M. 2d Jud. Dist. Bernalillo County)

"The Court finds that the form and method of notice given to the Settlement Class, including both mailed notice to persons and firms for whom such notice was practical and extensive notice by publication through multiple national and specialized publications, complied with the requirements of



Rule 1-023 NMRA 2006, satisfied the requirements of due process, was the best notice practicable under the circumstances, and constituted due and sufficient notice of the Settlement Agreements and their Final Approval Hearing, and other matters referred to in the Notice.  The notice given to the Settlement Class was reasonably calculated under the circumstances to inform them of the pendency of the actions involved in this case, of all material elements of the proposed Settlements, and of their opportunity to exclude themselves from, object to, or comment on the Settlements and to appear at the Final Approval Hearing." -Hon. William F. Lang  (2006)

*In re The Celotex Corporation,* Nos. 90-10016-8B1 and 90-10017-8B1 (Bankr. M.D. Fla.).

"...all counsel should be complimented on the fact that they have gone to every possible conceivable method of giving notice from putting it on TV and advertising it in papers..... the record should also reflect the Court's appreciation to Ms. Kinsella for all the work she's done, not only in pure noticing, but ensuring that what noticing we did was done correctly and professionally." - Hon. Thomas E. Baynes, Jr.

*Ahearn v. Fibreboard Corp.*, No. 6:93 cv526 (E.D. Tex.); *Continental Casualty Co. v. Rudd*, No. 6:94cv458 (E.D. Tex.).

In approving the notice plan for implementation in the Ahearn and Rudd class actions in 1994, Judge Parker stated, "I have reviewed the plan of dissemination, and I have compared them to my knowledge at least of similar cases, the notices that Judge Weinstein has worked with [Agent Orange] and Judge Pointer [Silicon Gel Breast Implants], and it appears to be clearly superior." - Chief Judge Robert M. Parker (1994)

*In re Western States Wholesale Natural Gas Antitrust Litigation*, No. CV-03-1431, MDL No. 1566, (D. Nev) (natural gas).

"This notice program fully complied with Federal Rule of Civil Procedure 23 and the requirements of due process.  It provided to the MDL Class the best notice practicable under the circumstances." - Hon. Philip M. Pro (2007)

*Johns-Manville Corp*.  68 B.R. 618, 626 (Bankr. S.D.N.Y. 1986), aff'd, 78 B.R. 407 (S.D.N.Y. 1987), aff'd sub nom. *Kane v. Johns-Manville Corp*.  843 F.2d. 636 (2d Cir. 1988).

In approving the notification plan in the Johns-Manville Bankruptcy Reorganization, the court referred to it as "an extensive campaign designed to provide the maximum amount of publicity ... that was reasonable to expect of man and media." - Hon. Burton Lifland  (1996/1998)

*Lovelis v. Titeflex Corp.,* No. CIV-2004-211 (Ark. 9th Cir. Ct. Clark Co.)



"Accordingly, the Notice as disseminated is finally approved as fair, reasonable, and adequate notice under the circumstances. The Court finds and concludes that due and adequate notice of the pendency of this Action, the Stipulation, and the Final Settlement Hearing has been provided to members of the Settlement Class, and the Court further finds and concludes that the Notice campaign described in the Preliminary Approval Order and completed by the Parties complied fully with the requirements of Arkansas Rule of Civil Procedure 23 and the requirements of due process under the Arkansas and United States Constitutions. The Court further finds that the Notice campaign undertaken concisely and clearly states in plain, easily understood language:

<ul>
<li>(a.)    the nature of the action;</li>
<li>(b.)    the definition of the class certified;</li>
<li>(c.)    the class claims, issues or defenses;</li>
<li>(d.)    that a Class Member may enter an appearance and participate in person or through counsel if the member so desires;</li>
<li>(e.)    that the Court will exclude from the class any member who requests exclusion, stating when and how members may elect to be excluded; and</li>
<li>(f.)    the binding effect of the Final Order and Judgment on Class Members.</li>
</ul>

- Hon. John A. Thomas


*Naef v. Masonite Corp.*, No. CV-94-4033 (Ala. Cir. Ct. Mobile County)

"In November, 1997, the Court approved a massive Notice Program to apprise class members of the class action Settlement, including the individually mailed, notices, publication notice and notification by way of other avenues nationally and locally. This Notice Program was designed by recognized experts, approved by the mediator and the Court, and implemented diligently by the parties, at defendants' cost. It provided the best notice practicable to the Class, comports with due process, and was clearly adequate under Alabama Rule of Civil Procedure 23(e), the United States Constitution, and other applicable law." - Hon. Robert G. Kendall (1997)



# EXHIBIT C



# NOTICE PROGRAM

*In re Flonase Antitrust Litigation*
No. 08-CV-3301

United States District Court
for the Eastern District of Pennsylvania

© 2012 Kinsella Media, LLC

# TABLE OF CONTENTS

PAGE

FIRM OVERVIEW                                                        2

CASE BACKGROUND
Situation Analysis                                                  4
Class Definition                                                    5

NOTICE PROGRAM OVERVIEW
Program Components                                                  7
Direct Notice To Third-Party Payors                                8
Paid Media Program                                                 10
Paid Media Placements Summary                                      11

PAID MEDIA METHODOLOGY                                             13

TARGET AUDIENCE
Selection Methodology                                             15
Demographics                                                      16
Media Usage                                                       18

PAID MEDIA PLACEMENTS
Newspaper Supplements                                             21
Consumer Magazines                                                23
Trade Publication                                                 24
Publications in U.S. Territories and Possessions                  25
Target Audience Print Readership                                  26
Internet Advertising                                              27

NATIONAL MEDIA DELIVERY                                            29

NOTICE DESIGN
Detailed Notice                                                   31
Postcard Notice                                                   32

© 2012 KINSELLA MEDIA, LLC

Publication Notice                                                      33

Website and Internet Ads                                                34

## TOLL-FREE TELEPHONE SUPPORT                                          35

## EXHIBITS

Exhibit 1 – Selected KM Cases

Exhibit 2 – Newspaper Supplements

Exhibit 3 – 24/7 Network sample sites

Exhibit 4 – Detailed Notices

Exhibit 5 – Postcard Notice

Exhibit 6 – Publication Notices

# FIRM OVERVIEW

Kinsella Media, LLC ("KM") is a nationally recognized legal notification firm in Washington, D.C. specializing in the design and implementation of notification programs to reach unidentified putative class members primarily in consumer and antitrust class actions and claimants in bankruptcy and mass tort litigation.

KM has developed and directed some of the largest and most complex national notification programs, primarily in antitrust, bankruptcy, consumer fraud, mass tort, and product liability litigation.  Specific cases have spanned a broad spectrum of issues, including asbestos, breast implants, home siding and roofing products, infant formula, pharmaceuticals, polybutylene plumbing, tobacco, and Holocaust claims.  The firm has developed or consulted on over 700 notification programs and has placed over $300 million in paid media notice.

KM develops advertisements, press materials, websites, and other notice materials that bridge the gap between litigation complexities and the need for a clear and simple explanation of legal rights.  The firm employs industry-recognized tools of media measurement to quantify the adequacy of the notice for the court, and ensures all notice materials are in "plain language" and are fully compliant with Rule 23 of the Federal Rules of Civil Procedure ("Rule 23") and comparable state guidelines.

# CASE BACKGROUND

*In re Flonase Antitrust Litigation*

# CASE BACKGROUND:
## SITUATION ANALYSIS

This Notice Program is submitted by Kinsella Media, LLC ("KM") in connection with *In re: Flonase Antitrust Litigation*, No. 08-CV-3301 and *Medical Mutual of Ohio v. GSK*, No. 12-CV-4212 in the U.S. District Court for the Eastern District of Pennsylvania. This document outlines the efforts that will be made to provide notice of the proposed Settlement to reach Consumers and Third-Party Payors ("TPPs").

A proposed Settlement has been reached in the class action lawsuits regarding the prescription nasal spray Flonase, which is used to treat the nasal symptoms of allergies. The lawsuits claim that the Defendant violated the state laws by delaying the availability of the generic equivalent of Flonase. The Defendant denies these claims and any liability, but has agreed to the proposed Settlement solely to avoid the further expense, inconvenience, and burden of these lawsuits.

Because direct notice in this case will not reach all potential Class Members, a paid media notice program targeted at unidentified Class Members is necessary.

# CASE BACKGROUND:
## CLASS DEFINITION

The Class is defined as:

> All persons throughout the United States and its territories who purchased and/or paid for, in whole or in part, fluticasone propionate nasal spray, whether branded Flonase or its AB-rated generic equivalents, intended for the consumption of themselves, their family members and/or household members, and all Third-Party Payor entities throughout the United States and its territories that purchased, paid for, administered and/or reimbursed for fluticasone propionate nasal spray, whether branded Flonase or its generic equivalents, intended for consumption by their members, employees, plan participants, beneficiaries, or insureds. The applicable time period for the Class is May 19, 2004 through March 31, 2009.

© 2012 KINSELLA MEDIA, LLC

# NOTICE PROGRAM OVERVIEW

NOTICE PROGRAM OVERVIEW:
# PROGRAM COMPONENTS

This Notice Program outlines procedures to provide notice of the Settlement of *In re Flonase Antitrust Litigation* as a class action, consistent with the requirements set forth in Rule 23.

KM recommends the following two-part notice program.

- ➤ **DIRECT NOTICE TO THIRD-PARTY PAYORS:**  A Postcard Notice will be sent via first-class mail to all TPPs identified by the Claims Administrator.

- ➤ **PAID MEDIA-BASED NOTICE:**   After careful research of the demographics of Class Members, KM recommends broad paid media notice comprised of print and Internet vehicles that will reach those Class Members, including:

    - ➤ Consumer magazines,

    - ➤ Newspaper supplements,

    - ➤ Local newspaper in U.S. territories and possessions,

    - ➤ Trade publication to reach TPPs, and

    - ➤ Internet banner ads on multiple networks and hundreds of targeted websites.

To complement the Notice Program and to ensure Class Members' easy access to updated information, KM recommends a dedicated informational website.

# NOTICE PROGRAM OVERVIEW:
# DIRECT NOTICE TO THIRD-PARTY PAYORS

Direct mail notice will consist of mailing the Postcard Notice to all identifiable TPPs, informing them of their legal rights.  The Postcard Notice will be sent to:

➢ Entities likely to be Class Members, in the proprietary TPP Database compiled by Rust Consulting, Inc. ("Rust"), the Claims Administrator.  The Database includes insurance companies, healthcare and welfare funds, employee benefit funds, third-party administrators, pharmacy benefit managers and other record keepers for noticing purposes in TPP class actions.  The Database was compiled from contacting, researching and accessing the records of various databases and listings of affiliations, group insurance plans, self-insureds, ERISA funds, pharmacy benefit manager listings, etc. as follows:

- Pharmacy Benefit Management Institute;
- Health Insurance Association of America;
- Benefits SourceBook;
- Managed Care Information Centers;
- Judy Diamond Associates;
- A.M. Best Company;
- Association of Managed Care Providers;
- Society of Professional Benefit Administrators;
- American Association of Health Plus;
- Self Insurers Institute of America; and
- National Association of Insurance Commissioners.

Included in the Database are:

- Approximately 30,000 companies with 100 or more employees that have self-funded (fully or partially) plans, derived from Form 5500 filings;
- Approximately 130 pharmaceutical benefits managers that may file claims on behalf of their clients, independently advise their clients of the settlement, or provide purchase documentation so that their clients may file claims;
- Approximately 13,500 Third-Party Claim Administrators or other authorized agents (including law firms) that have filed claims on behalf of TPPs in past cases and that would have an interest in notice of a class action being certified of settled; and
- Approximately 1,300 member companies of American Health Insurance Plans that provide or administer health insurance benefits to over 200 million Americans which represent 90 percent of the managed care market (HMOs, PPOs and POSs, etc.).

The Database is regularly updated with new entries from the above sources as well as TPPs identified through other class action litigation.  Through its experience as a court-appointed claims administrator in class action matters involving pharmaceutical products, Rust has

updated its TPP Mailing Database since its creation.  With new class action matters involving TPPs, Rust reviews the claimants and updates its database by adding previously identified TPPs, and correcting or updating contact information.

## NOTICE PROGRAM OVERVIEW:

## PAID MEDIA PROGRAM

Direct notice will be provided to all identifiable TPPs.  To reach unidentifiable Class Members, KM recommends the use of paid media.  Paid media advertising is guaranteed to appear, allowing for control of the content, timing, and positioning of the message.  Newspapers, consumer magazines, television, radio, and the Internet, among other sources, offer paid media opportunities.

In considering which media to use for this case, KM evaluated the media consumption habits of the following target audience: women 45 to 64 years old.

Based on data regarding the target audience's media consumption, KM researched the most appropriate media vehicles that would be best for this case.  KM reviewed available magazines, newspapers, newspaper supplements, and online advertising for the target audience as well as compatibility of the editorial.  Magazines, newspapers, newspaper supplements and Internet advertising will provide an efficient plan for reaching women 45 to 64 years old.

# NOTICE PROGRAM OVERVIEW:
## PAID MEDIA PLACEMENTS SUMMARY

The following list provides a brief summary of KM's recommended media placements in this case. More detailed information about each publication and its applicability to the target audience in this case appears in the Paid Media Placements section of this plan.

## PRINT PUBLICATIONS

**Newspaper Supplements**
- *American Profile*
- *Parade*
- *USA Weekend*

**Consumer Magazines**
- *National Geographic*
- *People*

**Trade Publication**
- *National Underwriter Life & Health*

**Publication in U.S. Territories and Possessions**
- *El Nuevo Dia*
- *El Vocero*
- *Pacific Daily News (Guam)*
- *Primera Hora*
- *Saipan Tribune*
- *Samoa News*
- *St. Croix Avis*
- *St. Croix Avis*
- *Virgin Islands Daily News*

## ONLINE MEDIA

**Internet Banner Ads**
- 24/7 Network
- AOL Advertising Network
- Yahoo! Network

*In re Flonase Antitrust Litigation*

# PAID MEDIA METHODOLOGY

*In re Flonase Antitrust Litigation*

# PAID MEDIA METHODOLOGY

KM notice programs directed to unidentified class members: (1) identify the demographics of class members and establish a target audience, (2) outline the methodology for selecting the media and other program elements and how they relate to product usage or exposure, and (3) provide results that quantify for the court the adequacy of the notice based upon recognized tools of media measurement.

In the wake of the Supreme Court's decisions in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), the reliability of a notice expert's testimony should be tested against the standards developed within the media industry for determining to what degree and at what frequency a target audience has been reached. In assessing the expert's reliability, the court must determine whether the testifying expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152. That showing would likely require evidence that the expert's data and methodology are similar to that used by professionals in the relevant field.

In keeping with the *Daubert* and *Kumho* rulings, KM employs methodology and measurement tools used in the media planning and advertising industry for designing and measuring the adequacy of a paid media program to reach a particular audience.

Choosing a target audience that encompasses the characteristics of class members is the first step in designing the paid media program. KM chooses media vehicles based on their ability to provide effective and cost-efficient penetration of the target audience. Then it measures selected vehicles against the target audience to quantify the reach of the media program and the frequency of exposure to the media vehicles. Reach and frequency estimates are two of the primary measurements used to quantify the media penetration of a target audience.

> ➤ *Reach* is the estimated percentage of a target audience that is exposed one or more times through a specific media vehicle or combination of media vehicles within a given period.

> ➤ *Frequency* is the estimated average number of opportunities an audience member has to see the notice.

# TARGET AUDIENCE

# TARGET AUDIENCE:
## SELECTION METHODOLOGY

To develop a profile of the demographics and media habits of potential Class Members, KM analyzed syndicated data available from GfK MRI's *2011 Doublebase Study*[1].

GfK MRI is the leading U.S. supplier of multimedia audience research.  As a nationally accredited research firm, it provides information to magazines, television, radio, Internet and other media, leading national advertisers and over 450 advertising agencies – including 90 of the top 100 in the U.S.  GfK MRI's nationally syndicated data are widely used by these companies as the basis for the majority of the media and marketing plans written for advertised brands in the U.S.

Specifically, GfK MRI presents a single-source measurement of major media, products, services, and in-depth consumer demographic and lifestyle characteristics.  GfK MRI provides data on media usage, audience composition, and other relevant factors pertaining to all major media types as well as the readership of print vehicles.

Since it is not possible to measure Internet against the target audience "Flonase Users," KM selected the age and gender targets available for all media that are most representative of Flonase user demographics.  "Flonase Users" skew women with an index of 116.  This means that "Flonase Users" are 16% more likely than the average adult to be women.  Of "Flonase Users," 47.9 percent are 45 to 64 years old.  Given this information, the measured delivery of media to women 45 to 64 years old will be representative of delivery to Class Members.

Therefore, to adequately reach the Class, KM will purchase and measure media against the following primary target:

➢ Women 45-64 years old ("Women 45-64")

---

[1] Since 1979, GfK MRI's *Survey of the American Consumer* has conducted detailed polling of a large sample of U.S. adults about the media they see and hear and about the products they use.  Participants in the survey are identified by age, occupation, income, education and by where they live, among other things.  They are asked what magazines and newspapers they read, what TV shows and cable channels they watch, and are asked questions about Internet access and radio formats.  Survey data indicate the brands and products they use from among 500 categories and 6000 consumer brands.  The data from this survey is used by media practitioners industry-wide to characterize media and product users by demographics and to account for and compare the size and make-up of media audiences.  The *Doublebase Study* consists of two years of *Survey of the American Consumer* data.  (GfK MRI was known until mid-2010 as Mediamark Research & Intelligence , or MRI.)

TARGET AUDIENCE:
## DEMOGRAPHICS

Based on GfK MRI data, the graph below outlines the demographics of the target audience and the demographics of adults 18 years and older ("Adults 18+") for comparison purposes:

| DEMOGRAPHICS | ADULTS 18+ | FLONASE USERS | WOMEN 45-64 |
|---|---|---|---|
| **Gender** | | | |
| Male | 48.4% | 39.9% | N/A |
| Female | 51.6% | 60.1% | 100% |
| **Age** | | | |
| 18-34 | 30.5% | 20.2% | N/A |
| 35-44 | 18.3% | 16.8% | N/A |
| 45-64 | 34.6% | 47.9% | 100% |
| 65+ | 16.6% | 15.1% | N/A |
| **Education** | | | |
| Graduated/Attended College | 55.0% | 66.0% | 58.9% |
| Graduated High School | 30.9% | 25.0% | 30.7% |
| **Household Income[2]** | | | |
| Under $10,000 | 6.3% | 5.2% | 5.4% |
| $10,000 - $29,999 | 16.6% | 11.2% | 18.7% |
| $30,000 - $49,999 | 16.0% | 16.8% | 17.8% |
| $50,000 - $74,999 | 11.2% | 15.2% | 13.2% |
| $75,000+ | 39.0% | 51.6% | 44.7% |
| $100,000+ | 25.2% | 35.6% | 29.7% |
| **Ethnicity[3]** | | | |
| Caucasian | 76.3% | 80.3% | 79.7% |
| African-American | 11.6% | 12.9% | 12.0% |
| Hispanic | 13.8% | 9.6% | 9.4% |
| Asian | 3.0% | 1.3% | 2.3% |
| Other | 9.4% | 5.6% | 6.0% |

---

[2] The total percentages listed do not equal exactly 100.00% percent because GfK MRI rounds up all percentages to the nearest tenth of a decimal.

[3] The GfK MRI *Doublebase Study* allows for multi-classification of an individual's ethnicity.  Therefore, the sum of all ethnicities may be greater than 100%.

© 2012 KINSELLA MEDIA, LLC

*In re Flonase Antitrust Litigation*

| Location[4] | | | |
|---|---|---|---|
| A & B Counties | 71.6% | 72.0% | 71.3% |
| C & D Counties | 28.4% | 28.0% | 28.7% |

Based on these data, Flonase Users are slightly more likely than the average adult to:

➢ Be female.

➢ Be 45-64 years old.

➢ Have graduated or attended college.

➢ Have a household income of $75,000+.

---

[4] A Counties, as defined by A.C. Nielsen Company ("Nielsen"), are all counties belonging to the 25 largest metropolitan areas. These metro areas correspond to the Metropolitan Statistical Area and include the largest cities and consolidated areas in the United States. B Counties, as defined by Nielsen, are all counties not included under A that have either a population greater than 150,000 or are in a metro area with a population greater than 150,000 according to the latest census. C Counties, as defined by Nielsen, are all counties not included under A or B that either have a population greater than 40,000 or are in a metro area with a population greater than 40,000 according to the latest census. D Counties are, essentially, rural counties.

© 2012 KINSELLA MEDIA, LLC

# TARGET AUDIENCE:
## MEDIA USAGE

Individuals spend varying amounts of time with different media. Certain demographic groups may be heavy consumers, light consumers, or non-users of a particular medium. For example, GfK MRI data shows that individuals who are less educated are likely to be heavy television viewers and light newspaper readers. Conversely, highly educated individuals are more likely to be heavy newspaper readers and light television viewers.

KM notice plans focus on the media types used most often by the target audiences. To examine the media habits of the target audience, KM compares the target audience's media usage to that of the average adult 18 years of age and older ("Adult 18+") in usage quintiles reported by GfK MRI. The study ranks respondents based on their amount of exposure to a medium and divides them into five equal-sized groups ("quintiles") from heaviest usage (1) to lightest usage (5).

The media usage of the target audience in each quintile is expressed as an index. An index of 100 is the average adult's usage of a particular medium. Therefore, an index above 100 indicates a heavier usage of the medium than the average adult, and an index below 100 indicates a lighter usage of the medium than the average adult.

The target audience's top two quintiles (heaviest and next heaviest usage) for each type of media are:

| MEDIA | ADULTS 18+ | FLONASE USERS | WOMEN 45-64 |
|---|---|---|---|
| **Magazine** | | | |
| Quintile 1 | 100 | 128 | 96 |
| Quintile 2 | 100 | 112 | 102 |
| **Newspaper** | | | |
| Quintile 1 | 100 | 119 | 118 |
| Quintile 2 | 100 | 103 | 109 |
| **Radio** | | | |
| Quintile 1 | 100 | 95 | 103 |
| Quintile 2 | 100 | 95 | 101 |
| **Television** | | | |
| Quintile 1 | 100 | 100 | 105 |
| Quintile 2 | 100 | 110 | 106 |
| **Internet** | | | |
| Quintile 1 | 100 | 108 | 95 |
| Quintile 2 | 100 | 109 | 103 |

© 2012 KINSELLA MEDIA, LLC

These data indicate the following regarding the media consumption habits of Women 45-64 and Flonase Users:

➢ Flonase Users are heavy magazine and newspaper readers.

➢ Flonase Users are somewhat heavy Internet users.

➢ Flonase Users are average radio listeners and television watchers.

➢ Women 45-64 are heavy newspaper readers.

➢ Women 45-64 are somewhat heavy television watchers.

➢ Women 45-64 are average magazine readers, radio listeners, and Internet users.

As Flonase Users are heavier magazine readers, similar newspaper readers and heavier Internet users than Women 45-64, it is likely that this plan has a higher reach to Flonase Users than Women 45-64.

© 2012 Kinsella Media, LLC

# PAID MEDIA PLACEMENTS

PAID MEDIA PLACEMENTS:
## NEWSPAPER SUPPLEMENTS

*Parade*, *USA Weekend*, and *American Profile* are publications known as newspaper supplements that are inserted into weekend or Sunday editions newspapers nationwide. Newspaper supplements are magazines that are articles written for broad, general appeal and encourage readership through brevity. Issues are typically fewer than 30 pages.  For this Notice Program, KM recommends newspaper supplements because of their cost-effective reach capability.

*Parade* appears in more than 640 papers, *USA Weekend* in more than 800, and *American Profile* in 1,282.  (There is a small amount of overlap, as some papers carry more than one supplement, so these numbers are not cumulative.)  *Parade* and *USA Weekend* together reach every major media market in the country.  The selected supplements provide coverage in all 50 states and the District of Columbia. A list of the newspapers into which the selected supplements are inserted is attached as Exhibit 2.

KM recommends the following newspaper supplement placements:



➢ A two-fifth-page ad (5.25" x 6.75") once in *Parade* with an estimated circulation of 33,000,000.[5]

➢ *Parade* is carried in the Sunday edition of more than 640 daily newspapers and is the highest circulating magazine in the world.  Carrier newspapers serve major urban and suburban markets in the U.S.

➢ 34.9% of women 45-64 read *Parade*.

➢ A two-fifth-page ad (5" x 6.4375") once in *USA Weekend* with an estimated circulation of 22,250,000.

➢ *USA Weekend* is carried in the weekend edition of more than 800 daily newspapers in major markets, complementing U.S. markets served by *Parade*.

---

[5] The GfK MRI readership estimates for *Parade* and *USA Weekend* are reflective of the broader readership measurement of the newspaper carrier groups into which these supplements are inserted.  A custom study, conducted in 2003, by GfK MRI indicates that the actual readership of the supplements is less than that of the carrier papers.  While this study provided directional insight into the audience, the data provided is highly variable and insufficient for use in specific computation of reach and frequency.  Therefore, the use of carrier paper readership for the newspaper supplements remains an accredited methodology

➢ 21.4% of women 45-64 read *USA Weekend*.

## American Profile

➢ A Digest-page ad (4.75" x 6.625") once in *American Profile* with an estimated circulation of 10,250,000.

➢ *American Profile* is carried in 1,282 weekly and daily newspapers that are published primarily in rural counties nationwide, including counties that are not served by *Parade* or *USA Weekend*. Editorial content is designed to appeal to small-town Americans and their interests and activities.

➢ 18.1% of women 45-64 read *American Profile*.

PAID MEDIA PLACEMENTS:
## CONSUMER MAGAZINES

Most adults read one or more magazines during an average month and nearly three out of five adults read or look at a magazine daily.  Magazines quickly accumulate readership and provide timely and efficient notice to readers.  KM chose the consumer magazines listed below because they provide efficient coverage of the target audience.

KM recommends the following consumer magazine placements:



> ➤ A full-page ad (5.75" x 9") once in *National Geographic* with an estimated circulation of 4,100,000.

> ➤ *National Geographic* is published monthly and covers people and places internationally. Readers spend an average of 56 minutes with each issue and tend to be upper-income and educated.

> ➤ 12.4% of women 45-64 read *National Geographic*.



> ➤ A half-page ad (3.375" x 10") twice in *People* with an estimated circulation of 3,450,000.

> ➤ *People* is a weekly publication covering contemporary personalities in entertainment, politics, business, and other current events.

> ➤ 24.9% of women 45-64 read *People*.

*In re Flonase Antitrust Litigation*

## PAID MEDIA PLACEMENTS:
## TRADE PUBLICATION

An important component of the Notice Program is advertising in a trade publication that is read by individuals who are in the business of insurance.  While the reach of this publication is not measured, it is targeted directly to TPPs.

The recommended trade publication is:



> ➤ A full-page ad (7" x 10") once in *National Underwriter Life & Health* with an estimated circulation of 50,550.

> ➤ *National Underwriter Life & Health* has a pass-along rate of 1.7 readers per copy.

> ➤ *National Underwriter Life & Health* is the only weekly magazine serving the life, health and financial services market.  Topics covered include agency management, taxes, legislation, executive benefits, retirement planning, and profitable sales ideas.

*In re Flonase Antitrust Litigation*

PAID MEDIA PLACEMENTS:
# PUBLICATIONS IN U.S. TERRITORIES AND POSSESSIONS

To provide notice in U.S. territories and possessions, KM selected newspaper advertising. The Consumer Publication Notice will be translated, when necessary, and appropriately sized for placement in the following newspapers:

| U.S. TERRITORY/POSSESSION | NEWSPAPER | CIRCULATION |
|---|---|---|
| American Samoa | *Samoa News* | 4,000 |
| Guam | *Pacific Daily News* | 30,000 |
| Northern Mariana Islands | *Saipan Tribune* | 2,500 |
| Puerto Rico | *El Nuevo Dia* | 250,000 |
| Puerto Rico | *El Vocero* | 140,000 |
| Puerto Rico | *Primera Hora* | 140,869 |
| St. Croix (United States Virgin Islands) | *St. Croix Avis* | 14,000 |
| St. John (United States Virgin Islands) | *St. Johns Trade Winds* | 2,000 |
| St. John (United States Virgin Islands) | *Virgin Islands Daily News* | 13,000 |

PAID MEDIA PLACEMENTS:
# TARGET AUDIENCE'S PRINT READERSHIP

Readership includes both primary readers and pass-along readers. Primary readers purchase a publication or are members of a household where the publication was purchased. Pass-along readers are those who read the publication outside the home, in places such as a doctor's office. The table below indicates the estimated number of readers for the target audience of an average issue of the magazine or newspaper supplement:

| PUBLICATION | INSERTIONS | WOMEN 45-64 |
|---|---|---|
| *American Profile* | 1 | 7,369,000 |
| *National Geographic* | 1 | 5,057,000 |
| *Parade* | 1 | 14,171,000 |
| *People* | 2 | 10,111,000 |
| *USA Weekend* | 1 | 8,679,000 |

GfK MRI does not measure trade publications. Therefore, their contribution to the overall reach of the media is not calculated. Their inclusion in the Notice Program is still recommended, however, given the demographics of the target audience.

PAID MEDIA PLACEMENTS:
## INTERNET ADVERTISING

GfK MRI provides data on Internet usage by asking survey respondents about their online usage during the 30 days prior to the survey. According to GfK MRI, 80.2% of women 45-64 used the Internet during the last 30 days.

Accordingly, KM recommends incorporating Internet advertising into the Notice Program in order to provide potential Class Members with additional national notice opportunities beyond the broad-reaching print program. Internet advertising delivers an immediate message and allows the viewer of an advertisement to instantly click through to a website for further information.

### WEBSITE ADVERTISING

KM recommends placing ads on a wide range of websites, enabling maximum exposure opportunities to reach the target audience of women 45-64. In addition, websites with audiences that are highly comprised of the specific target audiences were also selected. (Delivery of Internet impressions to specific sites and categories within sites are subject to availability at the time KM purchases the media.)

KM recommends the following Web placements:



- ➢ 24/7 Real Media is a network that represents over 800 websites. A partial list of websites in the 24/7 Real Media Network is attached as Exhibit 3.

- ➢ Banner advertisements measuring 728 x 90 pixels, 300 x 250 pixels, and 160 x 600 pixels will appear, on a rotating basis, on websites that are part of the 24/7 Real Media Network, for a total estimated 60,000,000 gross impressions.

- ➢ The banner advertisements will appear for approximately 30 days.



- ➢ AOL (America Online) Media Networks are a leading portfolio of websites attracting large and engaged audiences on the web.

- ➢ Banner advertisements measuring 728 x 90 pixels and 300 x 250 pixels will appear, on a rotating basis, on various AOL websites for a total estimated 30,000,000 gross impressions.

- ➢ The banner advertisements will appear for approximately 30 days.

*In re Flonase Antitrust Litigation*

# YAHOO!

➢ Yahoo! is a leading Internet brand and a global online network of integrated services providing users with entertainment and other quality content.

➢ Banner advertisements measuring 728 x 90 pixels and 300 x 250 pixels will appear, on a rotating basis, on various Yahoo! Web pages, for a total estimated 25,000,000 gross impressions.

➢ The banner advertisements will appear for approximately 30 days.

*In re Flonase Antitrust Litigation*

# NATIONAL MEDIA DELIVERY

The paid media program outlined in this plan provides Class Members with multiple exposure opportunities to media vehicles carrying the Notice and delivers the following estimated reach and frequency measurements to the target audience defined by the 2012 Spring Study[6] from GfK MRI:

➢ An estimated 80.02% of women 45-64 will be reached with an average estimated frequency of 2 times, delivering 67,104,000 gross impressions.

---

[6] GfK MRI Net+ Fusion combines GfK MRI's *Survey of the American Consumer* and Nielsen Online's NetView, providing a single-source dataset of off-line and online media usage by American consumers. Nielsen uses a patented metering technology and representative panels of Internet users to collect and report consumer Internet usage. The GfK MRI survey provides data on magazine and newspaper reading, television viewing, radio listening, product consumption, psychographic characteristics, computer and Internet access configurations, and geo-demographic characteristics. Combining the two datasets provides unduplicated audience estimates across print and online media.

# NOTICE DESIGN

## NOTICE DESIGN:
## DETAILED NOTICE

The Detailed Notice (Exhibit 4) will be compliant with Rule 23 and consistent with the Federal Judicial Center's "illustrative" class action notices.  Specifically, the Detailed Notice will clearly and concisely state in plain, easily understood language:

- ➢ The nature of the action;

- ➢ The definition of the class certified;

- ➢ The class claims, issues, or defenses;

- ➢ That a class member may enter an appearance through an attorney if the member so desires;

- ➢ That the Court will exclude from the class any member who requests exclusion;

- ➢ The time and manner for requesting exclusion; and

- ➢ The binding effect of a class judgment on members under Rule 23 (c)(3).

The Detailed Notice will prominently feature a toll-free number and website address for Class Members to obtain more information and file a claim.

NOTICE DESIGN:
# POSTCARD NOTICE

The plain language Postcard Notice (Exhibit 5) is designed to alert Class Members to the litigation by using a bold headline.  This headline will enable Class Members to quickly determine if they are potentially affected by the litigation. Plain language text provides important information regarding the subject of the litigation, the Class definition, and the legal rights available to Class Members.  The Postcard Notice includes all the substantive information required by Rule 23.

Each postcard will prominently feature a toll-free number and website address for Class Members to obtain the Detailed Notice and other information.

NOTICE DESIGN:
# PUBLICATION NOTICE

Rule 23(c)(2) of the Federal Rules of Civil Procedure requires notices in 23(b)(3) class actions to be written in "plain, easily understood language." KM applies the plain language requirement in drafting all notices in federal and state class actions. The firm maintains a strong commitment to adhering to the plain language requirement, while drawing on its experience and expertise to draft notices that effectively convey the necessary information to Class Members.

The plain language Publication Notice (Exhibit 6), is designed to alert Class Members to the litigation by using a bold headline. This headline will enable Class Members to quickly determine if they are potentially affected by the litigation. Plain language text provides important information regarding the subject of the litigation, the Class definition and the legal rights available to Class Members. The Publication Notice includes all the substantive information required by Rule 23.

Each advertisement will prominently feature a toll-free number and website for Class Members to obtain the Detailed Notice and other information.

*In re Flonase Antitrust Litigation*

## NOTICE DESIGN:
## WEBSITE AND INTERNET ADS

An informational interactive website is a critical component of the Notice Program. A website is a constant information source instantly accessible to millions. In this case, the site will capitalize on the Internet's ability to distribution information and provide access to customer service. Internet banner ads will help direct Class Members to the website.

### WEBSITE DESIGN

Combining clean site design, consistent site navigation cues and search engine optimization, the website will provide Class Members with easy access to the details of the litigation.

> ➤ **CLEAN DESIGN:** The site will be designed for ease of navigation and comprehension, with user-friendly words and icons. Clearly labeled content will include the Detailed Notice, court documents, and answers to frequently asked questions.

> ➤ **ONLINE REGISTRATION/CLAIM FILING:** In an effort to make it even easier for Class Members to receive information/make claims, the website will allow users to request hard copies of materials, and/or make a claim online.

### INTERNET BANNER AD DESIGN

KM will design Internet banner advertisements to alert Class Members to the litigation by using a bold headline. The headline will enable Class Members to quickly determine if they may be affected by the litigation. When users click on the banner advertisement, they will be connected to the informational website that contains complete information about their legal rights.

For reference, below is an Internet ad in a similar case:



---

# TOLL-FREE TELEPHONE SUPPORT

A toll-free interactive voice response system (IVR) will be established to service both Consumer Class Members and TPP Class Members calling as a result of seeing the paid media notice. Callers requesting the Detailed Notice will be prompted to input the telephone number of the residence where they would like to receive the Notice.

The system uses an address look-up database to locate the corresponding address of the resident. A portion of the address will be read back to the caller for address verification. For successful look-ups, the caller will be asked to speak the Class Member's full name and to spell the last name. If the look-up fails, is incorrect, or the call is placed from a rotary dial telephone, callers will be prompted to state their name and address.

# EXHIBIT 1



# Kinsella Media, LLC

## Relevant Case Experience

### Antitrust

*Big Valley Milling, Inc. v. Archer Daniels Midland Co.,* No. 65-C2-96-000215 (Minn. Dist. Ct. Renville County) (lysine).

*Carlson v. Abbott Laboratories*, No. 94-CV-002608 (Wis. Cir. Ct. Milwaukee County) (infant formula).

*Comes v. Microsoft Corp.,* No. CL8231 (Iowa Dist. Ct. Polk County

*Connecticut v. Mylan Laboratories, Inc.,* No. 99-276, MDL No. 1290 (D.D.C.)  (pharmaceutical).

*Conroy v. 3M Corp.*, No. C-00-2810 CW (N.D. Cal.) (invisible tape).

*Copper Antitrust Litigation,* MDL 1303 (W.D. Wis.) (physical copper).

*Cox v. Microsoft Corp.,* No. 105193/00 (N.Y. Sup. Ct. N.Y. County) (software).

*D.C. 37 Health  & Security Plan v. Medi-Span*, No. 07-cv-10988 (D.Mass.); *New England  Carpenters Health Benefits Fund v. First DataBank, Inc.,* No. 1:05-CV-11148 (D. Mass.) (pharmaceutical).

*Giral v. Hoffman-LaRoche Ltd.*, C.A. No. 98 CA 7467 (W. Va. Cir. Ct., Kanawha County) (vitamins).

*In re Buspirone Antitrust Litigation*, MDL No. 1413 (S.D.N.Y.) (pharmaceutical).

*In re Cardizem Antitrust Litigation*, 200 F.R.D. 326 (E.D. Mich.) (pharmaceutical).

*In re Compact Disc Minimum Price Antitrust Litigation*, MDL No. 1361 (D. Me.) (compact discs).

*In re Insurance Brokerage Antitrust Litig.*, MDL No. 1663 Civil No. 04-5184 (FSH) (D.N.J.) (insurance).

*In re International Air Transportation Surcharge Antitrust Litigation*, No. M 06-1793, MDL No. 1793 (N.D. Cal.) (airline fuel surcharges).

*In re Monosodium Glutamate Antitrust Litig.,* D-0202-CV-0200306168, D-202-CV-200306168 (N.M. Dist. Ct., Bernalillo County) (MSG).

*In re Motorsports Merchandise Antitrust Litigation,* No. 1:97-CV-2314-TWT (N.D. Ga.) (merchandise).

*In re Nasdaq Market-Makers Antitrust Litigation*, MDL No. 1023 (S.D.N.Y.) (securities).

*In re Pharmaceutical Industry Average Wholesale Price Litigation*, No. CA:01-CV-12257, MDL No. 1456 (D. Mass.) (pharmaceutical).

*In re Toys "R" Us Antitrust Litigation*, No. CV-97-5750, MDL No. 1211, (E.D.N.Y.) (toys and other products).

*In re Western States Wholesale Natural Gas Antitrust Litigation*, No. CV-03-1431, MDL No. 1566, (D. Nev) (natural gas).

*Kelley Supply, Inc. v. Eastman Chemical Co*., No. 99CV001528 (Wis. Cir. Ct., Dane County) (Sorbates).

*Ohio vs. Bristol-Myers Squibb, Co*., No. 1:02-cv-01080 (D.D.C.) (pharmaceutical).

*Raz v. Archer Daniels Midland Co.,* Inc., No. 96-CV-009729 (Wis. Cir. Ct. Milwaukee County) (citric acid).

## Consumer and Product Liability

*Azizian v. Federated Department Stores, Inc.,* No. 4:03 CV-03359 (N.D. Cal.) (cosmetics).

*Baird v. Thomson Consumer Elecs.,* No. 00-L-000761 (Ill. Cir. Ct., Madison County) (television).

*Bonilla v. Trebol Motors Corp.,* No. 92-1795 (D.P.R.) (automobiles).

*Burch v. American Home Products Corp.,* No. 97-C-204 (1-11) (W. Va. Cir. Ct., Brooke County) (Fen Phen).

*Cosby v. Masonite Corp., No.* CV-97-3408 (Ala. Cir. Ct. Mobile County) (siding product); *Quin v. Masonite Corp.,* No. CV-97-3313 (Ala. Cir. Ct. Mobile County) (roofing product).

*Cox v. Shell Oil Co.,* No. 18,844 (Tenn. Ch. Ct. Obion County) (polybutylene pipe).

*Daniel v. AON Corp.,* No. 99 CH 11893 (Ill. Cir. Ct. Cook County) (insurance).

*Fettke v. McDonald's Corp.,* No. 044109 (Cal. Super Ct. Marin County) (trans fatty acids).



*Florida v. Nine West Group, Inc.,* No. 00 CIV 1707 (S.D.N.Y.) (shoes).

*Foothill/De Anza Community College Dist. v. Northwest Pipe Co.,* No. 00-20749-JF(N.D. Cal.) (fire sprinklers).

*Galanti v. The Goodyear Tire & Rubber Company,*  No. 03-209 (D.N.J.) (radiant heating)  (2002).

*Garza v. Sporting Goods Properties, Inc.,* No. SA 93-CA-1082 (W.D. Tex.) (gun ammunition).

*Hoorman v. GlaxoSmithKline,* No. 04-L-715 (Ill. Cir. Ct., Madison Cty.) (Paxil pharmaceutical*).*

*In re Louisiana Pacific Corp. Inner Seal OSB Trade Practices Litigation,* MDL No. 1114 (N.D. Cal.) (oriented strand board).

*In re Tri-State Crematory Litig,* MDL 1467 (N.D. Ga.) (improper burial).

*Lebrilla v. Farmers Group Inc.,* No. 00-CC-07185 (Cal. Super. Ct., Orange County) (auto insurance).

*Lovelis v. Titflex,* No. 04-211 (Ak. Cir. Ct., Clark County)  (gas transmission pipe).

*Naef v. Masonite Corp.,* No. CV-94-4033 (Ala. Cir. Ct. Mobile County) (hardboard siding product).

*Peterson v. BASF Corp.,* No. C2-97-295 (D. Minn.) (herbicide).

*Posey v. Dryvit Sys., Inc.* No. 17,715-IV (Tenn. Cir. Ct., Jefferson County) (EIFS stucco).

*Reiff v. Epson America, Inc. and Latham v. Epson Am., Inc.,* J.C.C.P. No. 4347 (Cal. Super. Ct., L.A. County) (ink jet printers).

*Richison v. Weyerhaeuser Company Limited,* No. 05532 (Cal. Super. Ct. San Joaquin County) (roofing product).

*Ruff v. Parex, Inc.,* No. 96-CvS 0059 (N.C. Super. Ct. Hanover County) (synthetic stucco product).

*Shah v. Re-Con Building Products, Inc.,* No. C99-02919 (Cal. Super. Ct. Contra Costa County) (roofing product).

*Shields vs. Bridgestone/Firestone, Inc., Bridgestone Corp.,* No. E-167.637 (D. Tex.) (tires).

*Smith v. Behr Process Corp.,* No. 98-2-00635 (Wash. Super. Ct., Gray Harbor County) (stain product).



*Weiner v. Cal-Shake, Inc., J.*C.C.P. No. 4208 (Cal. Super. Ct., Contra Costa County) (roofing product).

*Wholesale Elec. Antitrust Cases I & II,* J.C.C.P. Nos. 4204 & 4205 (Cal. Super. Ct., San Diego County) (energy).

*Woosley v. State of California,* No. CA 000499 (Cal. Super. Ct., Los Angeles County) (automobiles).

## Mass Tort

*Ahearn v. Fibreboard Corp.,* No. 6:93cv526 (E.D. Tex); *Continental Casualty Co. v. Rudd*, No. 6:94cv458 (E.D. Tex) (asbestos injury).

*Backstrom v. The Methodist Hospital,* No. H.-94-1877 (S.D. Tex.) (TMJ injury).

*Engle v. RJ Reynolds Tobacco Co.,* No. 94-08273 (Fla. Cir. Ct. Dade County) (tobacco injury).

*Georgine v. Amchem, Inc.,* No. 93-CV-0215 (E.D. Pa.) (asbestos injury).

## Bankruptcies

*In re Armstrong World Industries, Inc.,* No. 00-4471 (Bankr. D. Del.).

*In re Dow Corning,* No. 95-20512 (Bankr. E.D. Mich.) (breast implants).

*In re Johns-Manville Corp.,* 68 B.R. 618, 626 (Bankr. S.D.N.Y.) (asbestos).

*In re Kaiser Aluminum Corp.,* No. 02-10429 (JFK) (D. Del).

*In re Owens Corning,* No. 00-03837 (Bankr. D. Del.).

*In re Raytech Corp.,* No. 5-89-00293 (Bankr. D. Conn.) (asbestos).

*In re The Celotex Corp.,* Nos. 90-10016-8B1 and 90-10017-8B1 (Bankr. M.D. Fla.) (asbestos).

*In re U.S. Brass Corp.,* No.94-40823S (Bankr. E.D. Tex.) (polybutylene).

*In re USG Corp.,* Nos. 01-2094 - 01-2104 (Bankr. D. Del.).

*In re W.R. Grace & Co.,* No. 01-01139 (Bankr. D. Del.).



## Insurance

*McNeil v. American General Life and Accident Insurance Co.,* No. 8-99-1157 (M.D. Tenn.) (insurance).

*Nealy v. Woodmen of the World Life Insurance Co.,* No. 3:93 CV-536 (S.D. Miss.) (insurance).

## Holocaust Victims Reparations

*In re Holocaust Victim Assets Litigation,* Nos. CV 96-4849, CV-5161 and CV 97-461 (E.D.N.Y.) (Holocaust).

The International Commission on Holocaust Era Insurance Claims Outreach

## Pension Benefits

*Collins v. Pension Benefit Guarantee Corp.,* No. 88-3406 (D.D.C.); Page v. Pension Benefit Guarantee Corp., No. 89-2997 (D.D.C.).

*Forbush v. J. C. Penney Co., Inc.,* Nos. 3:90-2719 and 3:92-0109 (N.D. Tex.).

## International

*Ahearn v. Fiberboard Corporation,* No. 6:93cv526 (E.D. Tex) and *Continental Casualty Co. v. Rudd,* No. 6:94cv458 (E.D. Tex.) (asbestos injury) (1993).

*Galanti v. The Goodyear Tire & Rubber Company,* No. 03-209 (D.N.J.) (radiant heating) (2002).

*In re Holocaust Victims Assets Litigation,* No. CV 96-4849 (ERK) (MDG) (Consolidated with CV-5161 and CV 97461) (E.D.N.Y.) (2003).

*In re Owens Corning, Chapter 11,* No. 00-03837 (MFW) (Bankr. D. Del.) (2006).

*In re The Celotex Corporation, Chapter 11,* Nos. 90-10016-8B1 and 90-10017-8B1 (Bankr. M.D. Fla.) (1996).

*In re USG Corporation, Chapter 11,* Nos. 01-2094 (RJN) through 01-2104(RJN) (Bankr. D. Del.) (2006).

*In re Western Union Money Transfer Litigation,* No. 01 0335 (CPS) (VVP) (E.D.N.Y.) (wire transactions) (2004).

*In re W.R. Grace & Co., Chapter 11,* No. 01-01139 (Bankr. D. Del.) (bankruptcy) (2001).



International Committee on Holocaust Era Insurance Claims (1999).

## Product Recall

Central Sprinkler Voluntary Omega Sprinkler Replacement Program

*Hart v. Central Sprinkler Corp.,* No. BC17627 (Cal. Super. Ct. Los Angeles County) & *County of Santa Clara v. Central Sprinkler Corp., No.* CV 17710119 (Cal. Super. Ct. Santa Clara County)

## Telecom

*Bidner, et al. v. LCI International Telecom Corp d/b/a Qwest Communications.*

*Community Health Association v. Lucent Technologies, Inc.,* No. 99-C-237, (W.Va. Cir. Ct., Kanawha County).

*Cundiff et al. v. Verizon California, Inc.,* No. 237806 (Cal. Super Ct., Los Angeles County).

*Kushner v. AT&T Corporation,* No. GIC 795315 (Cal. Super. Ct., San Diego County).

*Rish Enterprise v. Verizon New Jersey,* No. MID-L-8946-02 (N.J. Super. Ct.).

*Sonnier, et. al. v. Radiofone, Inc.,* No. 44-844, (L.A. Jud. Dist. Ct., Plaquemines Parish County).

*State of Louisiana v. Sprint Communications Company L.P.,* No. 26,334 (Jud. Dis. Ct., Parish of West Baton Rouge) and *State of Louisiana v. WilTel, Inc.,* No. 26,304 (Jud. Dis. Ct., Parish of West Baton Rouge).



# EXHIBIT 2

# American Profile Distributing Newspapers

| Publication | City | State | Zip | Circulation |
|---|---|---|---|---|
| Cherokee County Herald | Centre | AL | 35960 | 2,437 |
| The Cullman Times | Cullman | AL | 35055 | 11,000 |
| TheTimes-Record | Fayette | AL | 35555-2702 | 5,000 |
| Pickens County Herald | Fayette | AL | 35555-2702 | 5,000 |
| North Jefferson News | Gardendale | AL | 35071-0849 | 3,482 |
| Daily Mountain Eagle | Jasper | AL | 35501 | 11,044 |
| The Leeds News | Leeds | AL | 35094 | 2,288 |
| St. Clair News-Aegis | Pell City | AL | 35125 | 2,786 |
| The Eufaula Tribune | Eufaula | AL | 36027 | 5,582 |
| The Opelika-Auburn News | Opelika | AL | 36801 | 14,800 |
| The Dothan Eagle | Dothan | AL | 36303 | 35,700 |
| The Sand Mountain Reporter | Albertville | AL | 35950 | 10,000 |
| The News Courier | Athens | AL | 35611 | 7,300 |
| The Times-Journal | Fort Payne | AL | 35968 | 6,467 |
| The Daily Sentinel | Scottsboro | AL | 35768 | 5,074 |
| The Atmore Advance | Atmore | AL | 36502 | 3,200 |
| The Brewton Standard | Brewton | AL | 36426 | 3,000 |
| The Dadeville Times | Alexander City | AL | 35010 | 1,583 |
| The Outlook | Alexander City | AL | 35010 | 4,100 |
| The Outlook/Dadeville Times | Alexander City | AL | 35010 | 5,683 |
| The Andalusia Star-News | Andalusia | AL | 36420 | 4,431 |
| The Demopolis Times | Demopolis | AL | 36732-2255 | 3,000 |
| The Tallassee Tribune | Tallassee | AL | 36078 | 3,000 |
| The Messenger | Troy | AL | 36081 | 3,349 |
| The Eclectic Observer | Wetumpka | AL | 36092 | 2,000 |
| The Wetumpka Herald | Wetumpka | AL | 36092 | 4,600 |
| The Weekly Vista | Bentonville | AR | 72712 | 4,466 |
| Booneville Democrat | Booneville | AR | 72927-4043 | 2,874 |
| Charleston Express | Charleston | AR | 72933 | 1,916 |
| Greenwood Democrat | Greenwood | AR | 72936-0398 | 1,421 |
| Paris Express | Paris | AR | 72855 | 2,792 |
| Alma Journal | Salem | AR | 72921 | 750 |
| Van Buren Press Argus-Courier | Van Buren | AR | 72956-4306 | 3,000 |
| The Villager Journal | Cherokee Village | AR | 72525 | 2,200 |
| Clay County Times Democrat | Rector | AR | 72461 | 2,600 |
| Atkins Chronicle | Atkins | AR | 72823 | 2,000 |
| The Dover Times | Atkins | AR | 72823 | 1,948 |
| Batesville Daily Guard | Batesville | AR | 72501 | 10,149 |
| The Saline Courier | Benton | AR | 72015 | 6,000 |
| Log Cabin Democrat | Conway | AR | 72033 | 11,164 |
| Yell County Record | Danville | AR | 72833 | 3,552 |
| Cleburne County Sun-Times | Heber Springs | AR | 72543-3042 | 4,975 |
| Malvern Daily Record | Malvern | AR | 72104 | 4,000 |
| Stone County Leader | Mountain View | AR | 72560 | 4,263 |
| Newport Independent | Newport | AR | 72112 | 2,239 |

| Daily Leader | Stuttgart | AR | 72160 | 2,985 |
|---|---|---|---|---|
| The White Hall Journal | White Hall | AR | 71612 | 2,350 |
| Helena-West Helena Daily World | Helena | AR | 72342 | 4,050 |
| Northeast Arkansas Town Crier | Manila | AR | 72442 | 2,000 |
| The Osceola Times | Osceola | AR | 72370 | 2,537 |
| Poinsett County Democrat Tribune | Trumann | AR | 72472 | 1,500 |
| Evening Times | West Memphis | AR | 72301 | 8,627 |
| Little River News | Ashdown | AR | 71822-2817 | 3,045 |
| Hope Star | Hope | AR | 71801 | 3,045 |
| The Daily Siftings Herald | Hope | AR | 71801 | 3,045 |
| Nashville News | Nashville | AR | 71852 | 3,000 |
| Carroll County News | Berryville | AR | 72616 | 3,100 |
| Newton County Times | Harrison | AR | 72602 | 1,500 |
| The News | Salem | AR | 72576 | 2,550 |
| Mohave Valley Daily News | Bullhead City | AZ | 86439 | 9,134 |
| The Bugle | Cottonwood | AZ | 86326 | 2,500 |
| The Verde Independent | Cottonwood | AZ | 86326 | 2,574 |
| Arizona Silver Belt | Globe | AZ | 85502 | 3,500 |
| Holbrook Tribune - News | Holbrook | AZ | 86025 | 2,290 |
| The Kingman Daily Miner | Kingman | AZ | 86401 | 8,525 |
| Today's News Herald | Lake Havasu City | AZ | 86403 | 11,000 |
| Parker Pioneer | Parker | AZ | 85344 | 5,000 |
| Ahwatukee Foothills News | Phoenix | AZ | 85044 | 28,280 |
| The Daily Courier | Prescott | AZ | 86312 | 15,750 |
| Eastern Arizona Courier | Safford | AZ | 85546 | 6,900 |
| Sedona Red Rock News | Sedona | AZ | 86336 | 6,000 |
| White Mountain Independent | Show Low | AZ | 85902 | 8,500 |
| Daily News-Sun | Sun City | AZ | 85351 | 12,444 |
| Glendale/Peoria Today | Sun City | AZ | 85351 | 34,170 |
| Surprise Today | Sun City | AZ | 85351 | 40,290 |
| Chandler Tribune/East Valley Tribune | Tempe | AZ | 85282 | 98,000 |
| Wickenburg Sun | Wickenburg | AZ | 85390 | 2,537 |
| Arizona Range News | Willcox | AZ | 85544 | 3,146 |
| Williams-Grand Canyon News | Williams | AZ | 86046 | 3,482 |
| San Pedro Valley News - Sun | Benzon | AZ | 85602 | 3,045 |
| The Daily Dispatch | Douglas | AZ | 85607 | 4,080 |
| Green Valley News & Sun | Green Valley | AZ | 85614 | 10,200 |
| The Sahuarita News and Sun | Green Valley | AZ | 85614 | 6,630 |
| Sierra Vista Herald | Sierra Vista | AZ | 85635 | 10,710 |
| Intermountain News | Burney | CA | 96013 | 1,050 |
| Chico-Oroville Enterprise Record | Chico | CA | 95927-0009 | 28,000 |
| The Gridley Herald | Gridley | CA | 95948 | 2,500 |
| Paradise Post | Paradise | CA | 95969 | 8,119 |
| Red Bluff Daily News | Red Bluff | CA | 96080 | 8,119 |
| Shasta Lake Bulletin | Shasta Lake | CA | 96019 | 1,050 |
| Eureka Times Standard | Eureka | CA | 95502 | 19,500 |
| Kingsburg Recorder | Kingsburg | CA | 93631 | 2,500 |
| The Porterville Recorder | Porterville | CA | 93257 | 10,149 |

| | | | | |
|---|---|---|---|---|
| Selma Enterprise | Selma | CA | 93662 | 3,000 |
| Visalia Times Delta/Tulare Advance Register | Visalia | CA | 93291 | 24,000 |
| Inyo Register | Bishop | CA | 93514 | 4,872 |
| Palo Verde Valley Times(/Quartszite Times) | Blythe | CA | 92225 | 4,060 |
| Antelope Valley Press | Palmdale | CA | 93550 | 20,500 |
| The Daily Indpendent | Ridgecrest | CA | 93555 | 8,119 |
| Daily Midway Driller | Taft | CA | 92368 | 3,045 |
| The Desert Trail | Twenty-nine Palms | CA | 92277 | 3,500 |
| Press-Dispatch | Victorville | CA | 92392 | 38,566 |
| Hi-Desert Star | Yucca Valley | CA | 92286 | 7,000 |
| Mount Shasta Herald | Mount Shasta | CA | 96067 | 4,872 |
| Siskiyou Daily News | Yreka | CA | 96097 | 5,886 |
| Free Lance | Hollister | CA | 95023 | 3,542 |
| The Monterey County Herald | Monterey | CA | 93940 | 29,250 |
| Salinas Valley Weekly | Monterey | CA | 93940 | 35,700 |
| Tahoe Daily Tribune | South Lake Tahoe | CA | 96150 | 7,600 |
| Lassen County Times | Susanville | CA | 96130 | 8,600 |
| Westwood Pinepress | Susanville | CA | 96130 | 1,245 |
| The Sierra Sentinel | Altaville | CA | 95221 | 1,000 |
| Chester Progressive | Chester | CA | 96020 | 2,440 |
| Escalon Times | Escalon | CA | 95320 | 1,800 |
| Daily Republic | Fairfield | CA | 94533 | 18,805 |
| The Union | Grass Valley | CA | 95945 | 17,000 |
| Indian Valley Record | Greenville | CA | 95947 | 1,498 |
| Amador Ledger-Dispatch | Jackson | CA | 95642 | 7,600 |
| The Manteca Bulletin | Manteca | CA | 95336-0912 | 6,716 |
| Oakdale Leader | Oakdale | CA | 95361 | 5,074 |
| Mountain Democrat | Placerville | CA | 95667 | 14,527 |
| Portola Reporter | Portola | CA | 96122 | 2,475 |
| Feather River Bulletin | Quincy | CA | 95971 | 3,330 |
| The Riverbank News | Riverbank | CA | 95367-2389 | 1,284 |
| The Union Democrat | Sonora | CA | 95370 | 12,800 |
| Sierra Sun | Truckee | CA | 96160 | 5,700 |
| Turlock Journal | Turlock | CA | 95380 | 3,980 |
| Vacaville Reporter | Vacaville | CA | 95688 | 20,298 |
| The Valley Springs News | Valley Springs | CA | 95252 | 1,000 |
| Woodland Daily Democrat | Woodland | CA | 95695 | 10,352 |
| The San Diego Union-Tribune | San Diego | CA | 92108 | 254,900 |
| Fort Bragg Advocate News | Fort Bragg | CA | 95453 | 5,074 |
| The Dispatch | Gilroy | CA | 95021 | 4,432 |
| Lake County Record Bee | Lakeport | CA | 95453 | 9,134 |
| Morgan Hill Times | Morgan Hill | CA | 95038 | 3,266 |
| Ukiah Daily Journal | Ukiah | CA | 95482 | 7,815 |
| Vallejo Times Herald | Vallejo | CA | 94590 | 22,328 |
| The Willits News | Willits | CA | 95490 | 2,842 |
| Imperial Valley Press | El Centro | CA | 92243 | 11,500 |
| Holtville Tribune | Holtville | CA | 92250 | 3,045 |
| Calexico Chronicle | Holtville | CA | 92250 | 1,287 |

| | | | | |
|---|---|---|---|---|
| Imperial Valley Weekly | Holtville | CA | 92250 | 1,250 |
| Daily Record | Canon City | CO | 81212 | 6,100 |
| The Fowler Tribune | Fowler | CO | 81039 | 1,000 |
| La Junta Tribune Democrat | La Junta | CO | 81050 | 3,000 |
| Bent County Democrat | Las Animas | CO | 81054 | 1,500 |
| Akron News-Reporter | Akron | CO | 80720-1439 | 1,450 |
| Brush News-Tribune | Brush | CO | 80723 | 900 |
| Craig Daily Press | Craig | CO | 81625 | 9,200 |
| Estes Park Trail-Gazette | Estes Park | CO | 80517 | 3,900 |
| Fort Morgan Times | Fort Morgan | CO | 80701 | 3,360 |
| The Greeley Tribune | Greeley | CO | 80631 | 21,000 |
| Julesburg Advocate | Julesburg | CO | 80737-1520 | 1,343 |
| Lafayette News | Lafayette | CO | 80026-1261 | 2,000 |
| Daily Times - Call | Longmont | CO | 80501 | 21,500 |
| Louisville Times | Louisville | CO | 80027-1854 | 2,000 |
| (Loveland) Daily Reporter - Herald | Loveland | CO | 80537 | 18,500 |
| Steamboat Pilot | Steamboat Springs | CO | 80477-4827 | 3,500 |
| Steamboat Today | Steamboat Springs | CO | 80477-4827 | 3,500 |
| Journal Advocate | Sterling | CO | 80751 | 4,500 |
| Journal Inquirer | Manchester | CT | 6045 | 45,000 |
| The Chronicle | Willimantic | CT | 6226 | 7,000 |
| The Hour | Norwalk | CT | 6855 | 9,000 |
| Newark Post | Newark | DE | 19711 | 4,000 |
| Sun Newspapers | Charlotte Harbor | FL | 33980 | 8,800 |
| Chiefland Citizen | Chiefland | FL | 32644 | 3,500 |
| Courier Journal | Crescent City | FL | 32112 | 2,700 |
| The Florida Times-Union | Jacksonville | FL | 32202 | 140,000 |
| St. Augustine Record | St. Augustine | FL | 32086 | 21,560 |
| Riverland News | Dunnellon | FL | 34432-6035 | 2,700 |
| Osceola News-Gazette | Kissimmee | FL | 34741 | 40,000 |
| Jackson County Floridan | Marianna | FL | 32448 | 7,307 |
| The Wakulla News | Crawfordville | FL | 32327 | 6,000 |
| Suwannee Democrat | Live Oak | FL | 32064 | 6,350 |
| The Madison Enterprise-Recorder | Madison | FL | 32340 | 3,451 |
| Gadsden County Times | Quincy | FL | 32351 | 6,000 |
| The Polk County Democrat | Bartow | FL | 33831 | 3,500 |
| The Fort Meade Leader | Fort Meade | FL | 33841-3303 | 2,700 |
| Frostproof News | Frostproof | FL | 33843-2120 | 4,000 |
| Lake Placid Journal | Lake Placid | FL | 33852-9624 | 6,000 |
| Lake Wales News | Lake Wales | FL | 33853-4128 | 5,000 |
| Hardee Sun | Venice | FL | 34285 | 3,000 |
| Venice Gondolier Sun | Venice | FL | 34285 | 10,000 |
| The Herald Advocate | Wauchula | FL | 33873 | 4,000 |
| Athens Banner Herald | Athens | GA | 30601 | 22,000 |
| The Post Searchlight | Bainbridge | GA | 30525 | 7,650 |
| Calhoun Times | Calhoun | GA | 30703 | 7,021 |
| The Daily Tribune News | Cartersville | GA | 30120 | 6,600 |
| The Clayton Tribune | Clayton | GA | 30525 | 6,100 |

| | | | | |
|---|---|---|---|---|
| The Covington News | Covington | GA | 30015 | 6,000 |
| Forsyth County News | Cumming | GA | 30040-2405 | 12,500 |
| Dawson Community News | Dawsonville | GA | 30534 | 4,000 |
| The Eatonton Messenger | Eatonton | GA | 31024-1019 | 4,905 |
| Griffin Daily News | Griffin | GA | 30224 | 8,500 |
| LaGrange Daily News | LaGrange | GA | 30240 | 9,743 |
| Rockmart Journal and Cedartown Std | Rockmart | GA | 30153 | 5,553 |
| Rome News Tribune | Rome | GA | 30162 | 17,271 |
| The Thomaston Times | Thomaston | GA | 30286 | 4,000 |
| The Barrow County News | Winder | GA | 30680-2295 | 7,700 |
| The Augusta Chronicle | Augusta | GA | 30901 | 50,000 |
| North Augusta Today | Augusta | GA | 30901 | 12,000 |
| The News & Farmer | Louisville | GA | 30434 | 4,200 |
| McDuffie Mirror | Thomson | GA | 30824 | 2,400 |
| The Daily Citizen | Dalton | GA | 30720 | 12,250 |
| Walker County & Catoosa County  News | Lafayette | GA | 30728 | 6,160 |
| Early County News | Blakely | GA | 39823 | 2,786 |
| The Brunswick News & Advertiser | Brunswick | GA | 31521 | 10,600 |
| The Brunswick News | Brunswick | GA | 31521 | 16,200 |
| The Monroe County Reporter | Forsyth | GA | 31029 | 4,477 |
| The Jones County News | Gray | GA | 31032 | 4,060 |
| Hawkinsville Dispatch & News | Hawkinsville | GA | 31036 | 2,800 |
| The Baldwin Bulletin | Milledgeville | GA | 31061 | 3,248 |
| The Press-Sentinel | Jesup | GA | 31545 | 6,500 |
| The Metter Advertiser | Metter | GA | 30439 | 2,700 |
| The Tattnall Journal | Reidsville | GA | 30453 | 2,487 |
| Savannah Morning News | Savannah | GA | 31405 | 43,000 |
| The Statesboro Herald | Statesboro | GA | 30458 | 8,000 |
| The Sylvania Telephone | Sylvania | GA | 30467 | 4,375 |
| The Cairo Messenger | Cairo | GA | 31728 | 4,973 |
| Butler County Tribune Journal | Allison | IA | 50602 | 1,400 |
| Cascade Pioneer | Cascade | IA | 52033 | 1,475 |
| Clarksville Star | Clarksville | IA | 50619 | 1,150 |
| Dyersville Commerical | Dyersville | IA | 52040 | 3,383 |
| The Grundy Register | Grundy Grove | IA | 50638 | 2,200 |
| The Kalona News | Kalona | IA | 52247 | 2,000 |
| The Lone Tree Reporter | Kalona | IA | 52247 | 1,000 |
| Keota Eagle | Keota | IA | 52248 | 1,000 |
| Sigourney News Review | Sigourney | IA | 52591 | 2,000 |
| The Tipton Conservative and Advertiser | Tipton | IA | 52772 | 4,000 |
| The Washington Evening Journal | Washington | IA | 52353 | 3,820 |
| West Branch Times | West Branch | IA | 52358 | 1,500 |
| What Cheer Paper | What Cheer | IA | 50268 | 1,300 |
| The Hawk Eye | Burlington | IA | 52601 | 21,313 |
| Clinton Herald | Clinton | IA | 52733 | 11,900 |
| Mt. Pleasant News | Mount Pleasant | IA | 52641 | 2,994 |
| The West Liberty Index | West Liberty | IA | 52776 | 1,037 |
| Dallas County News | Adel | IA | 50003 | 1,500 |

| | | | | |
|---|---|---|---|---|
| NE Dallas County Record | Adel | IA | 50003 | 1,500 |
| Audubon County Advocate Journal | Audubon | IA | 50025 | 1,940 |
| The Bedford Times-Press | Bedford | IA | 50833 | 1,000 |
| Boone News-Republican | Boone | IA | 50036 | 2,850 |
| Daily Times Herald | Carroll | IA | 51401 | 5,700 |
| Daily Iowegian | Centerville | IA | 52544 | 3,146 |
| Creston News Advertiser | Creston | IA | 50801 | 4,600 |
| Dows Advocate | Dows | IA | 50071 | 1,000 |
| Eagle Grove Eagle | Eagle Grove | IA | 50533 | 1,670 |
| Village Vine | Freemont | IA | 52561 | 500 |
| Calhoun County Advocate | Hampton | IA | 50441 | 1,200 |
| Hampton Chonicle | Hampton | IA | 50441 | 2,930 |
| Pioneer Enterprise | Hampton | IA | 50441 | 700 |
| Journal Express | Knoxville | IA | 50138 | 2,139 |
| Lake City Graphic | Lake City | IA | 51449 | 1,000 |
| New Sharon Sun | New Sharon | IA | 50441 | 950 |
| Newton Daily News | Newton | IA | 50208 | 5,100 |
| Osceola Sentinel-Tribune | Osceola | IA | 50213 | 3,200 |
| Oskaloosa Herald | Oskaloosa | IA | 52577 | 3,200 |
| The Chronicle | Pella | IA | 50219 | 2,139 |
| Sheffield Press | Sheffield | IA | 50475 | 900 |
| The Story City Herald | Story City | IA | 50248 | 1,700 |
| Atlantic News - Telegraph | Atlantic | IA | 50022 | 3,552 |
| Clarinda Herald-Journal | Clarinda | IA | 51632 | 1,200 |
| The Daily Nonpareil | Council Bluffs | IA | 51503 | 17,000 |
| Denison Review | Denison | IA | 51442 | 1,000 |
| Hamburg Reporter | Hamburg | IA | 51640 | 1,244 |
| Harlan News-Advertiser | Harlan | IA | 51537 | 3,000 |
| Logan Herald-Observer | Logan | IA | 51546 | 1,000 |
| Valley News Today | Shenandoah | IA | 51601 | 2,000 |
| The Woodbine Twiner | Woodbine | IA | 51579 | 900 |
| The Fairfield Daily Ledger | Fairfield | IA | 52556 | 3,298 |
| The Ottumwa Courier | Ottumwa | IA | 52501 | 12,500 |
| Fort Madison Daily Democrat | Fort Madison | IA | 52627 | 5,000 |
| Daily Gate City | Keokuk | IA | 52627 | 5,000 |
| The Britt News Tribune | Britt | IA | 50423 | 1,100 |
| CWL Times | Corwith | IA | 50430 | 1,000 |
| Forest City Summit | Forest City | IA | 50436 | 1,750 |
| Garner Leader & Signal | Garner | IA | 50438 | 1,500 |
| Globe Gazette | Mason City | IA | 50401 | 15,200 |
| Mitchell County Press News | Osage | IA | 50461 | 2,550 |
| Chronicle Times | Cherokee | IA | 51012 | 2,579 |
| The Independent/Examiner | Hawarden | IA | 51023 | 1,045 |
| Ida County Courier | Ida Grove | IA | 51445 | 2,842 |
| LeMars Daily Sentinel | LeMars | IA | 51031 | 2,800 |
| Sioux City Journal | Sioux City | IA | 51102 | 45,670 |
| The Daily Reporter | Spencer | IA | 51301 | 3,781 |
| Dickinson County News | Spirit Lake | IA | 51360 | 3,084 |

| | | | | |
|---|---|---|---|---|
| Pilot Tribune | Storm Lake | IA | 50588 | 2,786 |
| Sioux County Index-Reporter | Hull | IA | 51246 | 1,029 |
| West Lyon Herald | Inwood | IA | 51240 | 1,031 |
| Lyon County Reporter | Rock Rapids | IA | 51246 | 1,929 |
| Independent Enterprise | Payette | ID | 83661 | 1,700 |
| The Aberdeen Times | Aberdeen | ID | 83210 | 900 |
| Power County Press | American Falls | ID | 83211 | 1,900 |
| The Morning News | Blackfoot | ID | 83221 | 3,980 |
| Teton Valley News | Driggs | ID | 83422 | 1,600 |
| Standard Journal | Rexburg | ID | 83440 | 5,472 |
| The Preston Citizen | Preston | ID | 83263 | 2,288 |
| Coeur d'Alene Press | Coeur d'Alene | ID | 83814 | 21,800 |
| Idaho County Free Press | Grangeville | ID | 83530 | 2,400 |
| Shoshone News-Press | Kellogg | ID | 83837 | 4,200 |
| Priest River Times | Priest River | ID | 83856 | 2,800 |
| Bonner County Daily Bee | Sandpoint | ID | 83864 | 5,200 |
| Bonners Ferry Herald | Sandpoint | ID | 83864 | 3,551 |
| Effingham Daily News | Effingham | IL | 62401 | 11,500 |
| Jacksonville Journal Courier | Jacksonville | IL | 62651 | 14,925 |
| The Courier | Lincoln | IL | 62656 | 7,003 |
| Paris - Beacon News | Paris | IL | 61944 | 4,700 |
| Shelbyville Daily Union | Shelbyville | IL | 62565 | 2,300 |
| Breeze Courier | Taylorville | IL | 62568 | 6,000 |
| The Northwest Herald | Crystal Lake | IL | 60014 | 32,000 |
| Lake County Journals | Crystal Lake | IL | 60014 | 8,150 |
| The Daily Chronicle | Dekalb | IL | 60115 | 8,300 |
| Kane County Chronicle | Geneva | IL | 60134 | 8,100 |
| The Daily Journal | Kankakee | IL | 60901 | 26,340 |
| La Salle News Tribune | La Salle | IL | 61301 | 19,000 |
| Morris Daily Herald | Morris | IL | 60450 | 7,600 |
| The Regional News | Palos Heights | IL | 60463 | 3,300 |
| Zion Benton News/Bargaineer | Zion | IL | 60099 | 22,000 |
| The Times Record | Aledo | IL | 61231 | 3,451 |
| The Paper | Galesburg | IL | 61401 | 18,268 |
| Geneseo Republic. | Geneseo | IL | 61254 | 5,920 |
| Star-Courier | Kewanee | IL | 61443 | 5,988 |
| The Dispatch/Rock Island Argus | Moline | IL | 61265 | 42,000 |
| Daily Review Atlas | Monmouth | IL | 61462 | 1,537 |
| Oquawka Current | Oquawka | IL | 61469 | 1,000 |
| Sauk Valley Newspaper | Sterling | IL | 61081 | 21,730 |
| Daily Republican-Register | Mount Carmel | IL | 62863 | 3,500 |
| The Evening News | Benton | IL | 62812 | 2,500 |
| The Southern Illinoisan | Carbondale | IL | 62901 | 28,925 |
| The Progress | Christopher | IL | 62822 | 1,000 |
| Du Quoin Evening Call | Du Quoin | IL | 62832 | 3,857 |
| The Daily Register | Harrisburg | IL | 62946 | 6,191 |
| Marion Daily Republican | Marion | IL | 62959 | 3,045 |
| Metropolis Planet | Metropolis | IL | 62960 | 4,872 |

| | | | | |
|---|---|---|---|---|
| Murphysboro American | Murphysboro | IL | 62966 | 1,841 |
| The Gallatin Democrat | Shawneetown | IL | 62984 | 2,239 |
| The Daily American | West Frankfort | IL | 62896 | 3,045 |
| The Daily Ledger | Canton | IL | 61520 | 5,582 |
| The Blade | Fairbury | IL | 61739 | 2,139 |
| (Pekin) Daily Times | Pekin | IL | 61555 | 7,500 |
| Chillicothe Times-Bulletin | Peoria | IL | 61612 | 5,000 |
| East Peoria Times-Courier | Peoria | IL | 61612 | 5,000 |
| Morton Times-News | Peoria | IL | 61612 | 5,000 |
| Washington Times-Reporter | Peoria | IL | 61612 | 7,666 |
| Woodford Times | Peoria | IL | 61612 | 5,381 |
| Daily Leader | Pontiac | IL | 61764 | 4,466 |
| Macomb Journal | Macomb | IL | 61455 | 4,179 |
| The Rushville Times | Rushville | IL | 62681 | 3,045 |
| The Journal-Standard | Freeport | IL | 61032 | 14,209 |
| Rock Valley Publishing | Loves Park | IL | 61111 | 1,600 |
| Elmhurst Independent | Machesney Park | IL | 61115 | 6,400 |
| Rockford Register Star | Rockford | IL | 61104 | 46,750 |
| The Telegraph | Alton | IL | 62002 | 22,200 |
| Randolph County Herald-Tribune | Chester | IL | 62233 | 2,487 |
| The Journal News | Hillsboro | IL | 62049 | 5,900 |
| Salem Times Commoner | Salem | IL | 62881 | 4,060 |
| Leader-Union | Vandalia | IL | 62471 | 5,176 |
| The Clay County Advocate-Press | Flora | IL | 62839 | 2,139 |
| Newton Press-Mentor | Newton | IL | 62448 | 2,239 |
| Olney Daily Mail | Olney | IL | 62450 | 3,675 |
| The LaPorte Herald Argus | LaPorte | IN | 46350 | 13,930 |
| The Herald Tribune | Batesville | IN | 47006 | 3,150 |
| Journal Press | Lawrenceburg | IN | 47025 | 5,350 |
| The Versailles Republican | Versailles | IN | 47042 | 4,567 |
| Boonville Standard | Boonville | IN | 47601 | 4,060 |
| Princeton Daily Clarion | Princton | IN | 47670 | 6,544 |
| The Post & Mail | Columbia City | IN | 46725 | 3,500 |
| Decatur Daily Democrat | Decatur | IN | 46733 | 5,650 |
| The News-Sun | Kendallville | IN | 46755 | 19,300 |
| The Commercial Review | Portland | IN | 47371 | 4,480 |
| The Bedford Times Mail | Bedford | IN | 47421 | 11,300 |
| The Herald Times | Bloomington | IN | 47401 | 23,600 |
| Banner - Graphic | Greencastle | IN | 46135 | 5,572 |
| Greensburg Daily News | Greensburg | IN | 47240 | 5,200 |
| The Hope Star-Journal | Hope | IN | 47246 | 1,000 |
| The Lebanon Reporter | Lebanon | IN | 46052 | 5,100 |
| The Reporter-Times | Martinsville | IN | 46151 | 5,500 |
| The Mooresville/Decatur Times | Mooresville | IN | 46158 | 5,000 |
| The Rushville Republican | Rushville | IN | 46173 | 3,050 |
| The News-Gazette | Winchester | IN | 47394 | 3,146 |
| Springs Valley Herald | French Lick | IN | 47432 | 2,842 |
| The Madison Courier | Madison | IN | 47250 | 8,600 |

| | | | | |
|---|---|---|---|---|
| North Vernon Plain Dealer | North Vernon | IN | 47265 | 6,169 |
| Paoli Republican | Paoli | IN | 47454 | 2,800 |
| The Tribune | Seymour | IN | 47274 | 8,000 |
| The Bremen Enquirer | Bremen | IN | 46506 | 800 |
| The Culver Citizen | Culver | IN | 46511 | 500 |
| The Leader | Knox | IN | 46534 | 430 |
| Nappanee Advance News | Nappanee | IN | 46550 | 500 |
| Pilot News | Plymouth | IN | 46563 | 5,870 |
| Bourbon News-Mirror | Plymouth | IN | 46563 | 900 |
| The Rochester Sentinel | Rochester | IN | 46975 | 4,100 |
| Brazil Times | Brazil | IN | 47834 | 4,179 |
| The Daily World | Linton | IN | 47441 | 5,582 |
| The Shoals News | Shoals | IN | 47581 | 2,438 |
| The Washington Times-Herald | Washington | IN | 47501 | 7,000 |
| Baxter Springs News | Baxter Springs | KS | 66713 | 1,600 |
| The Chanute Tribune | Chanute | KS | 66720 | 3,880 |
| The Columbus Advocate | Columbus | KS | 66725 | 2,200 |
| Parsons Sun | Parsons | KS | 67357-0836 | 4,800 |
| Pittsburg Morning Sun | Pittsburgh | KS | 66762 | 8,000 |
| Atchison Daily Globe | Atchison | KS | 66002 | 3,800 |
| Journal-World | Lawrence | KS | 66044 | 21,000 |
| Louisburg Herald | Louisburg | KS | 66053-5300 | 1,700 |
| Osawatomie Graphic | Osawatomie | KS | 66064-1420 | 1,975 |
| The Ottawa Herald | Ottawa | KS | 66067 | 5,587 |
| Johnson County Sun | Overland Park | KS | 66211 | 27,000 |
| Wednesday Sun | Overland Park | KS | 66211 | 20,000 |
| The Miami County Republic | Paola | KS | 66071 | 3,550 |
| The Shawnee Dispatch | Shawnee | KS | 66203 | 21,000 |
| The Belleville Telescope | Belleville | KS | 66935 | 2,500 |
| Hiawatha World | Hiawatha | KS | 66434 | 2,500 |
| The Holton Recorder | Holton | KS | 66436 | 3,700 |
| The Daily Union | Junction City | KS | 66441 | 4,400 |
| The Oskaloosa Independent | Oskaloosa | KS | 66066 | 2,338 |
| Topeka Capital Journal | Topeka | KS | 66607 | 37,000 |
| The Vindicator | Valley Falls | KS | 66088 | 2,740 |
| Augusta Daily Gazette | Augusta | KS | 67010 | 2,288 |
| The El Dorado Times | El Dorado | KS | 67042 | 3,482 |
| Ellsworth County Independent/Reporter | Ellsworth | KS | 67439 | 2,500 |
| The Eureka Herald | Eureka | KS | 67045 | 2,040 |
| The Goodland Daily News | Goodland | KS | 67735 | 1,950 |
| The Hays Daily News | Hays | KS | 67601 | 10,400 |
| The Herington Times | Herington | KS | 67449 | 2,089 |
| The High Plains Daily Leader & Times | Liberal | KS | 67901 | 5,000 |
| McPherson Sentinel | McPherson | KS | 67460 | 4,577 |
| The Norton Telegram | Norton | KS | 67654 | 1,900 |
| Bird City Times | Oberlin | KS | 67749 | 551 |
| Colby Free Press | Oberlin | KS | 67749 | 1,950 |
| The Oberlin Herald | Oberlin | KS | 67749-2243 | 1,850 |

| | | | | |
|---|---|---|---|---|
| The St. Francis Herald | Oberlin | KS | 67749 | 1,250 |
| The Pratt Tribune | Pratt | KS | 67124 | 2,040 |
| The Salina Journal | Salina | KS | 67401 | 30,000 |
| Stockton Sentinel | Stockton | KS | 67669 | 1,443 |
| Wellington Daily News | Wellington | KS | 67152 | 2,600 |
| Daily News | Bowling Green | KY | 42101 | 19,100 |
| Edmonson News | Brownsville | KY | 42210 | 4,079 |
| Greenup County News-Times | Greenup | KY | 41144 | 2,537 |
| Appalachian News Express | Pikeville | KY | 41501 | 6,766 |
| The Floyd County Times | Prestonsburg | KY | 41653 | 6,574 |
| The Falmouth Outlook | Falmouth | KY | 41040 | 4,060 |
| Union County Advocate | Morganfield | KY | 42437 | 4,000 |
| The Daily News | Middlesboro | KY | 40965 | 6,597 |
| The McCreary County Record | Whitley City | KY | 42653 | 3,645 |
| Times - Tribune | Corbin | KY | 40701 | 8,119 |
| The Advocate Messenger | Danville | KY | 40422 | 9,000 |
| The State Journal | Frankfort | KY | 40601 | 9,000 |
| Georgetown News Graphic | Georgetown | KY | 40324 | 4,200 |
| Hazard Herald | Hazard | KY | 41701 | 5,300 |
| Casey County News | Liberty | KY | 42539 | 4,776 |
| The Sentinel-Echo | London | KY | 40741 | 7,960 |
| The Wayne County Outlook | Monticello | KY | 42633 | 6,089 |
| The Jessamine Journal | Nicholasville | KY | 40356-1156 | 7,263 |
| The Winchester Sun | Winchester | KY | 40392 | 5,800 |
| Kentucky Standard | Bardstown | KY | 40004-1416 | 9,700 |
| Grayson Co. News - Gazette | Leitchfield | KY | 42754 | 3,000 |
| Henry County Local | New Castle | KY | 40050 | 4,975 |
| The Pioneer News | Shepherdsville | KY | 40165 | 7,000 |
| Taylorsville Spencer Magnet | Taylorsville | KY | 40071 | 3,654 |
| The Cadiz Record | Cadiz | KY | 42211 | 4,060 |
| Kentucky New Era | Hopkinsville | KY | 42240 | 10,500 |
| Fort Campbell Courier | Hopkinsville | KY | 42240 | 18,000 |
| The Eagle Post | Oak Grove | KY | 42262 | 5,400 |
| News Democrat & Leader | Russellville | KY | 42276 | 3,000 |
| The Tribune Courier | Benton | KY | 42025 | 4,700 |
| Lyon County Herald-Ledger | Eddyville | KY | 42038 | 2,040 |
| The Fulton Leader | Fulton | KY | 42041 | 1,800 |
| The Times - Leader | Princeton | KY | 42445 | 5,100 |
| Leesville News Leader | Leesville | LA | 71446 | 3,500 |
| Ascension Citizen | Gonzales | LA | 70737 | 7,164 |
| Beauregard Daily News | DeRidder | LA | 70634 | 3,500 |
| Southwest Daily News | Sulphur | LA | 70663 | 4,000 |
| Bastrop Daily Enterprise | Bastrop | LA | 71220 | 4,567 |
| The Jena - Times | Jena | LA | 71342 | 4,975 |
| The Plaquemines Watchman | Belle Chasse | LA | 70037 | 5,700 |
| Daily News | Bogalusa | LA | 70427 | 3,383 |
| St. Tammany News | Covington | LA | 70433 | 9,950 |
| L'Observateur | La Place | LA | 70068 | 5,100 |

| Bossier Press-Tribune | Bossier City | LA | 71111 | 4,770 |
|---|---|---|---|---|
| Minden Press-Herald | Minden | LA | 71055 | 5,074 |
| North Adams Transcript | North Adams | MA | 1247 | 8,627 |
| The Lynnfield Villager | North Reading | MA | 1864 | 1,600 |
| North Reading Transcript | North Reading | MA | 1864 | 4,500 |
| The Sun Chronicle | Attleboro | MA | 2703 | 25,372 |
| The Recorder | Greenfield | MA | 1301 | 15,422 |
| The Capital | Annapolis | MD | 21401 | 30,845 |
| The Record-Observer | Centreville | MD | 21617-1006 | 3,349 |
| Kent County News | Chestertown | MD | 21620-1517 | 7,000 |
| The Times Record | Denton | MD | 21629-1036 | 3,349 |
| The Star Democrat | Easton | MD | 21601 | 19,791 |
| Cecil Whig | Elkton | MD | 21921 | 15,000 |
| The Avenue News | Essex | MD | 21221 | 25,000 |
| The Bay Times | Stevensville | MD | 21666 | 5,074 |
| Carroll County Times | Westminster | MD | 21158 | 24,000 |
| Dorchester Star | Cambridge | MD | 21613 | 10,000 |
| The Frederick News-Post | Frederick | MD | 21703 | 37,000 |
| Bangor Daily News | Bangor | ME | 4401 | 56,000 |
| Kennebec Journal & Morning Sentinel | Augusta | ME | 4330 | 29,500 |
| Sun Journal | Lewiston | ME | 4243 | 36,500 |
| Portland Press Herald | Portland | ME | 4101 | 57,548 |
| Livingston County Daily Press and Argus | Howell | MI | 48843 | 15,500 |
| Lapeer County Press | Lapeer | MI | 48446 | 9,600 |
| Canton Observer | Livonia | MI | 48150 | 8,000 |
| Garden City Observer | Livonia | MI | 48150 | 8,000 |
| Livonia Observer | Livonia | MI | 48150 | 8,000 |
| Plymouth Observer | Livonia | MI | 48150 | 5,600 |
| Rochester Eccentric | Livonia | MI | 48150 | 8,000 |
| Westland Observer | Livonia | MI | 48150 | 5,600 |
| Milford Times | Milford | MI | 48381 | 5,074 |
| Northville Record | Northville | MI | 48167 | 5,074 |
| Novi News | Northville | MI | 48167 | 4,872 |
| South Lyon Herald | South Lyon | MI | 48178 | 5,785 |
| Ypsilanti Courier | Ypsilanti | MI | 48197 | 2,537 |
| (The Ironwood) Daily Globe | Ironwood | MI | 49938 | 6,300 |
| Tuscola County Advertiser | Caro | MI | 48723 | 6,467 |
| The Daily Reporter | Coldwater | MI | 49036 | 5,937 |
| Oceana's Herald Journal | Hart | MI | 49420 | 6,800 |
| The Holland Sentinel | Holland | MI | 49423 | 17,000 |
| Sentinel-Standard | Ionia | MI | 48846 | 3,146 |
| Ludington Daily News | Ludington | MI | 49341-0340 | 9,500 |
| Sturgis Journal | Sturgis | MI | 49091 | 6,800 |
| Three Rivers Commerical News | Three Rivers | MI | 49093 | 3,552 |
| White Lake Beacon | Whitehall | MI | 49461 | 4,600 |
| The Zeeland Record | Zeeland | MI | 49464 | 1,542 |
| The Hillsdale Daily News | Hillsdale | MI | 49242 | 6,500 |
| The Munising News | Munising | MI | 49862 | 1,900 |

| | | | | |
|---|---|---|---|---|
| The Tecumseh Herald | Tecumseh | MI | 49286 | 4,800 |
| Big Rapids Pioneer | Big Rapids | MI | 49307 | 6,000 |
| Cadillac News | Cadillac | MI | 49601 | 7,500 |
| Cheboygan Daily Tribune | Cheboygan | MI | 49721 | 4,364 |
| Manistee News Advocate | Manistee | MI | 49660 | 5,000 |
| Onaway Outlook | Rogers City | MI | 49779 | 1,900 |
| Presque Isle County Advance | Rogers City | MI | 49779 | 3,800 |
| The Evening News | Sault Ste. Marie | MI | 49783 | 7,612 |
| The Pine Journal | Cloquet | MN | 55720 | 3,300 |
| The Pine Knot | Cloquet | MN | 55720 | 1,450 |
| Herald Review | Grand Rapids | MN | 55744-0220 | 7,624 |
| The Daily Tribune | Hibbing | MN | 55746 | 6,597 |
| The Mesabi Daily News | Virginia | MN | 55792 | 9,642 |
| Farmers Independent | Bagley | MN | 56621 | 2,040 |
| The Baudette Region | Baudette | MN | 56623 | 1,393 |
| Crookston Daily Times | Crookston | MN | 56716 | 2,040 |
| Thief River Falls Times | Thief River Falls | MN | 56701 | 4,477 |
| Winona Daily News | Winona | MN | 55987 | 9,000 |
| Sleepy Eye Herald - Dispatch | Sleepy Eye | MN | 56085 | 2,000 |
| St. James Plaindealer | St. James | MN | 56081 | 2,338 |
| Aitkin Independent Age | Aitkin | MN | 56431 | 4,350 |
| Brainerd Daily Dispatch | Brainerd | MN | 56401 | 13,803 |
| Canby News | Canby | MN | 56220 | 1,642 |
| Independent News Herald | Clarissa | MN | 56440 | 2,000 |
| Tri-County News | Cottonwood | MN | 56229 | 1,343 |
| Grant County Herald | Elbow Lake | MN | 56531 | 1,600 |
| Faribault Daily News | Faribault | MN | 55021 | 6,467 |
| Granite Falls Advocate-Tribune | Granite Falls | MN | 56241 | 2,689 |
| Mille Lacs Messenger | Isle | MN | 56342 | 4,450 |
| Montevideo American News | Montevideo | MN | 56265 | 3,654 |
| Montgomery Messenger | Montgomery | MN | 56069 | 1,900 |
| The New Prague Times | New Prague | MN | 56071 | 4,250 |
| Owatonna People's Press | Owatonna | MN | 55060 | 6,467 |
| The Paynesville Press | Paynesville | MN | 56362 | 2,040 |
| The Redwood Falls Gazette | Redwood Falls | MN | 56283 | 3,958 |
| St. Peter Herald | St. Peter | MN | 56082 | 2,322 |
| Staples World | Staples | MN | 56479 | 2,100 |
| Waseca County News | Waseca | MN | 56093 | 3,371 |
| Westbrook Sentinel/Tribune | Westbrook | MN | 56183 | 1,339 |
| Post-Bulletin | Rochester | MN | 55903 | 47,700 |
| Boonville Daily News | Boonville | MO | 65233 | 2,537 |
| The Fulton Sun | Fulton | MO | 65251 | 4,770 |
| Mexico Ledger | Mexico | MO | 65265 | 5,500 |
| Evening Democrat | Moberly | MO | 65270 | 3,000 |
| Moberly Monitor - Index | Moberly | MO | 65270 | 2,970 |
| The Carthage Press | Carthage | MO | 64836 | 2,400 |
| Neosho Daily News | Neosho | MO | 64850 | 4,466 |
| The Concordian | Concordia | MO | 64020 | 2,835 |

| | | | | |
|---|---|---|---|---|
| Liberty Tribune | Gladstone | MO | 64188 | 10,500 |
| The Examiner | Independence | MO | 64050 | 10,000 |
| The Kearney Courier | Kearney | MO | 64060 | 3,000 |
| The Sedalia Democrat | Sedalia | MO | 65301 | 13,104 |
| The Smithville Lake Herald | Smithvilel | MO | 64089-8176 | 2,350 |
| The Daily Star-Journal | Warrensburg | MO | 64093 | 5,304 |
| Kirksville Daily Express | Kirksville | MO | 63501 | 6,368 |
| The North Stoddard Countian | Bloomfield | MO | 63841 | 1,600 |
| Democrat-Argus | Caruthersville | MO | 63830 | 2,040 |
| The Daily Statesman | Dexter | MO | 63841 | 2,900 |
| The Daily Dunklin Democrat | Kennett | MO | 63857 | 3,200 |
| Delta News Citizen | Malden | MO | 63863 | 2,400 |
| The Banner Press | Marble Hill | MO | 63764-8316 | 3,200 |
| The Weekly Record | New Madrid | MO | 63869 | 1,045 |
| Perry County Repubic-Monitor | Perrysville | MO | 63775 | 5,400 |
| Missourian-News | Portageville | MO | 63873 | 1,200 |
| The Steele Enterprise | Steele | MO | 63877 | 1,542 |
| The Edina Sentinel | Edina | MO | 63537-1350 | 1,741 |
| Hannibal Courier-Post | Hannibal | Mo | 63401 | 8,457 |
| The Media | Kahoka | MO | 63445-1637 | 2,100 |
| Palmyra Spectator | Palmyra | MO | 63461 | 2,842 |
| Aurora Advertiser | Aurora | MO | 65605-1516 | 3,045 |
| Bolivar Herald -Free Press | Bolivar | MO | 65613-0330 | 5,500 |
| Buffalo Reflex | Buffalo | MO | 65622 | 5,950 |
| Lake Sun Leader | Camdenton | MO | 65020 | 4,975 |
| The Index | Hermitage | MO | 65668 | 4,427 |
| The Lebanon Daily Record | Lebanon | MO | 65536 | 5,772 |
| The Marshfield Mall | Marshfield | MO | 65706 | 5,100 |
| The Monett Times | Monett | MO | 65708 | 4,100 |
| Christian County Headliner | Ozark | MO | 65721 | 5,300 |
| Republic Monitor | Republic | MO | 65738 | 2,750 |
| South County Mail | Rogersville | MO | 65742 | 1,625 |
| Rolla Daily News | Rolla | MO | 65401 | 6,300 |
| Cedar County Republican | Stockton | MO | 65785 | 3,700 |
| South Missourian-News | Thayer | MO | 65791 | 1,600 |
| West Plains Daily Quill | West Plains | MO | 65775 | 7,600 |
| Gladstone Dispatch | Liberty | MO | 64507 | 18,000 |
| Maryville Daily Forum | Maryville | MO | 64468 | 2,600 |
| St. Joseph News-Press | St. Joseph | MO | 64501 | 30,000 |
| Warren County Record | Warrenton | MO | 63383-2003 | 3,775 |
| Washington Missourian | Washington | MO | 63090 | 16,525 |
| New Albany Gazette | New Albany | MS | 38652-3310 | 4,200 |
| Starkville Daily News | Starkville | MS | 39759 | 5,970 |
| Daily Times Leader | West Point | MS | 39773 | 3,980 |
| Bolivar Commerical | Cleveland | MS | 38732 | 6,000 |
| The Daily Star | Grenada | MS | 38901 | 5,671 |
| Laurel Leader-Call | Laurel | MS | 39440 | 9,134 |
| Rankin County News | Brandon | MS | 39042 | 8,119 |

| | | | | |
|---|---|---|---|---|
| The Meteor | Crystal Springs | MS | 39059-2516 | 2,600 |
| Copiah County Courier | Hazelhurst | MS | 39083-3037 | 3,045 |
| The Star-Herald | Kosciusko | MS | 39090 | 5,074 |
| Lawrence County Press | Monticello | MS | 39654 | 1,300 |
| Spirit of Morton | Morton | MS | 39117 | 1,045 |
| The Tylertown Times | Tylertown | MS | 39667 | 2,250 |
| Vicksburg Post | Vicksburg | MS | 39180 | 14,500 |
| Panola Partnership | Batesville | MS | 38606-2311 | 2,000 |
| The Panolian | Batesville | MS | 38606-2311 | 4,500 |
| The South Reporter | Holly Springs | MS | 38635 | 5,200 |
| The Oxford Eagle | Oxford | MS | 38655 | 5,582 |
| The Democrat | Senatobia | MS | 38668-0369 | 4,500 |
| The Meridian Star | Meridan | MS | 39302 | 14,000 |
| The Big Timber Pioneer | Big Timber | MT | 59011 | 1,400 |
| Billings Gazette | Billings | MT | 59107 | 43,000 |
| Stillwater County News | Columbus | MT | 59019 | 1,841 |
| The Independent Press | Forsyth | MT | 59327 | 1,343 |
| Big Horn County New | Hardin | MT | 59034 | 1,741 |
| The Livingston Enterprise | Livingston | MT | 59047 | 3,259 |
| Miles City Star | Miles City | MT | 59301 | 3,408 |
| Carbon County News | Red Lodge | MT | 59068 | 2,288 |
| Dillon Tribune Examiner | Dillon | MT | 59725 | 2,438 |
| Ranger Review | Glendive | MT | 59330 | 3,060 |
| The Journal News-Opinion | Chinook | MT | 59523 | 1,500 |
| Cut Bank Pioneer | Cut Bank | MT | 59427 | 1,200 |
| Havre Daily News | Havre | MT | 59501 | 4,263 |
| Lewistown News-Argus | Lewistown | MT | 59457 | 3,333 |
| Shelby Promoter | Shelby | MT | 59474 | 1,800 |
| The Valierian | Valier | MT | 59486 | 300 |
| The Indpendent Record Editorial | Helena | MT | 59601 | 14,716 |
| Daily Inter Lake | Kalispel | MT | 59901 | 17,609 |
| The Western News | Libby | MT | 59923-1937 | 3,248 |
| Clay County Progress | Hayesville | NC | 28904 | 4,000 |
| The Stanly News & Press | Albemarle | NC | 28001 | 9,000 |
| The Gaston Gazette | Gastonia | NC | 28056 | 25,000 |
| Independent Tribune | Kannapolis | NC | 28083 | 14,000 |
| News-Topic | Lenoir | NC | 28645 | 8,800 |
| The Home News | Marshville | NC | 28103 | 1,800 |
| The Enquirer-Journal | Monroe | NC | 28112 | 7,400 |
| The News Herald | Morganton | NC | 28655 | 11,400 |
| The Observer-News-Enterprise | Newton | NC | 28658 | 2,000 |
| Richmond County Daily Journal | Rockingham | NC | 28379 | 9,751 |
| Shelby Star | Shelby | NC | 28150 | 12,000 |
| Statesville Record & Landmark | Statesville | NC | 28677 | 16,000 |
| The Taylorsville Times | Taylorsville | NC | 28681 | 6,300 |
| Cherokee Scout | Murphy | NC | 28906 | 5,000 |
| The Laurinburg Exchange | Laurinburg | NC | 28352 | 4,700 |
| The Robesonian | Lumberton | NC | 28358 | 13,000 |

| | | | | |
|---|---|---|---|---|
| The Randolph Guide | Asheboro | NC | 27203 | 2,500 |
| Times-News | Burlington | NC | 27215 | 27,352 |
| The Clemmons Courier | Clemmons | NC | 27012 | 3,600 |
| The High Point Enterprise | High Point | NC | 27262 | 21,800 |
| Davie County Enterprise-Record | Mocksville | NC | 27028 | 7,000 |
| The Stokes News | Mount Airy | NC | 27030 | 6,169 |
| Mt. Airy News | Mt. Airy | NC | 27030 | 10,961 |
| The Daily News | Jacksonville | NC | 28541 | 20,646 |
| Kinston Free Press | Kinston | NC | 28501 | 11,641 |
| Weekly Gazette | LaGrange | NC | 28551 | 1,492 |
| The Sun Journal | New Bern | NC | 28563 | 16,119 |
| The Roanoke Beacon | Plymouth | NC | 27962 | 4,000 |
| The Daily Courier | Forest City | NC | 28043 | 8,000 |
| The Franklin Press | Franklin | NC | 28734 | 8,600 |
| The Highlander | Highlands | NC | 28741 | 2,800 |
| The McDowell New | Marion | NC | 28752 | 7,200 |
| Graham Star | Robbinsville | NC | 28771 | 4,000 |
| Roanoke-Chowan News Herald | Ahoskie | NC | 27910 | 10,352 |
| The Sampson Independent | Clinton | NC | 28328 | 7,000 |
| The Daily Record | Dunn | NC | 28335 | 9,500 |
| The Herald Sun | Durham | NC | 27705 | 27,000 |
| Wayne-Wilson News Leader | Fremont | NC | 27830 | 1,600 |
| Holly Springs Sun | Fuquay Varina | NC | 27526 | 8,800 |
| Cleveland Post | Garner | NC | 27529 | 6,500 |
| The Daily Dispatch | Henderson | NC | 27536 | 8,000 |
| Mount Olive Tribune | Mount Olive | NC | 28365 | 3,600 |
| The Nashville Graphic | Nashville | NC | 27856 | 3,482 |
| Princeton News-Leader | Princeton | NC | 27569 | 1,600 |
| The Courier-Times | Roxboro | NC | 27573 | 7,800 |
| The Sanford Herald | Sanford | NC | 27330 | 9,000 |
| The Pilot | Southern Pines | NC | 28387 | 16,915 |
| Spring Hope Enterprise | Spring Hope | NC | 27882 | 2,537 |
| The Daily Southerner | Tarboro | NC | 27886 | 4,060 |
| The Wilson Times | Wilson | NC | 27893 | 16,238 |
| The Pender Chronicle | Burgaw | NC | 28425 | 2,400 |
| The News Reporter | Whiteville | NC | 28472-4023 | 11,164 |
| Devils Lake Journal | Devils Lake | ND | 58301 | 3,400 |
| Richland County News - Monitor | Hankinson | ND | 58041 | 1,400 |
| Valley City Times-Record | Valley City | ND | 58072 | 2,650 |
| The Daily News | Wahpeton | ND | 58074 | 2,945 |
| Beulah Beacon | Beulah | ND | 58523-6613 | 863 |
| Center Republican | Garrison | ND | 58540 | 866 |
| McClean Couty Independent | Garrison | ND | 58540 | 866 |
| McClusky Gazette | Garrison | ND | 58540 | 866 |
| The Leader-News | Garrison | ND | 58540 | 866 |
| Underwood News | Garrison | ND | 58540 | 866 |
| Hazen Star | Hazen | ND | 58545-7034 | 866 |
| New Town News | New Town | ND | 58763-4000 | 866 |

| | | | | |
|---|---|---|---|---|
| Mountrail County Record | Parshall | ND | 58770 | 866 |
| Mountrail County Promoter | Stanley | ND | 58784-4003 | 866 |
| McLean County Journal | Turtle Lake | ND | 58575 | 866 |
| Velva Voice | Velva | ND | 58790 | 866 |
| Star Herald | Scottsbluff | NE | 69361 | 15,300 |
| The Chadron Record | Chadron | NE | 69337 | 2,000 |
| Sun - Telegraph | Sidney | NE | 69162 | 2,740 |
| Beatrice Daily Sun | Breatrice | NE | 68310 | 6,000 |
| Custer County Chief | Broken Bow | NE | 68822-2019 | 3,781 |
| Fairbury Journal-News | Fairbury | NE | 68352 | 3,500 |
| Gothenburg Times | Gothenburg | NE | 69138 | 2,338 |
| Grand Island Independent | Grand Island | NE | 68801 | 20,000 |
| Journal  - Register | Hebron | NE | 68370 | 1,700 |
| Kearney Hub | Kearney | NE | 68848 | 13,000 |
| Lexington Clipper-Herald | Lexington | NE | 68850 | 2,985 |
| McCook Daily Gazette | McCook | NE | 69001 | 5,000 |
| The Minden Courier | Minden | NE | 68959 | 2,239 |
| The Ord Quiz | Ord | NE | 68862-1752 | 2,388 |
| Waverly News | Waverly | NE | 68462 | 2,119 |
| North Platte Telegraph | North Platte | NE | 69103 | 12,500 |
| Ashland Gazette | Ashland | NE | 68003 | 3,000 |
| Columbus Telegram | Columbus | NE | 68601 | 10,000 |
| Banner Press | David City | NE | 68632 | 2,300 |
| Fremont Tribune | Fremont | NE | 68025 | 7,900 |
| Nebraska City News-Press | Nebraska City | NE | 68410 | 2,164 |
| Bellevue Leader | Papillion | NE | 68046-2435 | 1,773 |
| Gretna Breeze | Papillion | NE | 68046-2435 | 3,600 |
| PapillionTimes | Papillion | NE | 68046-2435 | 3,600 |
| Ralston Recorder | Papillion | NE | 68046-2435 | 1,773 |
| The Schuyler Sun | Schuyler | NE | 68661-1914 | 2,189 |
| Syracuse Journal-Democrat | Syracuse | NE | 68446 | 2,200 |
| Wahoo Newspaper | Wahoo | NE | 68066 | 3,000 |
| Nebraska Journal Leader | Ponca | NE | 68770-0545 | 1,045 |
| The Telegraph | Hudson | NH | 3051 | 20,000 |
| Laconia Citizen | Laconia | NH | 3246 | 7,500 |
| Eagle Times | Claremont | NH | 3743 | 7,900 |
| New Jersey Herald | Newton | NJ | 7860 | 13,000 |
| The Albuquerque Journal | Albuquerque | NM | 87109 | 102,000 |
| Sangre De Cristo Chronicle | Angel Fire | NM | 87710 | 2,800 |
| Valencia County News-Bulletin | Belen | NM | 87002-2619 | 23,000 |
| The Gallup Independent | Gallup | NM | 87301 | 22,000 |
| Hobbs News Sun | Hobbs | NM | 88240 | 10,656 |
| Los Alamos Monitor | Los Alamos | NM | 87544 | 5,582 |
| Las Vegas Optic | Las Vegas | NM | 87701 | 5,074 |
| The Lovington Daily Leader | Lovington | NM | 88260 | 2,040 |
| Roswell Daily Record | Roswell | NM | 88201 | 10,940 |
| El Defensor Chieftain | Socorro | NM | 87801 | 3,500 |
| Clovis News Journal | Clovis | NM | 88101 | 5,600 |

| | | | | |
|---|---|---|---|---|
| Portales News Tribune | Portales | NM | 88130 | 3,200 |
| Quay County Sun | Tucumcari | NM | 88401 | 3,200 |
| Mineral County Independent News | Hawthorne | NV | 89145 | 1,500 |
| Pahrump Valley Times | Pahrump | NV | 89048 | 7,960 |
| Tonopah Times-Bonanza/Goldfield News | Tonopah | NV | 89049 | 1,542 |
| The Battle Mountain Bugle | Battle Mountain | NV | 89820 | 3,000 |
| Nevada Appeal | Carson City | NV | 89702 | 10,050 |
| Lahontan Valley News | Fallon | NV | 89406 | 3,150 |
| The Record Courier | Gardnerville | NV | 89410 | 5,000 |
| North Lake Tahoe Bonanza | Incline Village | NV | 89452 | 3,900 |
| The Humboldt Sun | Winnemucca | NV | 89445 | 3,576 |
| Ely Times | Ely | NV | 89315 | 3,045 |
| Catskill Daily Mail | Catskill | NY | 12414 | 6,500 |
| Hudson Register-Star | Hudson | NY | 12534 | 6,000 |
| Lockport Journal | Lockport | NY | 14094 | 9,000 |
| The Journal Register | Medina | NY | 14103 | 2,000 |
| Niagara Gazette Sunday | Niagara Falls | NY | 14302-0549 | 15,000 |
| Tonawanda News | North Tonawanda | NY | 14120 | 5,000 |
| Press-Republican | Plattsburgh | NY | 12901 | 20,000 |
| Sullivan County Democrat | Callicoon | NY | 12723 | 7,000 |
| Southern Dutchess News | Wappingers Falls | NY | 12590-2504 | 8,310 |
| Genesee Country Express | Dansville | NY | 14437 | 2,537 |
| The Chronicle-Express | Penn Yan | NY | 14527 | 3,857 |
| The Palladium Times | Oswego | NY | 13126 | 6,322 |
| The Evening Telegram | Herkimer | NY | 13350 | 4,000 |
| The Evening Times | Little Falls | NY | 13365 | 2,500 |
| The Daily Star | Oneonta | NY | 13820 | 15,922 |
| Cooperstown Crier | Oneonta | NY | 13820 | 1,811 |
| Watertown Daily Times | Watertown | NY | 13601 | 23,800 |
| The Athens Messenger | Athens | OH | 45701 | 11,729 |
| Vinton County Courier | Athens | OH | 45701 | 2,500 |
| The Jackson County Times-Journal | Jackson | OH | 45640 | 6,000 |
| Clermont Sun | Batavia | OH | 45103 | 1,542 |
| Georgetown News Democrat | Georgetown | OH | 45121 | 3,460 |
| Hillsboro Times Gazette | Hillsboro | OH | 45133 | 3,637 |
| People's Defender | West Union | OH | 45693 | 6,800 |
| Wilmington News Journal | Wilmington | OH | 45177 | 6,400 |
| The Subarbanite | Akron | OH | 44312 | 33,800 |
| Review | Alliance | OH | 44601 | 12,000 |
| Ashland Times-Gazette | Ashland | OH | 44805 | 14,209 |
| Star Beacon | Ashtabula | OH | 44004 | 16,200 |
| Gazette Publishing Company | Bellevue | OH | 44811 | 4,400 |
| The Chronicle Telegram | Elyria | OH | 44035 | 25,372 |
| The Independent | Massillon | OH | 44647 | 13,700 |
| The Medina County Gazette | Medina | OH | 44256 | 16,238 |
| The Holmes County Hub | Millersburg | OH | 44654 | 2,338 |
| Norwalk Reflector | Norwalk | OH | 44857 | 9,743 |
| Sandusky Register | Sandusky | OH | 44870 | 24,358 |

| | | | | |
|---|---|---|---|---|
| Daily Record | Wooster | OH | 44691 | 22,328 |
| Ada Herald | Ada | OH | 45810 | 1,700 |
| The Herald | Circleville | OH | 43113 | 6,500 |
| The Delaware Gazette | Delaware | OH | 43015 | 8,119 |
| The Galion Inquirer | Galion | OH | 44833 | 3,045 |
| Logan Daily News | Logan | OH | 43138 | 5,000 |
| Madison Press | London | OH | 43140 | 5,074 |
| Marysville Journal -Tribune | Marysville | OH | 43040 | 6,000 |
| Richwood Gazette | Marysville | OH | 43040 | 2,000 |
| The Mount Gilead Weeklies | Mount Gilead | OH | 43338 | 8,221 |
| Perry County Tribune | New Lexington | OH | 43764 | 4,000 |
| Record Herald | Washington Court House | OH | 43160 | 5,068 |
| The News Watchman | Waverly | OH | 45690 | 4,300 |
| The Register-Herald | Eaton | OH | 45320 | 6,700 |
| The Daily Advocate | Greenville | OH | 45331 | 6,500 |
| Piqua Daily Call | Piqua | OH | 45356 | 6,300 |
| The Sidney Daily News | Sidney | OH | 45365 | 12,937 |
| Troy Daily News | Troy | OH | 45373 | 10,000 |
| Urbana Daily Citizen | Urbana | OH | 43078 | 6,400 |
| Beavercreek News Current | Xenia | OH | 45385 | 2,785 |
| Fairborn Daily Herald | Xenia | OH | 45385 | 1,450 |
| The Xenia Daily Gazette | Xenia | OH | 45385 | 4,150 |
| Putnam County Sentinel | Van Wert | OH | 45891 | 5,500 |
| Times-Bulletin | Van Wert | OH | 45891 | 5,000 |
| The Daily Herald | Delphos | OH | 45833 | 3,400 |
| Wapakoneta Daily News | Wapakoneta | OH | 45895-0389 | 3,000 |
| The Bryan Times | Bryan | OH | 43506 | 10,547 |
| Mohawk Leader | Carey | OH | 43316 | 1,681 |
| The Progressor Times | Carey | OH | 43316 | 2,000 |
| Cresent-News | Defiance | OH | 43512 | 18,000 |
| Northwest Signal | Napoleon | OH | 43545 | 4,567 |
| Fulton County Expositor | Wauseon | OH | 43567 | 4,750 |
| Guymon Daily Herald | Guymon | OK | 73942 | 2,537 |
| Poteau Daily News | Poteau | OK | 74953 | 5,000 |
| Eastern Times Register | Roland | OK | 74954 | 1,500 |
| Vian Tenkiller News | Vian | OK | 74962 | 3,000 |
| The American | Fairland | OK | 74343 | 1,700 |
| Miami News-Record | Miami | OK | 74355 | 4,200 |
| Blackwell Journal Tribune | Blackwell | OK | 74631 | 2,000 |
| Express-Star | Chickasha | OK | 73018 | 5,785 |
| The Edmond Sun | Edmond | OK | 73034 | 4,200 |
| Elk City Daily News | Elk City | OK | 73644 | 5,000 |
| Guthrie News Leader | Guthrie | OK | 73044 | 2,400 |
| Mustang Times | Mustang | OK | 73064 | 8,000 |
| Pauls Valley Daily Democrat | Pauls Valley | OK | 73075 | 4,060 |
| The Perkins Journal | Perkins | OK | 74059 | 3,451 |
| Shawnee News-Star | Shawnee | OK | 74801 | 10,352 |
| Woodward News | Woodward | OK | 73801 | 4,975 |

| | | | | |
|---|---|---|---|---|
| The Daily Ardmoreite | Ardmore | OK | 73401 | 8,900 |
| Durant Daily Democrat | Durant | OK | 74702-0250 | 6,800 |
| McCurtain Daily Gazette | Idabel | OK | 74745 | 7,450 |
| Bartlesville Examiner-Enterprise | Bartlesville | OK | 74006 | 10,447 |
| McIntosh County Democrat | Checotah | OK | 74426 | 1,900 |
| Daily Progress | Claremore | OK | 74018 | 7,104 |
| Cleveland American | Cleveland | OK | 74020 | 2,537 |
| Indian Journal | Eufaula | OK | 74432 | 2,500 |
| Fort Gibson Times | Fort Gibson | OK | 74434 | 1,045 |
| The Grove Sun | Grove | OK | 74344 | 2,800 |
| Delaware County Journal | Jay | OK | 74346 | 2,000 |
| The Nowata Star | Nowata | OK | 74048 | 2,500 |
| The Daily Times | Pryor | OK | 74361 | 3,200 |
| Stilwell Democrat Journal | Stilwell | OK | 74960-3028 | 4,500 |
| Tahlequah Daily Press | Tahlequah | OK | 74464 | 5,472 |
| Vinita Daily Journal | Vinita | OK | 74301-0328 | 3,000 |
| Westville Reporter | Westville | OK | 74965 | 1,589 |
| Altus Times | Altus | OK | 73522 | 4,000 |
| The Duncan Banner | Duncan | OK | 73534 | 6,500 |
| Frederick Leader | Frederick | OK | 73542 | 1,045 |
| Blue Mountain Eagle | John Day | OR | 97845 | 3,045 |
| The News Review | Roseburg | OR | 97470 | 18,905 |
| Curry Coastal Pilot | Brookings | OR | 97415 | 7,000 |
| Herald & News | Klamath Falls | OR | 97601 | 17,253 |
| Ashland Daily Tidings | Medford | OR | 97501 | 3,000 |
| Mail Tribune | Medford | OR | 97501 | 21,650 |
| Baker City Herald | Baker City | OR | 97814 | 3,300 |
| Burns Times-Herald | Burns | OR | 97720 | 3,045 |
| Hood River News | Hood River | OR | 97031 | 5,074 |
| Keizertimes | Keizer | OR | 97307 | 3,248 |
| The Observer | La Grande | OR | 97850 | 6,400 |
| The Madras Pioneer | Madras | OR | 97741 | 4,179 |
| The Graphic | Newberg | OR | 97132 | 4,060 |
| Central Oregonian | Prineville | OR | 97754 | 4,428 |
| The Dalles Daily Chronicle | The Dalles | OR | 97058 | 4,800 |
| Wallowa County Chieftain | Enterprise | OR | 97828 | 2,842 |
| The Hermiston Herald | Hermiston | OR | 97838 | 3,880 |
| East Oregonian | Pendleton | OR | 97801 | 9,134 |
| The Kane Republican | Kane | PA | 16735 | 2,040 |
| Corry Evening Journal | Corry | PA | 16407 | 3,755 |
| The Sentinel | Carlisle | PA | 17013 | 16,847 |
| Valley Times-Star | Newville | PA | 17241 | 3,349 |
| The News-Chronicle | Shippensburg | PA | 17257-9777 | 4,770 |
| Bedford Gazette | Bedford | PA | 15522 | 9,421 |
| The Daily News | Huntingdon | PA | 16652 | 10,000 |
| The Spirit | Punxsutawney | PA | 15767-0444 | 5,200 |
| The Ridgway Record | Ridgway | PA | 15853 | 3,146 |
| The Daily Press | St. Marys | PA | 15857 | 4,973 |

| | | | | |
|---|---|---|---|---|
| The Daily Herald | Tyrone | PA | 16686 | 2,000 |
| East Penn Press | Allentown | PA | 18104-1805 | 6,500 |
| Northwestern Press | Allentown | PA | 18104-1805 | 4,000 |
| Parkland Press | Allentown | PA | 18104-1805 | 5,000 |
| Whitehall-Coplay Press | Allentown | PA | 18104-1805 | 5,000 |
| The Valley Voice | Hellertown | PA | 18055 | 1,443 |
| The Latrobe Bulletin | Latrobe | PA | 15650 | 7,510 |
| Derrick Publishing Co. | Oil City | PA | 16301 | 23,880 |
| Trib Total Media | Pittsburgh | PA | 15212 | 226,500 |
| Observer-Reporter | Washington | PA | 15301 | 36,500 |
| The Echo-Pilot | Greencastle | PA | 17225 | 2,537 |
| The Record Herald | Waynesboro | PA | 17268 | 9,642 |
| Press Enterprise | Bloomsburg | PA | 17815 | 23,850 |
| Hazleton Standard-Speaker | Hazleton | PA | 18201-6098 | 21,000 |
| The Wayne Independent | Honesdale | PA | 18431 | 4,060 |
| Salisbury Press | Lehighton | PA | 18235 | 4,000 |
| Times News | Lehighton | PA | 18235 | 16,500 |
| Lewisburg Daily Journal | Milton | PA | 17847 | 1,000 |
| The Standard Journal | Milton | PA | 17847 | 2,600 |
| (The Susquehanna County) Independent | Montrose | PA | 18801 | 3,755 |
| Republican-Herald/The News Item | Pottsville | PA | 17901 | 40,000 |
| Morning Times | Sayre | PA | 18840 | 6,100 |
| The Scranton Times | Scranton | PA | 18505 | 51,000 |
| The Pocono Record | Stroudsburg | PA | 18360 | 20,805 |
| The Daily Item | Sunbury | PA | 17801 | 23,000 |
| The Daily Review | Towanda | PA | 18848 | 9,540 |
| The New Age-Examiner | Tunkhannock | PA | 18657 | 5,886 |
| The Citizens' Voice | Wilkes-Barre | PA | 18711 | 33,000 |
| Rocket-Courier | Wyalusing | PA | 18853 | 4,060 |
| Cranston Herald | Warwick | RI | 2889 | 4,060 |
| Warwick Beacon | Warwick | RI | 2889 | 8,500 |
| The Westerly Sun | Westerly | RI | 2891 | 10,149 |
| The People-Sentinel | Barnwell | SC | 29812 | 6,000 |
| The Citizen News | Edgefield | SC | 29824 | 1,900 |
| The Weekly Observer | Henmingway | SC | 29554 | 2,040 |
| The Lancaster News | Lancaster | SC | 29720-2174 | 13,930 |
| The Newberry Observer & Herald & News | Newberry | SC | 29108 | 5,000 |
| The Times and Democrat | Orangeburg | SC | 29116 | 16,089 |
| Clarendon Sun | Sumter | SC | 29150 | 10,000 |
| The Herald Independent | Winnsboro | SC | 29180-1118 | 3,000 |
| Marlboro Herald - Advocate | Bennettsville | SC | 29512 | 7,104 |
| Morning News | Florence | SC | 29501 | 23,000 |
| The Messenger | Hartsville | SC | 29550 | 3,550 |
| The Messenger | Hartsville | SC | 29550 | 3,550 |
| Lake City News & Post | Lake City | SC | 29560 | 1,371 |
| Marion Star & Mullins Enterprise | Lake City | SC | 29560 | 2,550 |
| The Pickens Sentinel | Pickens | SC | 29671 | 4,600 |
| The Daily Journal | Seneca | SC | 29679 | 7,060 |

| | | | | |
|---|---|---|---|---|
| The Daily Messenger | Seneca | SC | 29679 | 1,940 |
| The Union Daily Times | Union | SC | 29379 | 6,495 |
| Bluffton Today | Bluffton | SC | 29910 | 12,500 |
| Hampton County Guardian | Hampton | SC | 29924 | 4,990 |
| Jasper County Sun Times | Ridgeland | SC | 29936 | 1,324 |
| Belle Fourche Bee/Post | Belle Fourche | SD | 57717 | 1,600 |
| Hot Springs Star | Hot Sprints | SD | 57747 | 1,200 |
| Butte County Valley Irrigator | Newell | SD | 57760 | 1,800 |
| Meade County Times Tribune | Sturgis | SD | 57785 | 2,000 |
| Leader-Courier | Elk Point | SD | 57025-0310 | 1,200 |
| American News | Aberdeen | SD | 57402 | 16,250 |
| Armour Chronicle | Armour | SD | 57313 | 865 |
| Brookings Register | Brookins | SD | 57006 | 5,074 |
| Central Dakota Times | Chamberlain | SD | 57325 | 2,438 |
| Corisca Globe | Corsica | SD | 57328 | 895 |
| The Delmont Record | Corsica | SD | 57328 | 230 |
| The New Era | Parker | SD | 57053 | 1,121 |
| Aurora County Standard | White Lake | SD | 57383 | 531 |
| The Stickney Argus | White Lake | SD | 57383 | 500 |
| Daily Press and Dakotan | Yankton | SD | 57078 | 8,557 |
| Cleveland Daily Banner | Cleveland | TN | 37320 | 16,238 |
| The Herald - News | Dayton | TN | 37321 | 5,683 |
| Elk Valley Times | Fayetteville | TN | 37334-2512 | 6,950 |
| Observer & News | Fayetteville | TN | 37334-2512 | 6,950 |
| Chester County Independent | Henderson | TN | 38340 | 3,800 |
| The News Leader | Parsons | TN | 38363 | 3,552 |
| Crossville Chronicle | Crossville | TN | 38555 | 7,242 |
| Fentress Courier | Jamestown | TN | 38556 | 5,074 |
| The Standard Banner | Jefferson City | TN | 37760 | 6,965 |
| The News-Herald | Lenoir City | TN | 37771 | 5,836 |
| The Daily Times | Maryville | TN | 37804 | 20,500 |
| The Oak Ridger | Oak Ridge | TN | 37830 | 8,119 |
| Independent Herald | Oneida | TN | 37841 | 5,074 |
| The Mountain Press | Sevierville | TN | 37876 | 9,300 |
| The Advocate & Democrat | Sweetwater | TN | 37874 | 5,300 |
| Claiborne Progress | Tazewell | TN | 37879 | 5,000 |
| Bolivar Bulletin-Times | Bolivar | TN | 38008 | 1,878 |
| Brownsville States-Graphic | Brownsville | TN | 38012-3032 | 3,300 |
| The Collierville Herald | Collierville | TN | 38017-2617 | 3,000 |
| The Leader | Covington | TN | 38019 | 5,500 |
| The Tri-City Reporter | Dyer | TN | 38343 | 1,700 |
| The State Gazette | Dyersburg | TN | 38024 | 6,089 |
| Humboldt Chronicle | Humboldt | TN | 38343 | 2,771 |
| Independent Appeal | Selmer | TN | 38375 | 7,104 |
| Carroll County News-Leader | Camden | TN | 38320 | 4,300 |
| The Camden Chronicle | Camden | TN | 38320-0527 | 4,000 |
| The Williamson Herald | Franklin | TN | 37064 | 8,500 |
| Macon County Times | Lafayette | TN | 37083 | 4,400 |

| | | | | |
|---|---|---|---|---|
| The Wilson Post | Lebanon | TN | 37087 | 9,134 |
| Southern Standard | McMinnville | TN | 37111 | 9,950 |
| The Mt. Juliet News | Mt. Juliet | TN | 37122 | 2,786 |
| The Pulaski Citizen | Pulaski | TN | 38478 | 7,500 |
| Shelbyville Times Gazette | Shelbyville | TN | 37162 | 10,945 |
| Smithville Review | Smithville | TN | 37166 | 3,500 |
| Manchester Times | Tullahoma | TN | 37388-0400 | 10,356 |
| The Wayne County News | Waynesboro | TN | 38485 | 5,000 |
| Cannon Courier | Woodbury | TN | 37190 | 3,600 |
| Elizabethton Star | Elizabethton | TN | 37644 | 9,000 |
| The Erwin Record | Erwin | TN | 37650 | 5,074 |
| The Greeneville Sun | Greeneville | TN | 37744 | 13,300 |
| Herald & Tribune | Jonesborough | TN | 37659 | 4,400 |
| Breckenridge American | Breckenridge | TX | 76424 | 1,550 |
| Brownwood Bulletin | Brownwood | TX | 76804 | 7,500 |
| The Snyder Daily News | Snyder | TX | 79550 | 5,582 |
| Sweetwater Reporter | Sweetwater | TX | 79556 | 3,755 |
| Borger News-Herald | Borger | TX | 79008 | 3,500 |
| The Canyon News | Canyon | TX | 79015 | 4,000 |
| Hereford Brand | Hereford | TX | 79045 | 2,639 |
| Lake Travis View | Austin | TX | 78705 | 4,050 |
| Westlake Picayune | Austin | TX | 78746 | 3,400 |
| Bastrop Advertiser | Bastrop | TX | 78602 | 5,700 |
| Fredericksburg Standard-Radio Post | Fredericksburg | TX | 78624 | 9,600 |
| Cedar Park Citizen | Jonestown | TX | 78645 | 14,350 |
| Leander Ledger | Jonestown | TX | 78645 | 8,700 |
| Pflugerville Pflag | Round Rock | TX | 78664 | 7,200 |
| Round Rock Leader | Round Rock | TX | 78664 | 7,500 |
| San Marcos Daily Record | San Marcos | TX | 78667 | 5,250 |
| Smithville Times | Smithvilel | TX | 78957 | 3,100 |
| The Orange Leader | Orange | TX | 77630 | 5,000 |
| Port Arthur News | Port Arthur | TX | 77640 | 13,500 |
| The Vidorian | Vidor | TX | 77670 | 1,200 |
| Tyler County Booster | Woodville | TX | 75979 | 3,857 |
| Alice Echo News-Journal | Alice | TX | 78332 | 4,567 |
| The Freer Press | Freer | TX | 78357 | 1,542 |
| Kingsville Record | Kingsville | TX | 78363 | 6,089 |
| Nueces Co. Record Star | Robstown | TX | 78380 | 4,000 |
| Rockport Pilot | Rockport | TX | 78381 | 4,975 |
| Athens Daily Review | Athens | TX | 75751-0032 | 5,200 |
| Alvarado Star | Burelson | TX | 76028 | 308 |
| Burleson Star | Burelson | TX | 76028 | 3,272 |
| Crowley Star | Burelson | TX | 76028 | 745 |
| Everman Star | Burelson | TX | 76028 | 289 |
| Joshua Star | Burelson | TX | 76028 | 687 |
| Kenne Star | Burelson | TX | 76028 | 569 |
| Clarksville Times | Clarksville | TX | 75426-3936 | 3,248 |
| Cleburne Times-Review | Cleburne | TX | 76031 | 5,000 |

| | | | | |
|---|---|---|---|---|
| Clifton Record | Clifton | TX | 76634 | 2,900 |
| Wise County Messenger | Decatur | TX | 76234 | 6,200 |
| Denton Record-Chronicle | Denton | TX | 76202 | 14,280 |
| Rains County Leader | Emory | TX | 75440-9321 | 3,146 |
| Gainesville Daily Register | Gainesville | TX | 76240 | 6,300 |
| Glen Rose Reporter | Glen Rose | TX | 76043 | 2,000 |
| Lake Country Sun | Graford | TX | 76449-3106 | 1,990 |
| Hood County News | Granbury | TX | 76048 | 10,149 |
| Greenville Herald-Banner | Greenville | TX | 75401 | 7,800 |
| Jack County Herald | Jacksboro | TX | 76458-2308 | 1,050 |
| Kaufman Herald | Kaufman | TX | 75142 | 4,364 |
| The Monitor/Leader | Mabank | TX | 75147 | 4,060 |
| Meridian Tribune | Meridian | TX | 76665 | 2,400 |
| Mineral Wells Index | Mineral Wells | TX | 76067 | 3,000 |
| Palestine Herald - Press | Palestine | TX | 75801 | 7,500 |
| The Suburbia News | Seagoville | TX | 75159 | 1,600 |
| Stephenville Empire-Tribune | Stephenville | TX | 76401 | 4,726 |
| The Teague Chronicle | Teague | TX | 75860 | 2,537 |
| Terrell Tribune | Terrell | TX | 75160 | 4,060 |
| Waxahachie Daily Light | Waxahachie | TX | 75165 | 5,480 |
| The Weatherford Democrat | Weatherford | TX | 76086 | 4,000 |
| Van Zandt News | Wills Point | TX | 75169 | 5,400 |
| Edinburg Review | Edinburg | TX | 78539 | 20,000 |
| Original Winter Texan | McAllen | TX | 78501 | 5,000 |
| Raymondville Chronicle | Raymondville | TX | 78580-1942 | 2,200 |
| Willacy County News | Raymondville | TX | 78580-1942 | 1,149 |
| Mid Valley Town Crier | Weslaco | TX | 78596 | 18,268 |
| Alvin Sun | Alvin | TX | 77511 | 1,000 |
| The Bay City Tribune | Bay City | TX | 77414 | 5,074 |
| Baytown Sun | Baytown | TX | 77520 | 9,384 |
| Corrigan Times | Corrigan | TX | 75939 | 1,194 |
| Jackson County Herald Tribune | Edna | TX | 77957 | 3,600 |
| El Campo Leader - News | El Campo | TX | 77437 | 5,200 |
| Galveston County Daily News | Galveston | TX | 77554-9119 | 24,500 |
| The Huntsville Item | Huntsville | TX | 77320 | 6,089 |
| The Katy Times | Katy | TX | 77493 | 6,000 |
| Polk County Enterprise | Livingston | TX | 77351 | 8,322 |
| The Port Lavaca Wave | Port Lavaca | TX | 77979 | 4,567 |
| The Fort Bend Herald | Rosenburg | TX | 77471-1088 | 8,880 |
| San Jacinto News-Times | Shepherd | TX | 77371 | 2,239 |
| Wharton Journal - Spectator | Wharton | TX | 77488 | 4,200 |
| Laredo Morning Times | Laredo | TX | 78041 | 19,500 |
| Brownfield News | Brownfield | TX | 79316-3203 | 2,700 |
| Lamesa Press-Reporter | Lamesa | TX | 79331-5405 | 3,383 |
| Levelland And Hockley County News-Press | Levelland | TX | 79336-4523 | 4,900 |
| The Lamb County Leader News | Littlefield | TX | 79339-3313 | 2,800 |
| Lubbock Avalanche-Journal | Lubbock | TX | 79401 | 33,250 |
| Muleshoe Journal | Muleshoe | TX | 79347 | 2,000 |

| | | | | |
|---|---|---|---|---|
| Plainview Daily Herald | Plainview | TX | 79072 | 6,800 |
| Seminole Sentinel | Seminole | TX | 79360-5058 | 1,240 |
| Andrews County News | Andrews | TX | 79714 | 2,842 |
| Big Spring Herald | Big Spring | TX | 79721 | 5,174 |
| Midland Reporter-Telegram | Midland | TX | 79701 | 15,000 |
| The Eldorado Success | Eldorado | TX | 76936 | 2,288 |
| The Junction Eagle | Junction | TX | 76849 | 1,800 |
| The Comfort News | Comfort | TX | 78013 | 1,000 |
| Cuero Record | Cuero | TX | 77954 | 3,200 |
| Yorktown News | Cuero | TX | 77954 | 1,900 |
| Wilson County News | Floresville | TX | 78114 | 11,000 |
| West Kerr Current | Ingram | TX | 78025 | 1,800 |
| Kerrville Daily Times | Kerrville | TX | 78028 | 9,540 |
| Leader News | Lytle | TX | 78052 | 2,686 |
| New Braunfels Herald-Zeitung | New Braunfels | TX | 78131 | 10,700 |
| Seguin Gazette-Enterprise | Seguin | TX | 78156 | 6,597 |
| The Uvalde Leader-News | Uvalde | TX | 78801 | 4,975 |
| Light and Champion | Center | TX | 75935 | 4,060 |
| The Jefferson Jimplecute | Jefferson | TX | 75657 | 2,000 |
| Marshall News Messenger | Marshall | TX | 75670 | 7,650 |
| Mount Pleasant Daily Tribune | Mt. Pleasant | TX | 75456 | 5,273 |
| Houston County Courier | Crockett | TX | 75835 | 5,176 |
| The Gilmer Mirror | Gilmer | TX | 75644-0250 | 5,074 |
| Groveton News | Groveton | TX | 75845 | 1,940 |
| Sabine County Reporter | Hemphill | TX | 75948 | 3,045 |
| Henderson Daily News | Henderson | TX | 75653 | 6,219 |
| Jacksonville Daily Progress | Jacksonville | TX | 75766 | 3,800 |
| Kilgore News Herald | Kilgore | TX | 75662 | 3,400 |
| Longview News Journal | Longview | TX | 75601 | 30,090 |
| The Lufkin Daily News | Lufkin | TX | 75904 | 13,668 |
| Mount Vernon Optic-Herald | Mount Vernon | TX | 75457 | 3,045 |
| The Daily Sentinel | Nochgodoches | TX | 75965 | 8,772 |
| Trinity Standard | Trinity | TX | 75862 | 2,388 |
| The Banner - Press | Brenham | TX | 77843 | 6,597 |
| Bryan-College Station Eagle | Bryan | TX | 77802 | 25,372 |
| Star-Forum | Gatesville | TX | 76528-2053 | 1,060 |
| The Gatesville Messenger | Gatesville | TX | 76528-2052 | 3,000 |
| Calvert Tribune | Hearne | TX | 77859 | 1,300 |
| Franlkin Advocate | Hearne | TX | 77859 | 1,300 |
| Hearne Democrat | Hearne | TX | 77859 | 2,000 |
| Hubbard City News | Mexia | TX | 76667 | 1,100 |
| The Mexia Daily News | Mexia | TX | 76667 | 2,100 |
| Waco Tribune - Herald | Waco | TX | 76701 | 37,000 |
| The Graham Leader | Graham | TX | 76450 | 3,486 |
| The Olney Enterprise | Olney | TX | 76374-1923 | 1,400 |
| The Vernon Daily Record | Vernon | TX | 76384 | 4,669 |
| Davis County Clipper | Bountiful | UT | 84010 | 10,000 |
| Iron County Today | Cedar City | UT | 84721 | 10,000 |

| | | | | |
|---|---|---|---|---|
| Wasatch Wave | Heber City | UT | 84032 | 4,263 |
| The Times Indpendent | Moab | UT | 84532 | 3,300 |
| Standard-Examiner | Ogden | UT | 84404 | 63,939 |
| Sun-Advocate | Price | UT | 84501 | 5,800 |
| Richfield Reaper | Richfield | UT | 84701 | 5,700 |
| The Salt Lake Tribune/Deseret News | Salt Lake City | UT | 84118 | 150,000 |
| Tooele Transcript Bulletin | Tooele | UT | 84074 | 7,409 |
| Clinch Valley News | Richlands | VA | 24641 | 2,400 |
| Richlands News-Press | Richlands | VA | 24641 | 3,798 |
| Page News and Courier | Harrisonburg | VA | 22801 | 7,815 |
| Shenandoah Valley-Herald | Harrisonburg | VA | 22801 | 3,700 |
| Valley Banner | Harrisonburg | VA | 22801 | 3,900 |
| Suffolk News-Herald | Suffolk | VA | 23434 | 4,263 |
| Herald Progress | Ashland | VA | 23005-3436 | 5,500 |
| The Farmville Herald | Farmville | VA | 23901-1312 | 8,322 |
| The Goochland Gazette | Goochland | VA | 23063-3202 | 5,500 |
| The Hopewell News | Hopewell | VA | 23860 | 3,000 |
| The Central Virginian | Louisa | VA | 23093 | 5,000 |
| Progress-Index | Petersburg | VA | 23803 | 15,223 |
| Bedford Bulletin | Bedford | VA | 24523 | 8,018 |
| The Floyd Press | Floyd | VA | 24091-2620 | 5,000 |
| The Gazette | Galax | VA | 24333 | 8,424 |
| The Carroll News | Hillsville | VA | 24343-1539 | 6,766 |
| The News - Gazette | Lexington | VA | 24450 | 8,627 |
| The Gazette-Virginian | South Boston | VA | 24592 | 10,500 |
| The Bland Messenger | Wytheville | VA | 24382 | 2,500 |
| Wytheville Enterprise | Wytheville | VA | 24382-2207 | 5,415 |
| The Post | Big Stone Gap | VA | 24219 | 3,000 |
| Bristol Herald Courier | Bristol | VA | 24201 | 30,000 |
| Smyth County News & Messenger | Marion | VA | 24354 | 4,632 |
| The Coalfield Progress | Norton | VA | 24273 | 6,000 |
| Dickenson Star/Cumberland Times | Norton | VA | 24273 | 3,500 |
| The Warren Sentinel | Front Royal | VA | 22630 | 3,400 |
| Northern Virginia Daily | Strasburg | VA | 22657 | 14,500 |
| Bennington Banner | Bennington | VT | 5201 | 8,119 |
| Brattleboro Reformer | Brattleboro | VT | 5301 | 10,656 |
| Deerfield Valley News | West Dover | VT | 5356 | 3,045 |
| The Newport Daily Express | Newport | VT | 5855 | 3,969 |
| St. Albans Messenger | St. Albans | VT | 5478 | 6,089 |
| The Caledonian-Record | St. Johnsbury | VT | 5819 | 10,000 |
| Camas-Washougal Post-Record | Camas | WA | 98607 | 4,100 |
| The Dispatch | Eatonville | WA | 98328 | 4,750 |
| Statesman-Examiner | Colville | WA | 99114 | 4,060 |
| Tribune | Deer Park | WA | 99006 | 1,194 |
| The (Omak-Okanogan County) Chronicle | Omak | WA | 98841 | 5,771 |
| The Quincy Valley Post-Register | Quincy | WA | 98848 | 2,040 |
| The Spokesman-Review | Spokane | WA | 99210 | 85,000 |
| Daily Record | Ellensburg | WA | 98926 | 6,268 |

| | | | | |
|---|---|---|---|---|
| Grandview Herald | Grandview | WA | 98930 | 2,040 |
| Record Bulletin | Prosser | WA | 99350 | 3,045 |
| Daily Sun News | Sunnyside | WA | 98944 | 3,755 |
| Yakima Herald-Republic | Yakima | WA | 98901 | 32,200 |
| The Daily Press | Ashland | WI | 54806 | 6,000 |
| Sawyer County Record | Hayward | WI | 54843 | 4,776 |
| The County Journal | Washburn | WI | 54891 | 1,900 |
| Clintonville Tribune Gazette | Clintonville | WI | 54929 | 2,500 |
| Manawa Advocate | Iola | WI | 54945 | 500 |
| The Iola Herald | Iola | WI | 54945 | 1,000 |
| Eagle Herald | Marinette | WI | 54143 | 9,000 |
| New London Buyers Guide | New London | WI | 54961 | 15,151 |
| Berlin/Ripon Ad Pack | Oshkosh | WI | 54904 | 12,700 |
| Oshkosh Buyers Guide | Oshkosh | WI | 54904 | 25,000 |
| Waupaca County Post | Waupaca | WI | 54981 | 7,300 |
| The Waushara Argus | Wautoma | WI | 54982 | 5,897 |
| The Chronicle | Weyauwega | WI | 54983 | 2,500 |
| Wisconsin Rapids Buyers Guide | Wisconsin Rapids | WI | 54961 | 22,040 |
| Jackson County Chronicle | Black River Falls | WI | 54615 | 2,000 |
| The Chetek Alert | Chetek | WI | 54720 | 2,900 |
| Baraboo News Republic | Baraboo | WI | 53913 | 4,950 |
| Grant County Herald Independent | Lancaster | WI | 53813 | 3,400 |
| Juneau County Star-Times | Mauston | WI | 53948 | 3,097 |
| The Monroe Times | Monroe | WI | 53566 | 5,074 |
| The Park Falls Herald | Park Falls | WI | 53566 | 2,800 |
| The Platteville Journal | Platteville | WI | 53813 | 3,900 |
| Daily Register | Portage | WI | 53901 | 5,555 |
| Reedsburg Times Press | Reedsburg | WI | 53959 | 1,059 |
| The Sauk Prairie Eagle | Sauk City | WI | 53583 | 2,218 |
| Wisconsin Dells Events | Wisconsin Dells | WI | 53901 | 2,288 |
| Daily Citizen | Beaver Dam | WI | 53916 | 10,550 |
| Burlington Standard Press | Burlington | WI | 53105 | 3,000 |
| Ozaukee County News Graphic | Cedarburg | WI | 53012 | 8,080 |
| The Delavan Enterprise | Delavan | WI | 53115 | 2,000 |
| The East Troy News | East Troy | WI | 53120 | 500 |
| The Elkhorn Independent | Elkhorn | WI | 53121 | 1,000 |
| Daily Jefferson County Union | Fort Atkinson | WI | 53538 | 8,728 |
| Lake Geneva Times | Lake Geneva | WI | 53147 | 2,000 |
| Milwaukee Journal Sentinel | Milwaukee | WI | 53203 | 260,000 |
| The Journal Times | Racine | WI | 53403 | 26,000 |
| Westosha Report | Twin Lakes | Wi | 53181 | 500 |
| Westine Report | Union Grove | WI | 53182 | 500 |
| The Times  Walworth | Walworth | WI | 53184 | 500 |
| Waterford Post | Waterford | WI | 53185 | 1,000 |
| Times Publishing Company | Watertown | WI | 53094 | 8,600 |
| Waukesha Freeman | Waukesha | WI | 53186 | 12,726 |
| West Bend Daily News | West Bend | WI | 53095 | 9,343 |
| Whitewater Register | Whitewater | WI | 53190 | 1,000 |

| | | | | |
|---|---|---|---|---|
| Amery Free Press | Amery | WI | 54001 | 5,100 |
| The Baldwin Bulletin | Baldwin | WI | 54002 | 1,900 |
| Barron News - Shield | Barron | WI | 54812 | 4,000 |
| Cumberland Advocate | Cumberland | WI | 54829 | 2,139 |
| Osceola Sun | Osceola | WI | 54020 | 2,139 |
| Spooner Advocate | Spooner | WI | 54801 | 4,229 |
| Clintonville Buyers Guide | Clintonville | WI | 59929 | 14,000 |
| Waupaca Buyers Guide | Antigo | WI | 54409 | 11,276 |
| Vilas County News - Review | Eagle River | WI | 54521 | 6,120 |
| Marshfield Buyers Guide | Marshfield | WI | 54449 | 21,513 |
| Foto News | Merrill | WI | 54452 | 16,400 |
| Star Journal | Rhinelander | WI | 54501 | 16,000 |
| Stevens Point Buyers Guide | Stevens Point | WI | 54481 | 21,097 |
| Marathon Buyers Guide | Wausau | WI | 54402 | 33,800 |
| Montgomery Herald | Montgomery | WV | 25136 | 1,300 |
| The Fayette Tribune | Oak Hill | WV | 25901 | 2,000 |
| Independent Herald | Pineville | WV | 24874 | 2,000 |
| Princeton Times | Princeton | WV | 24740 | 1,700 |
| Gilbert Times | Gilbert | WV | 25621 | 1,700 |
| Lincoln Journal | Hamlin | WV | 25523 | 3,000 |
| The Star Herald | Ravenswood | WV | 26164 | 12,179 |
| Braxton Democrat-Central | Sutton | WV | 26601-1399 | 3,552 |
| Wayne County News | Wayne | WV | 25570 | 3,045 |
| Ritchie Gazette | Harrisville | WV | 26362-0215 | 3,857 |
| Mineral Daily News Tribune | Keyser | WV | 26726 | 4,200 |
| Grant County Press | Petersburg | WV | 26847 | 4,060 |
| Hampshire Review | Romney | WV | 26757 | 7,150 |
| The Cody Enterprise | Cody | WY | 82414 | 6,089 |
| The Powell Tribune | Powell | WY | 82435 | 3,045 |
| Casper Star-Tribune | Casper | WY | 82604 | 31,000 |
| Douglas Budget | Douglas | WY | 82633 | 5,500 |
| The Journal | Landers | WY | 82520 | 4,191 |
| The Ranger | Riverton | WY | 82501 | 5,400 |
| Northern Wyoming Daily News | Worland | WY | 82401 | 4,060 |
| The News-Record | Gillette | WY | 82717 | 9,950 |
| Rawlins Daily Times | Rawlins | WY | 82301 | 3,755 |
| Sheridan Press | Sheridan | WY | 82801 | 7,104 |
| The Sundance Times | Sundance | WY | 82729 | 1,642 |
| Star Valley Independent | Afton | WY | 83110 | 3,184 |
| Daily Rocket-Miner | Rock Sprints | WY | 82901 | 9,452 |
| | | | **TOTAL** | **10,119,091** |

# PARADE

## Distributing Newspapers

**Effective January, 2012**

**33,000,000 National Circulation
in More than 640 Newspapers**

| State / State Circulation Newspaper | Circulation Newspaper / Cluster |
|---|---|
| **Alabama** | |
| 427,307 | |
| Alexander City:  The Outlook | 4,000 * |
| Selma:  The Selma Times-Journal | 4,800 * |
| | 8,800 |
| Anniston:  The Anniston Star | 20,649 |
| Birmingham:  The Birmingham News | 154,031 |
| Cullman:  The Cullman Times | 10,873 * |
| Gadsden:  The Gadsden Times | 17,459 |
| Talladega:  The Daily Home | 7,549 * |
| Tuscaloosa:  The Tuscaloosa News | 31,926 |
| | 242,487 |
| Athens:  The Athens News Courier | 5,794 * |
| Huntsville:  The Huntsville Times | 68,800 |
| | 74,594 |
| Mobile-Pensacola:  Press-Register | 101,426 |
| | 101,426 |
| **Alaska** | |
| 75,577 | |
| Anchorage:  Anchorage Daily News | 49,734 |
| Fairbanks:  Fairbanks Daily News-Miner | 14,879 |
| Juneau:  Juneau Empire | 4,800 * |
| Kenai:  Peninsula Clarion | 6,164 * |
| | 75,577 |
| **Arizona** | |
| 315,798 | |
| Cottonwood:  Verde Independent & The Bugle | 3,601 * |
| Flagstaff:  Arizona Daily Sun | 10,451 |
| Kingman:  The Kingman Daily Miner | 7,629 * |
| Lake Havasu City:  Today's News-Herald | 10,162 * |
| Mesa:  East Valley Tribune | 119,026 * |
| Prescott:  The Daily Courier | 15,544 |
| Sun City:  News-Sun | 6,463 |
| | 172,876 |
| Tucson:  The Arizona Daily Star | 128,813 |
| | 128,813 |
| Yuma:  The Sun | 14,109 |
| | 14,109 |
| **Arkansas** | |
| 290,510 | |
| Blytheville:  Blytheville Courier News | 2,595 |
| | 2,595 |

| State / State Circulation Newspaper | Circulation Newspaper / Cluster |
|---|---|
| **Arkansas** | |
| 290,510 | |
| Conway:  Log Cabin Democrat | 8,439 * |
| Little Rock:  Arkansas Democrat-Gazette | 198,559 * |
| | 206,998 |
| El Dorado:  Sunday News | 12,982 |
| Fayetteville:  Northwest Arkansas Democrat Gazette | 67,935 * |
| | 80,917 |
| **California** | |
| 3,307,762 | |
| Bakersfield:  The Bakersfield Californian | 52,472 |
| Lompoc:  Lompoc Record | 3,637 |
| San Luis Obispo:  The Tribune | 36,772 |
| Santa Barbara:  Santa Barbara News-Press | 23,778 |
| Santa Barbara/TMC:  Santa Barbara News-Press Direct | 34,476 * |
| Santa Maria:  Santa Maria Times | 18,367 |
| Santa Maria/Select:  Central Coast Preview | 6,000 * |
| | 175,502 |
| Camarillo:  Ventura County Star | 79,488 |
| Palmdale:  Antelope Valley Press | 19,110 |
| Riverside:  The Press Enterprise | 124,997 |
| Santa Ana:  The Orange County Register | 282,135 |
| Santa Ana/TMC:  Sunday Preferred | 86,000 * |
| Victorville:  Daily Press | 26,022 |
| | 617,752 |
| El Centro:  Imperial Valley Press | 9,468 |
| | 9,468 |
| Escondido:  North County Times | 65,597 |
| | 65,597 |
| Fairfield:  Daily Republic | 18,516 |
| Sacramento:  The Sacramento Bee | 265,074 |
| Sacramento/Select:  Yes! Your Essential Shopper | 40,023 * |
| | 323,613 |
| Fresno:  The Fresno Bee | 138,064 |
| Fresno/Select:  Yes!  Your Essential Shopper | 31,458 * |
| Hanford:  The Sentinel | 8,577 |
| Merced:  Merced Sun-Star | 15,079 |
| Porterville:  Recorder | 5,900 * |
| | 199,078 |
| Los Angeles:  Los Angeles Times | 887,775 |

| State / State Circulation<br>Newspaper | Circulation<br>Newspaper / Cluster | State / State Circulation<br>Newspaper | Circulation<br>Newspaper / Cluster |
|---|---|---|---|
| **California** | | **Connecticut** | |
| 3,307,762 | | 370,212 | |
| | 887,775 | | 241,578 |
| | | **Delaware** | |
| Marysville-Yuba City:  Appeal-Democrat | 15,684 | 16,981 | |
| Marysville-Yuba City/Select:  A-D Light | 5,000 * | Dover:  State News Sunday | 16,981 |
| Modesto:  The Modesto Bee | 71,332 | | 16,981 |
| Modesto/Select:  Yes! Your Essential Shopper | 31,023 * | **District of Columbia** | |
| Stockton:  The Record | 41,037 | 713,842 | |
| | 164,076 | Washington:  The Washington Post | 713,842 |
| | | | 713,842 |
| Napa:  Register | 12,722 | **Florida** | |
| Santa Rosa:  The Press Democrat | 60,956 | 2,482,112 | |
| | 73,678 | Bradenton:  Bradenton Herald | 39,235 |
| | | Bradenton/Select:  Yes! Your Essential Shopper | 12,500 * |
| Redding:  Record Searchlight | 24,124 | Lakeland:  The Ledger | 62,685 |
| | 24,124 | Winter Haven:  The Reporter | 28,758 * |
| | | | 143,178 |
| San Diego:  The San Diego Union-Tribune | 291,363 | | |
| San Diego/TMC:  Local Community Values | 202,084 * | Cape Coral:  Cape Coral Daily Breeze | 42,209 * |
| | 493,447 | Naples-Bonita:  Daily News | 52,437 |
| | | | 94,646 |
| San Francisco:  San Francisco Chronicle | 273,652 | | |
| | 273,652 | Ft. Walton Beach:  Northwest Florida Daily News | 29,863 |
| **Colorado** | | | 29,863 |
| 743,520 | | | |
| Boulder:  Sunday Camera | 26,565 | Gainesville:  The Gainesville Sun | 41,472 |
| Longmont:  Times-Call | 19,097 | Gainesville/Select:  Shop Gainesville | 10,000 * |
| Loveland:  Reporter-Herald | 20,535 | | 51,472 |
| | 66,197 | | |
| | | Jacksonville:  The Florida Times-Union | 148,436 |
| Canon City:  Canon City Daily Record | 5,705 | Lake City:  Lake City Reporter | 7,000 * |
| Colorado Springs:  The Gazette | 84,265 | St. Augustine:  St. Augustine Record | 17,227 |
| Colorado Springs/Select:  Sunday Preferred | 23,200 * | | 172,663 |
| Pueblo:  The Pueblo Chieftain | 45,388 | | |
| Trinidad:  The Chronicle-News | 2,554 * | Live Oak:  Live Oak Suwannee Democrat | 5,300 * |
| | 161,112 | | 5,300 |
| | | | |
| Denver:  The Denver Post | 443,446 | Miami:  The Miami Herald | 203,295 |
| Denver/Select:  Sunday Select | 40,500 * | Miami/Select:  The Miami Herald Sunday Select | 61,448 * |
| | 483,946 | Miami / El:  El Nuevo Herald | 72,142 |
| | | | 336,885 |
| Grand Junction:  The Daily Sentinel | 27,067 | | |
| Montrose:  Montrose Daily Press | 5,198 * | Ocala:  Star-Banner | 40,266 |
| | 32,265 | Ocala/Select:  Shop Ocala | 10,000 * |
| | | Orlando:  El Sentinel | 80,000 * |
| **Connecticut** | | Orlando:  Orlando Sentinel | 285,534 |
| 370,212 | | Orlando/Select:  Go Shopping, Orlando | 70,000 * |
| Bridgeport:  Connecticut Post | 69,815 | Orlando/TMC:  What's the Deal, Orlando? | 100,000 * |
| Danbury:  The News-Times | 28,724 | The Villages:  Daily Sun | 37,102 |
| Greenwich:  Time | 9,842 | | 622,902 |
| Stamford:  The Advocate | 20,253 | | |
| | 128,634 | Panama City:  Freedom Florida Newspapers | 25,280 * |
| | | Panama City:  The News Herald | 27,919 |
| Manchester:  Journal Inquirer | 33,993 | | 53,199 |
| Meriden:  Record-Journal | 17,883 * | | |
| Middletown:  The Middletown Press | 5,272 | Sarasota:  Herald-Tribune | 82,252 |
| New Britain:  Herald Press | 9,898 | St. Petersburg:  Tampa Bay Times | 399,547 |
| New Haven:  New Haven Register | 89,981 | Tampa:  The Tampa Tribune | 253,453 |
| New London:  The Day | 28,951 | | |
| Torrington:  The Register Citizen | 5,841 | | |
| Waterbury:  The Sunday Republican | 49,759 | | |

| State / State Circulation Newspaper | Circulation Newspaper / Cluster |
|---|---|
| **Florida** | |
| 2,482,112 | |
| | 735,252 |
| Stuart: SCRIPPS Treasure Coast Newspapers | 83,443 * |
| West Palm Beach: The Palm Beach Post | 123,309 |
| West Palm Beach/Select: Real Values | 30,000 * |
| | 236,752 |
| **Georgia** | |
| 1,103,915 | |
| Americus: Americus Times-Recorder | 3,211 * |
| Columbus: Columbus Ledger-Enquirer | 41,170 |
| Columbus/Select: Yes! Your Essential Shopper | 11,494 * |
| Macon: The Telegraph | 64,594 |
| Macon/Select: Yes! Your Essential Shopper | 23,374 * |
| Milledgeville: The Milledgeville Union-Recorder | 7,329 * |
| | 151,172 |
| Athens: Athens Banner-Herald | 21,858 |
| Atlanta: The Atlanta Journal-Constitution | 407,099 |
| Atlanta/Select: Buyer's Edge Select | 62,000 * |
| Atlanta/TMC: Atlanta - Reach | 265,500 * |
| | 756,457 |
| Augusta: The Augusta Chronicle | 64,316 |
| Augusta/Select: Yes! Your Essential Shopper | 8,200 * |
| | 72,516 |
| Cordele: Cordele Dispatch | 3,760 * |
| Moultrie: The Moultrie Observer | 5,654 * |
| Tifton: The Tifton Gazette | 6,635 * |
| | 16,049 |
| Hinesville: Liberty County Coastal Courier | 4,548 * |
| Richmond Hill: Bryan County News | 2,135 * |
| Savannah: Savannah Morning News | 54,890 |
| Statesboro: Statesboro Herald | 7,526 * |
| | 69,099 |
| Rome: Rome News-Tribune | 14,407 * |
| | 14,407 |
| Thomasville: Thomasville Times-Enterprise | 8,249 * |
| Valdosta: The Valdosta Daily Times | 15,966 * |
| | 24,215 |
| **Hawaii** | |
| 19,418 | |
| Wailuku: The Maui News | 19,418 |
| | 19,418 |
| **Idaho** | |
| 226,534 | |
| Boise: Idaho Statesman | 76,961 |
| Boise/Select: Yes! Your Essential Shopper | 25,000 * |
| Nampa: Idaho Press Tribune | 27,596 |
| Twin Falls: The Times-News | 21,442 |
| | 150,999 |
| Idaho Falls: Post Register | 28,046 |
| Pocatello: Idaho State Journal | 18,470 |

| State / State Circulation Newspaper | Circulation Newspaper / Cluster |
|---|---|
| **Idaho** | |
| 226,534 | |
| Rexburg: Standard Journal | 4,451 * |
| | 50,967 |
| Lewiston: Lewiston Morning Tribune | 24,568 * |
| | 24,568 |
| **Illinois** | |
| 1,786,240 | |
| Alton: The Telegraph | 20,397 |
| Belleville: Belleville Community Newspapers | 7,891 * |
| Belleville: Belleville News-Democrat | 51,117 |
| Belleville/Select: Yes! Your Essential Shopper | 13,694 * |
| | 93,099 |
| Bloomington: The Pantagraph | 42,353 |
| Canton: The Daily Ledger | 4,188 * |
| Pekin: Pekin Daily Times | 6,578 * |
| Peoria: Journal Star | 70,864 |
| | 123,983 |
| Carbondale: The Southern Illinoisan | 33,074 |
| | 33,074 |
| Champaign-Urbana: The News-Gazette | 42,964 |
| Decatur: Herald & Review | 43,055 |
| Effingham: Effingham Daily News | 10,120 |
| Jacksonville: Jacksonville Journal-Courier | 11,550 |
| Springfield: The State Journal-Register | 49,996 |
| | 157,685 |
| Chicago: Chicago Tribune | 777,038 |
| Chicago/Select: Chicago Tribune Sunday Select | 195,000 * |
| Chicago/Fin de Semana: Hoy fin de semana | 335,000 * |
| | 1,307,038 |
| Freeport: The Journal Standard | 10,326 * |
| | 10,326 |
| Galesburg: The Register-Mail | 9,947 |
| Kewanee: Star Courier | 3,778 * |
| Monmouth: Daily Review Atlas | 1,734 * |
| | 15,459 |
| Macomb: The Macomb Journal | 3,457 * |
| Quincy: Quincy Herald-Whig | 20,853 |
| | 24,310 |
| Mount Vernon: Mt. Vernon Register-News | 7,102 * |
| | 7,102 |
| Ottawa: The Times | 14,164 |
| | 14,164 |
| **Indiana** | |
| 540,894 | |
| Anderson: The Herald Bulletin | 20,751 * |
| Bloomington: Hoosier Times | 34,705 * |
| Columbus: The Republic | 19,330 |
| Franklin: Daily Journal | 13,906 |
| Greenfield: Daily Reporter | 9,266 * |
| Greensburg: Greensburg News | 4,306 * |

| State / State Circulation<br>Newspaper | Circulation<br>Newspaper / Cluster |
|---|---|
| **Indiana** | |
| 540,894 | |
| Kokomo:  Kokomo Tribune | 21,045 * |
| Lebanon:  The Lebanon Reporter | 4,043 * |
| Logansport:  Pharos-Tribune | 9,489 * |
| Mooresville-Decatur:  Reporter-Times | 3,076 * |
| Rushville:  Rushville Republican | 2,578 * |
| | 142,495 |
| Batesville:  The Batesville Herald Tribune | 2,569 * |
| | 2,569 |
| Evansville:  Evansville Courier & Press | 71,039 |
| | 71,039 |
| Ft. Wayne:  The Journal Gazette | 102,861 |
| | 102,861 |
| Goshen:  The Goshen News | 10,661 * |
| South Bend:  South Bend Tribune | 80,536 |
| | 91,197 |
| Munster:  The Times | 89,375 |
| | 89,375 |
| New Albany-Jeffersonville:  The Evening News<br>& The Tribune | 10,762 * |
| Seymour:  The Tribune | 6,618 * |
| | 17,380 |
| Terre Haute:  Tribune-Star | 23,978 |
| | 23,978 |
| **Iowa** | |
| 317,117 | |
| Ames:  The Tribune | 10,397 * |
| Fort Dodge:  The Messenger | 15,818 |
| Knoxville:  The Knoxville Crossville Chronicle | 2,015 * |
| Marshalltown:  Times-Republican | 8,678 |
| Oskaloosa:  Oskaloosa Herald | 2,691 * |
| | 39,599 |
| Cedar Rapids:  The Gazette | 61,165 |
| Dubuque:  Telegraph-Herald | 30,509 |
| Waterloo:  The Courier | 44,303 |
| | 135,977 |
| Clinton:  Clinton Herald | 9,688 |
| Davenport:  Quad-City Times | 59,272 |
| Muscatine:  Muscatine Journal | 5,706 |
| | 74,666 |
| Mason City:  Globe-Gazette | 18,241 |
| | 18,241 |
| Ottumwa:  The Ottumwa Courier | 10,626 |
| | 10,626 |
| Sioux City:  Sioux City Journal | 38,008 |
| | 38,008 |
| **Kansas** | |
| 254,196 | |
| Garden City:  The Garden City Telegram | 7,363 * |
| Great Bend:  Great Bend Tribune | 5,641 * |

| State / State Circulation<br>Newspaper | Circulation<br>Newspaper / Cluster |
|---|---|
| **Kansas** | |
| 254,196 | |
| Hays:  The Hays Daily News | 10,263 * |
| Hutchinson:  Hutchinson News | 28,503 |
| Salina:  Salina Journal | 26,070 |
| Wichita:  The Wichita Eagle | 99,624 |
| Wichita/Select:  Yes! Your Essential Shopper | 25,008 * |
| | 202,472 |
| Manhattan:  The Manhattan Mercury | 9,281 |
| Topeka:  Topeka Capital-Journal | 38,184 |
| | 47,465 |
| Ottawa:  The Ottawa Herald | 4,259 * |
| | 4,259 |
| **Kentucky** | |
| 241,159 | |
| Ashland:  The Independent | 15,263 |
| | 15,263 |
| Bowling Green:  Daily News | 23,911 |
| Glasgow:  The Glasgow Daily Times | 8,286 |
| | 32,197 |
| Corbin:  Corbin Times-Tribune | 5,805 * |
| Danville:  The Kentucky Advocate | 8,180 * |
| Lexington:  Lexington Herald-Leader | 113,350 |
| Lexington/Select:  Yes! Your Essential Shopper | 15,060 * |
| London:  The London Sentinel-Echo | 7,479 * |
| Somerset:  Commonwealth Journal | 8,118 * |
| | 157,992 |
| Elizabethtown:  The News Enterprise | 18,903 |
| | 18,903 |
| Henderson:  The Gleaner | 9,533 |
| | 9,533 |
| Maysville:  The Ledger Independent | 7,271 |
| | 7,271 |
| **Louisiana** | |
| 335,782 | |
| Abbeville-Eunice-Ville Platte:  Meridonial-News<br>Gazette | 10,863 * |
| Crowley:  The Crowley Post-Signal | 3,800 * |
| Lake Charles:  American Press | 35,300 |
| Ruston:  The Ruston Daily Leader | 5,200 * |
| | 55,163 |
| Baton Rouge:  The Advocate | 102,240 |
| Franklin:  The Banner Tribune | 2,138 * |
| Morgan City:  The Daily Review | 4,712 * |
| | 109,090 |
| Houma:  The Courier | 16,094 |
| | 16,094 |
| New Orleans:  The Times-Picayune | 155,435 |
| | 155,435 |
| **Maine** | |
| 136,400 | |

| State / State Circulation | Circulation | State / State Circulation | Circulation |
|---|---|---|---|
| Newspaper | Newspaper / Cluster | Newspaper | Newspaper / Cluster |

**Maine**
136,400

| | |
|---|---|
| Augusta:  Kennebeck Journal | 11,475 |
| Lewiston:  Sun Journal | 28,273 |
| Portland:  Maine Sunday Telegram | 82,286 |
| Waterville:  Morning Sentinel | 14,366 |
| | 136,400 |

**Maryland**
549,699

| | |
|---|---|
| Baltimore:  The Sun | 301,551 |
| Baltimore/Select:  Deals @ Your Door | 44,000 * |
| Baltimore / Weeklies:  Baltimore Weeklies | 117,000 * |
| Easton:  Star-Democrat | 14,973 * |
| | 477,524 |
| Cumberland:  Cumberland Times-News | 25,353 |
| Hagerstown:  The Herald-Mail Newspapers | 31,806 |
| | 57,159 |
| Elkton:  Cecil Whig | 15,016 * |
| | 15,016 |

**Massachusetts**
685,854

| | |
|---|---|
| Boston:  Boston Sunday Globe | 354,181 |
| Boston/Select:  Savings Central | 85,000 * |
| | 439,181 |
| Hyannis:  Sunday Cape Cod Times | 47,069 |
| Worcester:  Sunday Telegram | 74,629 |
| | 121,698 |
| New Bedford:  Sunday Standard-Times | 23,807 |
| | 23,807 |
| Springfield:  Sunday Republican | 101,168 |
| | 101,168 |

**Michigan**
880,037

| | |
|---|---|
| Adrian:  The Daily Telegram | 14,315 |
| | 14,315 |
| Ann Arbor:  AnnArbor.com | 37,087 * |
| Dearborn:  Press & Guide | 7,056 |
| Lapeer:  The County Press | 8,961 * |
| Monroe:  The Monroe Sunday News | 21,139 |
| Mount Clemens:  The Macomb Daily | 61,958 |
| Pontiac:  The Oakland Press | 71,867 |
| Royal Oak:  The Daily Tribune | 6,166 |
| Shelby Township:  Advisor & Source Newspapers | 116,637 |
| Southgate:  The News-Herald | 31,337 |
| | 362,208 |
| Bad Axe:  Huron Daily Tribune | 5,466 * |
| Bay City:  The Bay City Times | 32,141 * |
| Flint:  The Flint Journal | 68,502 |
| Midland:  The Midland Daily News | 14,406 |
| Mount Pleasant:  Morning Sun | 9,317 |
| Saginaw:  The Saginaw News | 36,880 * |

**Michigan**
880,037

| | |
|---|---|
| | 166,712 |
| Cadillac:  News | 7,849 * |
| Gaylord:  Gaylord Herald-Times | 5,000 * |
| Petoskey:  Petoskey News-Review | 8,895 * |
| Traverse City:  Record-Eagle | 29,065 |
| | 50,809 |
| Grand Rapids:  The Grand Rapids Press | 152,075 |
| Kalamazoo:  Kalamazoo Gazette | 55,459 |
| Muskegon:  The Muskegon Chronicle | 35,743 |
| | 243,277 |
| Jackson:  Citizen Patriot | 28,207 |
| | 28,207 |
| Marquette:  The Mining Journal | 14,509 |
| | 14,509 |

**Minnesota**
965,241

| | |
|---|---|
| Albert Lea:  Albert Lea Tribune | 5,561 * |
| Austin:  Austin Daily Herald | 3,810 * |
| Winona:  Winona Daily News | 10,327 |
| | 19,698 |
| Bemidji:  The Bemidji Pioneer | 9,238 |
| Brainerd:  Brainerd Dispatch | 15,964 * |
| Faribault:  Faribault Daily News | 5,183 * |
| Minneapolis-St. Paul:  Star Tribune | 503,838 |
| Minneapolis-St. Paul/Select:  Strib Express | 30,000 * |
| Northfield:  Northfield News | 4,200 * |
| Owatonna:  Owatonna People's Press | 6,342 |
| Red Wing:  Red Wing Republican Eagle | 5,700 * |
| St. Paul:  Pioneer Press | 248,179 |
| Willmar:  West Central Tribune | 13,785 |
| | 842,429 |
| Duluth:  Duluth News-Tribune | 47,071 |
| Grand Rapids:  Grand Rapids Herald-Review | 6,940 * |
| Hibbing:  The Hibbing Daily Tribune | 4,643 * |
| Virginia:  Virginia Mesabi Daily News | 9,965 * |
| | 68,619 |
| Mankato:  The Free Press | 19,049 * |
| New Ulm:  The Journal | 7,520 |
| Worthington:  Daily Globe | 7,926 |
| | 34,495 |

**Mississippi**
153,613

| | |
|---|---|
| Brookhaven:  The Daily Leader | 5,693 |
| Mc Comb:  Enterprise-Journal | 9,608 |
| Vicksburg:  The Vicksburg Post | 11,580 |
| | 26,881 |
| Clarksdale:  The Clarksdale Press Register | 1,800 * |
| | 1,800 |
| Columbus:  The Commercial Dispatch | 13,574 * |
| Laurel:  Laurel Leader-Call | 6,133 * |

| State / State Circulation Newspaper | Circulation Newspaper / Cluster |
|---|---|
| **Mississippi** | |
| 153,613 | |
| Tupelo:  Northeast Mississippi Daily Journal | 35,439 |
| | 55,146 |
| Greenville:  Delta Democrat Times | 7,211 |
| Greenwood:  The Greenwood Commonwealth | 6,163 |
| | 13,374 |
| Gulfport:  Sun Herald | 39,061 |
| | 39,061 |
| Meridian:  The Meridian Star | 12,653 * |
| | 12,653 |
| Picayune:  Picayune Item | 4,698 * |
| | 4,698 |
| **Missouri** | |
| 1,001,619 | |
| Cape Girardeau:  Southeast Missourian | 16,720 * |
| Dexter:  The Daily Statesman | 3,136 * |
| Kennett:  The Daily Dunklin Democrat | 3,055 * |
| Poplar Bluff:  Daily American Republic | 10,811 |
| Sikeston:  Standard Democrat | 5,964 |
| | 39,686 |
| Columbia:  Missourian | 4,100 * |
| Fulton:  The Fulton Sun | 3,698 * |
| Jefferson City:  News Tribune | 20,465 |
| Joplin:  The Joplin Globe | 28,618 |
| | 56,881 |
| Kansas City:  The Kansas City Star | 290,476 |
| Kansas City/Select:  Yes! Your Essential Shopper | 46,061 * |
| | 336,537 |
| Nevada:  Weekend Herald-Tribune | 4,650 * |
| | 4,650 |
| Park Hills:  Daily Journal | 6,701 |
| | 6,701 |
| Sedalia:  Democrat | 9,290 * |
| | 9,290 |
| St. Joseph:  St. Joseph News-Press | 30,011 |
| | 30,011 |
| St. Louis:  St. Louis Post-Dispatch | 311,199 |
| St. Louis:  St. Louis Suburban Journal Sunday | 206,664 * |
| | 517,863 |
| **Montana** | |
| 130,831 | |
| Billings:  Billings Gazette | 44,689 |
| Bozeman:  Bozeman Daily Chronicle | 15,643 |
| Butte:  Montana Standard | 12,203 |
| Helena:  Helena Independent Record | 13,134 |
| Kalispell:  Daily Inter Lake | 16,245 |
| Missoula:  Missoulian | 28,917 |
| | 130,831 |
| **Nebraska** | |
| 296,801 | |

| State / State Circulation Newspaper | Circulation Newspaper / Cluster |
|---|---|
| **Nebraska** | |
| 296,801 | |
| Beatrice:  Sun | 5,177 |
| Grand Island:  The Grand Island Independent | 19,573 |
| Lincoln:  JournalStar | 67,293 |
| York:  York News Times | 3,175 * |
| | 95,218 |
| Columbus:  Telegram | 8,285 |
| Omaha:  Sunday World-Herald | 169,974 |
| | 178,259 |
| North Platte:  The North Platte Telegraph | 10,436 |
| Scottsbluff:  Star-Herald | 12,888 |
| | 23,324 |
| **Nevada** | |
| 170,178 | |
| Elko:  Elko Daily Free Press | 6,100 |
| | 6,100 |
| Las Vegas:  Las Vegas Review-Journal | 161,478 |
| | 161,478 |
| Sparks:  Daily Sparks Tribune | 2,600 * |
| | 2,600 |
| **New Hampshire** | |
| 87,452 | |
| Keene:  Sentinel | 10,486 |
| Manchester:  New Hampshire Sunday News | 63,897 |
| Portsmouth:  Seacoast Sunday | 13,069 |
| | 87,452 |
| **New Jersey** | |
| 795,006 | |
| Atlantic City:  The Press Of Atlantic City | 70,733 |
| Trenton:  The Times | 40,237 |
| Trenton / Trentonian:  Trentonian | 20,355 |
| Willingboro:  Burlington County Times | 29,616 |
| Woodbury:  South Jersey Sunday | 33,798 * |
| | 194,739 |
| Flemington/TMC:  Hunterdon Observer | 48,309 * |
| Hackensack:  Suburban Trends | 7,496 * |
| Hackensack:  The Bergen Record | 172,103 |
| Newton:  New Jersey Herald | 17,398 |
| | 245,306 |
| Jersey City:  The Jersey Journal | 21,813 |
| Newark:  The Star-Ledger | 333,148 |
| | 354,961 |
| **New Mexico** | |
| 160,859 | |
| Albuquerque:  Journal | 112,540 |
| Hobbs:  News-Sun | 8,664 |
| Roswell:  Daily Record | 9,700 * |
| Santa Fe:  The Santa Fe New Mexican | 22,356 |
| | 153,260 |
| Clovis:  Clovis News Journal | 6,131 |

| State / State Circulation Newspaper | Circulation Newspaper / Cluster |
|---|---|

**New Mexico**
160,859

| Portales: Portales News-Tribune | 1,468 * |
|---|---|
| | 7,599 |

**New York**
1,209,437

| Albany: Times Union | 127,552 |
|---|---|
| Catskill: Daily Mail | 2,608 |
| Glens Falls: Post-Star | 29,653 |
| Gloversville: The Leader-Herald | 10,845 |
| Hudson: Register-Star | 4,538 |
| Saratoga Springs: Saratogian | 7,668 |
| Troy: Record | 10,436 |
| | 193,300 |

| Auburn: The Citizen | 10,329 |
|---|---|
| Oneida: The Oneida Daily Dispatch | 5,967 |
| Syracuse: The Post-Standard | 138,322 |
| | 154,618 |

| Batavia: The Daily News | 11,641 * |
|---|---|
| Buffalo: The Buffalo News | 235,671 |
| | 247,312 |

| Canandaigua: Post Messenger | 9,741 |
|---|---|
| Geneva: Finger Lakes Sunday Times | 15,554 |
| | 25,295 |

| Canton: Advance-News | 8,262 * |
|---|---|
| Oneonta: The Daily Star | 13,472 * |
| Watertown: Daily Times | 30,387 |
| | 52,121 |

| Corning: The Sunday Leader | 9,536 * |
|---|---|
| Hornell: The Spectator | 8,700 * |
| | 18,236 |

| Kingston: Sunday Freeman | 18,078 |
|---|---|
| Middletown: Times Herald-Record Sunday | 66,680 |
| Staten Island: Staten Island Sunday Advance | 47,993 |
| Staten Island/TMC: Staten Island Shore Editions | 54,500 * |
| | 187,251 |

| Malone: The Malone Telegram | 5,667 * |
|---|---|
| Plattsburgh: Press-Republican | 19,101 |
| | 24,768 |

| New York: New York Post | 306,536 |
|---|---|
| | 306,536 |

**North Carolina**
958,692

| Albemarle: Albemarle Stanley News & Press | 8,085 * |
|---|---|
| Charlotte: The Charlotte Observer | 211,334 |
| Gastonia: Gaston Gazette | 24,504 |
| Shelby: The Star | 11,136 * |
| | 255,059 |

| Burlington: Times-News | 21,759 |
|---|---|
| Greensboro: The News & Record | 86,932 |
| Greensboro/Select: Sunday Plus | 10,000 * |

**North Carolina**
958,692

| Winston-Salem: Winston-Salem Journal | 76,805 |
|---|---|
| | 195,496 |

| Chapel Hill: The Chapel Hill News | 17,033 * |
|---|---|
| Durham: The Durham News | 58,653 * |
| Fayetteville: The Fayetteville Observer | 58,668 |
| Goldsboro: Goldsboro News-Argus | 17,830 |
| Raleigh: The News & Observer | 189,437 |
| Rocky Mount: Rocky Mount Telegram | 13,593 |
| Southern Pines: The Pilot | 14,052 * |
| Tarboro: The Tarboro Daily Southerner | 3,300 * |
| | 372,566 |

| Elizabeth City: The Daily Advance | 9,331 |
|---|---|
| | 9,331 |

| Greenville: The Daily Reflector | 20,064 |
|---|---|
| Jacksonville: News | 16,539 |
| Kinston: Free Press | 9,748 |
| New Bern: Sun-Journal | 14,409 |
| Washington: Washington Daily News | 7,360 * |
| | 68,120 |

| Hendersonville: Times-News | 13,425 |
|---|---|
| | 13,425 |

| Wilmington: Sunday Star-News | 44,695 |
|---|---|
| | 44,695 |

**North Dakota**
136,755

| Bismarck: Tribune | 28,614 |
|---|---|
| Dickinson: The Dickinson Press | 6,395 |
| Minot: Minot Daily News | 17,648 |
| | 52,657 |

| Fargo: The Forum | 51,143 * |
|---|---|
| Grand Forks: Grand Forks Herald | 27,181 |
| Jamestown: The Jamestown Sun | 5,774 * |
| | 84,098 |

**Ohio**
1,488,228

| Akron: Akron Beacon Journal | 125,013 |
|---|---|
| Ashland: Ashland Times-Gazette | 10,528 |
| Ashtabula: Astabula Star Beacon | 15,684 |
| Canton: The Repository | 68,355 |
| Elyria: The Chronicle-Telegram | 22,628 |
| Lorain: Morning Jounal | 22,263 |
| New Philadelphia-Dover: The Times Reporter | 19,114 |
| Willoughby: Lake County News-Herald | 38,415 |
| Wooster: The Daily Record | 22,461 |
| | 344,461 |

| Athens: Messenger | 9,860 * |
|---|---|
| Ironton: Ironton Tribune | 7,971 * |
| | 17,831 |

| Cambridge: The Sunday Jeffersonian | 11,806 |
|---|---|
| Circleville: Herald | 5,764 * |

| State / State Circulation Newspaper | Circulation Newspaper / Cluster |
|---|---|
| **Ohio** | |
| 1,488,228 | |
| Columbus: Suburban News Publications | 122,944 * |
| Logan: News | 3,456 * |
| Waverly: The News Watchman | 2,903 * |
| | 146,873 |
| | |
| Cleveland: The Plain Dealer | 341,832 |
| Cleveland/TMC: PD Wrap-Up | 60,500 * |
| | 402,332 |
| | |
| Dayton: Cox Ohio Southwest Group | 81,353 * |
| Dayton: Dayton Daily News | 139,414 |
| Springfield: Springfield News-Sun | 26,717 |
| | 247,484 |
| | |
| Defiance: The Crescent-News | 17,305 |
| Findlay: The Courier | 21,860 * |
| Fostoria: Review-Times | 3,200 * |
| Toledo: The Blade | 141,348 |
| | 183,713 |
| | |
| East Liverpool: Sunday Review | 7,103 |
| Lima: The Lima News | 36,879 |
| Salem: Salem News | 4,660 |
| Youngstown: The Vindicator | 60,588 |
| | 109,230 |
| | |
| Hamilton: Journal News | 19,838 |
| Middletown: The Middletown Journal | 16,466 |
| | 36,304 |
| **Oklahoma** | |
| 593,309 | |
| Claremore: Claremore Daily Progress | 5,482 * |
| McAlester: McAlester News-Capitol | 7,044 * |
| Muskogee: Muskogee Phoenix | 12,527 |
| Pryor: The Pryor Daily Times | 3,605 * |
| Tahlequah: Tahlequah Daily Press | 3,816 * |
| Tulsa: Tulsa World | 127,502 |
| | 159,976 |
| | |
| Miami: Miami News-Record | 5,000 * |
| | 5,000 |
| | |
| Oklahoma City: The Oklahoman | 192,744 |
| Oklahoma City/TMC: Buyer's Edge | 232,000 * |
| Woodward: Woodward News | 3,589 * |
| | 428,333 |
| **Oregon** | |
| 492,173 | |
| Albany-Corvallis: Albany Democrat-Herald/Corvallis Gazette-Times | 24,787 |
| Coos Bay: The World | 10,291 |
| Eugene: The Register-Guard | 60,709 |
| | 95,787 |
| | |
| Bend: The Bulletin | 32,109 |
| Klamath Falls: Herald and News | 14,926 |
| Medford: Mail Tribune | 25,164 |
| | 72,199 |

| State / State Circulation Newspaper | Circulation Newspaper / Cluster |
|---|---|
| **Oregon** | |
| 492,173 | |
| Ontario: Argus Observer | 6,686 |
| | 6,686 |
| | |
| Pendleton: East Oregonian | 7,417 |
| | 7,417 |
| | |
| Portland: The Sunday Oregonian | 290,084 |
| Portland/Select: Community News | 20,000 * |
| | 310,084 |
| **Pennsylvania** | |
| 2,304,935 | |
| Allentown: The Morning Call | 123,405 |
| Allentown/Select: MC Select | 22,000 * |
| Doylestown: The Intelligencer | 39,329 |
| Easton: The Express-Times | 51,092 |
| Levittown: Bucks County Courier Times | 51,399 |
| Norristown: Times Herald | 19,537 |
| Pottstown: Mercury | 19,330 |
| Primos: Delaware County Daily Times | 30,555 |
| Reading: Reading Eagle | 70,802 |
| Reading/Select: Reading Eagle Direct | 5,000 * |
| West Chester: Daily Local News | 26,319 |
| | 458,768 |
| | |
| Beaver: Beaver County Times | 35,909 |
| New Castle: New Castle News | 14,254 |
| Oil City-Franklin: The Derrick/The News-Herald | 21,617 * |
| Uniontown: Herald-Standard | 22,415 |
| | 94,195 |
| | |
| Carlisle: The Sentinel | 13,556 |
| Gettysburg: Gettysburg Times | 8,364 |
| Harrisburg: Sunday Patriot-News | 111,729 |
| Harrisburg/Select: pn Community | 8,000 * |
| Lancaster: Sunday News | 94,168 |
| | 235,817 |
| | |
| Du Bois: Tri-County Sunday | 14,551 |
| Johnstown: The Tribune-Democrat | 35,564 |
| State College: Centre Daily Times | 26,349 |
| | 76,464 |
| | |
| Erie: Erie Times-News | 71,284 |
| | 71,284 |
| | |
| Hazleton: Hazleton Standard-Speaker | 17,685 * |
| Pottsville: Pottsville Republican Herald | 24,718 * |
| Sayre: Morning Times | 5,163 * |
| Scranton: Scranton Times-Tribune | 63,724 |
| Scranton/Select: Scranton Times-Tribune Sunday Opt-In | 13,100 * |
| Shamokin-Pottsville: The Shamokin-Pottsville News-Item | 8,583 |
| Stroudsburg: Pocono Record | 19,267 |
| Sunbury: The Daily Item | 22,937 |
| Towanda: Towanda Sunday Review | 8,667 |
| Wilkes-Barre: The Times Leader | 59,739 * |
| Williamsport: Williamsport Sun-Gazette | 29,850 |

| State / State Circulation Newspaper | Circulation Newspaper / Cluster | State / State Circulation Newspaper | Circulation Newspaper / Cluster |
|---|---|---|---|
| **Pennsylvania** | | **Tennessee** | |
| 2,304,935 | | 472,879 | |
| | 273,433 | Knoxville: Knoxville News Sentinel | 119,263 |
| Philadelphia: The Philadelphia Inquirer | 459,170 | Knoxville/Select: Sunday Saver Select | 5,000 * |
| Philadelphia/DN: Daily News | 49,155 | Morristown: Citizen Tribune | 24,354 |
| Philadelphia/Spree: Savings Spree! | 302,414 * | | 156,199 |
| | 810,739 | Dyersburg: The State Gazette | 5,321 * |
| Pittsburgh: Pittsburgh Post-Gazette | 266,504 | Memphis: The Commercial Appeal | 141,042 |
| | 266,504 | | 146,363 |
| Sharon: The Herald | 17,731 | Johnson City: Johnson City Press | 29,993 |
| | 17,731 | | 29,993 |
| **Rhode Island** | | Murfreesboro: The Murfreesboro Post | 20,500 * |
| 129,024 | | Shelbyville: Shelbyville Times-Gazette | 6,750 * |
| Providence: The Providence Sunday Journal | 129,024 | Tullahoma: The Sunday News | 10,500 * |
| | 129,024 | | 37,750 |
| **South Carolina** | | **Texas** | |
| 485,724 | | 2,817,292 | |
| Anderson: Anderson Independent-Mail | 29,676 | Abilene: Abilene Reporter-News | 30,749 |
| Greenville: Greenville Journal | 40,116 * | Brownwood: Brownwood Bulletin | 6,048 * |
| Greenwood: The Index-Journal | 12,919 | Midland: Reporter-Telegram | 18,140 |
| Spartanburg: Herald-Journal | 42,392 | Odessa: Odessa American | 17,207 |
| | 125,103 | San Angelo: Standard-Times | 21,638 |
| Charleston: The Post And Courier | 91,085 | | 93,782 |
| Myrtle Beach: The Sun News | 49,490 | Amarillo: Amarillo Globe-News | 43,510 |
| Myrtle Beach/Select: The Sun News Sunday Select | 11,264 * | Lubbock: Lubbock Avalanche-Journal | 42,240 |
| | | Plainview: Plainview Daily Herald | 4,340 * |
| | 151,839 | | 90,090 |
| Columbia: The State | 94,450 | Athens: Athens Daily Review | 3,701 * |
| Columbia/Select: Yes! Your Essential Shopper | 34,921 * | Corsicana: Corsicana Daily Sun | 4,385 * |
| Orangeburg: The Times & Democrat | 12,328 | Denton/TMC: Denton Record-Chronicle | 12,519 |
| Sumter: The Item | 14,363 | Gainesville: Gainesville Daily Register | 5,100 * |
| | 156,062 | Greenville: Greenville Herald Banner | 6,005 * |
| Hilton Head-Beaufort: The Island Packet-Gazette | 27,435 | Mineral Wells: The Mineral Wells Index | 2,699 * |
| | | Palestine: Palestine Herald-Press | 5,517 * |
| | 27,435 | Paris: The Paris News | 8,837 |
| Rock Hill: The Herald | 25,285 | Stephenville: Stephenville Empire-Tribune | 4,600 * |
| | 25,285 | Waxahachie: The Waxahachie Daily Light | 4,700 * |
| **South Dakota** | | | 58,063 |
| 74,568 | | Austin: Austin American-Statesman | 154,844 |
| Aberdeen: American News | 14,605 | | 154,844 |
| Belle Fourche : Butte County Post | 1,955 * | Beaumont: The Beaumont Enterprise | 31,864 |
| Huron: Plainsman | 5,314 * | | 31,864 |
| Mitchell: The Daily Republic | 11,455 | Brownsville: The Herald | 16,921 * |
| Rapid City: Rapid City Journal | 29,615 | Harlingen: Valley Morning Star | 16,370 |
| Watertown: Watertown Public Opinion | 11,624 | McAllen: Monitor | 36,085 |
| | 74,568 | Weslaco: Mid Valley Town Crier | 21,750 |
| **Tennessee** | | | 91,126 |
| 472,879 | | Corpus Christi: Corpus Christi Caller-Times | 56,548 |
| Chattanooga: Chattanooga Times Free Press | 102,574 | | 56,548 |
| | 102,574 | Dallas: The Dallas Morning News | 351,788 |
| Crossville: Crossville Chronicle | 7,582 * | Dallas/Al Dia: Al Dia | 122,933 |
| | | Dallas/Briefing: Briefing | 202,514 * |

| State / State Circulation<br>Newspaper | Circulation<br>Newspaper / Cluster |
|---|---|
| **Texas** | |
| 2,817,292 | |
| | 677,235 |
| Del Rio:  Del Rio News-Herald | 4,073 |
| Kerrville:  Kerrville Daily Times | 8,897 |
| | 12,970 |
| El Paso:  El Diario de El Paso | 10,500 * |
| | 10,500 |
| Fort Worth:  Star-Telegram | 228,793 |
| Fort Worth/Select:  Yes! Your Essential Shopper | 69,801 * |
| | 298,594 |
| Houston:  Houston Chronicle | 503,316 |
| Houston/SMC:  The Good Life | 315,000 * |
| | 818,316 |
| Huntsville:  The Huntsville Item | 4,275 * |
| | 4,275 |
| Jacksonville:  Jacksonville Daily Progress | 3,100 * |
| Tyler:  Tyler Courier-Times-Telegraph | 30,826 |
| | 33,926 |
| San Antonio:  San Antonio Express-News | 245,305 |
| | 245,305 |
| Temple:  Temple Daily Telegram | 19,573 |
| Waco:  Waco Tribune-Herald | 38,439 |
| | 58,012 |
| Texarkana:  Gazette | 29,042 |
| | 29,042 |
| Victoria:  Victoria Advocate | 28,467 |
| | 28,467 |
| Wichita Falls:  Times Record News | 24,333 |
| | 24,333 |
| **Utah** | |
| 278,356 | |
| Logan:  The Herald Journal | 16,662 |
| Provo:  Daily Herald | 43,525 |
| Salt Lake City:  The Salt Lake Tribune-Deseret News | 206,169 |
| Salt Lake City/Select:  The Salt Lake Tribune Sunday Select | 12,000 * |
| | 278,356 |
| **Vermont** | |
| 21,468 | |
| Rutland/Barre:  Rutland Herald/Barre Sunday Times Argus | 21,468 |
| | 21,468 |
| **Virginia** | |
| 581,179 | |
| Martinsville:  Martinsville Bulletin | 16,507 |
| | 16,507 |
| Newport News:  Daily Press | 90,924 |
| Norfolk:  The Virginian-Pilot | 174,018 |
| Norfolk/Select:  Non-Subscriber Sunday Opt-In | 34,000 * |

| State / State Circulation<br>Newspaper | Circulation<br>Newspaper / Cluster |
|---|---|
| **Virginia** | |
| 581,179 | |
| | 298,942 |
| Petersburg:  The Petersburg Progress-Index | 12,206 |
| Richmond:  Richmond Times-Dispatch | 163,347 |
| | 175,553 |
| Roanoke:  The Roanoke Times | 90,177 |
| | 90,177 |
| **Washington** | |
| 840,250 | |
| Bellingham:  The Bellingham Herald | 21,276 |
| Bremerton:  Kitsap Sun | 22,452 |
| Mount Vernon:  Skagit Valley Herald | 15,757 |
| Olympia:  The Olympian | 28,573 |
| Tacoma:  The News Tribune | 101,535 |
| Tacoma/Select:  Yes! Your Essential Shopper | 24,729 * |
| Wenatchee:  The Wenatchee World | 19,127 |
| | 233,449 |
| Ellensburg:  Daily Record | 5,669 * |
| Pasco-Kennewick-Richland:  Tri-City Herald | 37,538 |
| Walla Walla:  Walla Walla Union-Bulletin | 12,831 |
| Yakima:  Herald-Republic | 32,762 |
| | 88,800 |
| Longview:  The Daily News | 22,564 |
| Vancouver:  The Columbian | 39,952 |
| | 62,516 |
| Seattle:  The Seattle Times | 325,933 |
| Seattle/Select:  Savings Source | 40,000 * |
| | 365,933 |
| Spokane:  The Spokesman-Review | 89,552 |
| | 89,552 |
| **West Virginia** | |
| 234,953 | |
| Beckley:  The Register-Herald | 22,832 |
| Bluefield:  Bluefield Daily Telegraph | 15,953 |
| Princeton:  Princeton Times | 1,420 * |
| | 40,205 |
| Charleston:  Sunday Gazette-Mail | 65,247 |
| | 65,247 |
| Clarksburg:  Clarksburg Exponent-Telegram | 18,491 |
| Fairmont:  Times West Virginian | 10,291 |
| Parkersburg:  The Parkersburg News and Sentinel | 28,064 |
| Wheeling:  Sunday News-Register | 31,964 |
| | 88,810 |
| Martinsburg:  The Journal | 17,446 |
| | 17,446 |
| Morgantown:  The Dominion Post | 23,245 |
| | 23,245 |
| **Wisconsin** | |
| 274,445 | |

| State / State Circulation<br>Newspaper | Circulation<br>Newspaper / Cluster | State / State Circulation<br>Newspaper | Circulation<br>Newspaper / Cluster |
|---|---|---|---|
| **Wisconsin**<br>274,445 | | | |
| Baraboo:  Baraboo News Republic | 3,688 | | |
| Madison:  Wisconsin State Journal | 119,169 | | |
| Portage:  Daily Register | 4,115 | | |
| | 126,972 | | |
| | | | |
| Beaver Dam:  Daily Citizen | 9,978 | | |
| Kenosha:  Kenosha News | 26,450 | | |
| Racine:  The Journal Times | 28,266 | | |
| | 64,694 | | |
| | | | |
| Chippewa Falls:  Chippewa Valley Newspapers | 8,859 | | |
| Eau Claire:  Leader-Telegram | 29,854 | | |
| La Crosse:  La Crosse Tribune | 35,198 | | |
| Rhinelander:  The Daily News | 2,997 * | | |
| | 76,908 | | |
| Shawano:  Shawano Leader | 5,871 * | | |
| | 5,871 | | |
| | | | |
| **Wyoming**<br>23,867 | | | |
| Casper:  Casper Star-Tribune | 23,867 | | |
| | 23,867 | | |

*Newspaper Publisher's Statement

Sources:  PARADE 1/29/2012 circulation based on ABC, CAC, VAC and newspaper publisher statements, 9/30/2011



# Circulation List 2012

**Circulation: 22,655,210**          **Effective: January 1, 2012**



**NOW THE CHOICE OF MORE THAN** **800** **NEWSPAPER PUBLISHERS**

## CIRCULATION LIST 2012

**More than 800 newspapers  - Effective January 1, 2012 - Circulation 22,655,210**

| State/City/Newspaper | Circulation |
|---|---|
| **Alabama** | **155,683** |
| Decatur Daily | 23,848 |
| Dothan Eagle | 29,535 |
| Florence-Sheffield-Tuscumbia- | |
| Muscle Shoals Times Daily | 27,444 |
| Fort Payne Times-Journal | 5,064 |
| Gardendale North Jefferson News | 2,662 |
| Jasper Mountain Eagle | 9,623 |
| Montgomery Advertiser | 43,068 |
| Opelika/Auburn News | 14,439 |
| **Alaska** | **8,782** |
| Juneau Empire | 4,153 |
| Kenai Peninsula Clarion | 4,629 |
| **Arizona** | **649,911** |
| Bullhead City Mohave Valley Daily News | 10,143 |
| Casa Grande Dispatch | 7,783 |
| Nogales International | 2,850 |
| Arizona Republic | 471,108 |
| Arizona Republic - Sunday Select | 48,000 |
| Safford Eastern Arizona Courier | 5,739 |
| Sierra Vista Herald | 8,991 |
| Tucson Star | 94,797 |
| **Arkansas** | **202,421** |
| Clinton Van Buren County Democrat | 3,320 |
| Conway Log Cabin Democrat | 9,091 |
| Fayetteville Northwest Arkansas | |
| Democrat-Gazette | 60,597 |
| Fort Smith Times Record | 38,516 |
| Harrison Times | 7,350 |
| Hot Springs Sentinel-Record | 15,808 |
| Jonesboro Sun | 17,316 |
| Lonoke Democrat | 1,405 |
| Mountain Home Baxter Bulletin | 9,664 |
| North Little Rock Times | 3,765 |
| Paragould Daily Press | 4,815 |
| Pine Bluff Commercial | 11,239 |
| Russellville Courier | 10,060 |
| Searcy Citizen | 4,849 |
| Sherwood Voice | 1,671 |
| Van Buren Press Argus Courier | 2,955 |
| **California** | **3,255,020** |
| Auburn Journal | 9,764 |
| Benicia Herald | 3,015 |
| Big Bear Lake Grizzly Weekender | 7,500 |
| Carmel Valley News | 16,723 |
| Chico Enterprise-Record | 31,097 |
| Davis Enterprise | 8,585 |
| Eureka Times-Standard | 19,720 |
| Fairfield Republic | 18,422 |
| Gilroy Dispatch | 8,712 |
| Glendale News-Press | 7,855 |
| Grass Valley The Union | 13,997 |
| Hayward/Fremont/Newark/Pleasanton | |
| ANG Newspapers | 78,530 |
| Hollister Weekend Pinnacle | 17,327 |
| Laguna Beach Coastline Pilot | 21,855 |
| Lakeport Record-Bee | 6,688 |
| Lodi News-Sentinel | 13,349 |
| Long Beach Impacto USA | 212,530 |
| Los Angeles County Breeze | 58,543 |
| Los Angeles County Press Telegram | 62,777 |
| Los Angeles County Star News- | |
| Valley Tribune-Daily News | 79,714 |
| Los Angeles Daily News | 92,320 |
| Los Angeles Fin de Semana | 740,567 |
| **California (continued)** | |
| Los Angeles Times -- Sunday Select | 200,000 |
| Madera Tribune | 4,975 |
| Marin County Independent Journal | 29,507 |
| Monterey Herald | 27,065 |
| Morgan Hill Times | 10,229 |
| Napa Register | 12,722 |
| Oakland Tribune | 40,919 |
| Ontario Bulletin Express | 67,705 |
| Ontario Inland Valley Daily Bulletin | 56,054 |
| Ontario Inland Valley Daily Bulletin -- | |
| Sunday Select | 5,238 |
| Palm Springs Cathedral Sun | 10,000 |
| Palm Springs Desert Sun | 50,661 |
| Palm Springs Indio Sun | 9,000 |
| Palm Springs Sun | 9,000 |
| Palo Alto/Menlo Park The Daily News | 17,500 |
| Pasadena Weekly Star | 9,200 |
| Pasadena Star-news -- Sunday Select | 3,234 |
| Placerville Mountain Democrat | 11,224 |
| Poway News Chieftain | 15,090 |
| Ramona Ramona Sentinel | 14,000 |
| Rancho Bernardo News-Journal | 17,276 |
| Red Bluff News | 6,182 |
| Redlands Facts | 6,561 |
| Ridgecrest Daily Independent | 3,918 |
| Riverside La Prensa | 103,000 |
| Roseville Press-Tribune | 14,459 |
| Salinas Californian | 12,119 |
| San Bernardino Sun | 58,003 |
| San Francisco Examiner | 253,457 |
| San Gabriel Valley Highlander | 33,293 |
| San Jose Mercury News | 217,937 |
| San Jose Mercury News -- Sunday Select | 50,000 |
| San Mateo/Lompoc Times | 24,694 |
| Santa Cruz Sentinel | 22,577 |
| Solana Beach Sun | 3,700 |
| South Lake Tahoe Daily Tribune | 8,302 |
| Truckee Sierra Sun | 6,371 |
| Ukiah Journal | 5,993 |
| Vacaville Reporter | 16,756 |
| Vallejo Times-Herald | 15,443 |
| Victorville/Barstow Daily Press- | |
| Desert Dispatch | 25,846 |
| Visalia Times-Delta | 22,682 |
| Walnut Creek Contra Costa Times | 148,197 |
| Watsonville Register-Pajaronian | 5,210 |
| West Covina San Gabriel Valley Tribune -- | |
| Sunday Select | 7,959 |
| Whittier Daily News -- Sunday Select | 4,275 |
| Woodland Democrat | 8,312 |
| Yreka  Siskiyou Daily News | 5,885 |
| Yucca Valley Hi-Desert Star | 7,300 |
| Yucca Valley Observation Post | 6,400 |
| **Colorado** | **628,533** |
| Aspen Times | 8,000 |
| Denver Post | 448,165 |
| Denver Post -- Sunday Select | 51,000 |
| Durango/Cortez Herald-Journal | 11,736 |
| Fort Collins Coloradoan | 25,982 |
| Frisco Summit Daily News | 10,250 |
| Glenwood Springs Post Independent | 9,150 |
| Granby Sky Hi News | 5,000 |
| Grand Junction Free Press | 10,000 |
| Greeley Tribune | 21,863 |
| Steamboat Springs Steamboat Today | 8,736 |
| Vail Daily | 11,372 |
| Windsor now | 7,279 |
| **Connecticut** | **255,811** |
| Hartford Courant | 199,661 |
| Hartford Courant -- Sunday Select | 12,500 |
| Norwalk Hour | 16,342 |
| Norwich Bulletin | 21,139 |
| Willimantic Chronicle | 6,169 |
| **Delaware** | **122,327** |
| Wilmington News Journal | 108,100 |
| Wilmington News Journal -- Sunday Select | 14,227 |
| **Washington DC** | **303,476** |
| Washington Examiner | 303,476 |
| **Florida** | **1,463,723** |
| Brooksville Hernando Today | 2,991 |
| Charlotte Harbor Sun | 62,505 |
| Coral Springs Forum | 24,001 |
| Crystal River County Chronicle | 30,213 |
| Daytona Beach News-Journal | 89,541 |
| Deerfield Beach Forum | 9,100 |
| Ft. Lauderdale East Side Forum | 26,805 |
| Ft. Lauderdale El Sentinel | 124,183 |
| Ft. Lauderdale/South Florida Sun Sentinel | |
| -- Sunday Select | 70,000 |
| Ft. Lauderdale/South Florida Sun-Sentinel | 251,437 |
| Ft. Myers News-Press | 100,009 |
| Jackson County Floridian | 5,340 |
| Jacksonville Times-Union | 148,504 |
| Kissimmee Osceola News-Gazette | 37,856 |
| Leesburg Commercial | 20,180 |
| Margate & Coconut Creek Forum | 14,250 |
| Melbourne Florida Today | 75,762 |
| Melbourne Florida Today -- Sunday Select | 4,032 |
| Pensacola News Journal | 59,563 |
| Pompano Beach Forum | 11,700 |
| Sebring Highlands Today | 15,922 |
| St. Augustine Record | 18,117 |
| Tallahassee Democrat | 45,010 |
| Tampa Centro Mi Diario | 41,242 |
| Tampa Tribune -- Sunday Select | 53,500 |
| Tampa/Newport Richey Suncoast News | 115,943 |
| Winter Haven News Chief | 6,017 |
| **Georgia** | **640,910** |
| Albany Herald | 18,990 |
| Albany Herald -- Sunday Select | 10,000 |
| Athens Banner-Herald | 22,518 |
| Atlanta Inquirer | 40,000 |
| Augusta Chronicle | 63,632 |
| Canton Cherokee Tribune | 4,911 |
| Carrollton Times-Georgian | 6,861 |
| Cartersville Daily Tribune News | 6,409 |
| Cumming Forsyth County News | 14,566 |
| Cumming South Forsyth News | 16,000 |
| Dalton Citizen | 10,742 |
| Douglas County Sentinel | 2,546 |
| Dublin Courier Herald | 9,463 |
| Gainesville Times | 26,015 |
| Griffin News | 6,078 |
| Jonesboro/McDonough Clayton News Daily | 3,794 |
| LaGrange Daily News | 9,729 |
| Lawrenceville/Conyers/Rockdale | |
| Daily Post-Citizen | 108,705 |
| Lawrenceville Gwinnett Daily Post | |
| -- Sunday Select | 17,000 |
| Marietta Journal | 15,944 |
| Marietta Neighbor Papers | 154,516 |
| Newnan Times-Herald | 9,510 |

| Georgia (continued) | |
|---|---|
| Savannah Morning News | 55,377 |
| Winder Barrow County News | 7,604 |

| Hawaii | 172,620 |
|---|---|
| Hilo Tribune-Herald | 19,266 |
| Honolulu Star-Advertiser | 132,281 |
| Kailua/Kona West Hawaii Today | 12,805 |
| Lihue Garden Island | 8,268 |

| Idaho | 35,830 |
|---|---|
| Coeur D'Alene Press | 30,584 |
| Moscow-Pullman Daily News | 5,246 |

| Illinois | 1,143,062 |
|---|---|
| Arlington Heights Reflejos | 96,000 |
| Aurora Beacon News | 19,951 |
| Benton Evening News | 2,221 |
| Centralia Morning Sentinel | 14,883 |
| Chicago New Crusader | 90,071 |
| Chicago La Raza | 152,046 |
| Chicago Sun-Times | 224,839 |
| Chicago Sun-times -- Sunday Select | 30,924 |
| Crystal Lake Northwest Herald | 33,937 |
| Danville Commercial-News | 11,494 |
| De Kalb Daily Chronicle | 9,997 |
| Downers Grove Press Publications-Bartlett | 5,731 |
| Du Quoin Evening Call | 3,470 |
| Eldorado Journal | 645 |
| Elgin Courier News | 5,667 |
| Elmhurst Press Publications | 21,683 |
| Harrisburg Register | 2,793 |
| Joliet Herald-News | 31,343 |
| Kankakee Daily Journal | 27,161 |
| La Salle/Peru/Oglesby/Spring Valley News-Tribune | 15,996 |
| Lemont Reporter/Met | 4,488 |
| Marion Republican | 2,051 |
| Morris Daily Herald | 5,186 |
| Mt. Carmel Daily Republican Register | 3,943 |
| Naperville Sun | 12,069 |
| Oak Brook Suburban Life | 4,420 |
| Olney Daily Mail | 3,450 |
| Pontiac Leader | 2,936 |
| Rock Island/Moline/East Moline Argus-Dispatch | 40,900 |
| Rockford Register Star | 56,114 |
| Rockford Register Star -- Sunday Select | 5,000 |
| Shelbyville Daily Union | 2,290 |
| St. Charles Chronicle | 9,891 |
| Sterling/Rock Falls Sauk Valley | 17,432 |
| Suburban Chicago Herald | 110,824 |
| Suburban Chicago Southtown | 43,711 |
| Waukegan/Lake County News Sun | 15,875 |
| West Frankfort American | 1,630 |

| Indiana | 564,852 |
|---|---|
| Bluffton News-Banner | 4,417 |
| Connersville News Examiner | 5,690 |
| Crawfordsville Journal Review | 6,197 |
| Elkhart Truth | 23,075 |
| Frankfort Times | 3,397 |
| Huntington Herald-Press | 4,576 |
| Indianapolis Star | 272,416 |
| Indianapolis Star -- Sunday Select | 40,000 |
| Jasper Herald | 11,586 |
| Kendallville Publishing Company | 17,369 |
| La Porte Herald Argus | 8,629 |
| Lafayette/West Lafayette Journal & Courier | 27,711 |
| Marion Chronicle Tribune | 12,118 |
| Merriville Post-Tribune | 40,301 |
| Michigan City News-Dispatch | 7,059 |

| Indiana (continued) | |
|---|---|
| Muncie Star-Press | 28,150 |
| New Castle Courier-Times | 6,479 |
| Peru Tribune | 3,845 |
| Richmond Palladium-Item | 15,469 |
| Shelbyville News | 5,577 |
| Vincennes Sun-Commercial | 7,232 |
| Wabash Plain Dealer | 3,176 |
| Warsaw Times-Union | 10,383 |

| Iowa | 266,909 |
|---|---|
| Burlington Hawk Eye | 18,413 |
| Centerville Daily Iowegian | 2,375 |
| Council Bluffs Nonpareil | 14,838 |
| Des Moines Register | 200,205 |
| Des Moines Register -- Sunday Select | 9,657 |
| Ft. Madison The Daily Democrat | 4,480 |
| Iowa City Press-Citizen | 12,060 |
| Keokuk Daily Gate City | 4,881 |

| Kansas | 153,207 |
|---|---|
| Abilene Reflector-Chronicle | 3,350 |
| Arkansas City Traveler | 4,091 |
| Chanute Tribune | 3,682 |
| Dodge City Globe | 4,004 |
| Emporia Gazette | 6,162 |
| Garden City Telegram | 7,363 |
| Hays News | 10,866 |
| Hutchinson News | 28,850 |
| Lawrence Journal-World | 16,291 |
| Leavenworth Times | 4,065 |
| Newton Kansan | 6,120 |
| Ottawa Herald | 4,568 |
| Parsons Sun | 4,329 |
| Pittsburg Sun | 5,759 |
| Topeka Capital-Journal | 39,302 |
| Winfield Courier | 4,405 |

| Kentucky | 368,128 |
|---|---|
| Bardstown Kentucky Standard | 8,185 |
| Frankfort State Journal | 8,220 |
| Harlan Enterprise | 5,628 |
| Hopkinsville New Era | 10,100 |
| Louisville Courier-Journal | 230,649 |
| Louisville Courier-Journal - Sunday Select | 27,569 |
| Madisonville Messenger | 6,268 |
| Middlesboro News | 6,400 |
| Owensboro Messenger-Inquirer | 24,978 |
| Paducah Sun | 20,312 |
| Prestonsburg Floyd County Times | 5,763 |
| Richmond Register | 5,385 |
| Russellville News Democrat & Leader | 4,655 |
| Winchester Sun | 4,016 |

| Louisiana | 218,358 |
|---|---|
| Alexandria Town Talk | 26,485 |
| Bogalusa Daily News | 6,600 |
| Covington St. Tammany News | 21,100 |
| Hammond Star | 10,507 |
| La Place L'Observateur | 5,000 |
| Lafayette Advertiser | 41,356 |
| Monroe News-Star | 28,500 |
| Sunday Iberian | 12,237 |
| Opelousas World | 7,001 |
| Shreveport Times | 51,005 |
| Thibodaux Comet | 8,567 |

| Maine | 84,652 |
|---|---|
| Augusta-Waterville Kennebec Journal- Morning Sentinel | 25,313 |
| Bangor News | 53,868 |
| Biddeford Journal-Tribune | 5,471 |

| Maryland | 178,760 |
|---|---|
| Annapolis Capital | 38,247 |
| Annapolis Maryland Gazette | 21,482 |
| Baltimore Times | 20,000 |
| Easton Sunday Star | 15,782 |
| Frederick News-Post | 34,602 |
| Salisbury Times | 23,151 |
| Westminster Carrol County Times | 25,496 |

| Massachusetts | 435,656 |
|---|---|
| Attleboro Sun Chronicle | 15,736 |
| Beverly News | 21,828 |
| Boston Herald | 87,066 |
| Brockton Enterprise | 27,233 |
| Fall River Herald News | 16,271 |
| Fitchburg Sentinel & Enterprise | 14,379 |
| Framingham Tab | 6,956 |
| Framingham Natick Bulletin & Tab | 869 |
| Framingham/Milford Metrowest Daily News | 28,694 |
| Gloucester Daily Times | 8,052 |
| Greenfield Recorder | 11,318 |
| Lowell Sun | 40,412 |
| Marshfield Abington Mariner | 955 |
| Marshfield Rockland Standard | 744 |
| Newburyport Daily News | 10,042 |
| North Adams Transcript | 5,921 |
| North Andover Eagle-Tribune | 39,615 |
| Northampton Hampshire Gazette | 17,741 |
| Pittsfield/Berkshire Eagle | 25,249 |
| Quincy Patriot Ledger | 48,522 |
| Rayham Canton Journal | 446 |
| Taunton Gazette | 7,607 |

| Michigan | 1,145,537 |
|---|---|
| Alpena News | 8,803 |
| Battle Creek Enquirer | 15,788 |
| Benton Harbor/St. Joseph Herald-Palladium | 18,096 |
| Big Rapids/Manistee Pioneer- News Advocate | 8,515 |
| Cheboygan Daily Tribune | 4,125 |
| Coldwater Daily Reporter | 5,355 |
| Detroit News and Free Press | 485,803 |
| Detroit Free Press -- Sunday Select | 208,363 |
| Escanaba Press | 7,917 |
| Grand Haven Tribune | 9,064 |
| Greenville News | 6,661 |
| Hillsdale News | 6,010 |
| Holland Sentinel | 17,611 |
| Houghton Mining Gazette | 7,793 |
| Howell Livingston County Daily Press & Argus | 16,579 |
| Iron Mountain/Kingsford News | 9,172 |
| Ironwood Daily Globe | 6,400 |
| Lansing Community Newspapers | 83,059 |
| Lansing State Journal | 66,119 |
| Livonia Eccentric | 24,742 |
| Livonia Observer | 54,642 |
| Owosso Argus-Press | 8,825 |
| Port Huron Times-Herald | 19,463 |
| Sturgis Journal | 5,932 |
| Grand Traverse Insider | 40,700 |

| Minnesota | 498,222 |
|---|---|
| Brainerd Dispatch | 15,964 |
| Eden Prairie Minnesota Sun Newspapers | 372,534 |
| Fairmont Sentinel | 5,891 |
| Fergus Falls Journal | 5,415 |
| Marshall Independent | 6,148 |
| Rochester Post-Bulletin | 43,587 |
| St. Cloud Times | 31,481 |
| Stillwater Gazette | 17,202 |

| Mississippi | 111,378 |
|---|---|
| Cleveland Bolivar Commercial | 5,451 |
| Corinth Corinthian | 6,139 |
| Hattiesburg American | 15,560 |
| Jackson Clarion-Ledger | 75,495 |
| Natchez Democrat | 8,733 |

| Missouri | 131,901 |
|---|---|
| Columbia Tribune | 17,670 |
| Hannibal Courier-Post | 5,527 |
| Independence/Blue Springs Examiner | 11,407 |
| Kirksville Daily Express | 3,200 |
| Maryville Daily Forum | 2,017 |
| Mexico Ledger | 5,026 |
| Moberly Monitor - Index & Evening Democrat | 3,846 |
| Rolla Daily News | 3,890 |
| Springfield News-Leader | 63,158 |
| Washington Missourian | 16,160 |

| Montana | 28,856 |
|---|---|
| Great Falls Tribune | 28,856 |

| Nebraska | 43,890 |
|---|---|
| Fremont Tribune | 7,256 |
| Hastings Tribune | 9,549 |
| Kearney Hub | 11,285 |
| Norfolk Daily News | 15,800 |

| Nevada | 306,763 |
|---|---|
| Boulder City Review | 2,400 |
| Carson City Nevada Appeal | 13,559 |
| Fallon Lahontan Valley News | 2,493 |
| Las Vegas El Tiempo | 50,000 |
| Las Vegas Review -Journal | 151,223 |
| Mesquite Desert Valley Times | 7,100 |
| Pahrump Valley Times | 7,065 |
| Reno Gazette-Journal | 53,830 |
| Reno Gazette-journal -- Sunday Select | 17,293 |
| Tonopah Times-Bonanza | 1,800 |

| New Hampshire | 71,548 |
|---|---|
| Concord Monitor | 17,070 |
| Dover/Laconia Citizen-Foster's Sunday Citizen | 14,285 |
| Lebanon/Hanover Valley News | 17,017 |
| Nashua Telegraph | 23,176 |

| New Jersey | 346,620 |
|---|---|
| Bridgewater Courier-News | 21,644 |
| Camden/Cherry Hill Courier-Post | 64,620 |
| East Brunswick Home News Tribune | 41,448 |
| Morristown/Parsippany Record | 25,464 |
| Neptune Asbury Park Press | 157,063 |
| Trenton Trentonian | 20,964 |
| Vineland Journal | 15,417 |

| New Mexico | 185,671 |
|---|---|
| Alamagordo Times | 6,253 |
| Albuquerque Journal | 86,822 |
| Belen Valencia County News-Bulletin | 21,105 |
| Carlsbad Current-Argus | 6,442 |
| Farmington Times | 16,201 |
| Gallup Independent | 20,077 |
| Las Cruces Sun-News | 21,916 |
| Los Alamos Monitor | 3,725 |
| Socorro El Defensor Chieftain | 3,130 |

| New York | 1,898,744 |
|---|---|
| Adirondack Enterprise | 4,700 |
| Batavia Daily News | 12,456 |
| Binghamton Press & Sun-Bulletin | 53,071 |
| Dunkirk/Fredonia Observer | 8,442 |

| New York (continued) | |
|---|---|
| Elmira Star-Gazette | 25,516 |
| Hudson Register-Star-Daily Mail | 7,146 |
| Ithaca Journal | 15,347 |
| Jamestown Post-Journal | 16,159 |
| Long Island Newsday | 357,371 |
| Melville This Week | 300,746 |
| New York City Daily News | 499,971 |
| Niagara Falls Niagara County Community Newspapers | 28,110 |
| Olean Times Herald | 12,601 |
| Oswego Palladium-Times | 5,467 |
| Owego Pennysaver | 19,420 |
| Poughkeepsie Journal | 38,312 |
| Rochester Democrat and Chronicle | 175,146 |
| Saratoga Springs Saratogian | 7,220 |
| Schenectady Gazette | 40,705 |
| Troy Record | 10,358 |
| Utica Observer-Dispatch | 40,887 |
| Watertown Times | 25,265 |
| White Plains Journal News | 103,543 |
| White Plains Yonkers/Mt. Vernon Express | 90,785 |

| North Carolina | 468,958 |
|---|---|
| Asheboro Courier-Tribune | 13,051 |
| Asheville Citizen-Times | 49,537 |
| Boone Watauga Democrat | 2,934 |
| Boone Watauga Mountain Times | 14,500 |
| Charlotte Carolina Weekly Newspapers | 93,000 |
| Clinton Sampson Independent | 8,383 |
| Concord Harrisburg Horizons | 5,475 |
| Concord/Kannapolis Independent Tribune | 12,442 |
| Durham Herald-Sun | 25,390 |
| Eden News | 2,448 |
| Elizabethtown Bladen Journal | 4,557 |
| Elkin Tribune | 4,421 |
| Forest City Courier | 6,407 |
| Henderson Dispatch | 6,700 |
| Hickory Record | 18,775 |
| Hickory Daily Record -- Sunday Direct | 10,000 |
| High Point Enterprise | 18,355 |
| The Laurinburg Exchange | 6,071 |
| Lenoir News-Topic | 6,700 |
| Lexington Dispatch | 8,585 |
| Lumberton Robesonian | 15,555 |
| Marion McDowell News | 4,172 |
| Monroe Enquirer-Journal | 6,699 |
| Morganton News-Herald | 8,815 |
| Mount Airy News | 9,813 |
| Reidsville Review | 3,699 |
| Roanoke Rapids Herald | 8,955 |
| Rockingham Richmond County Daily Journal | 8,143 |
| Salisbury/Spencer/East Spencer Post | 19,408 |
| Sanford Herald | 7,900 |
| Statesville Record & Landmark | 12,259 |
| West Jefferson Ashe Mountain Times | 10,500 |
| Wilson Times | 14,195 |
| Winston-salem Journal -- Sunday Direct | 21,114 |

| Ohio | 1,373,458 |
|---|---|
| Akron Cuyahoga Falls News Press | 22,353 |
| Bowling Green Sentinel-Tribune | 9,674 |
| Bryan Times | 9,486 |
| Cincinnati Enquirer | 255,128 |
| Cincinnati The Enquirer -- Sunday Select | 27,413 |
| Columbus Dispatch | 265,879 |
| Columbus Dispatch Sunday Savings | 20,000 |
| Fairborn-Xenia Daily Herald Gazette News-Current | 5,716 |
| Greenville Advocate | 4,678 |
| Hillsboro Times-Gazette | 3,463 |
| Hudson Hub-Times | 9,460 |

| Ohio (continued) | |
|---|---|
| Jackson County Times-Journal | 5,500 |
| Kent/Ravenna Record-Courier | 16,531 |
| Lewis Center This Week Community Newspapers | 328,209 |
| Lisbon Morning Journal | 10,051 |
| Lorain Journal | 22,763 |
| Mansfield News Journal | 20,110 |
| Marietta Times | 11,031 |
| Martins Ferry/Belmont County Times Leader | 16,087 |
| Medina Gazette | 11,408 |
| Miami Valley Sunday News | 9,359 |
| Napoleon Northwest Signal | 4,461 |
| Newark Advocate Group | 83,732 |
| Norwalk Reflector | 8,111 |
| Piqua Call | 6,467 |
| Pomeroy-Gallipolis Daily Sentinel-Daily Tribune | 6,723 |
| Portsmouth Times | 11,525 |
| Sandusky Register | 18,876 |
| Sidney News | 11,353 |
| Steubenville Herald-star | 13,808 |
| Stow Sentry | 14,630 |
| Tallmadge Express | 8,813 |
| Tiffin Advertiser-Tribune | 8,890 |
| Urbana Citizen | 4,981 |
| Van Wert Times-Bulletin | 4,420 |
| Warren Tribune Chronicle | 30,733 |
| Washington Court House Record-Herald | 5,000 |
| Willoughby Lake County News-Herald | 40,486 |
| Wilmington News-Journal | 6,150 |

| Oklahoma | 250,075 |
|---|---|
| Ada Evening News | 6,699 |
| Altus Times | 4,204 |
| Ardmore Sunday Ardmoreite | 9,343 |
| Bartlesville Examiner-Enterprise | 9,928 |
| Chickasha Star | 3,779 |
| Duncan Banner | 6,500 |
| Durant Democrat | 5,376 |
| Edmond Sun | 3,261 |
| Enid News & Eagle | 15,372 |
| Lawton Sunday Constitution | 22,671 |
| McAlester News-Capitol | 6,026 |
| Norman Transcript | 11,303 |
| Pauls Valley Daily Democrat | 2,890 |
| Shawnee News-Star | 7,800 |
| Stillwater News-Press | 7,421 |
| Tulsa World | 127,502 |

| Oregon | 88,209 |
|---|---|
| Daily Astoria | 6,974 |
| Grant's Pass Courier | 17,003 |
| Roseburg News-Review of Douglas County | 17,942 |
| Salem Statesman-Journal | 46,290 |

| Pennsylvania | 813,723 |
|---|---|
| Altoona Mirror | 36,242 |
| Bloomsburg Press-Enterprise | 20,368 |
| Bradford Era | 10,056 |
| Butler Eagle | 25,832 |
| Chambersburg Public Opinion | 17,011 |
| Clearfield Progress | 10,467 |
| Greensburg Tribune-Review | 180,064 |
| Hanover Sun | 18,176 |
| Hazleton Standard-Speaker | 21,906 |
| Indiana Gazette | 14,548 |
| Lansdale Reporter | 9,388 |
| Lebanon News | 18,272 |
| Lehighton Times News | 12,931 |
| Lewistown Sentinel | 12,045 |
| Lock Haven Express | 9,044 |
| McKeesport/Duquesne/Clairton News | 11,398 |

## Pennsylvania (continued)

| | |
|---|---|
| Meadville Tribune | 11,431 |
| New Kensington-Tarentum-Vandegrift | |
| Valley News Dispatch | 24,585 |
| Norristown Times Herald | 9,536 |
| Phoenixville Phoenix | 9,396 |
| Pottstown Mercury | 19,581 |
| Primos Delaware County Times | 31,526 |
| Scranton Times-Tribune | 63,724 |
| Smaokin/Pottsville News-Item - | |
| Republic Herald | 33,283 |
| Somerset Daily American | 12,640 |
| Sunbury Danville News | 1,547 |
| Towanda Sunday Review | 8,803 |
| Warren Times-Observer | 8,724 |
| Washington Observer-Reporter | 33,203 |
| West Chester Local News | 20,397 |
| Wilkes-Barre Sunday Voice | 26,187 |
| York Sunday News | 71,412 |

## Rhode Island — 35,135

| | |
|---|---|
| Kent County Times | 2,236 |
| Newport Daily News | 10,035 |
| Pawtucket/Central Falls Times | 6,463 |
| Westerly Sun | 6,984 |
| Woonsocket Call | 9,417 |

## South Carolina — 214,229

| | |
|---|---|
| Aiken Standard | 15,933 |
| Florence Morning News | 28,004 |
| Georgetown Times | 6,356 |
| Goose Creek Gazette | 11,000 |
| Greenville News | 103,195 |
| Greenville News -- Sunday Select | 14,507 |
| Lancaster News | 11,822 |
| Newberry Observer | 6,869 |
| Summerville Journal Scene | 4,432 |
| Union Daily Times | 7,059 |
| Winnsboro Herald Independent | 5,052 |

## South Dakota — 61,616

| | |
|---|---|
| Sioux Falls Argus Leader | 53,508 |
| Yankton Press & Dakotan | 8,108 |

## Tennessee — 473,452

| | |
|---|---|
| Athens Post-Athenian | 9,832 |
| Clarksville Leaf-Chronicle | 19,175 |
| Cleveland Banner | 14,172 |
| Columbia Herald | 12,020 |
| Cookeville Herald-Citizen | 11,394 |
| Dickson Herald | 4,890 |
| Elizabethton Star | 10,081 |
| Gallatin News-Examiner | 4,354 |
| Greeneville Sun | 13,894 |
| Hendersonville Star News | 20,500 |
| Jackson Sun | 31,713 |
| Kingsport Times-News | 37,040 |
| Lebanon Democrat | 7,394 |
| Maryville/Alcoa Times | 17,868 |
| Murfreesboro News Journal | 16,206 |
| Nashville Tennessean | 204,328 |
| Nashville Tennessean -- Sunday Select | 17,488 |
| Newport Plain Talk | 6,908 |
| Oak Ridge Oak Ridger | 6,466 |
| Sevierville Mountain Press | 7,729 |

## Texas — 979,878

| | |
|---|---|
| Allen American | 22,440 |
| Amarillo Globe-News | 44,459 |
| Baytown Sun | 8,535 |
| Bryan/College Station Eagle | 21,891 |
| Cleburne Times-Review | 4,075 |

## Texas (continued)

| | |
|---|---|
| Clute Brazosport Facts | 15,162 |
| Colony Courier Leader | 7,345 |
| Conroe Courier | 9,590 |
| Denton Record Chronicle | 11,982 |
| El Paso Times | 70,449 |
| Flower Mound Leader | 20,500 |
| Frisco Enterprise | 19,510 |
| Galveston County News | 21,402 |
| Houston East Texas | |
| Community Newspapers | 19,728 |
| Houston Community Newspapers | 308,089 |
| Irving Rambler | 3,529 |
| Killeen Herald | 20,547 |
| Laredo/Zapata Morning Times | 15,932 |
| Lewisville Leader | 10,085 |
| Little Elm Journal | 6,350 |
| Longview News-Journal | 26,613 |
| Lubbock Avalanche-Journal | 43,200 |
| Lufkin Daily News | 11,184 |
| Marshall News Messenger | 5,950 |
| McAllen Monitor | 42,808 |
| McKinney Courier-Gazette | 25,855 |
| Mesquite News | 23,810 |
| Nacogdoches Daily Sentinel | 7,514 |
| New Braunfels Herald-Zeitung | 8,569 |
| Orange Leader | 4,251 |
| Plano Star Courier | 65,618 |
| Port Arthur News | 11,129 |
| Rowlett Lakeshore Times | 4,325 |
| San Marcos Daily Record | 5,750 |
| Seguin Gazette-Enterprise | 5,972 |
| Sherman/Denison Herald Democrat | 20,656 |
| Van Alstyne Leader | 952 |
| Weatherford The Democrat | 4,122 |

## Utah — 79,273

| | |
|---|---|
| Ogden Standard-Examiner | 57,631 |
| St. George Spectrum | 21,642 |

## Vermont — 55,125

| | |
|---|---|
| Bennington Banner | 6,183 |
| Brattleboro Reformer | 8,460 |
| Burlington Free Press | 40,482 |

## Virginia — 382,677

| | |
|---|---|
| Bristol Herald-Courier | 30,178 |
| Charlottesville Progress | 25,241 |
| Culpeper Star-Exponent | 6,191 |
| Danville Register & Bee | 17,822 |
| Fredericksburg Free Lance-Star | 46,135 |
| Harrisonburg News Record | 27,381 |
| Lynchburg News & Advance | 33,876 |
| Petersburg Progress-Index | 12,206 |
| Richmond Times Dispatch -- Sunday Direct | 112,500 |
| Staunton News Leader | 16,803 |
| Strasburg Northern Virginia Daily | 13,318 |
| Waynesboro News Virginian | 6,010 |
| Winchester Star | 22,142 |
| Woodbridge-Manassas Potomac News | |
| & Journal Messenger | 12,874 |

## Washington — 464,202

| | |
|---|---|
| Aberdeen Daily World | 10,938 |
| Aberdeen South Beach Bukiletin | 4,450 |
| Bellevue Reporter | 39,281 |
| Centralia/Chehalis Chronicle | 12,800 |
| Everett Auburn Reporter | 24,145 |
| Everett Bainbridge Island Review | 3,936 |
| Everett Bremerton Patriot | 12,112 |
| Everett Central Kitsap Reporter | 17,962 |
| Everett Covington/Maple Valley Reporter | 24,111 |

## Washington (continued)

| | |
|---|---|
| Everett Federal Way Mirror | 30,208 |
| Everett Herald | 49,086 |
| Everett North Kitsap Herald | 12,586 |
| Everett Port Orchard Independent | 18,925 |
| Everett South Whidbey Record | 3,850 |
| Everett Whidbey News Times | 5,875 |
| Issaquah/Sammamish Reporter | 29,377 |
| Kent Reporter | 25,458 |
| Kirkland Reporter | 26,035 |
| Montesano Vidette | 3,189 |
| Moses Lake Columbia Basin Herald | 8,073 |
| Mount Vernon Skagit Valley Herald | 15,606 |
| Port Angeles Peninsula Daily News | 15,758 |
| Redmond Reporter | 24,234 |
| Renton Reporter | 25,539 |
| Wenatchee World | 20,268 |

## West Virginia — 110,350

| | |
|---|---|
| Charleston Gazette-Mail | 49,740 |
| Elkins Inter-Mountain | 9,050 |
| Gallipolis/Point Pleasant Register | 3,653 |
| Huntington Herald-Dispatch | 28,830 |
| Logan Banner | 6,853 |
| Weirton Daily Times | 4,844 |
| Williamson Daily News | 7,380 |

## Wisconsin — 707,551

| | |
|---|---|
| Appleton Post-Crescent | 56,117 |
| Beloit My Stateline Shopper | 19,200 |
| Beloit News | 12,289 |
| Fond Du Lac Reporter | 13,782 |
| Green Bay Press-Gazette | 73,024 |
| Janesville Gazette | 22,618 |
| Manitowoc/Two Rivers Herald Times Reporter | 12,546 |
| Marinette Eagle Herald | 8,464 |
| Milwaukee Journal Sentinel | 340,446 |
| Milwaukee Journal Sentinel -- Sunday Select | 10,000 |
| Oshkosh Northwestern | 19,885 |
| Rhinelander Star Journal | 16,080 |
| Sheboygan Press | 18,955 |
| Superior Telegram | 6,065 |
| Watertown Times | 7,750 |
| Wausau Marshfield New-Herald-- | |
| Sunday Select | 5,142 |
| Wausau Stevens Point Journal-- | |
| Sunday Select | 7,720 |
| Wausau Daily Herlad -- Sunday Select | 10,367 |
| Wausau Wisconsin Rapids Daily Triubune -- | |
| Sunday Select | 5,060 |
| Wausau-Stevens Point Central WI Sunday | 19,123 |
| Wausau-Stevens Point Herald-Central | |
| WI Sunday | 22,918 |

## Wyoming — 20,038

| | |
|---|---|
| Cheyenne Wyoming Tribune-Eagle | 15,061 |
| Laramie Boomerang | 4,977 |



USA WEEKEND MAGAZINE

Contact your local USA WEEKEND representative:

New York: 212-715-2100
Chicago: 312-321-7762
Detroit: 248-680-1220
Los Angeles: 310-444-2140
Virginia: 703-854-6445

Source: USA WEEKEND Magazine's Total Circulation reflects 1/1/12 carrier newspaper market list.  Carrier newspaper circulation figures based on ABC, CAC, VAC or publisher-certified circulation for the most recent 6-month audit period.

# EXHIBIT 3

**24-7 Network Sample Sites**

| SiteUrl | Channel |
| --- | --- |
| Autoaubaine.com | Automotive |
| autokmh.com | Automotive |
| automotto.com | Automotive |
| automotto.org | Automotive |
| Autosmag.ca | Automotive |
| carsoundsystemsideas.com | Automotive |
| CVAutos.com | Automotive |
| leblogauto.ca | Automotive |
| Motomag.ca | Automotive |
| natm.com | Automotive |
| Vrmagazine.ca | Automotive |
| 1SeriesOnline.com | Automotive |
| 240Forum.com | Automotive |
| 300cForums.com | Automotive |
| 350z-tech.com | Automotive |
| 3si.org | Automotive |
| 460Ford.com | Automotive |
| 4RunnerForum.com | Automotive |
| 4WDAndSportUtility.com | Automotive |
| 4WheelOffRoad.com | Automotive |
| 502streetscene.net | Automotive |
| 6mt.net | Automotive |
| 6speedOnline.com | Automotive |
| 7thGenHonda.com | Automotive |
| 8-Lug.com | Automotive |
| 8thCivic.com | Automotive |
| a5oc.com | Automotive |
| AceLinks.net | Automotive |
| acuraforums.com | Automotive |
| acuralegend.com | Automotive |
| AcuraWorld.com | Automotive |
| acurazine.com | Automotive |
| ATVConnection.com | Automotive |
| audia1forum.com | Automotive |
| AudiForum.ca | Automotive |
| audiforums.com | Automotive |
| Audi-Forums.com | Automotive |
| audiworld.com | Automotive |
| AutoBuyGuide.com | Automotive |
| AutoCreditExpress.com | Automotive |
| autoexpert.ca | Automotive |
| AutoFederation.com | Automotive |
| autoguide.com | Automotive |
| AutoLoansinDetroit.com | Automotive |
| AutoLoansinMichigan.com | Automotive |
| AutomobileMag.com | Automotive |
| Automotive.com | Automotive |
| AutomotiveAddicts.com | Automotive |

**24-7 Network Sample Sites**

| | |
|---|---|
| automotiveprimers.com | Automotive |
| automotoportal.com | Automotive |
| AutoNetFinancial.com | Automotive |
| autoshopper.com | Automotive |
| Autospies.com | Automotive |
| autotraderclassics.com | Automotive |
| B15Sentra.net | Automotive |
| BadCreditCarDealers.com | Automotive |
| BenzForum.com | Automotive |
| BenzWorld.org | Automotive |
| bikerspost.com | Automotive |
| bimmerfile.com | Automotive |
| BimmerWerkz.com | Automotive |
| BlazerForum.com | Automotive |
| blog.autoshopper.com | Automotive |
| bmwblog.com | Automotive |
| BonnevilleForum.com | Automotive |
| BoxsterForums.com | Automotive |
| bringatrailer.com | Automotive |
| Buickforum.com | Automotive |
| BuyandPayHere.com | Automotive |
| Cadillacforum.com | Automotive |
| CaliberForums.com | Automotive |
| CamaroForums.com | Automotive |
| CamaroPerformers.com | Automotive |
| Camaros.net | Automotive |
| CanadianCarAudio.com | Automotive |
| CarAndDriver.com | Automotive |
| caraudiomag.com | Automotive |
| carbodydesign.com | Automotive |
| CarCraft.com | Automotive |
| CarGurus.com | Automotive |
| carreviewsandnews.com | Automotive |
| CarSoup.com | Automotive |
| CBRForum.com | Automotive |
| ChallengerTalk.com | Automotive |
| ChargerForums.com | Automotive |
| CherokeeSRT8.com | Automotive |
| Chevelles.com | Automotive |
| Chevroletforum.com | Automotive |
| chevyhiperformance.com | Automotive |
| ChevyMalibuForum.com | Automotive |
| ChevyTeam.com | Automotive |
| chryslerforum.com | Automotive |
| cincystreetscene.com | Automotive |
| circletrack.com | Automotive |
| CivicForums.com | Automotive |
| classiccars.com | Automotive |
| classicdriver.com | Automotive |

| | |
|---|---|
| ClassicOldsmobile.com | Automotive |
| classictrucks.com | Automotive |
| Clubarmada.com | Automotive |
| ClubFrontier.org | Automotive |
| ClubLexus.com | Automotive |
| ClubTitan.org | Automotive |
| ClubXterra.org | Automotive |
| CobaltSS.com | Automotive |
| ColoradoFans.com | Automotive |
| ConsumerGuideAuto.HowStuffWorks.com | Automotive |
| Corral.net | Automotive |
| Corvette-Forum.com | Automotive |
| CorvetteForums.com | Automotive |
| Crash.net | Automotive |
| crosstourownersclub.com | Automotive |
| CruzeChat.com | Automotive |
| CROwnersClub.com | Automotive |
| CT200Hforum.com | Automotive |
| CumminsForum.com | Automotive |
| customclassictrucks.com | Automotive |
| CustomTacos.com | Automotive |
| dealsonwheels.com | Automotive |
| DieselPlace.com | Automotive |
| dieselpowermag.com | Automotive |
| DigitalCorvettes.com | Automotive |
| dodgechallenger.com | Automotive |
| dodgeforum.com | Automotive |
| DodgeIntrepid.net | Automotive |
| Dodge-Nitro.com | Automotive |
| DriveAccord.net | Automotive |
| DrivenMag.com | Automotive |
| DriversLane.com | Automotive |
| Driveway.ca | Automotive |
| D-series.org | Automotive |
| DSMTalk.com | Automotive |
| DuramaxForum.com | Automotive |
| ElCaminoCentral.com | Automotive |
| ElementOwnersClub.com | Automotive |
| EuropeanCarWeb.com | Automotive |
| EuroTuner.com | Automotive |
| EvolutionM.net | Automotive |
| evotuners.net | Automotive |
| F150Online.com | Automotive |
| FCXclub.com | Automotive |
| Ferrari-Talk.com | Automotive |
| Fiat500owners.com | Automotive |
| FindCarsUnder1000.com | Automotive |
| FitFreak.net | Automotive |
| FitOwnersClub.com | Automotive |

| | |
|---|---|
| FJCruiserForums.com | Automotive |
| FordForums.com | Automotive |
| FordGT500.com | Automotive |
| Ford-Trucks.com | Automotive |
| ForteForums.com | Automotive |
| fourtitude.com | Automotive |
| FourWheeler.com | Automotive |
| FT86talk.com | Automotive |
| FullsizeBronco.com | Automotive |
| G35Driver.com | Automotive |
| g6ownersclub.com | Automotive |
| G8Board.com | Automotive |
| G8Forum.com | Automotive |
| gaspedaladdicts.com | Automotive |
| GenCoupe.com | Automotive |
| GenesisForums.com | Automotive |
| GermanAutoForums.com | Automotive |
| getauto.com | Automotive |
| Gmforum.com | Automotive |
| gmhightechperformance.com | Automotive |
| Gminsidenews.com | Automotive |
| greencar.com | Automotive |
| GreenHybrid.com | Automotive |
| Gtcars.ca | Automotive |
| GTOForum.com | Automotive |
| GTRforums.com | Automotive |
| H2Fanatic.com | Automotive |
| HDForums.com | Automotive |
| hemmings.com | Automotive |
| highperformancepontiac.com | Automotive |
| HondaAccordForum.com | Automotive |
| Honda-Acura.net | Automotive |
| HondaCivicForum.com | Automotive |
| HondaForum.com | Automotive |
| HondaMarketPlace.com | Automotive |
| HondaPoint.com | Automotive |
| Honda-Tech.com | Automotive |
| HondaTuningMagazine.com | Automotive |
| hotrod.com | Automotive |
| HummerForums.com | Automotive |
| HybridCars.com | Automotive |
| Hyundaiforum.com | Automotive |
| HyundaiPerformance.com | Automotive |
| i-club.com | Automotive |
| Impalas.net | Automotive |
| importtuner.com | Automotive |
| InsightCentral.net | Automotive |
| IntelliChoice.com | Automotive |
| InternetAutoGuide.com | Automotive |

24-7 Network Sample Sites

| | |
|---|---|
| IQ-Forums.com | Automotive |
| IsuzuForums.com | Automotive |
| JaguarForums.com | Automotive |
| japanesesportcars.com | Automotive |
| JDPower.com | Automotive |
| JeepCommander.com | Automotive |
| JeepsCanada.com | Automotive |
| JPMagazine.com | Automotive |
| JukeForums.com | Automotive |
| KawasakiForums.com | Automotive |
| KiaSoulForums.com | Automotive |
| kilometermagazine.com | Automotive |
| kitcarmag.com | Automotive |
| kitcars.com | Automotive |
| Lamborghini-Talk.com | Automotive |
| LandRoverForums.com | Automotive |
| LandRoversOnly.com | Automotive |
| leftlanenews.com | Automotive |
| LexusForum.com | Automotive |
| lotpro.com | Automotive |
| LotusTalk.com | Automotive |
| lowriderarte.com | Automotive |
| lowriderbike.com | Automotive |
| lowridermagazine.com | Automotive |
| LS1GTO.com | Automotive |
| LS1LT1.com | Automotive |
| LS1Tech.com | Automotive |
| mautofied.com | Automotive |
| Maxima.org | Automotive |
| Mazda3Club.com | Automotive |
| Mazda6Club.com | Automotive |
| MazdaForum.com | Automotive |
| MazdaWorld.org | Automotive |
| MBWorld.org | Automotive |
| MDXers.org | Automotive |
| MercedesForum.com | Automotive |
| MercedesMcLaren.com | Automotive |
| MercuryForum.com | Automotive |
| Mini2.com | Automotive |
| MiniCooperForums.com | Automotive |
| MiniTruckinWeb.com | Automotive |
| mitsubishiforum.com/forum/ | Automotive |
| ModdedMustangs.com | Automotive |
| modernhemi.com | Automotive |
| Modified.com | Automotive |
| modifiedcars.com | Automotive |
| modifiedle.com | Automotive |
| ModMotorTech.com | Automotive |
| MonteCarloForum.com | Automotive |

**24-7 Network Sample Sites**

| | |
|---|---|
| moparforums.com | Automotive |
| moparmusclemagazine.com | Automotive |
| motor.com | Automotive |
| motorcrave.com | Automotive |
| motoringfile.com | Automotive |
| MotorTrend.com | Automotive |
| motortrendenespanol.com | Automotive |
| motosport.com | Automotive |
| MuscleMustangFastFords.com | Automotive |
| Mustang50Magazine.com | Automotive |
| mustangandfords.com | Automotive |
| MustangBoards.com | Automotive |
| MustangForums.com | Automotive |
| mustangmonthly.com | Automotive |
| mwerks.com | Automotive |
| MX6.com | Automotive |
| My.is | Automotive |
| My350z.com | Automotive |
| MyG37.com | Automotive |
| NewAgeGTO.com | Automotive |
| NewCar.com | Automotive |
| NewScionXB.com | Automotive |
| NissanClub.com | Automotive |
| NissanForum.com | Automotive |
| NissanMaximas.com | Automotive |
| NIssanMurano.org | Automotive |
| NorthAmericanMotoring.com | Automotive |
| Novas.net | Automotive |
| OdysseyOwnersClub.com | Automotive |
| off-road.com | Automotive |
| off-roadweb.com | Automotive |
| OldsmobileForum.com | Automotive |
| OptimaForums.com | Automotive |
| PassionFord.com | Automotive |
| Performancetrucks.net | Automotive |
| Piloteers.org | Automotive |
| PontiacTalk.com | Automotive |
| PopularHotRodding.com | Automotive |
| Powerstroke.org | Automotive |
| PreludeOnline.com | Automotive |
| R8Talk.com | Automotive |
| ranger-Forums.com | Automotive |
| rcuniverse.com | Automotive |
| RedlineForums.com | Automotive |
| redliners.ca | Automotive |
| RegalForums.com | Automotive |
| RennList.com | Automotive |
| RidgelineOwnersClub.com | Automotive |
| RoadAndTrack.com | Automotive |

**24-7 Network Sample Sites**

| | |
|---|---|
| rodandcustommagazine.com | Automotive |
| rsportscars.com | Automotive |
| RVMagOnline.com | Automotive |
| RX7Club.com | Automotive |
| RX8Club.com | Automotive |
| S10forum.com | Automotive |
| S2000.com | Automotive |
| Saabforums.com | Automotive |
| SaabScene.com | Automotive |
| Saturnforum.com | Automotive |
| S-chassis.com | Automotive |
| ScionForum.com | Automotive |
| Scionlife.com | Automotive |
| scoobynet.com | Automotive |
| seriouswheels.com | Automotive |
| skyroadster.com | Automotive |
| smartcarofamerica.com | Automotive |
| sportcompactcarweb.com | Automotive |
| sportscardigest.com | Automotive |
| sporttruck.com | Automotive |
| Sr20Forum.com | Automotive |
| StevesNovaSite.com | Automotive |
| stockcarracing.com | Automotive |
| streetrodderweb.com | Automotive |
| Stuntlife.com | Automotive |
| SubaruForester.org | Automotive |
| SubaruOutback.org | Automotive |
| supercars.net | Automotive |
| superchevy.com | Automotive |
| SuperhawkForum.com | Automotive |
| superhonda.com | Automotive |
| superstreetonline.com | Automotive |
| suzukiforum.com | Automotive |
| Suzuki-Forums.com | Automotive |
| swedespeed.com | Automotive |
| TaurusClub.com | Automotive |
| tennspeed.net | Automotive |
| thatsracin.com | Automotive |
| TheDieselStop.com | Automotive |
| thedriversnetwork.com | Automotive |
| TheTruthaboutCars.com | Automotive |
| TitanTalk.com | Automotive |
| topgear.com | Automotive |
| TorontoCivics.com | Automotive |
| TorontoIntegras.ca | Automotive |
| ToyotaCelicas.com | Automotive |
| ToyotaNation.com | Automotive |
| Toyota-Yaris.com | Automotive |
| TrailVoy.com | Automotive |

**24-7 Network Sample Sites**

| | |
|---|---|
| TruckForums.com | Automotive |
| truckinweb.com | Automotive |
| truckshopper.com | Automotive |
| TruckTrend.com | Automotive |
| TrueCar.com | Automotive |
| TSXclub.com | Automotive |
| TundraSolutions.com | Automotive |
| TundraTalk.net | Automotive |
| TunerFriends.com | Automotive |
| Turbododge.com | Automotive |
| TurboMagazine.com | Automotive |
| vehix.com | Automotive |
| velocetoday.com | Automotive |
| VetteHound.com | Automotive |
| vetteweb.com | Automotive |
| Vintage-mustang.com | Automotive |
| ViperAlley.com | Automotive |
| VoltForums.com | Automotive |
| VolvoForums.com | Automotive |
| Vseries.net | Automotive |
| vweosclub.com | Automotive |
| VWForum.com | Automotive |
| VWTrendsWeb.com | Automotive |
| vwvortex.com | Automotive |
| Wikicars.org | Automotive |
| WRXTuners.com | Automotive |
| XLRForum.com | Automotive |
| YotaTech.com | Automotive |
| YourScionTC.com | Automotive |
| Z06Vette.com | Automotive |
| Zdriver.com | Automotive |
| ZDXforum.com | Automotive |
| boats.com | Automotive |
| boatshopper.com | Automotive |
| marine.com | Automotive |
| sailinganarchy.com | Automotive |
| sailingscuttlebutt.com | Automotive |
| sailmag.com | Automotive |
| sailnet.com | Automotive |
| speedwake.com | Automotive |
| YachtingMag.com | Automotive |
| yachtworld.com | Automotive |
| edmunds.com | Automotive |
| lemonfree.com | Automotive |
| sailboattraderonline.com | Automotive |
| searchnycars.com | Automotive |
| SmartCarFinder.com | Automotive |
| usedcars.com | Automotive |
| 50mustangandsuperfords.com | Automotive |

**24-7 Network Sample Sites**

| | |
|---|---|
| astonmartinlife.com | Automotive |
| automobilesdeluxe.tv | Automotive |
| benzinsider.com | Automotive |
| corvettefever.com | Automotive |
| ferrarichat.com | Automotive |
| ferrarilife.com | Automotive |
| Insideline.com | Automotive |
| lifewelldriven.com | Automotive |
| maseratilife.com | Automotive |
| megayachtnews.org | Automotive |
| wealthywheels.com | Automotive |
| atvrideronline.com | Automotive |
| baggersmag.com | Automotive |
| BikerForums.org | Automotive |
| cycleworld.com | Automotive |
| dirtrider.com | Automotive |
| hotbikeweb.com | Automotive |
| motocross.com | Automotive |
| motorcyclecruiser.com | Automotive |
| motorcyclistonline.com | Automotive |
| powersports.honda.com | Automotive |
| sportrider.com | Automotive |
| streetchopperweb.com | Automotive |
| superstreetbike.com | Automotive |
| thumpertalk.com | Automotive |
| atlanta.citybizlist.com | CareerRecruiting |
| atlantajobs.com | CareerRecruiting |
| baltimore.citybizlist.com | CareerRecruiting |
| boston.citybizlist.com | CareerRecruiting |
| bostonjobs.com | CareerRecruiting |
| careerbuilder.com | CareerRecruiting |
| charlotteraleigh.citybizlist.com | CareerRecruiting |
| chicagojobs.com | CareerRecruiting |
| ctjobs.com | CareerRecruiting |
| dallas.citybizlist.com | CareerRecruiting |
| dc.citybizlist.com | CareerRecruiting |
| driverjobs.com | CareerRecruiting |
| fayettevillejobs.com | CareerRecruiting |
| houston.citybizlist.com | CareerRecruiting |
| jacksonvillejobs.com | CareerRecruiting |
| Jobbi.com | CareerRecruiting |
| jobfetch.com | CareerRecruiting |
| jobster.com | CareerRecruiting |
| longislandjobs.com | CareerRecruiting |
| monster.com | CareerRecruiting |
| newjerseycareers.com | CareerRecruiting |
| newyork.citybizlist.com | CareerRecruiting |
| ontargetjobs.com | CareerRecruiting |
| philly.citybizlist.com | CareerRecruiting |

**24-7 Network Sample Sites**

| | |
|---|---|
| pittsburgh.citybizlist.com | CareerRecruiting |
| quintcareers.com | CareerRecruiting |
| snagajob.com | CareerRecruiting |
| southflorida.citybizlist.com | CareerRecruiting |
| vegasjobs.com | CareerRecruiting |
| americasjobexchange.com | CareerRecruiting |
| Entrepreneur.com | CareerRecruiting |
| tampacareers.com | CareerRecruiting |
| abcya.com | Education |
| academicpedsjnl.net | Education |
| askthebrain.com | Education |
| britannica.com | Education |
| education.com | Education |
| Infobourg.com | Education |
| collegecram.com | Education |
| DegreeVillage.com | Education |
| Dictionary.com | Education |
| Education-Reference.com | Education |
| Thesaurus.com | Education |
| reptilearchive.com | Education |
| whaleindex.com | Education |
| arthistorycommunity.com | Education |
| 50states.com | Education |
| babylon.com/define/ | Education |
| barnesandnoble.com | Education |
| bookwolf.com | Education |
| britannica.com | Education |
| cafegenius.com | Education |
| citationmachine.net | Education |
| college-cram.com | Education |
| counselingeducation.com | Education |
| dictionary-babylon.com | Education |
| ecampus.com | Education |
| helium.com | Education |
| history.com | Education |
| internet4classrooms.com | Education |
| italki.com | Education |
| jiffynotes.com | Education |
| lawschoolschooldiscussion.org | Education |
| maps.com | Education |
| mapsofworld.com | Education |
| Merriam-Webster.com | Education |
| ratemyteachers.com | Education |
| rorotoko.com | Education |
| schooldigger.com | Education |
| shmoop.com | Education |
| sparknotes.com | Education |
| squidoo.com | Education |
| studyworld.com | Education |

| | |
|---|---|
| suite101.com | Education |
| teleread.com | Education |
| thefreedictionary.com | Education |
| thesaurus.babylon.com | Education |
| translation.babylon.com | Education |
| visual.merriam-webster.com | Education |
| wordreference.com | Education |
| worldatlas.com | Education |
| Xplana.com | Education |
| xtimeline.com | Education |
| youniversitytv.com | Education |
| freecourtdockets.com | Education |
| lawyers.com | Education |
| martindale.com | Education |
| volokh.com | Education |
| languageisavirus.com | Education |
| literaturedepot.com | Education |
| answers.com | Education |
| bibme.org | Education |
| brainyquote.com | Education |
| easybib.com | Education |
| howcast.com | Education |
| ikonet.com | Education |
| merriam-webster.com | Education |
| refdesk.com | Education |
| RovingScholar.com | Education |
| spanishdict.com | Education |
| thefullwiki.com | Education |
| wikia.com | Education |
| wolframalpha.com | Education |
| yourdictionary.com | Education |
| anthropologycommunity.com | Education |
| astrology.com | Education |
| astronomyindex.com | Education |
| biochemistrynetwork.com | Education |
| biologycommunity.com | Education |
| chemistryarchive.com | Education |
| dinosaurnetwork.com | Education |
| ineedce.com | Education |
| popsci.com | Education |
| scienceillustrated.com | Education |
| 985fm.ca | Entertainment |
| 985sports.ca | Entertainment |
| adventoutpost.com | Entertainment |
| Astro.qc.ca | Entertainment |
| breakingdawnmovie.org | Entertainment |
| britishexpats.com | Entertainment |
| Chezmaya.com | Entertainment |
| cime.fm | Entertainment |

**24-7 Network Sample Sites**

| | |
|---|---|
| Cinemaclock.com | Entertainment |
| ckoi.com | Entertainment |
| Cliqueduplateau.com | Entertainment |
| ConcoursConcours.com | Entertainment |
| ConcoursWeb.com | Entertainment |
| craveonline.com | Entertainment |
| dailyviral.com | Entertainment |
| decodedstuff.com | Entertainment |
| Dromadaire.com | Entertainment |
| entertonement.com | Entertainment |
| everyjoe.com | Entertainment |
| filmannex.com | Entertainment |
| GagnezGros.ca | Entertainment |
| GillesParent.com | Entertainment |
| Humourhumour.com | Entertainment |
| Incroyable.org | Entertainment |
| Leblogue.ca | Entertainment |
| loftstory.abotch.com | Entertainment |
| ma.planete.qc.ca | Entertainment |
| marriland.com | Entertainment |
| metromix.com | Entertainment |
| moillusions.com | Entertainment |
| monkeysee.com | Entertainment |
| montrealnow.com | Entertainment |
| motionfeeds.com | Entertainment |
| mymodernmet.com | Entertainment |
| mynippon.com | Entertainment |
| mypodstudios.com | Entertainment |
| n4g.com | Entertainment |
| necolebitchie.com | Entertainment |
| Norja.net | Entertainment |
| ntdtv.com | Entertainment |
| okmagazine.com | Entertainment |
| ology.com | Entertainment |
| omg-facts.com | Entertainment |
| over-blog.com | Entertainment |
| People.com | Entertainment |
| phpmotion.in | Entertainment |
| pinkvilla.com | Entertainment |
| plunderguide.com | Entertainment |
| Psychonet.fr | Entertainment |
| rapdose.com | Entertainment |
| richworldproblems.com | Entertainment |
| Safarir.com | Entertainment |
| sharenator.com | Entertainment |
| slashfilm.com | Entertainment |
| slightlywarped.com | Entertainment |
| smackjeeves.com | Entertainment |
| soapcentral.com | Entertainment |

| | |
|---|---|
| splitsider.com | Entertainment |
| starcasm.net | Entertainment |
| starpulse.com | Entertainment |
| superiorpics.com | Entertainment |
| tasteofawesom.com | Entertainment |
| teenspot.com | Entertainment |
| thatvideosite.com | Entertainment |
| theberry.com | Entertainment |
| thecontaminated.com | Entertainment |
| thehdroom.com | Entertainment |
| theinsider.com | Entertainment |
| the-leaky-cauldron.org | Entertainment |
| tomandlorenzo.com | Entertainment |
| ToutACoup.ca | Entertainment |
| tvfanatic.com | Entertainment |
| Undergroundmusix.com | Entertainment |
| Unmondefou.com | Entertainment |
| unrealitymag.com | Entertainment |
| VideoBB.com | Entertainment |
| videoinmybackyard.com | Entertainment |
| weeworld.com | Entertainment |
| x17online.com | Entertainment |
| ArtInfo.com | Entertainment |
| artltdmag.com | Entertainment |
| artruby.com | Entertainment |
| artscenecal.com | Entertainment |
| artwelove.com | Entertainment |
| BET.com | Entertainment |
| contemporaryartdaily.com | Entertainment |
| deviantart.com | Entertainment |
| examiner.com | Entertainment |
| execdigital.com | Entertainment |
| flavorpill.com | Entertainment |
| flavorwire.com | Entertainment |
| lucywho.com | Entertainment |
| MutualArt.com | Entertainment |
| philadelphiaweekly.com | Entertainment |
| popgalaxy.com | Entertainment |
| TheCelebrityCafe.com | Entertainment |
| thelifeofluxury.com | Entertainment |
| theluxuryhub.com | Entertainment |
| trendhunter.com | Entertainment |
| twistedsifter.com | Entertainment |
| Universalnightlife.com | Entertainment |
| visualartsource.com | Entertainment |
| craftster.org | Entertainment |
| elitechoice.org | Entertainment |
| entertainmentwallpaper.com | Entertainment |
| livepuntamita.com | Entertainment |

**24-7 Network Sample Sites**

| | |
|---|---|
| smosh.com | Entertainment |
| About.com | Entertainment |
| americansuperstarmag.com | Entertainment |
| answerbag.com | Entertainment |
| AWarehouseMagazine.com | Entertainment |
| awesomenator.com | Entertainment |
| bartendercentral.com | Entertainment |
| buzzlol.com | Entertainment |
| buzzsugar.com | Entertainment |
| chacha.com | Entertainment |
| CityTV.com | Entertainment |
| coldarmy.com | Entertainment |
| comics.com | Entertainment |
| coolquiz.com | Entertainment |
| cracked.com | Entertainment |
| dailypuppy.com | Entertainment |
| dilbert.com | Entertainment |
| Dine.to | Entertainment |
| drewreports.com | Entertainment |
| EntertainmentWise.com | Entertainment |
| environmentalgraffiti.com | Entertainment |
| essortment.com | Entertainment |
| EventFul.com | Entertainment |
| examiner.com | Entertainment |
| GameSpy.com | Entertainment |
| GameStats.com | Entertainment |
| garfield.com | Entertainment |
| Gigwise.com | Entertainment |
| goodmusicdaily.com | Entertainment |
| GospelCity.com | Entertainment |
| hollywoodunwrapped.com | Entertainment |
| honolulupulse.com | Entertainment |
| iminent.com | Entertainment |
| interfacelift.com | Entertainment |
| leasticoulddo.com | Entertainment |
| mania.com | Entertainment |
| metrolyrics.com | Entertainment |
| mgid.com | Entertainment |
| mocospace.com | Entertainment |
| motherboard.tv | Entertainment |
| myfreewallpapers.com | Entertainment |
| myfuncards.com | Entertainment |
| mylifetime.com | Entertainment |
| myxer.com | Entertainment |
| nadatodo.com | Entertainment |
| nationalenquirer.com | Entertainment |
| neatorama.com | Entertainment |
| nowpublic.com | Entertainment |
| omgpop.com | Entertainment |

**24-7 Network Sample Sites**

| | |
|---|---|
| outside.in | Entertainment |
| overheardintheoffice.com | Entertainment |
| photo.net | Entertainment |
| Pixdaus.com | Entertainment |
| popsugar.com | Entertainment |
| popularscreensavers.com | Entertainment |
| portablenorthpole.tv | Entertainment |
| preprod.dailymotion.com | Entertainment |
| Read-Out-Loud.com | Entertainment |
| readoz.com | Entertainment |
| Screencrave.com | Entertainment |
| smbc-comics.com | Entertainment |
| soultrain.com | Entertainment |
| soyouwanna.com | Entertainment |
| Taletela.com | Entertainment |
| tarot.com | Entertainment |
| tattoojohnny.com | Entertainment |
| TheCoast.Ca | Entertainment |
| thedreamlandchronicles.com | Entertainment |
| theduckwebcomics.com | Entertainment |
| thefuntimesguide.com | Entertainment |
| thehollywoodreporter.com | Entertainment |
| themarysue.com | Entertainment |
| uniquescreenmedia.com | Entertainment |
| viceland.com | Entertainment |
| weblocal.ca | Entertainment |
| wordpress.com | Entertainment |
| wowio.com | Entertainment |
| accesshollywood.com | Entertainment |
| batman-on-film.com | Entertainment |
| bouncemag.com | Entertainment |
| celebritycrunch.com | Entertainment |
| celebrityschoolpics.com | Entertainment |
| celebrityviplounge.com | Entertainment |
| Cherryontop.com | Entertainment |
| complex.com | Entertainment |
| deadlinehollywooddaily.com | Entertainment |
| digitalspy.com | Entertainment |
| eonline.com | Entertainment |
| ew.com | Entertainment |
| famegame.com | Entertainment |
| fancast.com | Entertainment |
| fridaynightlightsfan.com | Entertainment |
| generalhospitalhappenings.com | Entertainment |
| givememyremote.com | Entertainment |
| globemagazine.com | Entertainment |
| gossipcop.com | Entertainment |
| gossipgirl.net | Entertainment |
| highsnobiety.com | Entertainment |

**24-7 Network Sample Sites**

| | |
|---|---|
| hollywire.com | Entertainment |
| hollywooddame.com | Entertainment |
| hollywoodlife.com | Entertainment |
| hollywoodreporter.com | Entertainment |
| mentalfloss.com | Entertainment |
| moejackson.com | Entertainment |
| parade.com | Entertainment |
| people.com | Entertainment |
| popcrunch.com | Entertainment |
| rick.com | Entertainment |
| younghollywood.com | Entertainment |
| asuitablewardrobe.dynend.com | Entertainment |
| beautyandstyle.com | Entertainment |
| beautynova.com | Entertainment |
| BlackBookMag.com | Entertainment |
| bloginity.com | Entertainment |
| BurdaStyle.com | Entertainment |
| chictopia.com | Entertainment |
| COLOURlovers.com | Entertainment |
| dearsugar.com | Entertainment |
| EcoSalon.com | Entertainment |
| emohairstyle.blogspot.com | Entertainment |
| exposay.com | Entertainment |
| FabricMag.com | Entertainment |
| fadeddesign.com | Entertainment |
| fadedtribune.com | Entertainment |
| fashioncopious.typepad.com | Entertainment |
| fashionetc.com | Entertainment |
| fashionfuss.com | Entertainment |
| fashionism.com | Entertainment |
| FashionWars.com | Entertainment |
| greatestlook.com | Entertainment |
| hairfinder.com | Entertainment |
| hairmotif.com | Entertainment |
| hauteliving.com | Entertainment |
| hintmag.com | Entertainment |
| i-amour.com | Entertainment |
| ilovebling.org | Entertainment |
| MadameNoire.com | Entertainment |
| mademansion.com | Entertainment |
| magxone.com | Entertainment |
| myfdb.com | Entertainment |

# EXHIBIT 4

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

# If You Purchased and/or Paid for Flonase or Generic Flonase

## A Class Action Settlement Could Affect You

*A court authorized this notice.  This is not a solicitation from a lawyer.  You are not being sued.*

- A proposed Settlement has been reached in a class action lawsuit regarding the prescription nasal spray Flonase.  The lawsuit claims that the seller of Flonase violated state laws by delaying the availability of generic versions of Flonase.  The seller is SmithKline Beecham Corporation doing business as GlaxoSmithKline ("GSK").  GSK denies it has done anything wrong but has agreed to the Settlement to resolve the controversy and to avoid the cost and expense of further litigation.

- GSK has agreed to settle the claims in the lawsuit for a total of $35 million.  This includes the claims of consumers and health insurers, which are referred to as Third-Party Payors ("TPPs") in the Class.

- You may be included if you made a percentage co-payment or paid for all or part of the cost of Flonase and/or its generic equivalents during the time period from May 19, 2004 to March 31, 2009.  *See* question 4 for details.

- The generic version of Flonase is called fluticasone propionate nasal spray.

**The lawsuit does not claim that Flonase or its generic equivalents are unsafe or ineffective.**

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS LAWSUIT | | |
|---|---|---|
| **You May:** | **Brief Description:** | **Due Date:** |
| **DO NOTHING** | By doing nothing, you remain in the Class and you give up any rights to sue GSK on your own about the same legal claims in these lawsuits.  However, if you do not file a claim, you will not receive any payment from the Settlement. | **N/A** |
| **FILE A CLAIM** | The only way to get a payment from the Settlement. | **TBA** |
| **EXCLUDE YOURSELF** | You may exclude yourself from the Settlement and keep your right to sue at your own expense.  If you do so, you will not receive any payment from the Settlement. | **TBA** |
| **OBJECT TO THE SETTLEMENT** | Remain in the Settlement and write to the Court about what you think about the Settlement. | **TBA** |

- Your options are explained in more detail in this notice.  To be excluded, you must act before Month XX, **2013**.

| WHAT THIS NOTICE CONTAINS |
|---|

**BASIC INFORMATION** ......................................................................... **PAGE 3**

1. Why was this Notice issued?
2. What are the lawsuits about?
3. What is a class action?

**WHO IS IN THE CLASS AND SETTLEMENT**.................................. **PAGE 4**

4. How do I know if I am part of the Class and the Settlement?
5. What does "purchased and/or paid for" Flonase or generic Flonase mean?
6. Who else is included in the Settlement?
7. What if I'm still not sure if I'm included in the Class?

**THE SETTLEMENT'S BENEFITS** ...................................................... **PAGE 5**

8. What does the Settlement Provide?
9. What do I have to do to get a payment?
10. How much will my payment be?

**EXCLUDING YOURSELF FROM THE SETTLEMENT** .................... **PAGE 6**

11. How do I get out of the Settlement?
12. If I don't exclude myself from the Settlement, can I sue GSK for the same thing later?
13. If I exclude myself, can I still get a payment from the Settlement?
14. What happens if I do nothing and stay in the Settlement?

**THE LAWYERS REPRESENTING YOU** .......................................... **PAGE 7**

15. Do I have a lawyer in this case?
16. How will the lawyers be paid?

**OBJECTING TO THE SETTLEMENT**............................................... **PAGE 8**

17. How do I tell the Court what I think about the Settlement?
18. What's the difference between objecting and excluding?

**THE FINAL APPROVAL HEARING** ................................................ **PAGE 9**

19. When and where will the Court decide whether to approve the Settlement?
20. Do I have to come to the Hearing?
21. May I speak at the Hearing?

**GETTING MORE INFORMATION**...................................................... **PAGE 10**

22. Where can I get more information?

**BASIC INFORMATION**

| **1. Why was this Notice issued?** |
|---|

You have a right to know about the Settlement of two class action lawsuits that are consolidated and pending in the U.S. District Court for the Eastern District of Pennsylvania: *In re: Flonase Antitrust Litigation*, No. 08-CV-3301 and *Medical Mutual of Ohio v. GSK*, No. 12-CV-4212 ("the lawsuit"). The lawsuit involves purchases of Flonase and its generic equivalents in the United States and its territories.  U.S. District Court Judge Anita Brody is overseeing the case.  The people who sued are called plaintiffs, and the company they sued is called the defendant, which in this case is GSK.

| **2. What are the lawsuits about?** |
|---|

The lawsuit relates to GSK's prescription nasal spray Flonase, which is used to treat the nasal symptoms of allergies.  The lawsuit claims that GSK violated state laws by delaying the availability of the generic equivalents of Flonase.  The lawsuit is only about pricing and availability, not about the safety of Flonase or generic Flonase.

Specifically, the lawsuit claims that GSK filed "sham" citizen petitions with the FDA in order to delay the approval of generic versions of Flonase.  Plaintiffs argue that this alleged conduct suppressed or eliminated competition that GSK would have faced from generic pharmaceutical manufacturers.  Plaintiffs further claim that Class Members were injured by paying more for Flonase nasal spray than they would have paid otherwise and/or from being unable to purchase less expensive, generic versions of Flonase.  As a result, Plaintiffs claim that Class Members were overcharged for Flonase nasal spray and its generic versions.  A copy of the Plaintiffs' Consolidated Class Action Complaint, filed _____ is available at www._____Settlement.com.

GSK denies these claims, and denies that it did anything wrong.  GSK states that it filed meritorious citizen petitions with the FDA that are entitled to First Amendment protection.  GSK argues that its conduct did not delay the entry of generic versions of Flonase into the market. GSK also denies that it had monopoly power.  No court or other authority has found that GSK engaged in any wrongdoing.  GSK has entered into the Settlement solely to avoid further expense, inconvenience, and the burden of this litigation.

Following investigation of the facts and extensive negotiations with Defendant, Plaintiffs, on behalf of the Class, entered into a Settlement Agreement with GSK.  The terms of the Settlement, which is subject to final approval by the Court, are set forth in a written Settlement Agreement dated December 6, 2012.  The Settlement Agreement is available for review at www._____Settlement.com.

**3. What is a class action?**

In a class action, one or more persons or entities, called class representatives, sue on behalf of those who have similar claims.  All these persons or entities are a "class" or "class members." One court resolves the issues for all class members, except for those who exclude themselves from the class.

## WHO IS IN THE CLASS AND THE SETTLEMENT

**4. How do I know if I am part of the Class and the Settlement?**

You are a Consumer Class Member if you purchased and/or paid for, in whole or in part, Flonase or generic Flonase for personal, family or household consumption, anywhere in the United States and its territories, from May 19, 2004 through March 31, 2009.

Excluded from the Class are:
(1) The Defendant and its officers, directors, management, employees, predecessors-in-interest, successors-in-interest, assignees or affiliates, and subsidiaries;
(2) The United States and/or State governments and their agencies and departments, except to the extent they purchased branded Flonase or its generic equivalents for their employees or others covered by a government employee health plan;
(3) All entities who purchased Flonase and/or generic Flonase directly from Defendant or its affiliates or purchased Flonase and/or generic Flonase for resale, but only to the extent of such purchases as a direct purchaser or for resale;
(4) Any judge or special master who has presided over the Actions; and
(5) All Settling Health Plans or "SHPs," a group of TPPs that have also settled with GSK for $11 million under a separate agreement.  Class Counsel negotiated with the SHPs to make sure that their payments were approximately proportionate to those of Class Members net of attorneys' fees.  As a result, the SHPs may receive payments from the Settlement Fund or they may contribute funds to the Settlement Fund to ensure this reconciliation.

**5. What does "purchased and/or paid for" Flonase or generic Flonase mean?**

You "purchased and/or paid for " Flonase or generic Flonase if you were:
(a) An uninsured consumer who paid the entire cost of the prescription,
(b) An insured consumer who made a co-payment or other partial out-of-pocket payment, or paid the entire cost because you had not met a deductible amount or had exceeded a benefit cap under your health  plan or the cost was not otherwise covered under your health plan.

**6. Who else is included in the Settlement?**

In addition to consumers, entities, known as Third-Party Payors or TPPs, are also included in the Class if they paid for or reimbursed for these products during the time periods as outlined above.  TPPs could include health insurers, employee welfare benefit plans, governmental

plans, or union plans that paid some portion of the cost of Flonase or its generic, for employees or family members of employees insured under these plans.

Also involved in the Settlement, but excluded from the Class, are SHPs.

| 7.  What if I'm still not sure if I'm included in the Class? |
|---|

If you are still not sure whether you are included, you can get more information at www.[Website].com, or get free help by calling or writing the lawyers in this case, at the phone number or address listed in Question 15.

## THE SETTLEMENT'S BENEFITS

| 8.   What does the Settlement provide? |
|---|

GSK will pay $35 million into a Settlement Fund to settle all claims in the lawsuit made on behalf of consumers and TPPs in the Class.  Attorneys' fees and expenses, including costs of administering the proposed Settlement, and Class Representative incentive payments will be deducted from the $35 million.  The remaining amount will be distributed *pro rata* according to the Plan of Allocation (*see* Question 10 below).

More details are in the Settlement Agreement, available at www.[Website].com.

| 9.   What do I have to do to get a payment? |
|---|

To be eligible to receive a payment if the Court approves the Settlement, you must fill out and submit a valid Consumer Claim Form by [insert date].  A Consumer Claim Form is attached to this Notice and can also be completed and submitted online at www.website.com.  It must be submitted online or postmarked by [insert date].  Read the instructions carefully.  To the best of your ability, fill out the form and include all the information the form requests, including your signature.  Then either scan the signed form and submit it electronically or mail it to the Settlement Administrator at:

Flonase Consumer Settlement
P.O. Box XXXX
City, State Zip

Please do not dispose of any documents that reflect your purchases of branded or generic Flonase for which you may make a claim in this case.  You may need these documents to support or complete your Claim Form.

| 10. How much will my payment be? |
|---|

The Settlement Fund will be distributed based on valid claims submitted on time by consumers and TPPs, allowed by the Claims Administrator and approved by the Court.  Distributions will be calculated as follows:

(a) All attorneys' fees, litigation expenses, and incentive awards awarded by the Court, and all costs of Settlement Notice and administration, will be deducted from the Settlement Fund; and

(b) The SHP payments or contributions will be added to or deducted from the Settlement Fund. These amounts will be calculated according to a Plan of Allocation that is available at www._____.com; then

(c) The remaining Settlement Fund will be allocated *pro rata* to each Class Member. Claims will be calculated by (1) multiplying the remaining Settlement Fund by the allowed claim amount, and then, (2) dividing by the total amount of all allowed claims. The Claims Administrator will allow only 25% of the otherwise timely and valid claim amount submitted by any consumer who either:

- Purchased Flonase or its generic equivalents under a health plan that required the same copayment amount, regardless of whether a brand or generic drug was purchased, or

- Purchased branded Flonase after March 6, 2006, the date a generic became available.

## EXCLUDING YOURSELF FROM THE SETTLEMENT

If you don't want a payment from the Settlement, and you want to keep the right to sue GSK on your own about the legal issues in this case, then you must take steps to get out of the Settlement.  This is called excluding yourself from – or "opting out" of – the Class.

### 11. How do I get out of the Settlement?

If you wish to exclude yourself from the Settlement, you must send a letter that includes the following:
- Your full name and address;
- A statement saying that you want to be excluded from the Settlement in *In re: Flonase Antitrust Litigation*, No. 08-CV-3301;
- Your signature; and
- If you claim to have authority to exclude a Class Member in a representative capacity, you must provide all information requested and written evidence of your specific authority to exclude the Class Member in a representative capacity.

The request for exclusion must be received by the Claims Administrator no later than [insert date], at the following address:

| [Administrator] | [Copy to: |
|---|---|

| Attorney] |
| --- |

## 12. If I don't exclude myself from the Settlement, can I sue GSK for the same thing later?

No.  Unless you exclude yourself, you give up the right to sue GSK for the claims that the Settlement resolves.  If you have a pending lawsuit against GSK that involves the claims resolved by the Settlement, speak to your lawyer in that lawsuit immediately.  You must exclude yourself from the Settlement Class to continue your own lawsuit.

## 13. If I exclude myself, can I still get a payment from the Settlement?

No.  You will not get any money if you exclude yourself from the Settlement.

## 14. What happens if I do nothing and stay in the Settlement?

If you remain in the Settlement, you will be bound by the Court's decisions.  Unless you exclude yourself, you won't be able to start a lawsuit, continue a lawsuit, or be part of any other lawsuit against GSK about the legal issues in this case, ever again.

You will also be bound by all terms of the Settlement Agreement, including, among other things, the Release and Discharge provision.  This means that if the Settlement becomes final, you will be releasing any claims you have against GSK as described in Section XX of the Settlement Agreement.  The Settlement Agreement is available at www.website.com or by calling 1-800-000-0000.

## THE LAWYERS REPRESENTING YOU

## 15. Do I have a lawyer in this case?

Yes.  The Court has appointed the following attorneys to represent you and other Class Members:

|  |  |
| --- | --- |
| Marvin A. Miller | Michael M. Buchman |
| Lori A. Fanning | 600 Third Avenue |
| Miller Law LLC | New York, NY 10016 |
| 115 S. LaSalle Street, Suite 2910 | 212.661.1100 |
| Chicago, IL 60603 | |
| 312.332.3400 | |

These lawyers are called Class Counsel.  You won't be charged personally for these lawyers, but they will ask the Court to award them a fee that will be paid out of the Settlement Fund.

**16. How will the lawyers be paid?**

Class Counsel will ask the Court for an award from the Settlement Fund for attorneys' fees in an amount not to exceed one-third of the Settlement Fund, plus interest. This request will cover all professional services already provided in this lawsuit, as well as all future services. Class Counsel's application for the award of attorneys' fees and reimbursement of expenses will be filed with the Clerk of the Court on or before [insert date], and posted at www.website.com shortly thereafter.

At the Final Approval Hearing, Class Counsel will also apply to the Court for incentive awards to be paid from the Settlement Fund to the Class Representatives in recognition of their efforts in initiating and pursuing this litigation on behalf of the Settlement Class. Requested amounts will not exceed $25,000.00 for each of the TPP Class Representatives and $10,000 for the Consumer Class Representative. The petition for the incentive awards to be paid to Plaintiffs will be filed with the Clerk of the Court on or before [insert date], and posted at www.website.com shortly thereafter.

## OBJECTING TO THE SETTLEMENT

If you do not exclude yourself, you can tell the Court that you don't agree with the Settlement or part of it.

**17. How do I tell the Court what I think about the Settlement?**

If you have comments about, or disagree with any aspect of the Settlement, including the requested attorneys' fees, you may express your views to the Court by writing to the address below. To comment, or object, you must submit a letter that includes the following:

- Your name, address, and telephone number;
- A statement saying that you object to the Settlement in *In re: Flonase Antitrust Litigation*, No. 08-CV-3301;
- The specific legal and/or factual reasons for your objections, including any briefs and evidentiary materials you want the Court to consider;
- Proof that you are a Class Member; and
- Your signature or the signature of a person with the authority to make the objection on your behalf, along with a statement of the basis for that authority.

The response must be filed with the Court, and received by Counsel, on or before [insert date] at the following addresses:

| Clerk of Court, United States District Court Address Philadelphia, Pennsylvania [[zip]] | Class Counsel<br><br>Marvin A. Miller<br>Lori A. Fanning<br>Miller Law LLC | Counsel for GSK<br><br>Stephen Kastenberg<br>Ballard Spahr<br>1735 Market Street |
|---|---|---|

| | 115 LaSalle Street, Suite 2910 Chicago, IL 60603 312.332.3400

Michael M. Buchman 600 Third Avenue New York, NY 10016 212.661.1100 | Philadelphia, PA 19103 215.665.8500 |
|---|---|---|

## 18. What's the difference between objecting and excluding?

Objecting is simply telling the Court that you don't like something about the Settlement. You can object to the Settlement only if you do not exclude yourself from it. Excluding yourself from the Settlement is telling the Court that you don't want to be part of it. If you exclude yourself from the Settlement, you have no basis to object because it no longer affects you.

## THE FINAL APPROVAL HEARING

The Court will hold a hearing to decide whether to approve the Settlement and any requests for fees, expenses, and incentive awards to the Plaintiffs. You may attend and you may ask to speak, but you don't have to.

## 19. When and where will the Court decide whether to approve the Settlement?

The Court will hold a Final Approval Hearing on [insert date] at the United States District Court, [[address]], Courtroom XXX, Philadelphia, Pennsylvania [[zip]], to: (1) determine whether the Settlement should be approved as fair, reasonable, and adequate; and (2) consider the award of attorneys' fees, reimbursement of expenses, and incentive awards to the Plaintiffs. If there are objections or comments, the Court will consider them at this time. The hearing may be moved to a different date or time without additional notice, so it is a good idea to check www.website.com for updated information.

## 20. Do I have to come to the Hearing?

Attendance is not required, even if you properly mailed a written comment or objection. If you file an objection, you may appear at the hearing described below and present evidence and argument in support of your objection. In order to speak at the hearing you must file a Notice of Intention to Appear described below.

Class Counsel is prepared to answer the Court's questions. If you or your personal attorney want to attend the hearing, you are more than welcome at your expense. As long as your objection was received before the deadline, the Court will consider it.

**21. May I speak at the Hearing?**

If you want to speak or want your own lawyer instead of Class Counsel to speak at the Final Approval Hearing, you must give the Court a paper that is called a "Notice of Intention to Appear." The Notice of Intention to Appear should include the following:

- Your name and address;
- A statement of your position to be asserted at the Final Approval Hearing and the grounds for your objections;
- Copies of any supporting papers or briefs;
- Your signature or the signature of your attorney.

The Notice of Intention to Appear must be filed with the Court on or before [insert date] at the address in Question 17 and also received by counsel listed in Question 17.

## GETTING MORE INFORMATION

**22. Where can I get more information?**

If you want more detailed information, you may visit the website www.[Website].com where you will find the important case-related documents. You may also call toll-free at 1-800-000-0000 for more information, or write to Flonase Consumer Class, PO Box 0000, City, ST 00000.

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

# If You Purchased, Paid for, Administered and/or Reimbursed for Flonase or Generic Flonase

## A Class Action Settlement Could Affect You

*A court authorized this notice.  This is not a solicitation from a lawyer.  You are not being sued.*

- A proposed Settlement has been reached in a class action lawsuit regarding the prescription nasal spray Flonase.  The lawsuit claims that the seller of Flonase violated state laws by delaying the availability of generic versions of Flonase.  The seller is SmithKline Beecham Corporation doing business as GlaxoSmithKline ("GSK"). GSK denies it has done anything wrong but has agreed to the Settlement to resolve the controversy and to avoid the cost and expense of further litigation.

- GSK has agreed to settle the claims in the lawsuit for a total of $35 million.  This includes the claims of Third-Party Payors ("TPPs") and consumers in the Class.

- You may be included if you paid for or reimbursed all or part of the cost of Flonase and/or its generic equivalents for your members, employees, plan participants, beneficiaries or insureds during the period from May 19, 2004 to March 31, 2009.  *See* question 5 for details.

- The generic version of Flonase is called fluticasone propionate nasal spray.

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS LAWSUIT | | |
|---|---|---|
| **You May:** | **Brief Description:** | **Due Date:** |
| **DO NOTHING** | By doing nothing, you remain in the Class and you give up any rights to sue GSK on your own about the same legal claims in these lawsuits.  However, if you do not file a claim, you will not receive any payment from the Settlement. | **N/A** |
| **FILE A CLAIM** | The only way to get a payment from the Settlement. | **TBA** |
| **EXCLUDE YOURSELF** | You may exclude yourself from the Settlement and keep your right to sue at your own expense.  If you do so, you will not receive any payment from the Settlement. | **TBA** |
| **OBJECT TO THE SETTLEMENT** | Remain in the Settlement and write to the Court about what you think about the Settlement. | **TBA** |

- Your options are explained in more detail in this notice.  To be excluded, you must act before Month XX, **2013**.

| WHAT THIS NOTICE CONTAINS |
|:---:|

**BASIC INFORMATION** ........................................................... **PAGE 3**
    1.    Why was this Notice issued?
    2.    What are the lawsuits about?
    3.    What is a class action?

**WHO IS IN THE CLASS AND SETTLEMENT**.................................. **PAGE 4**
    4.    What is a TPP?
    5.    How do I know if I am part of the Class and the Settlement?
    6.    Who else is included in the Settlement?
    7.    What if I'm still not sure if I'm included in the Class?

**THE SETTLEMENT'S BENEFITS** ....................................................... **PAGE 5**
    8.    What does the Settlement Provide?
    9.    What do I have to do to get a payment?
    10.    How much will my payment be?

**EXCLUDING YOURSELF FROM THE SETTLEMENT** ..................... **PAGE 6**
    11.    How do I get out of the Settlement?
    12.    If I don't exclude myself from the Settlement, can I sue GSK for the same thing later?
    13.    If I exclude myself, can I still get a payment from the Settlement?
    14.    What happens if I do nothing and stay in the Settlement?

**THE LAWYERS REPRESENTING YOU** ........................................... **PAGE 7**
    15.    Do I have a lawyer in this case?
    16.    How will the lawyers be paid?

**OBJECTING TO THE SETTLEMENT**................................................ **PAGE 8**
    17.    How do I tell the Court what I think about the Settlement?
    18.    What's the difference between objecting and excluding?

**THE FINAL APPROVAL HEARING** ................................................ **PAGE 9**
    19.    When and where will the Court decide whether to approve the Settlement?
    20.    Do I have to come to the Hearing?
    21.    May I speak at the Hearing?

**GETTING MORE INFORMATION**...................................................... **PAGE 10**
    22.    Where can I get more information?

## BASIC INFORMATION

| 1. Why was this Notice issued? |
| --- |

You have a right to know about the Settlement of two class action lawsuits that are consolidated and pending in the U.S. District Court for the Eastern District of Pennsylvania: *In re: Flonase Antitrust Litigation*, No. 08-CV-3301 and *Medical Mutual of Ohio v. GSK*, No. 12-CV-4212 ("the lawsuit").  The lawsuit involves purchases of Flonase and its generic equivalents in the United States and its territories.  U.S. District Court Judge Anita Brody is overseeing the cases.  The people who sued are called plaintiffs, and the company they sued is called the defendant, which in this case is GSK.

| 2. What are the lawsuits about? |
| --- |

The lawsuit relates to GSK's prescription nasal spray Flonase, which is used to treat the nasal symptoms of allergies.  The lawsuit claims that GSK violated state laws by delaying the availability of the generic equivalents of Flonase.  The lawsuit is only about pricing and availability, not about the safety of Flonase or generic Flonase.

Specifically, the lawsuit claims that GSK filed "sham" citizen petitions with the FDA in order to delay the approval of generic versions of Flonase.  Plaintiffs argue that this alleged conduct suppressed or eliminated competition that GSK would have faced from generic pharmaceutical manufacturers.  Plaintiffs further claim that Class Members were injured by paying more for Flonase nasal spray than they would have paid otherwise and/or from being unable to purchase less expensive, generic versions of Flonase.  As a result, Plaintiffs claim that Class Members were overcharged for Flonase nasal spray and its generic versions.  A copy of the Plaintiffs' Consolidated Class Action Complaint, filed _____ is available at www._____Settlement.com.

GSK denies these claims, and denies that it did anything wrong.  GSK states that it filed meritorious citizen petitions with the FDA that are entitled to First Amendment protection.  GSK argues that its conduct did not delay the entry of generic versions of Flonase into the market. GSK also denies that it had monopoly power.  No court or other authority has found that GSK engaged in any wrongdoing.  GSK has entered into the Settlement solely to avoid further expense, inconvenience, and the burden of this litigation.

Following investigation of the facts and extensive negotiations with Defendant, Plaintiffs, on behalf of the Class, entered into a Settlement Agreement with GSK.  The terms of the Settlement, which is subject to final approval by the Court, are set forth in a written Settlement Agreement dated December 6, 2012.  The Settlement Agreement is available for review at www._____Settlement.com.

**3. What is a class action?**

In a class action, one or more persons or entities, called class representatives, sue on behalf of those who have similar claims.  All these persons or entities are a "class" or "class members."  One court resolves the issues for all class members, except for those who exclude themselves from the class.

## WHO IS IN THE CLASS AND THE SETTLEMENT

**4. What is a TPP?**

TPPs are all health insurance companies, healthcare benefit providers, health maintenance organizations, self-funded health and welfare plans, and any other health benefit provider and/or entity that contracts with a health insurer acting as a third party administrator to administer their prescription drug benefits. These payors include such entities that may provide prescription drug benefits for current or former public employees and/or retirees, but only to the extent that such entity was at risk for the cost of the payment(s).

**5. How do I know if I am part of the Class and the Settlement?**

You are a TPP Class Member if you purchased, paid for, administered and/or reimbursed for Flonase or generic Flonase for consumption by your members, employees, plan participants, beneficiaries or insureds in the United States and its territories from May 19, 2004 through March 31, 2009.

Excluded from the Class are:
    (1) The Defendant and its officers, directors, management, employees, predecessors-in-interest, successors-in-interest, assignees or affiliates, and subsidiaries;
    (2) The United States and/or State governments and their agencies and departments, except to the extent they purchased branded Flonase or its generic equivalents for their employees or others covered by a government employee health plan;
    (3) All entities who purchased Flonase and/or generic Flonase directly from Defendant or its affiliates or purchased Flonase and/or generic Flonase for resale, but only to the extent of such purchases as a direct purchaser or for resale;
    (4) Any judge or special master who has presided over the Actions; and
    (5) All Settling Health Plans or "SHPs," a group of TPPs that have also settled with GSK for $11 million under a separate agreement.  Class Counsel negotiated with the SHPs to make sure that their payments were approximately proportionate to those of Class Members net of attorneys' fees.  As a result, the SHPs may receive payments from the Settlement Fund or they may contribute funds to the Settlement Fund to ensure this reconciliation.

**6. Who else is included in the Settlement?**

In addition to TPP Class Members, consumers who purchased and/or paid for, in whole or in part, Flonase or generic Flonase for personal, family or household consumption, anywhere in

the United States and its territories, from May 19, 2004 through March 31, 2009, are included in the Class.  Also involved in the Settlement, but excluded from the Class, are SHPs.

## 7. What if I am still not sure I am included in the Class?

If you are still not sure whether you are included, you can get more information at www.[Website].com, or get free help by calling or writing the lawyers in this case, at the phone number or address listed in Question 15.

## THE SETTLEMENT'S BENEFITS

## 8. What does the Settlement provide?

GSK will pay $35 million into a Settlement Fund to settle all claims in the lawsuit made on behalf of TPPs and consumers in the Class.  Attorneys' fees and expenses, including costs of administering the proposed Settlement, and Class Representative incentive payments will be deducted from the $35 million.  The remaining amount will be distributed *pro rata* according to the Plan of Allocation (*see* Question 10 below).

More details are in the Settlement Agreement, available at www.[Website].com.

## 9.  What do I have to do to get a payment?

To be eligible to receive a payment if the Court approves the Settlement, you must fill out and submit a valid TPP Claim Form by [insert date].  A TPP Claim Form is attached to this Notice and can also be completed and submitted online at www.website.com.  It must be submitted online or postmarked by [insert date].  Read the instructions carefully.  Fill out the form and include all the information the form requests, including your signature.  Then either scan the signed form and submit it electronically or mail it to the Settlement Administrator at:

Flonase TPP Settlement

P.O. Box XXXX

City, State Zip

## 10. How much will my payment be?

The Settlement Fund will be distributed based on valid claims submitted on time by consumers and TPPs, allowed by the Claims Administrator and approved by the Court.  Distributions will be calculated as follows:

    (a) All attorneys' fees, litigation expenses, and incentive awards awarded by the Court, and all costs of Settlement Notice and administration, will be deducted from the Settlement Fund; and

    (b) The SHP payments or contributions will be added to or deducted from the Settlement Fund. These amounts will be calculated according to a Plan of Allocation that is available at www._____.com; then

(c) The remaining Settlement Fund will be allocated *pro rata* to each Class Member. Claims will be calculated by (1) multiplying the remaining Settlement Fund by the allowed claim amount, and then, (2) dividing by the total amount of all allowed claims. The Claims Administrator will allow only 25% of the otherwise timely and valid claim amount submitted by any consumer who either:

- Purchased Flonase or its generic equivalents under a health plan that required the same copayment amount, regardless of whether a brand or generic drug was purchased,

- Purchased branded Flonase after March 6, 2006, the date a generic became available.

## EXCLUDING YOURSELF FROM THE SETTLEMENT

If you don't want a payment from the Settlement, and you want to keep the right to sue GSK on your own about the legal issues in this case, then you must take steps to get out of the Settlement. This is called excluding yourself from – or "opting out" of – the Class.

### 11. How do I get out of the Settlement?

If you wish to exclude yourself from the Settlement, you must send a letter that includes the following:
- The full name of your entity (including any predecessor entities from May 19, 2004 forward), FEIN and address;
- A statement saying that the entity wants to be excluded from the Settlement in *In re: Flonase Antitrust Litigation*, No. 08-CV-3301;
- Your signature on behalf of the entity; and
- If your entity claims to have authority to exclude a Class Member in a representative capacity, your entity must provide all information requested here for excluding any Class Member, and provide written evidence of your entity's authority to exclude the Class Member in a representative capacity.

The request for exclusion must be received by the Claims Administrator no later than [insert date], at the following address:

| [Administrator] | [Copy to: Attorney] |
| --- | --- |

### 12. If I don't exclude myself from the Settlement, can I sue GSK for the same thing later?

No. Unless you exclude yourself, you give up the right to sue GSK for the claims that the Settlement resolves. If you have a pending lawsuit against GSK that involves the claims

resolved by the Settlement, speak to your lawyer in that lawsuit immediately.  You must exclude yourself from the Settlement Class to continue your own lawsuit.

| **13. If I exclude myself, can I still get a payment from the Settlement?** |
|---|

No.  You will not get any money if you exclude yourself from the Settlement.

| **14. What happens if I do nothing and stay in the Settlement?** |
|---|

If you remain in the Settlement, you will be bound by the Court's decisions.  Unless you exclude yourself, you won't be able to start a lawsuit, continue a lawsuit, or be part of any other lawsuit against GSK about the legal issues in this case, ever again.

You will also be bound by all terms of the Settlement Agreement, including, among other things, the Release and Discharge provision.  This means that if the Settlement becomes final, you will be releasing any claims you have against GSK as described in Section XX of the Settlement Agreement.  The Settlement Agreement is available at www.website.com or by calling 1-800-000-0000.

## THE LAWYERS REPRESENTING YOU

| **15. Do I have a lawyer in this case?** |
|---|

Yes.  The Court has appointed the following attorneys to represent you and other Class Members:

Marvin A. Miller                    Michael M. Buchman
Lori A. Fanning                     600 Third Avenue
Miller Law LLC                      New York, NY 10016
115 S. LaSalle Street, Suite 2910   212.661.1100
Chicago, IL 60603
312.332.3400

These lawyers are called Class Counsel.  You won't be charged personally for these lawyers, but they will ask the Court to award them a fee that will be paid out of the Settlement Fund.

| **16. How will the lawyers be paid?** |
|---|

Class Counsel will ask the Court for an award from the Settlement Fund for attorneys' fees in an amount not to exceed one-third of the Settlement Fund, plus interest.  This request will cover all professional services already provided in this lawsuit, as well as all future services.  Class Counsel's application for the award of attorneys' fees and reimbursement of expenses will be filed with the Clerk of the Court on or before [insert date], and posted at www.website.com shortly thereafter.

At the Final Approval Hearing, Class Counsel will also apply to the Court for incentive awards to be paid from the Settlement Fund to the Class Representatives in recognition of their efforts in initiating and pursuing this litigation on behalf of the Settlement Class.  Requested amounts will not exceed $25,000.00 for each of the TPP Class Representatives and $10,000 for the Consumer Class Representative. The petition for the incentive awards to be paid to Plaintiffs will be filed with the Clerk of the Court on or before [insert date], and posted at www.website.com shortly thereafter.

## OBJECTING TO THE SETTLEMENT

If you do not exclude yourself, you can tell the Court that you don't agree with the Settlement or part of it.

**17. How do I tell the Court what I think about the Settlement?**

If you have comments about, or disagree with any aspect of the Settlement, including the requested attorneys' fees, you may express your views to the Court by writing to the address below.  To comment, or object, you must submit a letter that includes the following:

- The name of your entity, address, and telephone number;
- A statement saying that the entity objects to the Settlement in *In re: Flonase Antitrust Litigation*, No. 08-CV-3301;
- The specific legal and/or factual reasons for your objections, including any briefs and evidentiary materials you want the Court to consider;
- Proof that the entity is a Class Member; and
- Your signature or the signature of a person with the authority to make the objection on the entity's behalf, along with a statement of the basis for that authority.

The response must be filed with the Court, and received by Counsel, on or before [insert date] at the following addresses:

| Clerk of Court, United States District Court Address Philadelphia, Pennsylvania [[zip]] | Class Counsel<br><br>Marvin A. Miller<br>Lori A. Fanning<br>Miller Law LLC<br>115 LaSalle Street, Suite 2910<br>Chicago, IL 60603<br>312.332.3400<br><br><br>Michael M. Buchman<br>600 Third Avenue<br>New York, NY 10016<br>212.661.1100 | Counsel for GSK<br><br>Stephen Kastenberg<br>Ballard Spahr<br>1735 Market Street<br>Philadelphia, PA 19103<br>215.665.8500 |

## 18. What's the difference between objecting and excluding?

Objecting is simply telling the Court that you don't like something about the Settlement.  You can object to the Settlement only if you do not exclude yourself from it.  Excluding yourself from the Settlement is telling the Court that you don't want to be part of it.  If you exclude yourself from the Settlement, you have no basis to object because it no longer affects you.

## THE FINAL APPROVAL HEARING

The Court will hold a hearing to decide whether to approve the Settlement and any requests for fees, expenses, and incentive awards to the Plaintiffs.  You may attend and you may ask to speak, but you don't have to.

## 19. When and where will the Court decide whether to approve the Settlement?

The Court will hold a Final Approval Hearing on [insert date] at the United States District Court, [[address]], Courtroom XXX, Philadelphia, Pennsylvania [[zip]], to: (1) determine whether the Settlement should be approved as fair, reasonable, and adequate; and (2) consider the award of attorneys' fees, reimbursement of expenses, and incentive awards to the Plaintiffs. If there are objections or comments, the Court will consider them at this time.  The hearing may be moved to a different date or time without additional notice, so it is a good idea to check www.website.com for updated information.

## 20. Do I have to come to the Hearing?

Attendance is not required, even if you properly mailed a written comment or objection. If you file an objection, you may appear at the hearing and present evidence and argument in support of your objection.  In order to speak at the hearing you must file a Notice of Intention to Appear described below.

Class Counsel is prepared to answer the Court's questions. If you or your personal attorney want to attend the hearing, you are more than welcome at your expense. As long as your objection was received before the deadline, the Court will consider it..

## 21. May I speak at the Hearing?

If you want to speak or want your own lawyer instead of Class Counsel to speak at the Final Approval Hearing, you must give the Court a paper that is called a "Notice of Intention to Appear."  The Notice of Intention to Appear should include the following:

- Your name and address;

- A statement of your position to be asserted at the Final Approval Hearing and the grounds for your objections;
- Copies of any supporting papers or briefs;
- Your signature or the signature of your attorney.

The Notice of Intention to Appear must be filed with the Court on or before [insert date] at the address in Question 17 and also received by counsel listed in Question 17.

## GETTING MORE INFORMATION

| 22. Where can I get more information? |
| --- |

If you want more detailed information, you may visit the website www.[Website].com where you will find the important case-related documents.  You may also call toll-free at 1-800-000-0000 for more information, or write to Flonase TPP Class, PO Box 0000, City, ST 00000.

# EXHIBIT 5

# If You Purchased, Paid for, Administered and/or Reimbursed for Flonase or Generic Flonase

## A Class Action Settlement Could Affect You

A proposed Settlement has been reached in a class action lawsuit regarding the prescription nasal spray Flonase. The lawsuit claims that the seller of Flonase, violated state laws by delaying the availability of generic versions of Flonase. The seller is SmithKline Beecham Corporation doing business as GlaxoSmithKline ("GSK"). GSK denies it has done anything wrong.

**Who is included?** Third-Party Payors ("TPPs") who purchased, paid for, administered, and/or reimbursed for Flonase and/or its generic equivalents (fluticasone propionate nasal spray), anywhere in the United States and its territories, for consumption by their members, employees, plan participants, beneficiaries, or insureds, between May 19, 2004 and March 31, 2009.

**What does the Settlement Provide?** GSK will pay $35 million into a Settlement Fund to settle TPP and Consumer claims. A group of TPPs called Settling Health Plans ("SHPs") also settled with GSK under a separate agreement for $11 million. To make sure that their payments were approximately proportionate to those of Class Members, SHPs may receive payments from or contribute payments to the Class Settlement Fund.

Class Counsel will ask for attorneys' fees in an amount not to exceed one-third of the Settlement Fund, plus interest, litigation expenses and incentive payments to the Class Representatives. After these deductions and any SHP payments, the remainder of the Class Settlement Fund will be distributed pro rata to Class Members.

**What can I get from the Settlement?** The amount of money you are eligible to receive will depend on how much Flonase and generic Flonase you paid and/or reimbursed for and on how many Class Members file valid claims.

**How do I get a payment?** You must submit a Claim Form by Month Day, Year to get a payment. See below.

**What are my other rights?** If you do not want to be legally bound by the Settlement, you must exclude yourself from the Settlement. The exclusion deadline is Month Day, Year. If you stay in the Settlement you will not be able to sue GSK for any claims relating to the Settlement. You will be bound by all the Court's orders. However, if you stay in the Settlement, you may object to all or part of it by Month Day, Year and you may appear at the hearing described below in support of your objection.

The Court will hold a hearing on Month Day, Year to consider whether to approve the Settlement and a request for attorneys' fees. The Court has appointed attorneys to represent the Class. You may also hire your own attorney, at your own expense.

**For more information or a Claim Form:**     1- 000-000-0000     www.website.com

Court-Ordered Legal Notice

NOTICE ADMINISTRATOR
PO BOX 0000
MINNEAPOLIS, MN 00000-0000

PRESORTED
FIRST-CLASS MAIL
U.S. POSTAGE
PAID
Rust Consulting, Inc.

**Important Notice About Flonase Settlement**

NAME
ADDRESS
CITY STATE ZIP CODE

**EXHIBIT 6**

# If You Purchased and/or Paid for

# Flonase or Generic Flonase

## A Class Action Settlement Could Affect You

A proposed Settlement has been reached in a class action lawsuit regarding the prescription nasal spray Flonase.  The lawsuit claims that the seller of Flonase violated state laws by delaying the availability of generic versions of Flonase.  The seller is SmithKline Beecham Corporation doing business as GlaxoSmithKline ("GSK").  GSK denies it has done anything wrong but agreed to the Settlement to resolve the controversy and to avoid the cost and expense of further litigation.

*No one is claiming that Flonase or its generic equivalent is unsafe or ineffective.*

### Who is included?

You are a Consumer Class Member if you:
- Purchased and/or paid for Flonase and/or its generic equivalents,
- Anywhere in the United States and its territories,
- For personal, family or household use,
- Between May 19, 2004, and March 31, 2009.

You "purchased and/or paid for" Flonase or generic Flonase (fluticasone propionate nasal spray) if you were:
(a) An uninsured consumer who paid the entire cost of the prescription, or
(b) An insured consumer who made a co-payment or other partial out-of-pocket payment, or paid the entire cost because you had not met a deductible amount under your health plan.

### What does the Settlement Provide?

GSK will pay $35 million into a Settlement Fund to settle all claims in the lawsuit brought on behalf of consumers and health insurers known as Third-Party Payors or "TPPs.  A group of TPPs called Settling Health Plans ("SHPs") also settled with GSK under a separate agreement for $11 million.  To make sure their payments were approximately proportionate to those of Class Members, SHPs may receive payments from or contribute payments to the Class Settlement Fund.

Class Counsel will ask the Court to award attorneys' fees in an amount not to exceed one-third of the Settlement Fund, plus interest, litigation expenses and incentive payments to the Class Representatives.  After these deductions and any SHP payments, the remainder of the Class Settlement Fund will be distributed *pro rata* to Class Members.

### What can I get from the Settlement?

The amount of money you are eligible to receive will depend on how much you paid for Flonase and generic Flonase and on how much other Class Members and SHPs paid and/or reimbursed.

### How do I get a payment?

Submit a Claim Form by <mark>Month Day Year</mark>.  See below.

### What are my other rights?

If you do not want to be legally bound by the Settlement, you must exclude yourself from the Settlement.  The exclusion deadline is <mark>Month Day, Year</mark>.  If you stay in the Settlement you will not be able to sue GSK for any claims relating to the Settlement. You will be bound by all the Court's orders.  However, if you stay in the Settlement, you may object to it by <mark>Month Day, Year.</mark>

The Court will hold a hearing on <mark>Month Day, Year</mark> to consider whether to approve the Settlement and a request for attorneys' fees, expenses and incentive awards.  The Court has appointed attorneys to represent the Class.  You or your own lawyer may ask to appear and speak at the hearing at your own expense.

**Call Toll-Free: 1-000-000-0000  Visit: <u>www.website.com</u>**

# If You Purchased, Paid for, Administered and/or Reimbursed for Flonase or Generic Flonase

## A Class Action Settlement Could Affect You

A proposed Settlement has been reached in a class action lawsuit regarding the prescription nasal spray Flonase.  The lawsuit claims that the seller of Flonase violated state laws by delaying the availability of generic versions of Flonase.  The seller is SmithKline Beecham Corporation doing business as GlaxoSmithKline ("GSK"). GSK denies it has done anything wrong but agreed to the Settlement to resolve the controversy and to avoid the cost and expense of further litigation.

### Who is included?

Third-Party Payors ("TPPs") who purchased, paid for, administered, and/or reimbursed for Flonase and/or its generic equivalents (fluticasone propionate nasal spray), anywhere in the United States and its territories, for consumption by their members, employees, plan participants, beneficiaries, or insureds, between May 19, 2004 and March 31, 2009.

### What does the Settlement Provide?

GSK will pay $35 million into a Settlement Fund to settle TPP and consumer claims.  A group of TPPs called Settling Health Plans ("SHPs") also settled with GSK under a separate agreement for $11 million.  To make sure that their payments are approximately proportionate to those of Class Members, SHPs may receive payments from or contribute payments to the Class Settlement Fund.

Class Counsel will ask for attorneys' fees in an amount not to exceed one-third of the Settlement Fund, plus interest, litigation expenses and incentive payments to the Class Representatives. After these deductions and any SHP payments, the remainder of the Class Settlement Fund will be distributed *pro rata* to Class Members.

### What can I get from the Settlement?

 The amount of money you are eligible to receive will depend on how much you paid and/or

reimbursed for Flonase and generic Flonase and on how much other Class Members and SHPs paid and/or reimbursed.

### How do I get a payment?

You must submit a Claim Form by <mark>Month Day, Year</mark> to get a payment.  See below.

### What are my other rights?

If you do not want to be legally bound by the Settlement, you must exclude yourself from the Settlement.  The exclusion deadline is <mark>Month Day, Year</mark>.  If you stay in the Settlement you will not be able to sue GSK for any claims relating to the Settlement. You will be bound by all the Court's orders.  However, if you stay in the Settlement, you may object to all or part of it by <mark>Month Day, Year</mark> and you may appear at the hearing described below in support of your objection.

The Court will hold a hearing on <mark>Month Day, Year</mark> to consider whether to approve the Settlement and a request for attorneys' fees.  The Court has appointed attorneys to represent the Class.  You may also hire your own attorney, at your own expense.

**For more information or a Claim Form:    1-000-000-0000    www.website.com**

# EXHIBIT 5

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE FLONASE ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>Indirect Purchaser Actions | CIVIL ACTION<br><br>No. 08-3301<br><br>**Hon. Anita B. Brody** |
| MEDICAL MUTUAL OF OHIO, on behalf of itself and all others similarly situated,<br><br>        Plaintiff,<br>   v.<br><br>SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE plc,<br><br>        Defendant. | CIVIL ACTION<br><br>NO. 12-4212<br><br>**Hon. Anita B. Brody** |

**PLAN OF ALLOCATION**

THIS PLAN OF ALLOCATION is proposed by Plaintiffs[1] in the class actions <u>IBEW–NECA Local 505 Health & Welfare Plan v. SmithKline Beecham Corp.</u>, No. 08–3301 (E.D. Pa.), and <u>Medical Mutual of Ohio, Inc. v. SmithKline Beecham Corp.</u>, No. 12-cv-4212 (E.D. Pa.) pending in the Eastern District of Pennsylvania (collectively, the "Actions"), for the distribution of the Settlement Fund.

    1.     **General Definitions.** As used in this Plan of Allocation, the following terms shall have the indicated meanings:

---

[1] Unless otherwise specified herein, capitalized terms have the meanings provided in the Settlement Agreement between Plaintiffs and GSK dated December 6, 2012.

(a)    "Authorized Consumer Claimant" means a Consumer Class Member who submits a timely Proof of Claim (the form that will be submitted to the Claims Administrator with the documented amount of unreimbursed out-of-pocket Flonase Purchases during the Class Period) that is accepted in whole or in part by the Claims Administrator.

(b)    "Authorized TPP Claimant" means a TPP Class Member who submits a timely Proof of Claim that is accepted in whole or in part by the Claims Administrator.

(c)    "Claim Documentation" means the materials required for submission of a Proof of Claim to the Claims Administrator pursuant to the Class Settlement, this Plan of Allocation, the SHP-Class Allocation Agreement, and/or by order of the Court.

(d)    "Claims Administrator" means the person or entity chosen by Class Counsel, subject to Court approval, as set forth in the Class Settlement Agreement and/or this Plan of Allocation.

(e)    "Class Counsel" means Marvin A. Miller, Lori A. Fanning, and Michael M. Buchman.

(f)    "Class Member" means any natural person or entity falling within the definition of the Settlement Class who is not a Class Opt-Out.

(g)    "Class Opt-Out" means any natural person or entity falling within the definition of a Settlement Class who timely and validly submits a request for exclusion from the Settlement Class in accordance with the procedures set forth in the Settlement Notice.

(h)    "Class Plaintiffs" means: A.F. of L.-A.G.C Building Trades Welfare Plan ("AFL"), IBEW-NECA Local 505 Health & Welfare Plan ("IBEW"), Painters District Council No. 30 Health and Welfare Plan ("Painters"), Medical Mutual of Ohio, Inc. ("MMOH"), and Andrea Kehoe ("Kehoe").

(i)      "Class Settlement Fund" means the Total Settlement Amount minus the SHP Group Initial Payment, and shall be in an amount not less than Thirty-Five Million Dollars ($35,000,000.00).

(j)      "Consumer" means any person falling within the definition of the Settlement Class who is a natural person and not a TPP. "Consumer" includes living persons as well as the executors, heirs, administrators, trustees, or other authorized representatives of deceased persons.

(k)      "Consumer Allocation Counsel" means Deborah R. Gross of the Law Offices of Bernard M. Gross, P.C., Philadelphia, Pennsylvania.

(l)      "Consumer Class Members" means Consumers who are not Class Opt-Outs.

(m)      "Consumer Settlement Pool" means the Consumer Settlement Percentage (which is 1 minus the TPP Settlement Percentage) times the Total Settlement Amount, plus all interest or other income that accrues thereon.

(n)      "Court" or "Settlement Court" means the Honorable Anita B. Brody of the United States District Court for the Eastern District of Pennsylvania, or if Judge Brody is not available, another judge from the United States District Court for the Eastern District of Pennsylvania who will be designated by Judge Brody or duly appointed to act in Judge Brody's absence.

(o)      "Defendant" means SmithKline Beecham Corporation, d/b/a GlaxoSmithKline, including GlaxoSmithKline LLC and GlaxoSmithKline plc ("GSK") and any respective predecessor entities and past or present parents, subsidiaries, divisions, affiliates, successors, and assigns.

(p)      "Effective Date" has the meaning used in the Class Settlement Agreement.

(q)     "Escrow Agent" means an entity designated by Class Counsel to hold funds as referenced in this Plan of Allocation.

(r)     "Flonase" means fluticasone propionate nasal spray formulations of various strengths marketed under the brand-name Flonase® and its generic equivalents.

(s)     "Flonase Purchases" means payments or reimbursements for all or part of the cost of Flonase prescribed and dispensed in the United States; including but not limited to, the payment or partial payment for or reimbursement of Flonase to any retail or mail order pharmacy, prescription benefit manager, or healthcare provider, or the payment of a co-insurance amount, deductible amount, or co-pay amount for Flonase pursuant to a Medicare or Medicaid co-insurance obligation, an insurance agreement, or other health care plan. Flonase Purchases do not include purchases of Flonase directly from Defendant, for resale purposes, or for which a class member has been reimbursed.

(t)     "Net TPP Settlement Pool" means the balance of the TPP Settlement Pool after deducting the SHP Initial Payment, and then deducting Court-awarded attorneys fees, expenses, incentive awards, and notice and administrative costs to be borne by TPPs, plus any amounts paid by or less any amounts paid to the SHP Group, if any, as provided herein.

(u)     "Settlement Class" means the class as defined in the Class Settlement Agreement.

(v)     "Settlement Notice" means the Notice Program prepared by Kinsella Media, Inc. in conjunction with Claims Administrator or as otherwise ordered by the Court.

(w)     "SFPs" means self-funded healthcare plans and/or entities ("SFPs") for which one or more SHP Group Member provides or provided prescription drug or health benefit services through administrative services-only contracts or as a third-party administrator and on whose behalf the SHP Group Member submits a claim to the Claims Administrator. Such SFPs will be

4

identified by group or plan name and tax identification number in the Claim Documentation submitted by the SHP to the Claims Administrator.

(x)     "SHP Group" or "SHPs" means Blue Cross and Blue Shield Association and other TPPs represented by SHP Counsel that are listed in Exhibit A to the SHP-Class Allocation Agreement, which is attached hereto as Exhibit 1, and SFPs for which one or more SHP Group Member provides or provided prescription drug or health benefit services through administrative services-only contracts or as a third-party administrator and on whose behalf the SHP Group Member makes an authorized claim to the Claims Administrator.

(y)     "SHP Group Counsel" means the law firms of Rawlings & Associates, PLLC; Lowey Dannenberg Cohen & Hart P.C.; and Crowell & Moring LLP.

(z)     "SHP Group Initial Reversion" means One Million Dollars ($1,000,000.00).

(aa)    "SHP Group Initial Payment" means Ten Million Dollars ($10,000,000).

(bb)    "SHP Group Recognized Claim Percentage" or "SHPRCP" means the total amount of claims by all members of the SHP Group that are allowed by the Claims Administrator divided by the total allowed claims of (a) all Authorized TPP Claimants and (b) all members of the SHP Group.

(cc)    "SHP Group Reversion Amount" means an amount calculated after all TPP claims have been processed and the total allowed claim amounts for all Authorized TPP Claimants and the SHP Group have been determined by the Claims Administrator. The SHP Group Reversion Amount is calculated as follows: SHP Over/Underage x TPP Settlement Pool x (1-((TPP Class Fees + TPP Expenses & Costs)/(TPP Settlement Pool – SHP Initial Payment))). If the SHP Group Reversion Amount is positive, then it will be paid from the TPP Settlement

Pool to the SHP Group.  If the SHP Group Reversion Amount is negative, then it will be paid from the SHP Group to the TPP Settlement Pool.

(dd)  "SHP Over/Underage" means the SHPRCP less whatever percentage the SHP Group Initial Payment is of the TPP Settlement Pool.  For example, if the SHPRCP is 60%, then the SHP Over/Underage would equal 60% less the percentage of the SHP Group Initial Payment/ TPP Settlement Pool.

(ee)  SHP Recognized Claim Percentage ("SHPRCP") means the total amount of claims by all SHP Group Members that are allowed by the Claims Administrator divided by the total allowed claims of (a) all Authorized TPP Claimants and (b) all members of the SHP Group.

(ff)  "Third-Party Payor" or "TPP" means any entity that fits within the definition of the Class as contained in Paragraph 1 of the Class Settlement Agreement, and any SHP.

(gg)  "Total Settlement Amount" means $45 million.

(hh)  "TPP Allocation Counsel" means Kimberly R. West of Wallace, Jordan, Ratliff & Brandt LLC, Birmingham, Alabama.

(ii)  "TPP Claimant List" means a list of the identities of all TPP Class Members that submit Claim Documentation prepared by the Claims Administrator.

(jj)  "TPP Class Fees" means the fee award granted by the Settlement Court multiplied by the TPP Settlement Percentage.

(kk)  "TPP Class Members" means TPPs falling within the definition of the Settlement Class, excluding any Class Opt-Outs.

(ll)  "TPP Expenses & Costs" means (a) the expenses and incentive awards approved by the Court multiplied by the TPP Settlement Percentage, and (b) the portion of Settlement Notice and the portion of the costs of administering the Class Settlement, including, but not

limited to payments to the Claims Administrator or Escrow Agent, or taxes due from the Class Settlement Fund, that are attributable to TPPs.

(mm)  "TPP Settlement Percentage" means the portion of the Total Settlement Amount allocated to all TPPs, including TPP Class Members and the SHP Group, expressed as a percentage.

(nn) "TPP Settlement Pool" means the TPP Settlement Percentage times the Total Settlement Amount, plus all interest or other income that accrues thereon.

(pp)  "United States" means the United States of America including its states, commonwealths, territories and possessions.

2.      **Allocation Among Consumers and TPPs**.  Consumer Allocation Counsel and TPP Allocation Counsel, after vigorous arms-length negotiations, have recommended that the division of settlement funds available for distribution to Consumers and TPPs be *pro rata*, based on the timely and valid claim submitted by each Consumer and TPP, subject to approval by the Claims Administrator, as follows:

(a)      All attorneys' fees, litigation expenses, and incentive awards awarded by the Court, and all costs of Settlement Notice and administration, shall be deducted from the Class Settlement Fund; and

(b)      The SHP Group Reversion Amount shall be added to or deducted from the Class Settlement Fund; then

(c)      The remaining Class Settlement Fund will be allocated *pro rata* to each Authorized Consumer Claimant and Authorized TPP Claimant by multiplying the remaining Class Settlement Amount by the amount of the Authorized Consumer Claimant's or Authorized TPP Claimant's timely and valid claim allowed by the Claims Administrator, and then dividing

by the total amount of all timely and valid claims allowed by the Claims Administrator for Consumers and TPPs.  For the purpose of this calculation, the Claims Administrator will allow only 25% of the otherwise valid and timely claim amount submitted by an Authorized Consumer Claimant who either (i) purchased Flonase or its generic equivalents under a health plan that required the same copayment amount, regardless of whether a brand or generic drug was purchased, or (ii) purchased branded Flonase after March 6, 2006, the date a generic became available.

3.      **Disbursements Prior to Final Approval.**  Prior to the Settlement's becoming final, disbursements for the costs and expenses of Settlement Notice and administration may be made from the Class Settlement Fund as provided in the Settlement Agreement.

4.      **SHP-Class Allocation Agreement and SHP Group Reversion Amounts.** In accordance with the SHP-Class Allocation Agreement, which is attached hereto as Exhibit 1, the following shall occur:

(a)      Within two (2) business days of the date on which the SHP Group Initial Payment and SHP Group Initial Reversion has been received from Defendant and SHP Group Counsel has received wiring instructions from Class Counsel, SHP Group Counsel shall wire to the account(s) designated by Class Counsel the SHP Group Initial Reversion, which is to be paid as SHP Fees to Class Counsel, except to the extent necessary to effectuate the purpose of this Plan of Allocation to insure that Class Members be paid as much as or more than they would have been paid had SHPs been members of the Class and the Total Settlement Amount had been paid for the benefit of the Class.

(b)      No less than twenty-one (21) days prior to the final approval hearing set by the Court, each member of the SHP Group shall submit its Proof of Claim, which will be the

8

same form of Proof of Claim required by TPP Class Members, including Claim Documentation to the Claims Administrator, which the Claims Administrator may make available to Class Counsel and the Defendant's Counsel.

(c)     Class Counsel shall submit a schedule of all non-SHP Group TPP Opt-Outs to SHP Group Counsel, with a copy to the Defendant's Counsel, no later than fourteen (14) days before the final approval hearing set by the Settlement Court. SHP Group Members shall then submit to the Claims Administrator, which the Claims Administrator may make available to the Defendant's Counsel and Class Counsel, any necessary amendments to their Proof of Claim and Claim Documentation to exclude any claims such SHP Group members previously made on behalf of any TPP Opt-Outs no later than three (3) days before the final approval hearing.

(d)     The Claims Administrator shall not authorize any claims made by SHP Group Members on behalf of any entity (i) that is otherwise not included or is specifically excluded from the Class under the Settlement Agreement, except as specifically provided herein; or (ii) that files a claim on its own behalf, so as not to duplicate claims. The Claims Administrator will, however, permit claims made on behalf of such entities where it is shown by the SHP that such claims are not duplicative of claims by other TPPs.

(e)     Representations and Warranties. As part of the SHP Agreement, each SHP shall warrant that any Proof of Claim, Claim Documentation, data, or other information it submits to the Claims Administrator will be true and accurate in good faith and to the best of their ability.

(f)     Effect of Failure of an SHP Group Member to Submit Claim Documentation. To verify the accuracy of claim information and to prevent duplication of claims, the Claims Administrator may reasonably request additional information from SHP

Group Members as deemed appropriate by the Claims Administrator. The SHP Agreement shall set forth that SHP Group Members will provide additional information to the Claims Administrator as requested. The calculation of the SHP Group Reversion Amount shall not include claims of any SHP Group Member that fails to timely submit the above Proof of Claim and Claim Documentation or additional claims documentation reasonably requested by the Claims Administrator.

      (g)      Confidentiality. All Claim Documentation (including the identification of SFPs) or other information submitted by SHP Group Members pursuant to this Paragraph shall be kept confidential and may be used or disclosed only for the purpose of effectuating this SHP-Class Allocation Agreement, including disclosure to the Claims Administrator, the Defendants, Class Counsel, and the Court. Adequate steps shall be taken to protect against unlawful disclosure of confidential patient information, if any, that is included in such Claim Documentation, or other information

      (h)      SHP Group "True Up" Reversion Amount Computation

      (i)      Notice of Proposed Computation. The Claims Administrator shall make available to SHP Group Counsel a list of the identities of all TPP Class Members that submit Claim Documentation (the "TPP Claimant List"). The TPP Claimant List shall be held in confidence by SHP Group Counsel and any third party consultant, who shall not be employed by any TPP, who agrees in writing to be bound by the same confidentiality as SHP Group Counsel. The TPP Claimant List shall not be provided or shared with any other person, including any member of the SHP Group or another TPP, and can be used only for the purposes of determining duplication of claims or whether any entity submitting Claim Documentation falls within the definition of TPP as set forth herein. The TPP Claimant List shall be generated by the Claims

Administrator and transmitted to SHP Group Counsel no later than the date for the fairness hearing set by the Settlement Court. SHP Group Counsel shall have the opportunity, within twenty-one (21) days of receipt of a TPP Claimant List, to identify in writing to Class Counsel any TPP Class Member that SHP Group Counsel believes has submitted a claim that is duplicative of a claim already asserted by another TPP Class Member or SHP Group Member, or that falls outside the definition of TPP as set forth herein. At least thirty-five (35) days prior to any distribution of the Net TPP Settlement Pool to TPP Class Members, Class Counsel shall provide SHP Group Counsel with the proposed computation of the SHP Group Reversion Amount payment, including a list reflecting the Claims Administrator's determination of the amount of each SHP Group Member's allowed claims for Flonase Purchases. Such computation will become binding upon the SHP Group unless within ten (10) business days of receipt of computation, SHP Group Counsel disputes the amount of the proposed SHP Group Reversion Amount payment in writing to Class Counsel. In the event of such a dispute, SHP Group Counsel may request and receive from Class Counsel a list of the TPP Class Members who have the 100 largest aggregate claims approved by the Claims Administrator and the amount of such claims (the "TPP List"). The TPP List shall be held in confidence by SHP Group Counsel, will be provided for attorneys' eyes only, and shall not be provided or shared with any other person, including any member of the SHP Group or another TPP. SHP Group Counsel shall be entitled to show the list to a single third-party consultant who is not employed by any TPP, and who agrees in writing to be bound by the same confidentiality as SHP Group Counsel, solely for purposes of dispute resolution under this Paragraph. The proposed computation will then become binding upon the SHP Group within ten (10) business days of receipt of the TPP List, unless SHP Group Counsel further disputes the amount of the proposed SHP Group Reversion Amount

payment in writing to Class Counsel. Other than as provided in this SHP-Class Allocation Agreement, the SHP Group and SHP Group Counsel shall not be entitled to any information collected or generated by the Claims Administrator or Class Counsel, except to the extent permitted by the arbitrators or the Court in a proceeding pursuant to the Dispute Procedure below.

(ii)     Dispute Procedure. Class Counsel and the SHP Group shall attempt to resolve any disputes arising pursuant to this Paragraph through good faith negotiations. If the dispute cannot be resolved informally, it shall be submitted to binding arbitration. The arbitrator will be agreed upon by the parties or, if no agreement can be reached, the arbitrator will be selected by the Settlement Court. The arbitrator's decision shall be final and will not be subject to appeal. Defendant shall not be involved in any arbitration pursuant to this Paragraph, and shall have no obligations or liability with respect thereto.

(i)     SHP Group "True Up" Reversion Amount Payment. Within five (5) days (i) after the Effective Date, (ii) of any resolution of a dispute under Paragraph (h) above, (iii) after all TPP claims have been processed and the total authorized claim amounts for all Authorized TPP Claimants and SHP Group Members has been finally determined, or (iv) of the provision of appropriate instructions for the transfer of any SHP Group Reversion Amount due, whichever is later, the parties to this SHP-Class Allocation Agreement shall cause the payment of the SHP Group Reversion Amount to be made as follows:

(i)     If the SHP Group Reversion Amount is a positive amount, Class Counsel shall cause the Escrow Agent to pay from the Class Settlement Fund and into an account designated by SHP Group Counsel an amount equal to the SHP Group Reversion Amount; or

(ii)     If the SHP Group Reversion Amount is a negative amount, the SHP Group shall cause payment to be made from the SHP Group to the Class Settlement Fund in an amount equal to the SHP Group Reversion Amount.

5.      **Court Approval of Disbursements and Distributions**. As set forth in the Settlement Agreement, approval by the Court shall be required prior to any disbursement or any distribution from the Class Settlement Fund, other than for any fees and expenses incurred to administer the Escrow Account, costs associated with the Settlement Notice and claims administration, and taxes on the Class Settlement Fund.

# EXHIBIT 1

## SHP-CLASS ALLOCATION AGREEMENT

THIS SHP-Class Allocation Agreement is made and entered into on December 2, 2012, by and among Class Plaintiffs (as defined herein) in the class actions <u>IBEW–NECA Local 505 Health & Welfare Plan v. SmithKline Beecham Corp.</u>, No. 08–3301 (E.D. Pa.), and <u>Medical Mutual of Ohio, Inc. v. SmithKline Beecham Corp.</u>, No. 12-cv-4212 (E.D. Pa.) pending in the Eastern District of Pennsylvania (collectively, the "Class Actions"); and the SHP Group (as defined herein).

WHEREAS, Class Plaintiffs and Defendant SmithKline Beecham Corporation d/b/a GlaxoSmithKline, including GlaxoSmithKline LLC and GlaxoSmithKline plc ("GSK" or "Defendant") have entered into a settlement agreement of the Class Actions ("the Class Settlement Agreement") dated as of _____, 2012;

WHEREAS, the Settlement Class is comprised of certain third-party payors ("TPPs") and individual consumers;

WHEREAS, the SHP Group and Defendant have entered into a settlement agreement of the claims of SHPs (the "SHP Agreement") dated as of November 20, 2012;

WHEREAS, the SHP Group has represented that, in the aggregate, they provide or administer prescription drug and health benefits to at least sixty percent (60%) of the covered lives privately insured in the United States as of December 31, 2011;

WHEREAS, Class Plaintiffs, through Class Counsel, and the SHP Group, through SHP Group Counsel, after vigorous, arm's-length negotiations, have agreed to an allocation of the Total Settlement Amount between the TPP Class Members and the SHP Group ("the SHP-Class Allocation Agreement");

WHEREAS, Class Plaintiffs and the SHP Group intend the claims of TPP Class Members and SHPs to be paid on the same *pro rata* basis and intend to establish a reconciliation mechanism herein between settlement amounts allocated to the TPP Settlement Pool and the SHP Group Initial Payment, to be applied once all claims of TPPs and SHPs are submitted to the Claims Administrator, for that purpose;

NOW THEREFORE, it is agreed by the undersigned, on behalf of Class Plaintiffs and the Settlement Class, and on behalf of the SHP Group, that the Total Settlement Amount shall be allocated and distributed, subject to the Class Settlement Agreement, Plan of Allocation, and Court approval, where required, as set forth herein:

1.    **General Definitions.** As used in this Agreement, the following terms shall have the indicated meanings:

(a)    "Authorized TPP Claimant" means a TPP Class Member (not an SHP or a TPP Opt Out) who submits a timely Proof of Claim that is accepted in whole or in part by the Claims Administrator.

(b)    "Claim Documentation" means the materials required for submission of a claim to the Claims Administrator pursuant to Class Settlement, the Plan of Allocation and/or by order of the Court.

(c)    "Claims Administrator" means the person or entity chosen by Class Counsel, subject to Court approval, as set forth in the Class Settlement Agreement and/or Plan of Allocation.

(d)    "Class Counsel" means Marvin A. Miller and Lori A. Fanning.

(e)    "Class Member" means any natural person or entity falling within the definition of the Settlement Class who is not a Class Opt-Out.

2

(f)     "Class Opt-Out" means any natural person or entity falling within the definition of a Settlement Class who timely and validly submits a request for exclusion from the Settlement Class in accordance with the procedures set forth in the Settlement Notice.

(g)     "Class Plaintiffs" means: A.F. of L.-A.G.C Building Trades Welfare Plan ("AFL"), IBEW-NECA Local 505 Health & Welfare Plan ("IBEW"), Painters District Council No. 30 Health and Welfare Plan ("Painters"), Medical Mutual of Ohio, Inc. ("MMOH"), and Andrea Kehoe ("Kehoe").

(h)     "Class Settlement Fund" means the Total Settlement Amount minus the SHP Group Initial Payment, and shall be in an amount not less than Thirty-Five Million Dollars ($35,000,000.00).

(i)     "Consumer" means any person falling within the definition of the Settlement Class who is a natural person and not a TPP. "Consumer" includes living persons as well as the executors, heirs, administrators, trustees, or other authorized representatives of deceased persons.

(j)     "Consumer Allocation Counsel" means the person appointed by Class Counsel to negotiate the allocation of the Class Settlement Fund on behalf of Consumer Class Members.

(k)     "Consumer Class Members" means Consumers who are not Class Opt-Outs.

(l)     "Consumer Settlement Pool" means the Consumer Settlement Percentage (which is 1 minus the TPP Settlement Percentage) times the Total Settlement Amount, plus all interest or other income that accrues thereon.

(m)     "Court" or "Settlement Court" means the Honorable Anita B. Brody of the United States District Court for the Eastern District of Pennsylvania, or if Judge Brody is not

available, another judge from the United States District Court for the Eastern District of Pennsylvania who will be designated by Judge Brody or duly appointed to act in Judge Brody's absence.

(n)    "Defendant" means GSK and any respective predecessor entities and past or present parents, subsidiaries, divisions, affiliates, successors, and assigns.

(o)    "Effective Date" has the meaning used in the Class Settlement Agreement.

(p)    "Escrow Agent" means the entity designated by Class Counsel to hold funds as referenced in the Plan of Allocation.

(q)    "Flonase" means fluticasone propionate nasal spray formulations of various strengths marketed under the brand-name Flonase® and its generic equivalents.

(r)    "Flonase Purchases" means payments or reimbursements for all or part of the cost of Flonase prescribed and dispensed in the United States; including but not limited to, the payment or partial payment for or reimbursement of Flonase to any retail or mail order pharmacy, prescription benefit manager, or healthcare provider, or the payment of a co-insurance amount, deductible amount, or co-pay amount for Flonase pursuant to a Medicare or Medicaid co-insurance obligation, an insurance agreement, or other health care plan. Flonase Purchases do not include purchases of Flonase directly from Defendant, for resale purposes, or for which a class member has been reimbursed.

(s)    "Net TPP Settlement Pool" means the balance of the TPP Settlement Pool after deducting the SHP Initial Payment, and then deducting Court-awarded attorneys fees, expenses, incentive awards, and notice and administrative costs to be borne by TPPs, plus any amounts paid by or less any amounts paid to the SHP Group, if any, as provided herein.

(t)    "Plan of Allocation" means the plan for allocation of the Class Settlement Fund Class Counsel will submit to the Court for approval.

(u)    "Settlement Class" means the class as defined in the Class Settlement Agreement.

(v)    "Settlement Notice" means the Notice Program prepared by Kinsella Media, Inc. in conjunction with Claims Administrator or as otherwise ordered by the Court.

(w)    "SFPs" means self-funded healthcare plans and/or entities ("SFPs") for which one or more SHP Group Member provides or provided prescription drug or health benefit services through administrative services-only contracts or as a third-party administrator and on whose behalf the SHP Group Member submits a claim to the Claims Administrator. Such SFPs will be identified by group or plan name and tax identification number in the Claim Documentation submitted by the SHP to the Claims Administrator.

(x)    "SHP Group" or "SHPs" means Blue Cross and Blue Shield Association and other TPPs represented by SHP Counsel that are listed in Exhibit A hereto, and SFPs for which one or more SHP Group Member provides or provided prescription drug or health benefit services through administrative services-only contracts or as a third-party administrator and on whose behalf the SHP Group Member makes an authorized claim to the Claims Administrator.

(y)    "SHP Group Counsel" means the law firms of Rawlings & Associates, PLLC; Lowey Dannenberg Cohen & Hart P.C.; and Crowell & Moring LLP.

(z)    "SHP Group Initial Reversion" means One Million Dollars ($1,000,000.00).

(aa)    "SHP Group Initial Payment" means Ten Million Dollars ($10,000,000).

(bb)    "SHP Group Recognized Claim Percentage" or "SHPRCP" means the total amount of claims by all members of the SHP Group that are allowed by the Claims

Administrator divided by the total allowed claims of (a) all Authorized TPP Claimants and (b) all members of the SHP Group.

(cc) "SHP Group Reversion Amount" means an amount calculated after all TPP claims have been processed and the total allowed claim amounts for all Authorized TPP Claimants and the SHP Group have been determined by the Claims Administrator. The SHP Group Reversion Amount is calculated as follows: SHP Over/Underage x TPP Settlement Pool x (1-((TPP Class Fees + TPP Expenses & Costs)/(TPP Settlement Pool – SHP Initial Payment)). If the SHP Group Reversion Amount is positive, then it will be paid from the TPP Settlement Pool to the SHP Group. If the SHP Group Reversion Amount is negative, then it will be paid from the SHP Group to the TPP Settlement Pool.

(dd) "SHP Over/Underage" means the SHPRCP less whatever percentage the SHP Group Initial Payment is of the TPP Settlement Pool). For example, if the SHPRCP is 60%, then the SHP Over/Underage would equal 60% less the percentage of the SHP Group Initial Payment/ TPP Settlement Pool.

(ee) SHP Recognized Claim Percentage ("SHPRCP") means the total amount of claims by all SHP Group Members that are allowed by the Claims Administrator divided by the total allowed claims of (a) all Authorized TPP Claimants and (b) all members of the SHP Group.

(ff) "Third-Party Payor" or "TPP" means any entity that fits within the definition of the Class as contained in Paragraph 1 of the Class Settlement Agreement, and any SHP.

(gg) "Total Settlement Amount" means $45 million.

(hh) "TPP Allocation Counsel" means the person appointed by Class Counsel to negotiate the allocation of the Class Settlement Fund on behalf of TPP Class Members.

(ii)    "TPP Claimant List" means a list of the identities of all TPP Class Members that submit Claim Documentation prepared by the Claims Administrator.

(jj)    "TPP Class Fees" means the fee award granted by the Settlement Court multiplied by the TPP Settlement Percentage.

(kk)    "TPP Class Members" means TPPs falling within the definition of the Settlement Class, excluding any Class Opt-Outs.

(ll)    "TPP Expenses & Costs" means (a) the expenses and incentive awards approved by the Court multiplied by the TPP Settlement Percentage, and (b) the portion of Settlement Notice and the portion of the costs of administering the Class Settlement, including, but not limited to payments to the Claims Administrator or Escrow Agent, or taxes due from the Class Settlement Fund, that are attributable to TPPs.

(mm)   "TPP Settlement Percentage" means the portion of the Total Settlement Amount allocated to all TPPs, including TPP Class Members and the SHP Group, expressed as a percentage.

(nn)   "TPP Settlement Pool" means the TPP Settlement Percentage times the Total Settlement Amount, plus all interest or other income that accrues thereon.

(pp)    "United States" means the United States of America including its states, commonwealths, territories and possessions.

2.      **Initial Allocation of the Total Settlement Amount.** The Defendant has agreed to pay Forty-Six Million Dollars ($46,000,000.00) to settle the claims of the Plaintiffs, Class Members and SHPs, collectively, which amount is allocated as follows:

(a)     Thirty-Five Million Dollars ($35,000,000.00) to the Class, to be further allocated between a Consumer Settlement Pool and TPP Settlement Pool as determined through

7

negotiations by Consumer Allocation Counsel and TPP Allocation Counsel, and as set forth in the Plan of Allocation, subject to Court approval. Any amounts due to be transferred from the Consumer Settlement Pool pursuant to the Plan of Allocation or from the SHP Group pursuant to this SHP-Class Allocation Agreement will be added to the TPP Settlement Pool.

(b)     Eleven Million Dollars ($11,000,000.00) to the SHPs, to be allocated as Ten Million Dollars ($10,000,000) for the SHP Group Initial Payment and One Million Dollars ($1,000,000) as SHP Group Initial Reversion.

(c)     Class Counsel will submit a Plan of Allocation which will, pursuant to the agreement between Consumer Allocation Counsel and TPP Allocation Counsel, allocate the Class Settlement Fund on the basis of Flonase Purchases allowed by the Claims Administrator.

3.     **Disbursements from the SHP Initial Payment.**  Within two (2) business days of the date on which the SHP Group Initial Payment and SHP Group Initial Reversion has been received from Defendant and SHP Group Counsel has received wiring instructions from Class Counsel, SHP Group Counsel shall wire to the account(s) designated by Class Counsel the SHP Group Initial Reversion.

4.     **SHP Group "True-Up" and Reversion Amount Requirements.**

(a)     No less than twenty-one (21) days prior to the final approval hearing set by the Court, each member of the SHP Group shall submit its Proof of Claim, which will be the same form of Proof of Claim required by TPP Class Members, including Claim Documentation to the Claims Administrator, which the Claims Administrator may make available to Class Counsel and the Defendant's Counsel.

(b)     Class Counsel shall submit a schedule of all non-SHP Group TPP Opt-Outs to SHP Group Counsel, with a copy to the Defendant's Counsel, no later than fourteen (14)

days before the final approval hearing set by the Settlement Court. SHP Group Members shall then submit to the Claims Administrator, which the Claims Administrator may make available to the Defendant's Counsel and Class Counsel, any necessary amendments to their Proof of Claim and Claim Documentation to exclude any claims such SHP Group members previously made on behalf of any TPP Opt-Outs no later than three (3) days before the final approval hearing.

(c)     The Claims Administrator shall not authorize any claims made by SHP Group Members on behalf of any entity (i) that is otherwise not included or is specifically excluded from the Class under the Settlement Agreement, except as specifically provided herein; or (ii) that files a claim on its own behalf, so as not to duplicate claims. The Claims Administrator will, however, permit claims made on behalf of such entities where it is shown by the SHP that such claims are not duplicative of claims by other TPPs.

(d)     Representations and Warranties. As part of the SHP Agreement, each SHP shall warrant that any Proof of Claim, Claim Documentation, data, or other information it submits to the Claims Administrator will be true and accurate in good faith and to the best of their ability.

(e)     Effect of Failure of an SHP Group Member to Submit Claim Documentation. To verify the accuracy of claim information and to prevent duplication of claims, the Claims Administrator may reasonably request additional information from SHP Group Members as deemed appropriate by the Claims Administrator. The SHP Agreement shall set forth that SHP Group Members will provide additional information to the Claims Administrator as requested. The calculation of the SHP Group Reversion Amount shall not include claims of any SHP Group Member that fails to timely submit the above Proof of Claim

and Claim Documentation or additional claims documentation reasonably requested by the Claims Administrator.

(f)     Confidentiality. All Claim Documentation (including the identification of SFPs) or other information submitted by SHP Group Members pursuant to this Paragraph shall be kept confidential and may be used or disclosed only for the purpose of effectuating this SHP-Class Allocation Agreement, including disclosure to the Claims Administrator, the Defendants, Class Counsel, and the Court. Adequate steps shall be taken to protect against unlawful disclosure of confidential patient information, if any, that is included in such Claim Documentation, or other information

(g)     SHP Group "True Up" Reversion Amount Computation

(i)     Notice of Proposed Computation. The Claims Administrator shall make available to SHP Group Counsel a list of the identities of all TPP Class Members that submit Claim Documentation (the "TPP Claimant List"). The TPP Claimant List shall be held in confidence by SHP Group Counsel and any third party consultant, who shall not be employed by any TPP, who agrees in writing to be bound by the same confidentiality as SHP Group Counsel. The TPP Claimant List  shall not be provided or shared with any other person, including any member of the SHP Group or another TPP, and can be used only for the purposes of determining duplication of claims or whether any entity submitting Claim Documentation falls within the definition of TPP as set forth herein. The TPP Claimant List shall be generated by the Claims Administrator and transmitted to SHP Group Counsel no later than the date for the fairness hearing set by the Settlement Court. SHP Group Counsel shall have the opportunity, within twenty-one (21) days of receipt of a TPP Claimant List, to identify in writing to Class Counsel any TPP Class Member that SHP Group Counsel believes has submitted a claim that is

10

duplicative of a claim already asserted by another TPP Class Member or SHP Group Member, or that falls outside the definition of TPP as set forth herein. At least thirty-five (35) days prior to any distribution of the Net TPP Settlement Pool to TPP Class Members, Class Counsel shall provide SHP Group Counsel with the proposed computation of the SHP Group Reversion Amount payment, including a list reflecting the Claims Administrator's determination of the amount of each SHP Group Member's allowed claims for Flonase Purchases. Such computation will become binding upon the SHP Group unless within ten (10) business days of receipt of computation, SHP Group Counsel disputes the amount of the proposed SHP Group Reversion Amount payment in writing to Class Counsel. In the event of such a dispute, SHP Group Counsel may request and receive from Class Counsel a list of the TPP Class Members who have the 100 largest aggregate claims approved by the Claims Administrator and the amount of such claims (the "TPP List"). The TPP List shall be held in confidence by SHP Group Counsel, will be provided for attorneys' eyes only, and shall not be provided or shared with any other person, including any member of the SHP Group or another TPP. SHP Group Counsel shall be entitled to show the list to a single third-party consultant who is not employed by any TPP, and who agrees in writing to be bound by the same confidentiality as SHP Group Counsel, solely for purposes of dispute resolution under this Paragraph. The proposed computation will then become binding upon the SHP Group within ten (10) business days of receipt of the TPP List, unless SHP Group Counsel further disputes the amount of the proposed SHP Group Reversion Amount payment in writing to Class Counsel. Other than as provided in this SHP-Class Allocation Agreement, the SHP Group and SHP Group Counsel shall not be entitled to any information collected or generated by the Claims Administrator or Class Counsel, except to the extent

permitted by the arbitrators or the Court in a proceeding pursuant to the Dispute Procedure below.

(ii)     Dispute Procedure. Class Counsel and the SHP Group shall attempt to resolve any disputes arising pursuant to this Paragraph through good faith negotiations. If the dispute cannot be resolved informally, it shall be submitted to binding arbitration. The arbitrator will be agreed upon by the parties or, if no agreement can be reached, the arbitrator will be selected by the Settlement Court. The arbitrator's decision shall be final and will not be subject to appeal. Defendant shall not be involved in any arbitration pursuant to this Paragraph, and shall have no obligations or liability with respect thereto.

(h)     SHP Group "True Up" Reversion Amount Payment. Within five (5) days (i) after the Effective Date, (ii) of any resolution of a dispute under Paragraph (g) above, (iii) after all TPP claims have been processed and the total authorized claim amounts for all Authorized TPP Claimants and SHP Group Members has been finally determined, or (iv) of the provision of appropriate instructions for the transfer of any SHP Group Reversion Amount due, whichever is later, the parties to this SHP-Class Allocation Agreement shall cause the payment of the SHP Group Reversion Amount to be made as follows:

(i)     If the SHP Group Reversion Amount is a positive amount, Class Counsel shall cause the Escrow Agent to pay from the TPP Settlement Pool and into an account designated by SHP Group Counsel an amount equal to the SHP Group Reversion Amount; or

(ii)     If the SHP Group Reversion Amount is a negative amount, the SHP Group shall cause payment to be made from the SHP Group to the TPP Settlement Pool in an amount equal to the SHP Group Reversion Amount.

5.    **Execution in Counterparts.** This SHP-Class Allocation Agreement may be executed in counterparts. Facsimile signatures shall be considered as valid signatures as of the date hereof, although the original signature pages shall thereafter be appended to this agreement and filed with the Court.

IN WITNESS WHEREOF, the parties hereto through their fully authorized representatives have agreed to this SHP-Class Allocation Agreement as of the date first herein above written.

SETTLING HEALTH PLANS

Richard Cohen
Gerald Lawrence
Peter D. St. Phillip
Uriel Rabinovitz
LOWEY DANNENBERG COHEN & HART, P.C.
One North Broadway - 5th Floor
White Plains, NY 10601

Mark D. Fischer
RAWLINGS & ASSOCIATES, PLLC
One Eden Parkway
LaGrange, KY 40031-1800

Robert T. Rhoad
CROWELL & MORING
1001 Pennsylvania Avenue, NW
Washington, D.C. 20004-2595

*Attorneys for the Settling Health Plans*

Marvin A. Miller
Lori A. Fanning
MILLER LAW LLC
115 South LaSalle Street
Suite 2910
Chicago, IL 60603

*Counsel for Indirect Purchaser Plaintiffs Class*

14

## Exhibit A
### Flonase Settling Health Plans

Aetna, Inc.
AmeriGroup/HMS
Arcadian Health
Assurant Health
Avmed Health Plans
Blue Cross and Blue Shield of Florida, Inc.
Blue Cross and Blue Shield of Kansas City
Blue Cross Blue Shield of North Carolina
Blue Cross and Blue Shield of Vermont
Blue Cross Blue Shield Association
Blue Cross Blue Shield of Minnesota
Blue Cross Blue Shield of Nebraska
Blue Cross Blue Shield of Rhode Island
Blue Cross Blue Shield of Tennessee
Blue Cross Northeastern Pennsylvania
Cambia Health Solutions*
CareFirst Blue Cross Blue Shield
Connecticut General Life Insurance Company a/k/a Cigna
Coventry Health Care of Florida, Inc. f/k/a Vista HealthPlan, Inc.
Coventry Health Care, Inc.
Coventry Health Plan
Coventry Health Plan of Florida, Inc. f/k/a Vista HealthPlan of South Florida, Inc.
Coventry Summit Health Plan, Inc. f/k/a Summit Health Care, Inc.
EmblemHealth
Excellus Blue Cross Blue Shield
Government Employees Health Association
Harvard Pilgrim Health Care, Inc.
Hawaii Medical Service Association
Health Care Services Corporation
Health Net, Inc.
HealthNow New York
HealthPartners, Inc.
Humana Insurance Company
Johns Hopkins Health Care LLC
Kaiser Foundation Health Plan**
Lovelace Health Plan
Mutual of Omaha
MVP Health Care
Noridian d/b/a Blue Cross Blue Sheild of North Dakota
Premera Blue Cross
Priority Health
Tufts Associated Health Plans, Inc.
United Healthcare Services, Inc.

Wellpoint, Inc.

*Cambia Health Solutions includes:
Regence Blue Shield
Regence Blue Cross Blue Shield of Oregon
Regence Blue Cross Blue Shield of Utah
Regence Blue Shield of Idaho
Asuris Northwest Health
Regence Life and Health Insurance Co.

**Kaiser Foundation Health Plan includes:
Kaiser Foundation Hospitals
Kaiser Foundation Health Plan of Colorado, Inc.
Kaiser Foundation Health Plan of Georgia, Inc.
Kaiser Foundation Health Plan of Hawaii, Inc.
Kaiser Foundation Health Plan of Ohio, Inc.
Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.
Kaiser Foundation Health Plan of the Northwest, Inc.

# EXHIBIT 6

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE FLONASE ANTITRUST LITIGATION | CIVIL ACTION |
| | No. 08-3301 |
| THIS DOCUMENT RELATES TO: | **Hon. Anita B. Brody** |
| Indirect Purchaser Actions | |
| | |
| MEDICAL MUTUAL OF OHIO, on behalf of itself and all others similarly situated, | |
| Plaintiff, | CIVIL ACTION |
| | No. 12-4212 |
| v. | **Hon. Anita B. Brody** |
| SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE plc, | |
| Defendant. | |

**[PROPOSED] ORDER CONDITIONALLY CERTIFYING A SETTLEMENT CLASS,
GRANTING PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT,
APPROVING FORM AND MANNER OF NOTICE, AND SCHEDULING FINAL
APPROVAL HEARING**

This cause is before the Court on Indirect Purchaser Plaintiffs' Unopposed Motion for Preliminary Approval of a Settlement Agreement (the "Motion"). The Court, having considered the Motion, the Parties' Settlement Agreement dated December 6, 2012 (the "Settlement Agreement"), the proposed form of notice to the Settlement Class, the pleadings and other papers filed in these Actions, and the statements of counsel and the parties; and for good cause shown;

IT IS HEREBY ORDERED as follows:

Preliminary Approval of Settlement Agreement

1.      Unless otherwise defined herein, all terms that are capitalized herein shall have the meanings ascribed to those terms in the Settlement Agreement.

2.      This Court has jurisdiction over the Actions (and all actions and proceedings consolidated in the Actions), Plaintiffs, all Settlement Class members, Defendant SmithKline Beecham Corporation d/b/a GlaxoSmithKline ("GSK" or "Defendant"), and any party to any agreement that is part of or related to the Settlement.

3.      The Court finds that the proposed Settlement with GSK set forth in the Settlement Agreement is sufficiently fair, reasonable and adequate such that it is hereby preliminarily approved and notice of the settlement should be provided to the Settlement Class (defined  in paragraph 7 below), and that a hearing should be held as set forth below.  In accordance with the schedule outlined in paragraph 30 below, Class Counsel shall seek entry of an Order and Final Judgment.

4.      The Court finds that the proposed Plan of Allocation, attached to the Motion, also is sufficiently fair, reasonable and adequate such that it is hereby preliminarily approved, subject to further consideration at the hearing to be held as set forth below.

5.      The Court finds that pursuant to Fed. R. Civ. P. 42, as a part of the Settlement, IBEW–NECA Local 505 Health & Welfare Plan v. SmithKline Beecham Corp., No. 08–3301 (E.D. Pa.), and Medical Mutual of Ohio, Inc. v. SmithKline Beecham Corp., No. 12-cv-4212 (E.D. Pa.) shall be consolidated into Docket No. 08-3301.  The Clerk is hereby directed to close Matter No. 12-4212.

Class Certification

6.      In Matter No. 08-3301, for litigation purposes the Court previously entered an order dated June 18, 2012 (Docket No. 437), certifying a class of certain indirect purchasers

within four states.  That Order is hereby superseded by the instant Order conditionally certifying

the Settlement Class defined in paragraph 7 immediately below.

      7.      Solely for purposes of the Settlement, the Court conditionally certifies the

following class pursuant to Fed. R. Civ. P. 23(a) and (b)(3) ("Settlement Class"):

> All persons throughout the United States and its territories who
> purchased and/or paid for, in whole or in part, fluticasone
> propionate nasal spray, whether branded Flonase or its AB-rated
> generic equivalents, intended for the consumption of themselves, their
> family members and/or household members, and all Third Party
> Payor entities throughout the United States and its territories that
> purchased, paid for, administered and/or reimbursed for fluticasone
> propionate nasal spray, whether branded Flonase or its generic
> equivalents, intended for consumption by their members, employees,
> plan participants, beneficiaries or insureds.
>
> The applicable time period for the Settlement Class is May 19, 2004
> through March 31, 2009.
>
> Third Party Payors are all health insurance companies, healthcare
> benefit providers, health maintenance organizations, self-funded
> health and welfare plans, and any other health benefit provider and/or
> entity that contracts with a health insurer acting as a third party
> administrator to administer their prescription drug benefits.  These
> payors include such entities that may provide prescription drug
> benefits for current or former public employees and/or retirees, but
> only to the extent that such entity was at risk for the cost of the
> payment(s).  For purposes of this definition, an entity "paid for"
> fluticasone propionate nasal spray (branded Flonase and/or its
> equivalents) if it paid some or all of the purchase price, or reimbursed
> any part of the purchase price paid by their members, employees,
> insureds, participants or beneficiaries.

Excluded from the Settlement Class are: (1) Defendant and its officers, directors, management,

employees, predecessors-in-interest, successors-in-interest, assignees or affiliates, and subsidiaries;

(2) the United States and/or State governments and their agencies and departments, except to the

extent they purchased fluticasone propionate nasal spray (branded Flonase and/or its generic

equivalents) for their employees or others covered by a government employee health plan; (3) all entities who purchased fluticasone propionate nasal spray (branded Flonase and/or its generic equivalents) directly from Defendant or its affiliates or purchased fluticasone propionate nasal spray (branded Flonase and/or its generic equivalents) for resale, to the extent and solely to the extent of such purchase as a direct purchaser or for resale; (4) any judge or special master who has presided over the Actions; and (5) the health benefit plans listed in Exhibit A hereto ("Settling Health Plans" or "SHPs").

8.      Subject to final approval of the Settlement, the Court finds and concludes for settlement purposes only that the prerequisites to a class action, set forth in Fed. R. Civ. P. 23(a) and Fed. R. Civ. P. 23(b), are satisfied in that:

(a) the Settlement Class is so numerous that joinder of all members is impracticable;

(b) there are questions of law or fact common to the Settlement Class;

(c) Plaintiffs and Class Counsel (each defined below) will fairly and adequately represent the Settlement Class;

(d) the claims of Plaintiffs are typical of those of Settlement Class members;

(e) common issues predominate over any individual issues affecting the members of the Settlement Class;

(f) in the context of settlement, Plaintiffs will fairly and adequately protect and represent the interests of all members of the Settlement Class, and Plaintiffs' interests are aligned with the interests of all other members of the Settlement Class; and

(g) settlement of the Actions on a class action basis is superior to other means of resolving this matter.

9.      The Court appoints Marvin A. Miller, Lori A. Fanning and Michael M. Buchman

Class Counsel, having determined that the requirements of Rule 23(g) of the Federal Rules of Civil Procedure are fully satisfied by this appointment.

10.   The Court hereby appoints Plaintiffs, A.F. of L.-A.G.C Building Trades Welfare Plan ("AFL"), IBEW-NECA Local 505 Health & Welfare Plan ("IBEW"), Painters District Council No. 30 Health and Welfare Plan ("Painters"), Medical Mutual of Ohio, Inc. ("MMOH"), and Andrea Kehoe ("Kehoe"), to serve as Class Representatives for settlement purposes only on behalf of the Settlement Class.

Notice to Settlement Class Members

11.   The Court approves the Notices of Pendency and Proposed Settlement of Class Action (the "Settlement Notices"), and finds that the dissemination of the Notices substantially in the manner and form set forth in the Notice Plan attached to the Motion complies fully with the requirements of the Federal Rule of Civil Procedure 23 and due process of law, and is the best notice practicable under the circumstances.

12.   The notice procedures described in the Notice Plan attached to the Motion are hereby found to be the best means of providing notice under the circumstances and, when completed, shall constitute due and sufficient notice of the proposed Settlement Agreement and the Final Approval Hearing to all persons affected by and/or entitled to participate in the Settlement Agreement, in full compliance with the notice requirements of Rule 23 of the Federal Rules of Civil Procedure and due process of law.

13.   No later than thirty (30) days from the date of this Order preliminarily approving the Settlement, Class Counsel shall cause the postcard Settlement Notice attached to the Notice Plan to be mailed to each third-party payor Settlement Class member, by first class mail, postage prepaid, who can be identified through reasonable effort, and the long form Settlement Notice to

any potential Settlement Class member that requests one; and shall cause to be published the summary notice available to the rest of the Class as stated in the proposed Notice Plan.  All notices by publication shall be complete sixty-five (65) days prior to the Final Approval Hearing. Thirty (30) days prior to the Final Approval Hearing, Class Counsel shall file with the Court and serve on GSK an Affidavit of Compliance with Notice Requirements.

14.     All costs incurred in disseminating and otherwise in connection with the Settlement Notices shall be paid from the Settlement Fund pursuant to the Settlement Agreement.

15.     The claims forms attached to the Notice Plan satisfy the requirements of due process and of Rule 23(e) of the Federal Rules of Civil Procedure and thus are approved for dissemination to the Settlement Class.  The Claims Administrator (defined in Paragraph 31 below) shall make available a copy of the third-party claim form to each third-party payor Settlement Class member with notice, and to any other potential Settlement Class member that requests one.  The consumer claim form shall be made available to the rest of the Settlement Class as set forth on the Notice Plan and shall be made available to any potential Class member that requests one.

Responses by Class Members and the Scheduling of a Final Approval Hearing.

16.     Settlement Class members will have until thirty (30) days prior to the Final Approval Hearing to opt-out (the "Opt-Out Deadline") and shall have until thirty days (30) days prior to the Final Approval Hearing to object to the proposed Settlement.

17.     Any member of the Settlement Class who or that wishes to be excluded ("opt out") from the Settlement Class must send a written Request for Exclusion to Class Counsel on or before the close of the Opt-Out Deadline.  Members of the Settlement Class may not

exclude themselves by filing Requests for Exclusion as a group or class, but must in each instance individually and personally execute a Request for Exclusion.  All Settlement Class members that exclude themselves from the Settlement Class will not be eligible to receive any benefits under the Settlement, will not be bound by any further orders or judgments entered for or against the Settlement Class, and will preserve their ability to independently pursue any claims they may have against Defendant.

18.    Any member of the Settlement Class that does not properly and timely request exclusion from the Settlement Class shall, upon entry of the Order and Final Judgment, be bound by all the terms and provisions of the Settlement Agreement and Release, whether or not such Class member objected to the Settlement and whether or not such Class member received consideration under the Settlement Agreement.

19.    A hearing on the Settlement (the "Final Approval Hearing") shall be held before this Court on _____, 2013 at _____, Courtroom 7-B of the U.S. Courthouse, 601 Market Street, Philadelphia, PA.

20.    At the Final Approval Hearing, the Court will consider (a) the fairness, reasonableness, and adequacy of the proposed class settlement and whether the settlement should be granted final approval by the Court; (b) approval of the proposed Plan of Allocation; (c) dismissal with prejudice of the Actions; (c) entry of an order including the Release; (d) entry of the Final Approval Order; and (e) entry of final judgment in these Actions.  Class Counsel's application for award of attorney's fees and costs, and request for the Court to award an incentive award to the named plaintiffs, shall also be heard at the time of the hearing.

21.    The date and time of the Final Approval Hearing  shall be subject to adjournment by the Court without further notice to the members of the Settlement Class, other than that which

may be posted by the Court. Should the Court adjourn the date for the Final Approval Hearing, that shall not alter the deadlines for mailing and publication of notice, the Opt-Out deadline, or the deadlines for submissions of settlement objections, claims, and notices of intention to appear at the Final Approval Hearing unless those dates are explicitly changed by subsequent Order.

22.    Any person or entity who or which does not elect to be excluded from the Settlement Class may, but need not, enter an appearance through its own attorney. Settlement Class members that do not timely object or opt out and that do not have an attorney enter an appearance on their behalf will be represented by Class Counsel.

23.    Any person or entity who or which does not elect to be excluded from the Settlement Class may, but need not, submit comments or objections to the proposed Settlement. Any Class member may object to (a) the proposed Settlement, (b) entry of Final Approval Order and the judgment approving the Settlement, (c) Class Counsel's application for fees and expenses, or (d) incentive award requests, by serving a written objection upon Class Counsel, GSK's counsel, and the Court.

24.    Any Class member making the objection (an "Objector") must sign the objection personally or through Objector's counsel. An objection must state why the Objector objects to the proposed Settlement and provide the basis to support such position. If an Objector intends to appear at the hearing, personally or through counsel, the Objector must include with the objection a notice of the Objector's intent to appear at the hearing. The objection must also contain a detailed list of any other objections by the Objector to any class action settlements submitted to any court, whether State, Federal, or otherwise, in the United States in the previous five (5) years.

25.    Objections, along with any notices of intent to appear, must be filed with the

Court no later than thirty (30) days prior to the Final Approval Hearing.  If counsel is appearing on behalf of more than one Settlement Class member, counsel must identify each such Settlement Class member and each Settlement Class member must have complied with the requirements of this Order.  The notice of objection shall be sent to (a) Class Counsel, (b) GSK's counsel, and (c) the Court.  Such objection shall state the name, address and telephone number of the objector, proof of purchase, payment or reimbursement, and a detailed statement of each objection asserted, including the grounds for objection together with any documents such person wishes to be considered in support of the objection.  No objector may appear at the hearing unless the objector indicates an intent to appear.  These documents must be filed with the Clerk of the Court electronically or at the following address and the Counsel listed below:

U.S. District Court for the Eastern District of Pennsylvania
Office of the Clerk of Court
601 Market Street
Philadelphia, PA  19106-1797

Marvin A. Miller
Lori A. Fanning
MILLER LAW LLC
115 South LaSalle Street
Suite 2910
Chicago, IL 60603
*Counsel for Indirect Purchaser Plaintiffs Class*

Stephen J. Kastenberg
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA  19103
*Counsel for GSK*

26.    Only Settlement Class members that have filed and served valid and timely notices of objection shall be entitled to be heard at the Final Approval Hearing.  Any Settlement Class member that does not timely file and serve an objection in writing in accordance with the procedure set forth in the Class Notice and mandated in this Order shall be deemed to have

waived any objection to (a) the Settlement; (b) the Release; (c) entry of Final Approval Order or any judgment; (d) Class Counsel's application for fees, costs, and expenses; or (e) incentive award requests for the named Plaintiffs, whether by appeal, collateral attack, or otherwise.

27.     Settlement Class members need not appear at the hearing or take any other action to indicate their approval.

28.     Upon entry of the Order and Final Judgment all members of the Settlement Class that have not personally and timely requested to be excluded from the Settlement Class will be enjoined from proceeding against defendant GSK and all other Released Parties with respect to all of the Released Claims.

29.     GSK shall prepare and send, at GSK's expense, all notices that may be required by the Class Action Fairness Act of 2005 ("CAFA") as specified in 28 U.S.C. § 1715.  Class Counsel and Defendant shall cooperate promptly and fully in the preparation of such notices, including providing Defendant with any and all information in their possession necessary for the preparation of these notices.  Defendant shall provide copies of the notices to Class Counsel for the purpose of implementing the settlement.  Plaintiffs, Settlement Class members, and Class Counsel shall not have or assert any claim against Defendant regarding the Class Action Fairness Act notification.  Defendant shall provide notice to Class Counsel and the Court of compliance with the CAFA requirements within ten (10) days of providing notice to Attorneys General under CAFA.

30.     The schedule by which the events referenced above should occur is as follows:

| Event | Date |
|---|---|
| Postcard Notice of Class Action Settlement  to be Mailed to TPPs and Posted on Internet | Within 30 days of Preliminary Approval Order |
| Notice of Class Action Settlement to be | To be complete 65 days prior to the Final |

| Published in National Media | Approval Hearing |
|---|---|
| Affidavit of Compliance with Notice Requirements | To be complete 30 days prior to the Final Approval Hearing |
| Notification of Compliance with CAFA Requirements | To be completed 10 days after providing notice to Attorneys General |
| Receipt/Filing Deadline for requests for Exclusion (Opt-Out) or Objections | 30 days prior to Final Approval Hearing |
| Postmark/Filing Deadline for Filing Claims | 60 days after entry of Order and Final Judgment |
| Filing Motion for Final Approval, Attorney's Fees, Reimbursement of Expenses, and Incentive Awards to be Filed by Class Counsel | 45 days prior to Final Approval Hearing |
| Filing Motion for Final Approval to be Filed by Class Counsel | 14 days prior to Final Approval Hearing |
| Service/Filing Notice of Appearance at Final Approval Hearing | 30 days prior to Final Approval Hearing |
| Final Approval Hearing | No sooner than 30 days after Opt-Out Deadline |

Administration of the Settlement Fund.

31.     The Court hereby appoints the claims administrator proposed by the Indirect Purchaser Plaintiffs, Rust Consulting, Inc. (the "Claims Administrator").  Responsibilities of the Claims Administrator shall include:  (a) establishing a post office box for purposes of communicating with Class members; (b) disseminating notice to the Class; (c) developing a web site to enable Class members to access documents; (d) accepting and maintaining documents sent from Class members relating to claims administration; and (e) distributing settlement checks to Class members.  Pursuant to the Settlement Agreement, the Claims Administrator and costs of

administration shall be paid out of the Settlement Fund, subject to Court review and approval.

32.   All funds held by the Escrow Agent shall be deemed and considered to be in *custodia legis* of the Court, and shall remain subject to the jurisdiction of the Court, until such time as such funds shall be distributed pursuant to the Settlement Agreement and further order(s) of the Court.

33.   The Settlement Fund shall be a trust under Pennsylvania law and, to the extent it is held at a financial institution designated by Class Counsel or the Claims Administrator, it shall be established as a fiduciary account and administered in accordance with the provisions of paragraph 6 of the Settlement Agreement.  The Court approves the establishment of the escrow account under the Settlement Agreement as a qualified settlement fund ("QSF") pursuant to Internal Revenue Code Section 468B and the Treasury Regulations promulgated thereunder, and retains continuing jurisdiction as to any issue that may arise in connection with the formation and/or administration of the QSF.  Class Counsel are, in accordance with the Settlement Agreement, authorized to expend funds from the QSF for payment of taxes, notice costs, and related expenses.

34.   All further indirect purchaser proceedings as to the Defendant are hereby stayed, except for any actions required to effectuate the Settlement Agreement, or matters related to the Settlement Fund, including applications for attorneys' fees, reimbursement of expenses, and incentive awards to Class Representatives.

35.   In the event the Settlement Agreement and the proposed settlement are terminated in accordance with the applicable provisions of the Settlement Agreement, the Settlement Agreement, the proposed Settlement, and all related proceedings shall, except as expressly provided to the contrary in the Settlement Agreement, become null and void, shall have no

further force and effect, and Indirect Purchaser Plaintiffs shall retain all of their current rights to assert any and all claims against Defendant and any other released party, and the Defendant and any other released parties shall retain any and all of their current defenses and arguments thereto (including but not limited to arguments that the requirements of Fed. R. Civ. P. 23(a) and (b)(3) are not satisfied for purposes of continued litigation). These Actions shall thereupon revert forthwith to their respective procedural and substantive status prior to the date of execution of the Settlement Agreement and shall proceed as if the Settlement Agreement and all other related orders and papers had not been executed.

36.     Neither this Order nor the Settlement Agreement nor any other settlement-related document nor anything contained herein or therein or contemplated hereby or thereby nor any proceedings undertaken in accordance with the terms set forth in the Settlement Agreement or herein or in any other settlement-related document, shall constitute, be construed as or be deemed to be evidence of or an admission or concession by Defendant as to the validity of any claim that has been or could have been asserted against it or as to any liability by it as to any matter set forth in this Order, or as to the propriety of class certification for any purposes other than for purposes of the current proposed settlement.


Dated: _____


_____
Anita B. Brody, U.S.D.J.

## CERTIFICATE OF SERVICE BY ELECTRONIC MEANS

I, Marvin A. Miller, one of the attorneys for plaintiffs, hereby certify that on December 14, 2012 service of the foregoing Plaintiffs' Unopposed Motion for Preliminary Approval of the Class Action Settlement  was accomplished via electronic mail.


*/s/    Marvin A. Miller*

Marvin A. Miller