# EXHIBIT "A"

19TH JUDICIAL DISTRICT COURT, PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

NO. 036032        DIVISION ____        SEC. 25

STATE OF LOUISIANA,
by and through its ATTORNEY GENERAL JAMES CALDWELL

VERSUS

SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE PLC

FILED: _____        _____
                                        DEPUTY CLERK

Plaintiff State of Louisiana, by and through its Attorney General James D. "Buddy" Caldwell, ("Plaintiff"), based upon information and belief and after an inquiry reasonable under the circumstances, for its Petition against Defendant SmithKline Beecham Corporation d/b/a GlaxoSmithKline plc ("Defendant" or "GSK"), alleges as follows:

## I.    NATURE OF THE ACTION

1.    Plaintiff brings this action with respect to purchases of and reimbursements for the prescription drug Flonase and its generic equivalent, fluticasone propionate. Plaintiff alleges that GSK employed a "brand maturation strategy" designed to prevent or delay a less expensive generic version of fluticasone propionate from entering the market. The "brand maturation strategy" included the following four tactics: (i) improperly influencing the Food and Drug Administration's ("FDA") bioequivalence guidance process; (ii) filing successive objectively and subjectively baseless Citizen Petitions with the FDA; (iii) drafting a fluticasone propionate monograph for submission to the United States Pharmacopeia - which list test, procedures, and acceptance criteria in order to set standards for quality, purity, strength, and consistency of the pharmaceutical ingredients in an approved drug - in an attempt to raise the bar for fluticasone propionate market entrants and create an unlevel playing field; and (iv) supplementing its original New Drug Application ("NDA") in an attempt to delay the FDA from approving any ANDAs before approving GSK's supplements.

2.    As a result of its unlawful "brand maturation" scheme to keep generic versions of Flonase off the market, and in violation of Louisiana antitrust and unfair competition laws, GSK: (a) illegally maintained monopoly power in the market for fluticasone propionate in the United States for at least twenty (20) months and sold more than $1 billion of Flonase during



EXHIBIT
"A"

that time; (b) maintained the price of Flonase at supra-competitive levels; and (c) overcharged Plaintiff millions of dollars by depriving it of the benefits of unrestricted competition and access to less expensive generic versions of fluticasone propionate.

3.    GSK marketed and sold Flonase in the State of Louisiana.

4.    Due to Defendant's monopolistic actions and unfair and deceptive trade practices and acts, the State paid unlawfully inflated prices for brand name Flonase when generic versions of Flonase, and the accompanying lower generic prices, would otherwise have been available but for Defendant's unlawful agreements.

5.    The State is accountable to its citizens and taxpayers for how it spends limited State resources, and it is empowered to pursue any party whose unlawful conduct has caused the State to be overcharged led to the unlawful obtainment of State funds.

6.    Consequently, the State, by and through its Attorney General, brings this action to seek restitution and treble damages, via the enforcement powers of the Louisiana Attorney General as provided by Louisiana state laws and statutes, including but not limited to La. R.S. §§ 51:123, 51:128, 51:136, 51:137, 51:138, 51:1404, 51:1405, 51:1407, 51:1408, 51:1409, and 51:1414. Through this civil action, the State seeks to recover amounts paid by the State of Louisiana for illegally obtained funds due to Defendant's monopolistic actions and unfair and deceptive trade practices and acts. The State brings this action exclusively under the laws and statutes of Louisiana. No claims arising under the laws of the United States are asserted herein.

## II.    PARTIES

### A. Plaintiff

7.    This action is brought for and on behalf of the sovereign State of Louisiana, by and through its duly elected Attorney General, James D. "Buddy" Caldwell. The Attorney General, as chief legal officer of the State, is statutorily authorized to initiate and prosecute any and all suits deemed necessary for the protection of the interests and rights of the State pursuant to La. R.S. §§ 13:5036, 51:128, 51:138, 51:1404, 51:1405, 51:1414 and related statutes and Louisiana law. Specifically, the Attorney General is authorized to initiate and prosecute suits to penalize conduct that constitutes unfair or deceptive trade practices and that monopolizes or restrains trade or commerce. The Attorney General is also charged with the duty to protect the fiscal and programmatic integrity of the medical assistance programs from companies that engage in abusive practices. Plaintiff brings this action in its proprietary and/or sovereign

capacity, which may include state departments, bureaus, agencies, political subdivisions, and other instrumentalities as purchasers (either directly, indirectly, or as assignees) or as purchasers under medical or pharmaceutical reimbursement programs, of Flonase.

**B.  Defendant**

8.      Defendant SmithKline Beecham Corporation is a Pennsylvania Corporation with its principal offices located at One Franklin Plaza, Philadelphia, Pennsylvania.  SmithKline Beecham also conducts business in the name of GlaxoSmithKline Inc. and is a subsidiary of GlaxoSmithKline plc.

### III.    JURISDICTION AND VENUE

9.      This Court has jurisdiction over the State's claims because they arise exclusively under Louisiana Law.

10.      This Court has personal jurisdiction over each Defendant pursuant to La. C.C.P. Art. 6, La. R.S. §§ 13:3201, 51:128, 51:1407(A), 51:1418 and related statutes because each Defendant engages in consumer transactions within the State of Louisiana, purposefully directs and/or directed its actions toward the State of Louisiana, and/or has the requisite minimum contacts within the State of Louisiana needed to permit this Court to exercise jurisdiction.

11.      Venue is proper in this judicial district pursuant to the Louisiana Code of Civil Procedure article 42, La. R.S. §§ 51:131, 51:1407 and related statutes. Further, the State pays reimbursement through its Medicaid agency for prescription drugs dispensed in this Parish and throughout the State of Louisiana. The events giving rise to the claims herein arose, in substantial part, in this Parish.

### IV.    LEGAL BACKGROUND

**A.    The Regulatory Structure for Approval of Generic Drugs**

12.      Under the FDCA, codified at 21 U.S.C. §§ 301-392, manufacturers who create a new drug product must obtain the approval of the FDA to sell the new drug by filing a New Drug Application ("NDA"). An NDA must include submission of specific data concerning the safety and effectiveness of the drug, as well as any information on applicable patents. 21 U.S.C. § 355(a), (b).

13.      In 1984, Congress modified the FDCA by enacting the Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984). The modification, more typically known as the Hatch-Waxman Amendments, simplified the regulatory hurdles for

prospective generic manufacturers by eliminating the need for them to file a lengthy and costly NDA in order to obtain FDA approval. Instead, the FDA provides an expedited review process by which generic manufacturers file an abbreviated application (an "ANDA") which relies in substantial part on the scientific finding of safety and effectiveness included by the brand named manufacturer in the NDA for the same drug. 21 U.S.C. § 3550).

14.     Two primary goals motivated the enactment of the Hatch-Waxman Amendments. First, where a generic product could be developed that did not infringe any existing legitimate patent, Congress sought to expedite the entry of generic competitors and thereby reduce healthcare expenses nationwide. Second, Congress wanted to protect the incentive of pharmaceutical companies to create new and innovative products. The Hatch-Waxman Amendments achieved both goals, substantially advancing the rate of generic product launches, and ushering in an era of historic high profit margins for brand name pharmaceutical companies.

15.     Under the terms of the FDCA and the Hatch-Waxman Amendments, a prospective generic manufacturer must demonstrate to the FDA that the generic drug it proposes to market is bioequivalent to the brand named drug. 21 U.S.C. § 355(j)(2)(A)(iv). The FDCA and Hatch-Waxman Amendments operate on the presumption that bioequivalent drug products containing identical amounts of the same active ingredients in the same route of administration and dosage form, and meeting applicable standards of strength, quality, purity and identity, are therapeutically equivalent and may be substituted for one another.

16.     Bioequivalency demonstrates that the active ingredient of the proposed generic drug would be present in the blood of a patient to the same extent and for the same amount of time as the branded counterpart. 21 U.S.C. § 355(j)(8)(B). For drugs that are not intended to be absorbed into the bloodstream, including Flonase, the Hatch-Waxman Amendments provide that the FDA "may establish alternative, scientifically valid methods to show bioequivalence if the alternative methods are expected to detect a significant difference between the drug and the listed drug in safety and therapeutic effect." 21 U.S.C. § 355(j)(8)(C); 21 C.F.R. § 320.24(b)(6).

17.     In reviewing what "alternative, scientifically valid methods" it might consider in determining bioequivalence of drugs, the FDA may - but is not required to - issue a guidance document articulating the agency's current thinking on the issue. No regulations require the FDA to issue such a guidance document, however, and guidance documents, where they exist, do not bind either the FDA or the public as they do not establish legally enforceable rights or

responsibilities. Rather, the guidance documents are just that - they embody the FDA's current thinking on a subject and provide guidance to the public. The FDA's obligation to make a determination as to whether an individual ANDA meets statutory requirements and thus should be approved depends in no part on whether or not a guidance document relevant to that ANDA exists.

18.     As a counter-balance to this abbreviated approval procedure for bioequivalent generic drugs, the Hatch-Waxman Amendments streamlined the process for brand name manufacturers to enforce legitimate patents they may hold against infringement by generic manufacturers. Beyond traditional patent rights, the Hatch-Waxman Amendments also provide brand name manufacturers with several means to obtain legitimate protection from generic competition for set, and specifically limited, periods of time. For example, each approved NDA provides the owner of that drug with three years of exclusivity during which time no generic manufacturer can even file an ANDA. 21 U.S.C. § 355(j)(5)(F)(iii). Pioneer drugs or truly new or innovative drugs that make use of a never-before-approved chemical entity or moiety receive even more time: a "New Chemical Entity" ("NCE") exclusivity period of five years. 21 U.S.C. § 355(j)(5)(F)(ii).

**B.     Generic Drugs Offer Significant Savings and Thus Take Significant Sales From Brand Name Drugs**

19.     Drugs proven to meet bioequivalence requirements through *in vivo* (clinical) and/or *in vitro* (laboratory) testing receive an "AB" rating from the FDA, indicating they are therapeutically equivalent to other drugs with the same rating in the same category. For example, Roxane Laboratories, Inc.'s ("Roxane") fluticasone propionate is an AB-rated generic version of GSK's Flonase, indicating the drugs are therapeutically equivalent and bioequivalent to one another.

20.     Typically, manufacturers of AB-rated generic versions of brand name drugs price their drugs significantly below the brand name counterparts. Because of the price differential and certain institutional features of the pharmaceutical market which seek to capitalize on this price differential, AB-rated generic versions are rapidly and substantially substituted for their brand name counterparts.

21.     Under the statutory regime enacted by Congress (*i.e.*, the Hatch-Waxman Amendments) and as found in most state legislatures (*i.e.*, Drug Product Selection, or "DPS laws"), pharmacists in Louisiana may – and, in the case of Medicaid, must – substitute an AB-

rated generic version of a drug for the brand name drug without seeking or obtaining permission from the prescribing doctor.[1] Congress and state legislatures actively encourage generic substitution of brand name drugs because of the enormous cost savings to purchasers and consumers generated.[2]

22.     Once a physician writes a prescription for a brand name drug such as Flonase, the prescription defines and limits the options to the named drug and its AB-rated generic equivalent(s). Only drugs which carry the FDA's AB generic rating in that category may be substituted by pharmacists for a physician's prescription for a brand name drug.

23.     Generic competition enables the purchase of generic versions of brand name drugs at substantially lower prices. Such competition also results in reduced prices for, and thus savings on purchases of, the brand name drug (as the brand manufacturer lowers prices in an attempt to maintain market share). Prior to entry of an AB-rated generic and competition, however, brand name manufacturers can charge supra-competitive prices without losing all, or a substantial portion, of its brand name sales. Consequently, brand name drug manufacturers have strong incentives to delay the introduction of AB-rated generic competition into the market.

C.     Citizen Petitions to the FDA

24.     Recognizing the central role that healthcare and pharmaceutical drugs play in the United States, Congress enacted federal regulations governing the FDA that allow individuals to express genuine concerns about safety, scientific, or legal issues regarding a product any time before, or after, its market entry. Under these regulations, any person or entity, including a pharmaceutical company, may file a Citizen Petition with the FDA requesting that the FDA

---

[1] La. Admin Code, Title 46, Chapter 25, SubChapter B, Section 2511(B)(6) provides: Equivalent Drug Product Interchange
a.     The pharmacist shall not select an equivalent drug product when the prescriber handwrites a mark in the check box labeled "Dispense as Written", or "DAW", or both, and personally handwrites his signature on a printed single signature line. Otherwise, the pharmacist may select an equivalent drug product, provided the patient has been informed of, and has consented to, the proposed cost saving interchange.
b.     In the event an authorized prescriber has indicated that an equivalent drug product interchange is prohibited by handwriting a mark in the check box labeled "Dispense as Written", or "DAW", or both, then a non-licensed, non-certified, or non-registered agent of the pharmacy shall not inquire as to a patient's desire for an equivalent drug product interchange.
c.     For prescriptions reimbursable by Medicaid or Medicare, the authorized prescriber may only prohibit equivalent drug product interchange by handwriting the words "brand necessary" or "brand medically necessary" on the face of the prescription order or on a sheet attached to the prescription order.
[2] Federal and state legislatures also recognize that the economics of the pharmaceutical industry prevent generic manufacturers from engaging in the heavy promotion or "detailing" typically done by brand name manufacturers.

take, or refrain from taking, any administrative action. 21 C.F.R. 10.30.

25.     Within 180 days of receipt, the FDA Commissioner must respond to each Citizen Petition and may approve the request in part or in full, deny it, or provide a tentative response with an estimate on a time for a full response. 21 CFR 10.30(e)(2).

26.     Reviewing and responding to these petitions often requires the use of substantial time and resources because the FDA must, in addition to its already-existing workload: (a) research the subject matter of the Citizen Petition; (b) examine scientific, medical, legal, and sometimes economic issues; (c) consider public responses to the Citizen Petition; and (d) coordinate internal agency review and clearance of the petition response. These activities can and do strain the FDA's limited resources.

**D.     Named Brand Manufacturers Use Citizen Petitions to Forestall Generic Competition**

27.     In recent years, a number of brand name pharmaceutical manufacturers abused the Citizen Petition process, using it as a tactic to extend their monopolies on name brand drugs. Citizen Petitions by rival companies rarely raise legitimate concerns about the safety or efficacy of generic products, and instead only seek to preserve monopolies after the end of a statutorily granted patent or FDA exclusivity period. Companies frequently file these Citizen Petitions on the eve of FDA approval of an ANDA for competing AB-rated generic drugs, even though the petitioner could have made the same arguments months, or even years, before. This results in delay of final approval of a pending ANDA for several months or more while the FDA evaluates the merits of the Citizen Petition.

28.     The resulting delay of generic competition can be lucrative for an incumbent brand name manufacturer facing impending competition from an AB-rated generic. The cost of filing an improper, sham Citizen Petition pales in comparison to the value of securing an additional period of monopoly profits.

29.     In recent years, only about 7% of Citizen Petitions regarding the approvability of generic products led to any change in the FDA's policy on the basis of data or information submitted in the petition. Yet prior to 2007, the FDA maintained a practice, well known in the pharmaceutical industry, of considering and responding to relevant Citizen Petitions prior to approval of an ANDA to assure itself that the petitions did not present any new issues or issues of concern.

30.     The abuse of the Citizen Petition process in part helped lead Congress to enact

the FDA Amendments Act of 2007, 21 U.S.C. 355(q) (the "2007 Amendments"). In pertinent part, the 2007 Amendments provide that the FDA shall not delay approval of a pending ANDA because of a Citizen Petition unless the FDA determines that a delay is necessary to protect the public health. The 2007 Amendments also authorize the FDA to summarily deny any Citizen Petition whose primary purpose, as determined by the FDA, is to delay competition. Signed into law on September 27, 2007, these revisions were not yet in effect at the time the FDA was considering the petitions at issue here.

## V.     FACTUAL BACKGROUND

### A.     Flonase

31.     GSK manufactures, markets, and sells Flonase, a brand name prescription drug. Flonase, the generic name for which is fluticasone propionate, is a corticosteroid nasal spray used for treatment of nasal symptoms of seasonal and year-round allergies, as well as non-allergic rhinitis in adults and pediatric patients four years of age and older.

32.     The active ingredient in Flonase is a corticosteroid: fluticasone propionate. Flonase consists of an aqueous suspension of microfine fluticasone propionate intended for topical administration to the nasal mucosa through a metered atomized spray pump. The device is made up of a container, a pump and an actuator.

33.     Flonase belongs to a class of medications called intranasal corticosteroids that reduce inflammatory reactions that may lead to nasal symptoms such as congestion, sneezing, and itchy, runny nose.

34.     Flonase, as acknowledged by GSK in its promotional materials related to the drug, offers unique attributes among allergy medications in that it is non-habit forming and does not cause drowsiness. It is the only drug approved to treat the nasal symptoms of indoor and outdoor allergies as well as year-round nonallergic nasal symptoms.

### B.     Approval and Sale of Flonase

35.     The FDA approved the NDA for GSK's Flonase Nasal Spray (in 50 mcg) for sale in the United States on October 19, 1994. The agency subsequently approved several supplements to the Flonase NDA in order to add new labeling information, including new indications for use.

36.     GSK held a single patent on Flonase which expired on November 14, 2003. Having fulfilled certain requirements regarding pediatric studies, GSK received a six-month

extension of market exclusivity from the FDA.[3] Thus, GSK's exclusive right to market Flonase in the United States expired on May 14, 2004 and with final approval by the FDA, a generic manufacturer could have begun marketing a generic form of Flonase on or after that date.

37.     Prior to entry of generic forms of fluticasone propionate, Flonase held 100% of the relevant market. GSK marketed and sold Flonase in the U.S., yielding annual sales of approximately $930 million in 2004 and over a billion dollars in 2005. The pharmaceutical industry publication *Drug Topics' Top 200 Brand Name Drugs by Dollars* ranked Flonase at number 37 in 2004 and number 33 in 2005.

38.     As a sophisticated and long-standing pharmaceutical manufacturer, GSK knew that as its patent exclusivity for Flonase approached, generic manufacturers would seek approval from the FDA to market a generic version of the drug. GSK also knew that such ANDAs would be filed with the FDA in time for the FDA to carefully consider them and issue approval prior to or concomitant with the expiration of GSK's market exclusivity.

C.     FDA's Preparation for Approval of Generic Competition for Flonase

39.     Recognizing that it would begin to get ANDAs from manufacturers seeking to market generic versions of nasal aerosol and nasal spray products in the coming years, the FDA initiated a guidance development process in June 1999 to establish a recommended approach for measuring the bioequivalency of those products. Following receipt of comments from the public and the pharmaceutical industry, the FDA reissued the guidance document in draft form in 2003. See FDA Draft Guidance, *Bioavailability and Bioequivalence Studies for Nasal Aerosols and Nasal Sprays for Local Action*, April 2003 ("2003 Draft Guidance").

40.     FDA guidance documents simply embody the FDA's current thinking on a subject and provide guidance to the public; they are only recommendations meant to solicit public comment and input. Guidance documents do not bind the FDA and they do not restrict the FDA's ability to consider methodologies or processes other than those articulated in the guidance document. The FDA's obligation to make a determination as ANDA meets statutory requirements and thus should be approved whether or not a guidance document relevant to that

---

[3] Section 505A of the FDCA provides for a six-month extension beyond the expiration of the relevant patent during which time an ANDA may not be approved if the FDA determines it desires information about the drug in pediatric populations, and if certain conditions regarding studies of the drug in that population are met.

ANDA exists.

41.     The FDA approves a multitude of generic drugs without benefit of any relevant guidance document, in draft or final form. If the FDA had to finalize guidance documents prior to taking any relevant administrative action, generic drug approvals stemming from ANDAs would face significant delays. The FDA itself realizes this: "[i]f the FDA were required to answer questions from potential generic drug applicants by issuing guidance documents, it would be impossible for the Agency to fulfill its responsibility under the Act to approve every generic drug that meets the statutory standards." *See* FDA's consolidated response to submissions regarding ANDAs for fluticasone propionate, attached as Exhibit 1, at p. 22 ("FDA's consolidated response").

42.     Federal statutes require that in evaluating generic drugs for approval, the FDA must use its own scientific judgment when analyzing bioequivalence data to determine whether there is a "significant difference" in the rate and extent of absorption of the drug between the brand name and proposed generic. Although not bound by its draft guidance documents, the FDA articulated scientifically valid methodologies for making this determination in the 2003 Draft Guidance. The FDA approach to establish bioequivalence for locally acting nasal suspension spray relies on "(1) qualitative and quantitative sameness of formulation of test and reference products, (2) comparability in container and closure systems, and (3) *in vitro* and *in vivo* methods that demonstrate equivalent product performance." Id. at p. 5 (citing 2003 Draft Guidance).

43.     Product quality standards are also an important consideration for the FDA both for brand name and generic drugs. In 1997, the FDA began recommending that manufacturers seeking approval of nasal sprays include specifications for droplet size distribution ("DSD") and spray pattern ("SP") to help evaluate product quality.

44.     Because a nasal spray pump delivers a drug locally (to the nasal mucosa) rather than through the bloodstream, the FDA and manufacturers must consider the amount and method of delivery to the affected area in evaluating the amount of active ingredient provided by each application of the drug. In addition, manufacturers and the FDA must be able to show that, within a certain acceptable variation, each actuation of the nasal pump delivers the same amount of active ingredient to ensure consistent performance over the lifetime of the device. DSD and SP demonstrate, in part, these important considerations.

45.     For generic drugs, "the specifications ensure that each production batch of generic ... nasal spray meets the standards for drug quality (i.e., delivers clinical performance per label claims), based on batches that have been demonstrated to be bioequivalent with [the brand name nasal spray]." Id. at 21. However, the actual specifications used may differ from manufacturer to manufacturer based on the equipment and testing conditions used. Such differences are perfectly acceptable as long as the products all meet the same standard for product quality.

46.     The FDA approved Flonase before it began recommending nasal spray applicants include DSD and SP specifications, but soon requested GSK submit such information. As part of a 1999 supplement to its NDA, GSK submitted specifications for DSD and DS to the FDA. In response, the FDA requested that GSK tighten the acceptable limits and reduce variation in SP and DSD and that GSK test the SP and DSD of each batch of Flonase. In October 2004, the FDA approved final DSD and SP specifications for Flonase based on GSK's reduction in variation in SP and DSD. GSK, with the FDA's knowledge and blessing, continued to sell Flonase as a safe and effective drug during these years even though it filed Citizen Petitions with the FDA demanding generics be immediately held to the new standards.

**D.     GSK's Unlawful Scheme to Delay Generic Competition for Flonase**

47.     As the end of its exclusivity period for Flonase neared, GSK knew both that generic manufacturers would be filing ANDAs and that they would do so in time for the FDA to act on them before or by the time GSK's exclusivity period expired.

48.     On October 3, 2002, more than a year before GSK's patent expired and more than a year and a half before GSK's statutorily-regulated market exclusivity expired, Roxane filed an ANDA with the FDA seeking approval to market an AB-rated generic version of Flonase upon the expiration of GSK's period of market exclusivity.

49.     On May 19, 2004 - just days after the expiration of GSK's Flonase exclusivity and on the eve of what would have been the FDA's approval of Roxane's ANDA - GSK filed an objectively baseless Citizen Petition with the FDA for the express purpose, and with the express intent, of delaying the FDA's final approval of any generic manufacturer's ANDA thus delaying generic competition in the United States market for fluticasone propionate. Over the next year, GSK filed additional objectively baseless submissions with the FDA, including

a Supplement to the Citizen Petition on November 23, 2004, a Petition for Stay of Action on March 25, 2005, and a Second Supplement to the Citizen Petition on June 16, 2005.

(1)   **GSK's Citizen Petition**

50.   On May 19, 2004, five days after its exclusivity period for Flonase expired but more than a year and a half after Roxane filed its ANDA for a generic version of the drug, GSK filed an objectively baseless Citizen Petition with the FDA. See GSK Citizen Petition, dated May 19, 2004, attached as Exhibit 2 ("GSK's First Petition").

51.   As stated in the petition, GSK filed the document with the belief that the FDA "may be nearing an approval decision on an ANDA" for generic fluticasone propionate. Id. at p. 2.

52.   GSK's First Petition did not address the adequacy of Roxane's ANDA, present any evidence that Roxane's fluticasone propionate failed to demonstrate bioequivalence to Flonase, or raise any concerns about public health - the issues for which citizens petitions were primarily implemented. Instead, GSK's First Petition urged the FDA to refrain from approving any AB-rated ANDA for fluticasone propionate until after the FDA completed the process of issuing a final guidance document setting forth a scientifically valid methodology for determining bioequivalence for nasal spray products.

53.   GSK's Citizen Petition urged the FDA not to act on any ANDAs for fluticasone propionate until completing the guidance development process, which would presumably include another lengthy period of public comment and the issuance of a final form of the 2003 Draft Guidance. GSK's First Citizen Petition argued that prior to approval of any ANDA, the FDA must first develop statistical criteria for *in vitro* and *in vivo* comparative tests, direct that in vivo clinical studies be conducted in the "most difficult to treat" indication, and direct that any ANDA applicant conduct certain pharmacokinetic studies. GSK's First Petition at p. 2-3. GSK knew this was not true.

54.   GSK's First Citizen Petition was nothing other than a sham designed to prevent or delay generic entry. GSK could not reasonably have expected to prevail on the substance of the Petition. Though it purported to be caught unaware that the FDA would even consider approving an ANDA before finalizing the 2003 Draft Guidance, GSK, a sophisticated and long-standing player in the pharmaceutical industry, knew that generic manufacturers would file one or more ANDAs seeking approval to market generic Flonase as soon as GSK's

exclusivity for Flonase expired. GSK also knew that the FDA faced no law or regulation requiring it, nor was it FDA's practice, to finalize relevant guidance documents prior to evaluating a pending ANDA or taking other administrative action.

55.     As the FDA pointed out in its response to the first GSK Citizen Petition:

> Neither the Act nor the FDA regulations require the FDA to issue final guidance prior to approving an ANDA... GSK has cited no authority to support its position that the Agency must complete a guidance document prior to approving an ANDA for a fluticasone propionate nasal spray product... Whether or not FDA issues final guidance does not speak to the scientific validity of FDA's bioequivalence methodology, scientific evaluation, and approval of generic fluticasone propionate nasal spray products... Over the past eight or more years, based on industry and public input, FDA has developed a scientifically valid methodology capable of detecting a significant difference between test and reference fluticasone propionate nasal spray products.

Exhibit 1: FDA's Consolidated Response at p. 21-22.

(2)     GSK's Supplemental Citizen Petition

56.     On November 23, 2004, six months after the filing of GSK's First Petition, GSK submitted a supplemental Citizen Petition with respect to fluticasone propionate to the FDA. See GSK's Supplement to the Citizen Petition, dated November 23, 2004, attached as Exhibit 3 ("GSK's Supplemental Petition"). Like its previous submission, GSK's Supplemental Petition neither addressed the adequacy of Roxane's ANDA nor presented any evidence that Roxane's fluticasone propionate failed to demonstrate bioequivalence with Flonase. The petition also failed to raise any safety or efficacy concerns.

57.     GSK's Supplemental Petition claimed that with respect to product quality, the FDA could not substitute bioequivalence tests as a surrogate for product quality standards. It sought to have the FDA impose on any ANDA filer for fluticasone propionate the same set of standards related to droplet size distribution ("DSD") and spray pattern ("SP") as that imposed by the FDA on GSK's Flonase in October 2004 (supplement S-019 to NDA 20-121).

58.     GSK's Supplemental Petition was also a sham. GSK could not reasonably have expected to prevail on the substance of the petition. First, prior to GSK's 1999 NDA supplement, and during the entire time GSK worked with the FDA to tighten its SP and DSD parameters, GSK continued to sell Flonase as a safe and effective product. Thus, GSK could not reasonably expect that the FDA would refrain from approving an ANDA that lacked SP and DSD standards. Second, GSK's Supplemental Petition ignored the fact that the FDA had already recommended that all NDA and ANDA applicants for nasal spray products provide

specifications for SP and DSD. *See* 2003 Draft Guidance. *See also* FDA's *Nasal Spray and Inhalation Solution, Suspension, and Spray Drug Products - Chemistry, Manufacturing, and Controls Documentation,* July 2002.

59.     Although the actual specifications for drug quality between ANDA and NDA products may differ, the FDA requires generic and innovator applicants to meet the same standards for product quality. How that quality is measured differs from drug to drug and from manufacturer to manufacturer due to variations in manufacturing processes, as well as tests developed to measure quality. GSK acknowledged that "A generic drug product need not be manufactured in the same way as the innovator, nor must it necessarily meet identical manufacturing specifications." Exhibit 3: GSK's Supplemental Petition at p. 16.

60.     As the FDA pointed out:

> [e]ach firm develops its own proprietary product quality tests (e.g., to measure DSD and SP) that may use different equipment under different conditions. Because GSK's DSD and SP product quality tests and methodologies are proprietary, it is virtually impossible for a generic manufacturer to perform the exact same tests that GSK used for Flonase approval to compare test and reference products.... ANDA applicants are not expected to have exactly the same product quality specifications as the [NDA product].

Exhibit 1: FDA's consolidated response at p. 20.

61.     When it submitted its supplemental petition, GSK knew and understood the requirements with respect to product quality for nasal spray products previously articulated by the FDA. Given the proprietary nature of quality tests and methodologies GSK had employed with respect to Flonase and the fact that the exact standards imposed on Flonase were dependent in part on those proprietary tests, GSK also understood that it was asking the FDA to impose a nearly impossible standard on any ANDA filer.

(3)     GSK's Petition for Stay of Action

62.     On March 25, 2005, GSK filed a Petition for Stay of Action seeking "a stay of *just three business days* - beyond the point in time when GSK is first notified of FDA's decision to grant final approval - of the effective date of any approvals FDA may decide to grant of the abbreviated new drug applications... for generic version of Flonase..." Petition for Stay of Action, dated March 25, 2005, Exhibit 4 at p. 1 (emphasis in original) ("GSK's Stay Petition").

63.     Federal regulations at 21 CFR 10.35(e) set out the standard for review of a petition for stay of action to the FDA and provide that such a stay may only be granted if the

petitioner demonstrates: (1) it will suffer irreparable harm; (2) its case is not frivolous and is being pursued in good faith; (3) it has demonstrated sound public policy grounds supporting the stay; and (4) the delay resulting from the stay is not outweighed by public health or other public interests.

64.     Having knowingly failed to provide any legitimate basis in its two prior petitions as to why the FDA should delay approval of any ANDA for generic Flonase and given the FDA's statutory mandate to approve all generic drugs that meet statutory requirements, GSK could not reasonably have expected to prevail in its request for a stay. Instead, GSK submitted the stay application to further hamper efforts to approve the pending ANDA by requiring the FDA to consider and respond to its request.

65.     The FDA recognized GSK's Stay Petition as a sham and ruled that "GSK has not articulated sound public policy grounds for supporting a stay." Exhibit 2 at p. 23. The FDA noted that "[a]n assumption underlying GSK's argument is that the Agency's approval standards will, upon further examination, be found inadequate. This assumption is too speculative and too unlikely to form the basis of a public policy argument for grant of a stay." Id. Continuing, the FDA observed that "One of the purposes of the Hatch-Waxman Amendments is to foster the availability of low-cost generic drugs. This important public policy would be frustrated if FDA were to grant the stay GSK requests." Id at p. 24.

66.     The FDA explicitly recognized GSK's attempt to monopolize the market and reprimanded Defendant stating: "[t]he policies behind Hatch-Waxman dictate that GSK should not be permitted to shield its market share when the Agency has reasonably determined that competing generic drug products may be approved under section 5050 of the Act." Id.

(4)     GSK's Second Supplement to the Citizen Petition

67.     On June 16, 2005, GSK filed yet another objectively baseless supplement to the Citizen Petition with the FDA. See Second Supplement to Citizen Petition, dated June 16, 2005 attached as Exhibit 5 ("GSK's Second Supplement"). As per course, this petition neither addressed the adequacy of Roxane's ANDA nor presented any evidence that Roxane's fluticasone propionate lacked bioequivalence to Flonase. GSK's Second Supplement similarly failed to raise any concerns about public health. Rather, it included a declaration from a GSK statistician who had reviewed publicly available in vitro study data from FDA bioequivalence review of some approved generic nasal solution products, asserting that the FDA

inconsistently applied statistical methods for comparative *in vitro* tests for ANDAs for nasal spray *solution* products, a class to which Flonase (a *suspension*) does not belong.

68.      Like its other filings, GSK's Second Supplement was a sham and GSK could not reasonably have expected to prevail based on the issues raised in this petition. In the 2003 Draft Guidance, the FDA established that Population Bioequivalence ("PBE") method was appropriate for reviewing and evaluating *in vitro* studies related to nasal spray suspension products. As the FDA's response clearly indicates, the issues raised in GSK's Second Supplement bore no relevance to the FDA's evaluation of fluticasone propionate nasal spray using the PBE methodology already publically identified by the FDA: "GSK's arguments... are not relevant to the fluticasone propionate nasal spray suspension products evaluated under the PBE method." Exhibit 1: FDA's consolidated response at p.11.

**D.   GSK's Anticompetitive Actions Harmed Plaintiff**

69.      On February 22, 2006, the FDA rebuffed GSK's various Citizen Petitions in a 24 page letter, finding the petitions to be without merit. *See* Exhibit 1: FDA's consolidated response. In the denial, the FDA chastised the company and its "brand maturation strategy," writing "GSK is not permitted to shield its market share when the Agency has reasonably determined that competing generic drug products may be approved." But GSK's submissions had the desired effect and extended the company's monopoly in the United States by nearly two years.

70.      On the same date, the FDA issued an approval of Roxane's ANDA for generic Flonase. FDA approval letter to Roxane Laboratories, Inc., dated February 22, 2006, attached as Exhibit 6. After an unsuccessful attempt by GSK to obtain a preliminary injunction overturning the FDA's denial of its Citizen Petitions and approval of Roxane's ANDA, Roxane began selling generic Flonase in the United States on March 6, 2006 - approximately twenty-two (22) months after GSK's statutorily-granted market exclusivity expired.

71.      GSK did not make its series of submissions to the FDA to influence FDA policy or address any legitimate concern about the efficacy or safety of generic fluticasone propionate. Rather, GSK meant solely to forestall generic competition in the United States market for fluticasone propionate during the time it would take the FDA to evaluate and respond to the petitions. GSK, with full knowledge that its exclusivity period for Flonase was approaching expiration and that the FDA was very likely in the process of considering the

bioequivalency of one or more generic products, waited until the last possible moment to submit the first of its series of submissions to the FDA, hoping to impose significant delay into the consideration by the FDA of any generic competition. Given the FDA's limited resources and practice at that time of carefully considering all Citizen Petitions before granting final approval to ANDAs, GSK knew that the filing of a Citizen Petition would immediately derail the FDA process for approving generic versions of Flonase regardless of whether the petition raised safety or efficacy concerns. GSK made its submissions to the FDA not to influence FDA policy or procedure but instead to delay FDA approval of generic Flonase and unlawfully extend the company's monopoly for Flonase products in the United States.

72.    GSK's "brand maturation strategy" denied Plaintiff the benefits of free and unrestrained competition in the market for fluticasone propionate from May 19, 2004, the date of GSK's First Petition, until February 22, 2006, the date the FDA approved generic fluticasone propionate for sale in the United States. Further, the effects of GSK's anticompetitive scheme extended beyond February 22, 2006, as the full extent and benefit of generic penetration does not to occur immediately upon generic market entry.

73.    GSK's unlawful actions denied Plaintiff the opportunity to purchase or reimburse for lower-priced AB-rated generic versions of Flonase, and thus forced Plaintiff to pay supra-competitive prices for fluticasone propionate.

74.    GSK's actions are part of, and in furtherance of, the illegal monopolization scheme alleged herein, and were authorized, ordered or done by GSK's officers, agents, employees or representatives while actively engaged in the management of GSK's affairs.

## VI.    INTERSTATE COMMERCE

75.    GSK's efforts to monopolize and restrain competition in the market for fluticasone propionate substantially affected interstate and foreign commerce, and commerce within Louisiana.

76.    At all material times, GSK manufactured, marketed and sold substantial amounts of Flonase in a continuous and uninterrupted flow of commerce across state and national lines, within Louisiana and throughout the United States.

77.    At all material times, GSK transmitted funds as well as contracts, invoices and other forms of business communications and transactions in a continuous and uninterrupted flow of commerce across state and national lines, within Louisiana and throughout the United

States, in connection with the sale of Flonase.

## VII.   RELEVANT MARKET

78.   Direct proof exists that GSK had monopoly power over the price of fluticasone propionate in the United States. Such direct evidence includes transactional data showing a significant, non-transitory decline in prices of fluticasone propionate immediately upon entry of generic versions of the drug. Such a significant, non-transitory decline in prices did not occur until generic entry into the market. This direct evidence of monopoly power obviates the need to define a relevant product market in assessing whether GSK had monopoly power.

79.   GSK, as the only seller of fluticasone propionate products in the United States, could and would impose a significant, non-transitory price increase without losing sufficient sales to render the price increase unprofitable, as demonstrated by GSK's ability to profitably charge supra-competitive prices during the period in which it was without generic competition. There were no reasonably interchangeable drug products available to prescribing physicians for the indications for which fluticasone propionate is prescribed.

80.   To the extent that the law requires Plaintiff to prove monopoly power circumstantially by first defining a relevant product market, Plaintiff alleges that the relevant market is all fluticasone propionate products - *i.e.*, Flonase (in all its forms and dosage strengths) and AB-rated bioequivalent fluticasone propionate products.

81.   The relevant geographic market is the United States and its territories.

82.   Prior to generic entry in March 2006, GSK held 100% market share in the relevant market. Following market entry by generic manufacturers and much less expensive generic version of Flonase, GSK's market share for fluticasone propionate products declined dramatically in a short period of time.

## VIII.   MARKET EFFECTS

83.   GSK's "brand maturation strategy," as herein alleged, had the purpose and effect of unreasonably restraining and injuring competition by protecting Flonase from generic competition in the relevant market.

84.   Had generic competitors been able to enter the relevant market and compete with GSK, Plaintiff would have paid for lower-priced generics in place of the higher priced brand name drug, resulting in far fewer dollars paid for fluticasone propionate products between May 19, 2004 and March 6, 2006, if not beyond. Regulations generally permit - and

sometimes even mandate - pharmacists to substitute generic drugs for their branded counterparts, unless the prescribing physician has directed that the branded product be dispensed. Similarly, many third-party payors of prescription drugs (e.g., managed care plans) encourage or insist on the use of generic drugs whenever possible, thus creating a ready market for generic products. Louisiana Medicaid requires the substitution of generic drugs whenever possible, unless the prescribing physician has specifically required the use of the brand name drug.

85.    The initial entry of generic products generally leads to a significant erosion of a branded drug's sales within the first year as generic drugs can quickly and efficiently enter the marketplace at substantial discounts. GSK itself recognizes the effects of market entry of generic versions of a drug - both generally and in the specific instance of Flonase competition: affidavits from GSK in its litigation to block entry of a generic version of Flonase state that the company expected to lose $684 million in gross sales during the first six months of generic competition and a total of $1.25 billion in the first year after generic competition began.

86.    By preventing generic competitors from entering the market, GSK injured Plaintiff by causing it to pay more for fluticasone propionate products than they otherwise would have paid. GSK's unlawful conduct deprived Plaintiff of the benefits of competition that Louisiana's antitrust and consumer protection laws are intended to preserve.

## IX.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
#### Violations of the Louisiana Monopolies Act

87.    Plaintiff incorporates by reference the preceding allegations.

88.    GSK used willful and exclusionary means as part of an overall scheme described herein to improperly maintain and extend its monopoly power in the fluticasone propionate market, as described above. GSK accomplished this scheme by filing successive, objectively and subjectively baseless Citizen Petitions with the FDA in an attempt to delay generic versions of Flonase from entering the market.

89.    The goal, purpose and effect of GSK's "brand maturation" scheme was to prevent, delay, and/or minimize the success of the entry of AB-rated generic versions of fluticasone propionate which would have sold in the United States at prices significantly below GSK's prices for Flonase.

90.    The goal, purpose and effect of GSK's "brand maturation" scheme was also to

maintain and extend its monopoly power with respect to fluticasone propionate. GSK's illegal scheme enabled GSK to continue charging supra-competitive prices for fluticasone propionate, without a substantial loss of sales.

91.     As a result of GSK's illegal conduct, Plaintiff was compelled to pay, and did pay, more than it would have paid for fluticasone propionate absent GSK's illegal conduct. But for GSK's illegal conduct, competitors would have begun marketing generic versions of Flonase well before they actually did.

92.     Had manufacturers of generic fluticasone propionate entered the market and lawfully competed with GSK in a timely fashion, Plaintiff would have substituted lower-priced generic fluticasone propionate for the higher-priced brand name Flonase for some or all of their fluticasone propionate requirements, and/or would have paid lower net prices on its remaining Flonase purchases or reimbursements.

93.     Defendant has intentionally and wrongfully maintained its monopoly power in the relevant market in violation of La. Rev. Stat. §§ 51:121, *et seq.*, with respect to purchases of and reimbursements for Flonase in Louisiana by Plaintiff.

94.     Plaintiff has been injured by reason of Defendant's antitrust violations alleged in this Count. The State's injury consists of paying higher prices for Flonase than it would have paid in the absence of those violations. This injury is of the type the antitrust and consumer protection laws of Louisiana were designed to prevent and flows from that which makes Defendant's conduct unlawful.

95.     Pursuant to La. R.S. §§ 51:136, 51:137, 51:138 and related statutes, Defendant is liable to the State for restitution, in an amount to be determined at trial, and treble damages, arising out of Defendant's efforts to monopolize trade and/or commerce which had an effect in Louisiana, as well as reasonable attorney fees and costs.

96.     Plaintiff seeks damages and multiple damages as permitted by law for its injuries by Defendant's violations of the aforementioned statutes.

### SECOND CLAIM FOR RELIEF
#### Violations of the Louisiana Unfair Trade Practices Act

97.     Plaintiff incorporates by reference the preceding allegations.

98.     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of La. Rev. Stat. § 51:1401, *et seq.*

99.     Plaintiff has been injured by reason of Defendant's anticompetitive, unfair or

deceptive acts alleged in this Count. The State's injury consists of paying higher prices for Flonase than it would have paid in the absence of these violations. This injury is of the type the Louisiana Unfair Trade Practices Act was designed to prevent and directly results from Defendant's unlawful conduct.

100.   Pursuant to La. R.S. §§ 51:1405, 51:14707, 51:1408, 51:1409, 51:1414 and related statutes, Defendant is liable to the State for restitution, in an amount to be determined at trial, arising out of Defendant's anticompetitive, deceptive and unfair methods, acts and trade practices.

### THIRD CLAIM FOR RELIEF
### Unjust Enrichment

101.   In the alternative, Defendant has benefited from the monopoly profits on its sales of Flonase resulting from the unlawful and inequitable acts alleged in this Petition.

102.   Defendant's financial benefits resulting from its unlawful and inequitable conduct are traceable to overpayments for Flonase by Plaintiff.

103.   Plaintiff has conferred upon Defendant an economic benefit, in the nature of profits resulting from unlawful overcharges and monopoly profits, to the economic detriment of Plaintiff.

104.   The economic benefit of overcharges and unlawful monopoly profits derived by Defendant through charging supra-competitive and artificially inflated prices for Flonase is a direct and proximate result of Defendant's unlawful practices.

105.   The financial benefits derived by Defendant rightfully belong to Plaintiff, as Plaintiff paid anticompetitive and monopolistic prices, inuring to the benefit of Defendant.

106.   It would be inequitable for the Defendant to be permitted to retain any of the overcharges for Flonase derived from Defendant's unfair and unconscionable methods, acts and trade practices alleged in this Petition.

107.   Defendant should be compelled to disgorge for the benefit of Plaintiff all unlawful or inequitable proceeds received by it.

108.   Plaintiff has no adequate remedy at law.

### JURY DEMAND

109.   Plaintiff, the State of Louisiana, hereby demands a trial by jury on all claims so triable pursuant to La. C.C.P. Art. 1731 and related statutes.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, the State of Louisiana, by and through its Attorney General James D. "Buddy" Caldwell, prays for relief as follows:

110.    For judgment in favor of the State and against Defendant, under the Louisiana Monopolies Act, La. R.S. §§ 51:123, 51:128, 51:136, 51:137, 51:138, *et seq.*, for restitution for an amount to be determined at trial, and treble damages to the State, and for reasonable attorney fees and costs;

111.    For judgment in favor of the State and against Defendant, under Louisiana's Unfair Trade Practices Act, La. R.S. § 51:1401, *et seq.*, for restitution to the State for an amount to be determined at trial, and for fees, attorney fees, costs, and expenses;

112.    For judgment in favor of the State and against Defendant, under La. C.C. Art. 2298, that Defendant has been unjustly enriched, for costs, expenses, fees, and attorney fees;

113.    For all damages sustained by the State in such amount as is proven at trial, together with prejudgment interest;

114.    For all costs of these proceedings, fees, attorney fees, and expenses;

115.    For jury trial; and

116.    For any such relief as may be justified and which the State may be entitled to by law, and any further relief that this Court deems appropriate in favor of the State.

RESPECTFULLY SUBMITTED this 29 day of December, 2014.

JAMES D. "BUDDY" CALDWELL
ATTORNEY GENERAL FOR
THE STATE OF LOUISIANA

James D. "Buddy" Caldwell (No. 02211)
Keetsie T. Gunnels (No. 12952)
Nicholas J. Diez (No. 31701)
Stacie Deblieux (No. 29142)
Office of the Attorney General, State of Louisiana
1885 North 3rd Street
Baton Rouge, Louisiana  70802

-and-

SHOWS, CALI & WALSH, LLP
E. Wade Shows (No. 7637)
628 St. Louis Street
Baton Rouge, LA 70802
Telephone: (225) 346-1461
Facsimile:  (225)346-1467

SALIM-BEASLEY LLC
Robert L. Salim (No. 11663)
1901 Texas Street
Natchitoches, LA 71457
Telephone: (318) 352-5999
Facsimile:  (318) 352-5998

MEADE LAW LLC
John Alden Meade (No. 29975)
909 Poydras St., Suite 1600
New Orleans, LA  70112
Telephone: (504) 799-3102
Facsimile:  (504) 717-2846

MORROW MORROW RYAN & BASSETT
James P. Ryan (No. 11560)
Pat Morrow (No. 9748)
P.O. Drawer 1787
Opelousas, LA 70571
Telephone: (337) 948-4483
Facsimile:  (337) 942-5234

KANNER & WHITELEY LLC
Allan Kanner (No. 20580)
Conlee S. Whiteley (No. 22678)
John R. Davis (No. 34872)
701 Camp Street
New Orleans, LA  70130
Telephone: (504) 524-5777
Facsimile:  (504) 524-5763

HAMMONDS, SILLS, ADKINS & GUICE LLP
Alejandro Perkins (No. 30288)
2431 South Acadian Thruway, Suite 600
Baton Rouge, LA 70808
Telephone: (225) 923-3462
Facsimile:  (225) 923-0315

USRY, WEEKS & MATHEWS, APLC
T. Allen Usry (No. 12988)
1615 Poydras Street, Suite 1250
New Orleans, Louisiana 70112
Telephone:  (504) 592-4600
Facsimile:   (504) 592-4641

**PLEASE SERVE:**

SmithKline Beecham Corporation d/b/a GlaxoSmithKline PLC
Through its Agent for Service of Process:
Corporation Service Company
320 Somerulos St.
Baton Rouge, LA 70802-6129

# EXHIBIT "B"

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE FLONASE ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>Indirect Purchaser Actions | CIVIL ACTION<br><br>No. 08-3301<br><br>**Hon. Anita B. Brody** |
| MEDICAL MUTUAL OF OHIO, on behalf of itself and all others similarly situated,<br><br>                  Plaintiff,<br><br>     v.<br><br>SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE plc,<br><br>                  Defendant. | CIVIL ACTION<br><br>NO. 12-4212<br><br>**Hon. Anita B. Brody** |

## SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (the "Settlement Agreement") is made and entered

into on December 6, 2012, by and between (a) Defendant SmithKline Beecham Corporation

d/b/a GlaxoSmithKline, including GlaxoSmithKline LLC and GlaxoSmithKline plc ("GSK" or

"Defendant"); and (b) Plaintiffs A.F. of L.-A.G.C Building Trades Welfare Plan ("AFL"),

IBEW-NECA Local 505 Health & Welfare Plan ("IBEW"), Painters District Council No. 30

Health and Welfare Plan ("Painters"), Medical Mutual of Ohio, Inc. ("MMOH"), and Andrea

Kehoe ("Kehoe"), individually and on behalf of a class and/or proposed class (collectively

"Plaintiffs"); in IBEW–NECA Local 505 Health & Welfare Plan v. SmithKline Beecham Corp.,

No. 08–3301 (E.D. Pa.), and Medical Mutual of Ohio, Inc. v. SmithKline Beecham Corp., No.

12-cv-4212 (E.D. Pa.) (the "Actions") (GSK and Plaintiffs are collectively referred to as the "Parties").

WHEREAS, Plaintiffs brought the original Class Action Complaint against Defendant in the United States District Court for the Eastern District of Pennsylvania (the "Court") on July 14, 2008. Plaintiffs recently filed the Fourth Amended Consolidated Class Action Complaint on February 24, 2012. Most recently, <u>Medical Mutual of Ohio v. SmithKline Beecham Corp.</u>, 12-04212 was filed on July 24, 2012 in the Court. Collectively, the Actions allege, among other things, that GSK violated various state antitrust and consumer protection laws, that GSK has been unjustly enriched in connection with the sales of the drug Flonase, and that Plaintiffs and the Settlement Class (as further defined in paragraph 1 below) suffered injury and calculable damages as a result;

WHEREAS, GSK denies each and every one of Plaintiffs' allegations of unlawful or wrongful conduct, denies that any conduct challenged by Plaintiffs caused any damage whatsoever, and has asserted a number of defenses to Plaintiffs' claims;

WHEREAS, Plaintiffs and GSK agree that this Settlement Agreement shall not be deemed or construed to be an admission or evidence of any violation of any statute or law or of any liability or wrongdoing by GSK or of the truth of any claim or allegation or a waiver of any defenses thereto;

WHEREAS, arm's length settlement negotiations have taken place between counsel for Plaintiffs and counsel for GSK for an extended period of months, and this Settlement Agreement, which embodies all of the terms and conditions of the settlement (the "Settlement") between GSK and Plaintiffs, both individually and on behalf of the Settlement Class (as defined in paragraph 1 below), has been reached, subject to final approval of the Court;

2

WHEREAS, Plaintiffs and their counsel have concluded, after extensive discovery, investigation, and motion practice and after carefully considering all of the circumstances of the Actions, and despite their belief in the validity of Plaintiffs' claims, that it would be in the best interests of Plaintiffs and the Settlement Class to enter into this Settlement Agreement in order to avoid the uncertainties of, and risks and delays associated with, the outcome of GSK's and Plaintiffs' anticipated or pending motions and/or a trial and any subsequent appeals, and risks and delays, and other uncertainties, related to the litigation of the Actions, and to assure a benefit to Plaintiffs and the Settlement Class and further, that Plaintiffs and their counsel consider the Settlement to be fair, reasonable, and adequate and in the best interests of Plaintiffs and the Settlement Class; and

WHEREAS, GSK has concluded, despite its belief that it is not liable for the claims asserted and that it has good defenses thereto, that it would be in its best interests to enter into this Settlement to avoid further expense, inconvenience, uncertainties of, and risks and delays associated with, the outcome of GSK's and Plaintiffs' anticipated or pending motions and/or a trial and any subsequent appeals, and the distraction of burdensome and protracted litigation and thereby to resolve this controversy;

NOW THEREFORE, it is agreed by the Parties, through their respective authorized representatives who have signed below, that the Actions and all claims made or that could have been made against Defendant by Plaintiffs and the Settlement Class be settled, compromised, and dismissed on the merits and with prejudice and, except as hereinafter provided, without costs as to Plaintiffs, the Settlement Class or Defendant, subject to the approval of the Court, on the following terms and conditions:

1.   <u>Settlement Class</u>.  The Parties stipulate to Court approval, in the form of a

proposed order acceptable to all Parties, of the certification of a class in light of the fact of

settlement (the "Settlement Class"), defined as follows:

> All persons throughout the United States and its territories who
> purchased and/or paid for, in whole or in part, fluticasone
> propionate nasal spray, whether branded Flonase or its AB-rated
> generic equivalents, intended for the consumption of themselves, their
> family members and/or household members, and all Third Party
> Payor entities throughout the United States and its territories that
> purchased, paid for, administered and/or reimbursed for fluticasone
> propionate nasal spray, whether branded Flonase or its generic
> equivalents, intended for consumption by their members, employees,
> plan participants, beneficiaries or insureds.

> The applicable time period for the Settlement Class is May 19, 2004
> through March 31, 2009.

> Third Party Payors are all health insurance companies, healthcare
> benefit providers, health maintenance organizations, self-funded
> health and welfare plans, and any other health benefit provider and/or
> entity that contracts with a health insurer acting as a third party
> administrator to administer their prescription drug benefits.  These
> payors include such entities that may provide prescription drug
> benefits for current or former public employees and/or retirees, but
> only to the extent that such entity was at risk for the cost of the
> payment(s).  For purposes of this definition, an entity "paid for"
> fluticasone propionate nasal spray (branded Flonase and/or its
> equivalents) if it paid some or all of the purchase price, or reimbursed
> any part of the purchase price paid by their members, employees,
> insureds, participants or beneficiaries.

Excluded from the Settlement Class are: (1) Defendant and its officers, directors, management,

employees, predecessors-in-interest, successors-in-interest, assignees or affiliates, and subsidiaries;

(2) the United States and/or State governments and their agencies and departments, except to the

extent they purchased fluticasone propionate nasal spray (branded Flonase and/or its generic

equivalents) for their employees or others covered by a government employee health plan; (3) all

entities who purchased fluticasone propionate nasal spray (branded Flonase and/or its generic

equivalents) directly from Defendant or its affiliates or purchased fluticasone propionate nasal spray (branded Flonase and/or its generic equivalents) for resale, to the extent and solely to the extent of such purchase as a direct purchaser or for resale; (4) any judge or special master who has presided over the Actions; and (5) the health benefit plans listed in Exhibit A hereto ("Settling Health Plans" or "SHPs").

The Parties' stipulation to Court approval of certification of the Settlement Class is only for purposes of effectuating the Settlement, and for no other purpose. The Parties retain all of their respective objections, arguments and/or defenses with respect to class certification, including of a nationwide class, should there be no settlement of the Actions. The Parties acknowledge that there has been no stipulation to a class as defined above for any purposes other than effectuating the Settlement, and that if the Settlement Agreement does not become final and effective pursuant to the terms of paragraph 5 herein, the stipulation as to the settlement class shall be null and void.

2.    Best Efforts to Effectuate This Settlement. Counsel for the undersigned agree to recommend approval of this Settlement Agreement by the Court and to undertake their best efforts, including all steps and efforts contemplated by this Settlement Agreement and any other steps and efforts that may be necessary or appropriate, by order of the Court or otherwise, to carry out the terms of this Settlement Agreement. Counsel for the undersigned as well as the Parties to this Settlement Agreement further agree, consistent with their obligations in this paragraph, not to do anything to encourage any member of the Settlement Class to oppose or obstruct the Settlement, or to do anything to encourage any member of the Settlement Class to opt out.

3.    Motion for Preliminary Approval. Plaintiffs, through their counsel Marvin A. Miller, Lori A. Fanning, and Michael Buchman ("Class Counsel"), shall file with the Court,

5

promptly after the execution of this Settlement Agreement, a motion for preliminary approval of the Settlement, which will contain a proposed preliminary approval order in a form agreed upon by Class Counsel and GSK, substantially in the form attached as Exhibit B hereto. In the event that the Court preliminarily approves the Settlement, Class Counsel shall, in accordance with Rule 23 of the Federal Rules of Civil Procedure and the preliminary approval order, direct the Claims Administrator, to be approved by the Court, to provide the Settlement Class with settlement notice as ordered by the Court ("Settlement Notice"). All costs of Settlement Notice shall be paid exclusively from the Settlement Fund (as defined in paragraph 6 herein) as provided in this Settlement Agreement, without recourse to the Plaintiffs or GSK. Settlement Notice does not include notice that may be required under the Class Action Fairness Act, 28 U.S.C. § 1711-1715, the cost of which shall be borne solely by GSK.

    4.   <u>Motion for Final Approval and Entry of Final Judgment</u>. If the Court preliminarily approves the Settlement, Plaintiffs, through Class Counsel, after Settlement Notice, shall submit a motion for final approval by the Court, and shall seek entry of an order and final judgment:

    a.   finding the Settlement and its terms to be fair, reasonable and adequate within the meaning of Rule 23 of the Federal Rules of Civil Procedure and directing its consummation pursuant to its terms;

    b.   providing for incentive payments from the Settlement Fund (as defined in paragraph 6 herein) to the Plaintiffs in addition to whatever monies each will receive from the Settlement Fund pursuant to the Court-approved plan of allocation;

    c.   providing for payment of reasonable attorneys' fees and reimbursement of expenses from the Settlement Fund (as defined in paragraph 6 herein);

      d.     setting forth the method for allocating the Settlement Fund (as defined in paragraph 6 herein);

      e.     directing that the Actions, <u>IBEW–NECA Local 505 Health & Welfare Plan v. SmithKline Beecham Corp.</u>, No. 08–3301 (E.D. Pa.), and <u>Medical Mutual of Ohio, Inc. v. SmithKline Beecham Corp.</u>, No. 12-cv-4212 (E.D. Pa.), be dismissed with prejudice and, except as provided for herein, without costs;

      f.     approving the release of claims specified herein as binding and effective as to all Settlement Class members and permanently barring and enjoining such Settlement Class members from asserting any Released Claims (as defined in paragraph 11 herein);

      g.     reserving exclusive and continuing jurisdiction over the Settlement and this Settlement Agreement, including the Settlement Fund (as defined in paragraph 6 herein) and the administration, consummation and interpretation of this Settlement and Settlement Agreement; and

      h.     directing that order and final judgment of dismissal be entered in the Actions.

    5.    <u>Effective Date of Settlement</u>.  The Settlement and Settlement Agreement shall become final and effective upon the occurrence of all of the following ("Effective Date"):

      a.     Neither Plaintiffs nor Defendant have/has availed themselves/itself of any right to terminate the Settlement pursuant to paragraph 12 or 13 herein;

      b.     the Settlement is approved by the Court as required by Rule 23(e) of the Federal Rules of Civil Procedure;

      c.     entry, as provided for in paragraph 4 herein, is made of the order and final judgment with prejudice against Plaintiffs and the members of the Settlement Class; and

7

d.       the time for appeal from the Court's approval of the Settlement as described in subparagraph (b) hereof and entry of an order and final judgment as described in subparagraph (c) hereof has expired or, if an appeal has been filed, either all such appeals shall have been dismissed prior to resolution by the appellate court or approval of this Settlement Agreement and final judgment has been affirmed in its entirety by the court of last resort to which such appeal has been taken and such affirmance is no longer subject to further appeal or review, by certiorari or otherwise, provided, however, a modification or reversal on appeal of any amount of the fees and expenses awarded by the Court from the Settlement Fund, the amount of payments to the Plaintiffs or the Plan of Allocation shall not by itself prevent this Settlement Agreement from becoming final and effective if all other aspects of the final judgment have been affirmed.

6.       <u>Settlement Consideration: Cash</u>. Subject to the provisions hereof, and in full, complete, and final settlement of the Actions, Defendant shall pay thirty-five million dollars ($35,000,000.00), by the later of either twenty (20) calendar days of GSK's receipt of the Court's order preliminarily approving the Settlement, a properly completed W-9 form from the Escrow Agent identified in writing by Class Counsel, and a fully executed Escrow Agreement (as defined below) or January 7, 2013, into an escrow account (the "Settlement Fund"), held and administered by an escrow agent to be selected by Class Counsel with consent of GSK and approval of the Court.  The escrow account shall be established and administered pursuant to an escrow agreement in a form satisfactory to Class Counsel and GSK ("Escrow Agreement"). Defendant shall have no liability, obligation or responsibility with respect to the investment, disbursement, or other administration or oversight of the Settlement Fund.  The Settlement Fund is the total amount that Defendant will pay under this Settlement Agreement in exchange for the

Released Claims (as defined in paragraph 11 herein), including without limitation funds to satisfy claims by Plaintiffs, Settlement Class members attorneys' fees and costs, any Court-approved payments to Plaintiffs, and payment of any and all administrative and notice expenses associated with the Actions or this Settlement.  It is intended that the escrow account shall be at all times a "qualified settlement fund" for federal income tax purposes pursuant to Treas. Reg. § 1.468B-1, and that the "administrator" of the Settlement Fund, within the meaning of Treas. Reg. § 1.468B-2(k), shall comply with all applicable requirements, which shall include, without limitation, (a) preparing a "Regulation Section 1.468B-3 Statement" pursuant to Treas. Reg. § 1.468B-3(e) on behalf of Defendant and providing copies to Defendant's counsel for review and approval; and (b) preparing and timely filing on behalf of the Settlement Fund (i) such income tax and other returns and statements as are required to comply with Treas. Reg. § 1.468B-2 and the other applicable provisions of the Internal Revenue Code of 1986, as amended (the "Code"), and (ii) all necessary state, local and foreign tax returns.  Any taxes due as a result of income earned by the Settlement Fund will be imposed upon and paid from the Settlement Fund.  Interest earned by the Settlement Fund (less any tax imposed upon such interest) shall be for the benefit of the Settlement Class, less reasonable attorneys' fees and expenses approved by the Court (and any interest awarded thereon), any Court-approved award to Plaintiffs and payment of any and all administrative and notice expenses associated with the Actions or Settlement.  Defendant shall have no liability, obligation or responsibility for any such taxes, costs, expenses, or for any reporting requirements relating thereto.  Defendant's transfer of the Settlement Fund to the escrow account described above shall constitute full and complete satisfaction of its obligations under this paragraph.  Defendant shall not have any liabilities, obligations or responsibilities with respect to the payment, disbursement, disposition or distribution of the

Settlement Fund after such transfer.  Notwithstanding any effort, or failure, of the administrator of the Settlement Fund and the parties to treat the Settlement Fund as a "qualified settlement fund" within the meaning of Section 1.468B-1 of the Treasury Regulations effective as of the date hereof, any tax liability, interest or penalties incurred by Defendant resulting from income earned by the Settlement Fund (or the receipt of any payment under this paragraph) shall be reimbursed from the Settlement Fund in the amount of such tax liability, interest or penalties upon Defendant's written request to the administrator of the Settlement Fund.

7.     Full Satisfaction: Limitation of Interest and Liability. Plaintiffs and members of the Settlement Class shall look solely to the Settlement Fund for settlement and satisfaction against Defendant of all claims that are released herein.  Plaintiffs and members of the Settlement Class shall not under any circumstances be entitled to any further compensation from Defendant with respect to any claims released herein.  In the event that the Settlement becomes final and effective pursuant to paragraph 5 herein, the Settlement Fund will fully satisfy any and all Released Claims as defined in paragraph 11 herein. Except as provided by order of the Court, no Settlement Class member shall have any interest in the Settlement Fund or any portion thereof.

8.     Reimbursement of Costs, Fees and Expenses.  Plaintiffs and their counsel will be reimbursed and indemnified solely out of the Settlement Fund for all costs, fees and expenses under this Settlement including, but not limited to, the costs of Settlement Notice and administration of the Settlement Fund.  Defendant shall not be liable for any costs, fees or expenses of any Settlement Class members, Plaintiffs, or of any Settlement Class members' or Plaintiffs' attorneys, experts, consultants, advisors, agents and representatives.  Any such costs,

fees and expenses, to the extent approved and awarded by the Court, shall be paid out of the Settlement Fund.

9.    <u>Disbursement of the Settlement Fund</u>.  If the Settlement becomes final and effective pursuant to the provisions of paragraph 5 herein, the Settlement Fund shall be disbursed as follows or as otherwise ordered by the Court.  GSK shall, as set forth in paragraph 6 above, have no liability or responsibility with respect to disbursement or distribution from the Settlement Fund.

    a.    <u>Prior to the Effective Date of this Settlement Agreement</u>.

        i.    Any fees and expenses incurred in administering the escrow account and the Settlement Fund shall be paid pursuant to the Escrow Agreement from the Settlement Fund.  The Costs of Notice and Administration of the Settlement shall be paid by the Escrow Agent to the Claims Administrator with notice of such payments provided to counsel for the Parties; and

        ii.    Disbursements for the payment of any taxes (including any estimated taxes, interest or penalties) due, as a result of income earned by the Settlement Fund, shall be made promptly by the Escrow Agent pursuant to the Escrow Agreement with notice of such disbursements provided to counsel for the Parties.

    b.    <u>After the Effective Date of this Settlement Agreement</u>.

        i.    The attorneys' fees and costs approved by the Court shall be distributed to Class Counsel from the Settlement Fund within ten (10) days of the Effective Date of this Settlement Agreement;

ii.      The remaining fees or expenses incurred in connection with the administration of the escrow account and the Settlement Fund shall be paid pursuant to the Escrow Agreement, and to the extent, if any, the reasonable remaining fees and expenses incurred as part of notice and claims administration, shall be paid from the Settlement Fund by the Escrow Agent with notice of such disbursements provided to Plaintiffs' counsel;

iii.     Disbursements for the payment of any taxes (including any estimated taxes, interest or penalties) due as a result of income earned by the Settlement Fund shall be made promptly by the Escrow Agent pursuant to the Escrow Agreement with notice of such disbursements provided to counsel for the Parties;

iv.      Any incentive awards determined by the Court for services rendered to the Settlement Class by Plaintiffs as set forth in the proposed notice forms ordered by the Court, shall be distributed to Plaintiffs from the Settlement Fund after the Effective Date of the Settlement; and

v.       The balance of the Settlement Fund after the payment of attorneys' fees, costs, and expenses, taxes, incentive awards, costs of notice and administration of the Settlement and Settlement Fund, and any payments to or from the SHPs pursuant to the procedures set forth in a plan of allocation ("Plan of Allocation"), shall be distributed to Settlement Class members who submit timely claims that are accepted by the Claims Administrator and approved by the Court ("Authorized Claimants") in accordance with the applicable procedures as approved by the Court.  No funds will be disbursed to any Authorized Claimant

12

until the claims of all Authorized Claimants have been submitted and verified by the Claims Administrator. The Claims Administrator shall make periodic reports to the Parties describing the status of the claims administration process, the number and amount of claims received, and any amounts disbursed.

10.   <u>Attorneys' Fees, Expenses and Costs</u>. Class Counsel intend to seek for distribution to Plaintiffs' counsel, attorneys' fees and reimbursement of reasonable costs and expenses incurred in the prosecution of the Actions. Class Counsel may further seek payment of reasonable incentive awards for Plaintiffs, as noted in Paragraph 4(b) above. Plaintiffs and members of the Settlement Class shall look solely to the Settlement Fund for the satisfaction against Defendant of any distribution to Plaintiffs' counsel, including for attorneys' fees, reimbursement of reasonable costs and expenses incurred in the prosecution of the Actions, and payment of incentive awards for Plaintiffs.

11.   <u>Releases</u>.

a.   As used throughout this Settlement Agreement and specifically in this paragraph 11, references to the "Settlement Class," "members of the Settlement Class," or "Settlement Class members" refer to members of the Settlement Class and include any of their past, present or future officers, directors, stockholders, attorneys, employees, legal representatives, trustees, agents, parents, subsidiaries, general and limited partners, heirs, executors, administrators, purchasers, predecessors, successors and assigns, acting in their capacity as such.

b.   Upon the Settlement Agreement becoming effective in accordance with paragraph 5 herein, Defendant and its past, present and future parents, subsidiaries, divisions, affiliates, stockholders, officers, directors, insurers, general or limited partners, employees,

agents, attorneys, and any of their legal representatives (and the predecessors, heirs, executors,

administrators, successors, purchasers, and assigns of each of the foregoing) (the "Released

Party" or "Released Parties") are and shall be released and forever discharged from all manner of

claims, demands, actions, suits, causes of action, damages whenever incurred, and liabilities of

any nature whatsoever (whether such claims, demands, actions, suits, causes of action, damages

or liabilities arise or are incurred before, during or after the date hereof), including costs,

expenses, penalties and attorneys' fees known or unknown, suspected or unsuspected, in law or

equity, that Plaintiffs or any member or members of the Settlement Class, whether or not they

object to the Settlement and whether or not they make a claim upon or participate in the

Settlement Fund, ever had, now has, or hereafter can, shall or may have, directly, indirectly,

representatively, derivatively or in any other capacity, relating to any conduct, events or

transactions, prior to the date hereof, alleged or which could have been alleged in the Actions,

relating to fluticasone propionate nasal sprays (branded Flonase and/or its generic equivalents)

(the "Released Claims"). Except for enforcing this Settlement Agreement, each member of the

Settlement Class hereby covenants and agrees that he, she or it shall not, hereafter, seek to

establish liability against any Released Party based, in whole or in part, on any of the Released

Claims. Without in any way limiting the definition of Released Parties, the following specific

entities are Released Parties: SmithKline Beecham Corporation d/b/a GlaxoSmithKline;

GlaxoSmithKline LLC; GlaxoSmithKline Holdings (America) Inc.; GlaxoSmithKline plc; Smith

Kline Beecham plc; Glaxo Wellcome plc.; GlaxoSmithKline Finance plc.; GlaxoSmithKline

Services Unlimited; and Smith Kline Beecham Limited.

            c.      In addition, Plaintiffs and each Settlement Class member hereby expressly

waives and releases, upon the Settlement becoming effective pursuant to paragraph 5 herein, any

and all provisions, rights and benefits conferred by § 1542 of the California Civil Code, which

reads:

> Section 1542. General Release -- Claims Extinguished. A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor;

or rights and benefits conferred by any law of any state or territory of the United States or any

other jurisdiction or principle of common law, which is similar, comparable or equivalent to §

1542 of the California Civil Code.  Plaintiffs and each Settlement Class member may hereafter

discover facts other than or different from those which he, she or it knows or believes to be true

with respect to the claims which are the subject matter of this paragraph, but each Plaintiff and

each Settlement Class member hereby expressly waives and fully, finally and forever settles and

releases, upon the Settlement Agreement becoming final, any known or unknown, suspected or

unsuspected, contingent or non-contingent claim that would otherwise fall within the definition

of Released Claims, whether or not concealed or hidden, without regard to the subsequent

discovery or existence of such different or additional facts.  Plaintiffs and each Settlement Class

member also hereby expressly waives and fully, finally and forever settles and releases any and

all claims it may have against any Released Party under §17200, et seq., of the California

Business and Professions Code, or any similar, comparable or equivalent provision of the law of

any other state or territory of the United States or other jurisdiction or principle of common law,

which claims are hereby expressly incorporated into the definition of Released Claims.

        d.     Plaintiffs' counsel and the Claims Administrator will ensure that each

claim form contains a copy of the of the release set forth in paragraph 11(a) through (c) hereof,

which shall be signed by each member of the Settlement Class or its authorized representative as a precondition to receiving any portion of the Settlement Fund.

      e.     The releases set forth above shall not release any claims arising in the ordinary course of business among Plaintiffs, Settlement Class members and the Released Parties concerning product liability, breach of warranty or contract (other than breach of warranty or contract based in whole or in part on any conduct challenged in the Actions), and/or personal or bodily injury, and/or any claims for costs of providing medical care for individuals allegedly injured by fluticasone propionate nasal spray products.

     12.    <u>Withdrawal from Settlement</u>.  GSK, in its sole and complete discretion, shall have the right to withdraw from this settlement on those terms contained in the submission filed under seal and solely for *in camera* review.  If GSK withdraws from this Settlement, the Settlement Agreement shall be cancelled and terminated.

     13.    <u>Effect of Disapproval</u>.  If the Court declines to finally approve the Settlement, or if such approval is reversed, vacated, or otherwise modified on appeal, or if the Court does not enter the final judgment in substantially the form provided for in paragraph 4, or if the Court enters the final judgment and appellate review is sought, and on such review, such final judgment is reversed, vacated or modified, then this Settlement Agreement shall be terminated upon the election of either (a) Class Counsel, or (b) GSK; provided however that any reversal, vacating, or modification on appeal of any amount of the fees and expenses awarded by the Court from the Settlement Fund, or any amount of payments to any Plaintiff, or any determination by the Court to award less than the amount requested in attorneys' fees or costs or awards to Plaintiffs, or any determination by the Court to modify the Plan of Allocation of the

16

Settlement Fund, shall not give rise to any right of termination or otherwise serve as a basis for termination of this Settlement Agreement.

14.   <u>Termination</u>. In the event that the Settlement is terminated pursuant to paragraph 12 or 13 herein, or for any other reason does not become effective in accordance with the terms of paragraph 5 herein, then (a) this Settlement Agreement shall be of no force or effect, except for payment of notice and settlement administration costs from the Settlement Fund, (b) the Settlement Fund, including any and all interest earned thereon, shall be returned to GSK less only the amount validly disbursed for the costs incurred in giving notice to the Settlement Class and administering the Settlement Fund during the interim period, and (c) any release pursuant to paragraph 11 herein shall be of no force or effect.

15.   <u>Preservation of Rights</u>. The Parties agree that this Settlement Agreement, whether or not it shall become effective pursuant to paragraph 5 herein, and any and all negotiations, documents and discussions associated with it shall be without prejudice to the rights of any party, shall not be deemed or construed to be an admission or evidence of any violation of any statute or law, of any liability or wrongdoing by the Defendant, or of the truth of any of the claims or allegations contained in the complaints in the Actions or any other pleading or document, and evidence thereof shall not be discoverable or used directly or indirectly, in any way, whether in this case or any other action or proceeding.  The Parties expressly reserve all of their rights and defenses if the Settlement Agreement does not become final and effective in accordance with the terms of this Settlement Agreement.

16.   <u>Binding Effect</u>. This Settlement Agreement shall be binding upon, and inure to the benefit of, the successors and assigns of the Parties and to the Released Parties. Without

limiting the generality of the foregoing, each and every covenant and agreement herein by the Plaintiffs and their counsel shall be binding upon all members of the Settlement Class.

17.   <u>Integrated Agreement</u>. This Settlement Agreement (including all exhibits hereto and the submission referenced in paragraph 12) contains the entire, complete, and integrated statement of each and every term and provision of the Settlement Agreement agreed to by and among the Parties.  This Settlement Agreement shall not be modified in any respect except by a writing executed by the undersigned in the representative capacities specified, or others who are authorized to act in such representative capacities.

18.   <u>Headings</u>. The headings used in this Settlement Agreement are intended for the convenience of the reader only and shall not affect the meaning or interpretation of this Settlement Agreement.

19.   <u>No Party is the Drafter</u>.  All counsel to all Parties hereto have materially participated in the drafting of this Settlement Agreement.  None of the Parties hereto shall be considered to be the drafter of this Settlement Agreement or any provision hereof for the purpose of any statute, case law or rule of interpretation or construction that would or might cause any provision to be construed against the drafter hereof.

20.   <u>Choice of Law</u>.  All terms of this Settlement Agreement shall be governed by and interpreted according to the substantive laws of the Commonwealth of Pennsylvania without regard to its choice of law or conflict of laws principles.

21.   <u>Consent to Jurisdiction and Choice of Exclusive Forum</u>.  Any and all disputes arising out of or related to the Settlement, the Settlement Agreement, or claims administration, including attorneys' fees, must be brought by Defendant, Plaintiffs, each member of the Settlement Class, and/ or each Settling Health Plan, exclusively in this Court.  Defendant,

Plaintiffs and each member of the Settlement Class hereby irrevocably submit to the exclusive and continuing jurisdiction of the Court for any suit, action, proceeding or dispute arising out of or relating to this Settlement or the Settlement Agreement or the applicability or interpretation of this Settlement Agreement, including, without limitation any suit, action, proceeding or dispute relating to the release provisions herein, except that this paragraph shall not prohibit (a) any Released Party from asserting in the forum in which a claim is brought that the release herein is a defense, in whole or in part, to such claim or, (b) in the event that such a defense is asserted in that forum and this Court determines that it cannot bar the claim, the determination of the merits of the defense in that forum.

22.    <u>Enforcement of Settlement</u>. Nothing in this Settlement Agreement prevents Defendant from enforcing or asserting any release herein, subject to the provisions of paragraph 13 and 14 herein.  Notwithstanding any other provision of this Settlement Agreement, this Settlement Agreement and the releases contained herein may be pleaded as a full and complete defense to any action, suit or other proceeding that has been or may be instituted, prosecuted or attempted by Plaintiffs and each member of the Settlement Class with respect to any Released Claims and may be filed, offered and received into evidence and otherwise used for such defense.

23.    <u>Authorization to Act on Behalf of Plaintiffs and Settlement Class</u>. The undersigned counsel to Plaintiffs represent that they have been and are fully authorized to conduct settlement negotiations with Defendant's counsel on behalf of Plaintiffs and the Settlement Class and to enter into, and execute, this Settlement Agreement on behalf of Plaintiffs and the Settlement Class, subject to Court approval pursuant to Fed. R. Civ. P. 23(e).

24. <u>Severability</u>. In the event any one or more of the provisions of this Settlement Agreement shall for any reason be held to be illegal, invalid or unenforceable in any respect, such illegality, invalidity or unenforceability shall not affect any other provision if Defendant's counsel and Plaintiffs' counsel mutually agree to proceed as if such illegal, invalid, or unenforceable provision had never been included in the Settlement Agreement.

25. <u>No Admission</u>. Nothing in this Settlement Agreement shall be construed as an admission in any action or proceeding, of any kind whatsoever, civil, criminal or otherwise, before any court, administrative agency, regulatory body or any other body or authority, present or future, by Defendant or Plaintiffs, or any of them, including without limitation that Defendant has engaged in any conduct or practices that violate any antitrust statute or other law.

26. <u>Execution in Counterparts</u>. This Settlement Agreement may be executed in counterparts. Facsimile or PDF'd signatures shall be considered as valid signatures as of the date hereof, although the original signature pages shall thereafter be appended to this Settlement Agreement and filed with the Court.

27. <u>Failure to Follow Procedures and Requirements.</u> The agreed-upon procedures and requirements regarding Settlement Class members' rights and options, including for opting out of the Settlement Class, filing objections in connection with and/or appearing at the final approval hearing are intended to ensure the efficient administration of justice and the orderly presentation of any Settlement Class members' objections to the Settlement Agreement, in accordance with such Settlement Class member's due process rights. The preliminary approval order will further provide that objectors that fail to properly or timely file their objections, along with the required information and documentation set forth above, or to serve them as provided

above shall not be heard during the final approval hearing, nor shall their objections be considered by the Court.

28.   Appeals.  The proposed order and final judgment shall provide that any Settlement Class member that wishes to appeal the order and final judgment, which appeal will delay the distribution of the Settlement to the Settlement Class, shall post a bond with this Court in an amount to be determined by the Court as a condition of prosecuting such appeal.

IN WITNESS WHEREOF, the Parties hereto through their fully authorized

representatives have agreed to this Settlement Agreement on the date first herein above written.

FOR PLAINTIFFS:

_____
Nicholas E. Chimicles
CHIMICLES & TIKELLIS LLP
One Haverford Centre
3 61 West Lancaster A venue
Haverford, Pennsylvania 19041

*Counsel for Indirect Purchaser Plaintiffs Class*

_____
Marvin A. Miller
Lori A. Fanning
MILLER LAW LLC
115 South LaSalle Street
Suite 2910
Chicago, IL 60603

*Counsel for Indirect Purchaser Plaintiffs Class*

_____
Michael M. Buchman
600 Third Avenue
New York, NY 10016

*Counsel for Indirect Purchaser Plaintiffs Class*

FOR DEFENDANT:

_____
Stephen J. Kastenberg
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103

*Counsel for Defendant SmithKline Beecham Corporation d/b/a GlaxoSmithKline*

IN WITNESS WHEREOF, the Parties hereto through their fully authorized representatives have agreed to this Settlement Agreement on the date first herein above written.

FOR PLAINTIFFS:

Nicholas E. Chimicles
CHIMICLES & TIKELLIS LLP
One Haverford Centre
3 61 West Lancaster A venue
Haverford, Pennsylvania 19041

*Counsel for Indirect Purchaser Plaintiffs Class*

Marvin A. Miller
Lori A. Fanning
MILLER LAW LLC
115 South LaSalle Street
Suite 2910
Chicago, IL 60603

*Counsel for Indirect Purchaser Plaintiffs
Class*

Michael M. Buchman
600 Third Avenue
New York, NY 10016

*Counsel for Indirect Purchaser Plaintiffs
Class*

FOR DEFENDANT:

Stephen J. Kastenberg
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA  19103

*Counsel for Defendant SmithKline Beecham Corporation d/b/a GlaxoSmithKline*

22

**Exhibit A**
**Flonase Settling Health Plans**

Aetna, Inc.
AmeriGroup/HMS
Arcadian Health
Assurant Health
Avmed Health Plans
Blue Cross and Blue Shield of Florida, Inc.
Blue Cross and Blue Shield of Kansas City
Blue Cross Blue Shield of North Carolina
Blue Cross and Blue Shield of Vermont
Blue Cross Blue Shield Association
Blue Cross Blue Shield of Minnesota
Blue Cross Blue Shield of Nebraska
Blue Cross Blue Shield of Rhode Island
Blue Cross Blue Shield of Tennessee
Blue Cross Northeastern Pennsylvania
Cambia Health Solutions*
CareFirst Blue Cross Blue Shield
Connecticut General Life Insurance Company a/k/a Cigna
Coventry Health Care of Florida, Inc. f/k/a Vista HealthPlan, Inc.
Coventry Health Care, Inc.
Coventry Health Plan
Coventry Health Plan of Florida, Inc. f/k/a Vista HealthPlan of South Florida, Inc.
Coventry Summit Health Plan, Inc. f/k/a Summit Health Care, Inc.
EmblemHealth
Excellus Blue Cross Blue Shield
Government Employees Health Association
Harvard Pilgrim Health Care, Inc.
Hawaii Medical Service Association
Health Care Services Corporation
Health Net, Inc.
HealthNow New York
HealthPartners, Inc.
Humana Insurance Company
Johns Hopkins Health Care LLC
Kaiser Foundation Health Plan**
Lovelace Health Plan
Mutual of Omaha
MVP Health Care
Noridian d/b/a Blue Cross Blue Shield of North Dakota
Premera Blue Cross
Priority Health
Tufts Associated Health Plans, Inc.
United Healthcare Services, Inc.
Wellpoint, Inc.

A-1

*Cambia Health Solutions includes:
Regence Blue Shield
Regence Blue Cross Blue Shield of Oregon
Regence Blue Cross Blue Shield of Utah
Regence Blue Shield of Idaho
Asuris Northwest Health
Regence Life and Health Insurance Co.

**Kaiser Foundation Health Plan includes:
Kaiser Foundation Hospitals
Kaiser Foundation Health Plan of Colorado, Inc.
Kaiser Foundation Health Plan of Georgia, Inc.
Kaiser Foundation Health Plan of Hawaii, Inc.
Kaiser Foundation Health Plan of Ohio, Inc.
Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.
Kaiser Foundation Health Plan of the Northwest, Inc.

# EXHIBIT "C"

+UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE FLONASE ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>Indirect Purchaser Actions | CIVIL ACTION<br><br>No. 08-3301<br><br>**Hon. Anita B. Brody** |
| MEDICAL MUTUAL OF OHIO, on behalf of itself and all others similarly situated,<br><br>                    Plaintiff,<br><br>          v.<br><br>SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE plc,<br><br>                    Defendant. | CIVIL ACTION<br><br>NO. 12-4212<br><br>**Hon. Anita B. Brody** |

## FINAL ORDER AND JUDGMENT

This matter came for a duly-noticed hearing on June 3, 2013 (the "Final Approval Hearing"), upon the Plaintiffs' Motion for Final Approval of Settlement between Defendant SmithKline Beecham Corporation d/b/a GlaxoSmithKline, including GlaxoSmithKline LLC and GlaxoSmithKline plc ("GSK" or "Defendant") and Plaintiffs A.F. of L. A.G.C. Building Trades Welfare Plan ("AFL"), IBEW NECA Local 505 Health & Welfare Plan ("IBEW"), Painters District Council No. 30 Health and Welfare Plan ("Painters"), Medical Mutual of Ohio, Inc. ("MMOH"), and Andrea Kehoe ("Kehoe"), individually and on behalf of a class (collectively "Plaintiffs") in IBEW NECA Local 505 Health & Welfare Plan v. SmithKline Beecham Corp., No. 08-3301 (E.D. Pa.), and Medical Mutual of Ohio, Inc. v. SmithKline Beecham Corp., No. 12-cv-4212 (E.D. Pa.) (the "Actions"), (the "Motion").  GSK and Plaintiffs are collectively referred to as the Parties.  Due and adequate notice of the Settlement Agreement having been given to the members of the Settlement Class, the Final Approval Hearing having been held and the Court having considered all papers filed and proceedings had herein and otherwise being fully informed in the premises and good cause appearing therefor, and a determination having been made expressly pursuant to Rule 54(b) of the Federal Rules of Civil Procedure that there is no justification for delay,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED:**

1.      This Final Order and Judgment hereby incorporates by reference the definitions in the Settlement Agreement dated December 6, 2012 (the "Settlement Agreement"), and all terms used herein shall have the same meanings as set forth in the Settlement Agreement.

2.      This Court has jurisdiction over the subject matter of the Actions and over all parties to the Actions and over all members of the Settlement Class.

3.     The Court finds that due process and adequate notice have been provided pursuant to Rule 23 of the Federal Rules of Civil Procedure to all members of the Settlement Class, notifying the Settlement Class of, among other things, the pendency of these Actions and the proposed Settlement with GSK.

4.     The notice provided was the best notice practicable under the circumstances and included individual notice to those members of the Settlement Class whom the parties were able to identify through reasonable efforts.  The Court finds that Notice was also given by publication in multiple publications as set forth in the Declarations of Daniel Coggeshall and Katherine Kinsella dated May 1, 2013.  Such notice fully complied in all respects with the requirements of Rule 23 of the Federal Rules of Civil Procedure and due process of law.

5.     Pursuant to and in compliance with Rule 23 of the Federal Rules of Civil Procedure, the Court hereby finds that due and adequate notice of these proceedings was directed to all Settlement Class members of their right to object to the Settlement, the Plan of Allocation, including the SHP-Class Allocation Agreement ("Plan of Allocation"), and Class Counsel's application for incentive payments for named Plaintiffs, payment of attorneys' fees and reimbursement of expenses associated with the Actions.  A full and fair opportunity was accorded to all members of the Settlement Class to be heard with respect to the foregoing matters.

6.     The Court finds that, for settlement purposes, under the requirements of Rule 23 of the Federal Rules of Civil Procedure, the following Settlement Class is hereby certified:

> All persons throughout the United States and its territories who purchased and/or paid for, in whole or in part, fluticasone propionate nasal spray, whether branded Flonase or its AB-rated generic equivalents, intended for the consumption of themselves, their family members and/or household members, and all Third Party Payor entities throughout the United States and its territories

that purchased, paid for, administered and/or reimbursed for fluticasone propionate nasal spray, whether branded Flonase or its generic equivalents, intended for consumption by their members, employees, plan participants, beneficiaries or insureds.

The applicable time period for the Settlement Class is May 19, 2004 through March 31, 2009.

Third Party Payors are all health insurance companies, healthcare benefit providers, health maintenance organizations, self-funded health and welfare plans, and any other health benefit provider and/or entity that contracts with a health insurer acting as a third party administrator to administer their prescription drug benefits. These payors include such entities that may provide prescription drug benefits for current or former public employees and/or retirees, but only to the extent that such entity was at risk for the cost of the payment(s). For purposes of this definition, an entity "paid for" fluticasone propionate nasal spray (branded Flonase and/or its equivalents) if it paid some or all of the purchase price, or reimbursed any part of the purchase price paid by their members, employees, insureds, participants or beneficiaries.

7.      Excluded from the Settlement Class are: (1) Defendant and its officers, directors, management, employees, predecessors-in-interest, successors-in-interest, assignees or affiliates, and subsidiaries; (2) the United States and/or State governments and their agencies and departments, except to the extent they purchased fluticasone propionate nasal spray (branded Flonase and/or its generic equivalents) for their employees or others covered by a government employee health plan; (3) all entities who purchased fluticasone propionate nasal spray (branded Flonase and/or its generic equivalents) directly from Defendant or its affiliates or purchased fluticasone propionate nasal spray (branded Flonase and/or its generic equivalents) for resale, to the extent and solely to the extent of such purchase as a direct purchaser or for resale; (4) any judge or special master who has presided over the Actions; (5) the health benefit plans listed in Exhibit A to the Settlement Agreement ("Settling Health Plans" or "SHPs"); and (6) those persons who would otherwise be members of the Settlement Class who have timely excluded

themselves from the Settlement Class and who are identified on the schedule attached hereto as

Exhibit 1.  No other individuals or entities have excluded themselves from the Settlement Class.

       8.     It is hereby determined that all members of the Settlement Class are bound by this

Final Order and Judgment.

       9.     For purposes of settlement, the Court finds that the requirements of Rule 23 are

satisfied as follows:

      a)     The members of the Settlement Class are so numerous that joinder of all members is impracticable.

      b)     In the context of settlement, there are common issues of law and fact as to whether the conduct challenged violates state antitrust and consumer protection statutes and/or constitutes unjust enrichment under various state laws.

      c)     In the context of settlement, the claims of the named Plaintiffs are typical of the claims of the Settlement Class.

      d)     In the context of settlement, Class Counsel will fairly and adequately protect and represent the interests of all members of the Settlement Class, and the interests of the named Plaintiffs are not antagonistic to those of the Settlement Class. The named Plaintiffs and the Settlement Class are represented by counsel who are experienced and competent in the prosecution of complex class action antitrust litigation.

      e)     In the context of settlement, questions of law and fact common to the Settlement Class predominate over questions that may affect only individual members and a class action is superior to other available methods for the fair and efficient adjudication of these Actions.

      10.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, this Court hereby

approves the Settlement, as set forth in the Settlement Agreement and the Plan of Allocation, and

finds that the Settlement Agreement and Plan of Allocation are, in all respects, fair, reasonable

and adequate, and in the best interests of the Settlement Class, including Plaintiffs.  This Court

further finds that the parties' Settlement resulted from an extensive investigation of facts,

complete discovery, expert analysis and reports, motion practice, and development of the case

for trial and that the Settlement set forth in the Settlement Agreement and Plan of Allocation are the result of *bona fide* and arm's-length negotiations conducted in good faith between experienced counsel representing the interests of Plaintiffs, the Settlement Class, and GSK. The Settlement is fair, reasonable and adequate in light of the factors set forth in *Girsh v. Jepson*, 521 F.2d 153 (3rd Cir. 1975), as explained in the accompanying memorandum.

11.    The Court has held a hearing to consider the fairness, reasonableness and adequacy of the proposed Settlement, and has been advised that there have been two objections to the Settlement from purported members of the Class. Despite the fact that the objections were not timely filed and each objector failed to provide proof of class membership, the Court has considered and found the objections to lack merit.

12.    Accordingly, the Settlement embodied in the Settlement Agreement and Plan of Allocation is hereby approved in all respects. The Parties are hereby directed to consummate the Settlement Agreement and Plan of Allocation in accordance with all of their terms and provisions, including the Termination provisions.

13.    Subject to the terms set forth in paragraph 13 of the Settlement Agreement, if final approval is reversed, vacated, or otherwise modified on appeal, or if appellate review is sought and on such review final judgment is reversed, vacated, or modified, the Settlement Agreement shall be terminated upon the election of either (a) Plaintiffs, through Class Counsel, or (b) GSK.

14.    Notwithstanding the provisions of any other paragraph of this Final Order and Judgment, if the Settlement Agreement is terminated pursuant to the terms of the Settlement Agreement, or for any other reason does not become effective in accordance with its terms, then (a) the Settlement Agreement shall be of no force or effect, except for the payment of notice and

settlement administration costs from the Settlement Fund; and (b) the Settlement Fund, including any and all interest earned thereon, shall be returned to GSK less only the amount validly disbursed for the costs incurred in giving notice to the Settlement Class and administering the Settlement Fund during the interim period, and (c) any release pursuant to the Settlement Agreement shall have no force or effect, and (d) this Final Order and Judgment shall be rendered null and void as provided by the Settlement Agreement, shall be vacated, and all orders entered and releases delivered in connection herewith shall be null and void to the extent provided by and in accordance with the Settlement Agreement.

15.    The Court approves the Plan of Allocation of the Settlement proceeds (net of attorneys' fees, reimbursed expenses, incentive awards, and costs of administration) proposed by Plaintiffs as fair, reasonable and adequate.  The Plan of Allocation proposes to distribute the net Settlement proceeds *pro rata* based on Class members' purchases of Flonase during the Class period, and does so fairly and efficiently.  The Court directs Rust Consulting, Inc., the Claims Administrator retained by class counsel and approved by the Court in the preliminary approval order, to distribute the net Settlement proceeds to Class members in the manner provided in the Plan of Allocation.

16.    Class members shall look solely to the net Settlement proceeds for settlement and satisfaction against Defendant of all claims that are released by this Order, and shall not under any circumstances be entitled to any further compensation from Defendant with respect to any claims released by this Order.  Except as provided by this Order, no Class member shall have any interest in the Settlement proceeds or any portion thereof.

17.    Any and all disputes arising out of or related to the Settlement, the Settlement Agreement, the Plan of Allocation, or claims administration, including attorneys' fees, must be

brought by Defendant, Plaintiffs, each member of the Settlement Class, and/or any other person or entity, exclusively in this Court.

18.     The Court reserves exclusive and continuing jurisdiction, without affecting in any way the finality of this Final Order and Judgment, over the Settlement, Settlement Agreement and the Settlement Fund, the Plan of Allocation, the administration, consummation and interpretation of the Settlement Agreement or Plan of Allocation, and the enforcement of this Final Order and Judgment. The Court also retains exclusive jurisdiction in order to resolve any disputes that may arise with respect to the Settlement Agreement, the Settlement, the Plan of Allocation, the Settlement Fund, or allocation of attorneys' fees and reimbursed expenses, to consider or approve administration costs and fees, and to consider or approve the amounts of distributions to members of the Settlement Class. In addition, without affecting the finality of this Final Order and Judgment, Defendant, Plaintiffs and each Settlement Class member hereby irrevocably submit to the exclusive and continuing jurisdiction of the United States District Court for the Eastern District of Pennsylvania, for any suit, action, proceeding or dispute arising out of or relating to this Settlement or the Settlement Agreement or the applicability or interpretation of the Settlement Agreement, or the Final Order and Judgment, including, without limitation any suit, action, proceeding or dispute relating to the Release provisions therein, except that this submission to the Court's jurisdiction shall not prohibit: (a) any Released Party from asserting in the forum in which a claim is brought that the Release included in the Settlement Agreement is a defense, in whole or in part, to such claim or (b) in the event that such a defense is asserted in that forum and this Court determines it cannot bar the claim, the determination of the merits of the defense in that forum.

19.    As used throughout this Order, references to the "Settlement Class," "members of the Settlement Class," or "Settlement Class members" refer to members of the Settlement Class and include any of their past, present or future officers, directors, stockholders, attorneys, employees, legal representatives, trustees, agents, parents, subsidiaries, general and limited partners, heirs, executors, administrators, purchasers, predecessors, successors and assigns, acting in their capacity as such.

20.    Upon the Settlement Agreement becoming effective in accordance with its terms, Defendant and its past, present and future parents, subsidiaries, divisions, affiliates, stockholders, officers, directors, insurers, general or limited partners, employees, agents, attorneys, and any of their legal representatives (and the predecessors, heirs, executors, administrators, successors, purchasers, and assigns of each of the foregoing) (the "Released Party" or "Released Parties"), are and shall be released and forever discharged from all manner of claims, demands, actions, suits, causes of action, damages whenever incurred, and liabilities of any nature whatsoever (whether such claims, demands, actions, suits, causes of action, damages or liabilities arise or are incurred before, during or after the date hereof), including costs, expenses, penalties and attorneys' fees known or unknown, suspected or unsuspected, in law or equity, that Plaintiffs or any member or members of the Settlement Class , whether or not they object to the Settlement and whether or not they make a claim upon or participate in the Settlement Fund, ever had, now has, or hereafter can, shall or may have, directly, indirectly, representatively, derivatively or in any other capacity relating to any conduct, events or transactions, prior to the date hereof, alleged or which could have been alleged in the Actions relating to fluticasone propionate nasal sprays (branded Flonase and/or its generic equivalents) (the "Released Claims"). Except for enforcing the Settlement Agreement, each member of the Settlement Class hereby covenants

and agrees that he, she or it shall not, hereafter, seek to establish liability against any Released

Party based, in whole or in part, on any of the Released Claims. Without in any way limiting the

definition of Released Parties, the following specific entities are Released Parties: SmithKline

Beecham  Corporation  d/b/a  GlaxoSmithKline;  GlaxoSmithKline  LLC;  GlaxoSmithKline

Holdings (America) Inc.; GlaxoSmithKline plc; Smith Kline Beecham plc; Glaxo Wellcome

plc.; GlaxoSmithKline Finance plc.; GlaxoSmithKline Services Unlimited; and Smith Kline

Beecham Limited. In addition, Plaintiffs and each Settlement Class member hereby expressly

waives and releases, upon the Settlement becoming effective pursuant to paragraph 5 of the

Settlement Agreement, any and all provisions, rights and benefits conferred by § 1542 of the

California Civil Code, which reads:

> Section 1542. General Release — Claims Extinguished. A general
> release does not extend to claims which the creditor does not know
> or suspect to exist in his or her favor at the time of executing the
> release, which if known by him or her must have materially
> affected his or her settlement with the debtor;

or rights and benefits conferred by any law of any state or territory of the United States or any

other jurisdiction, or principle of common law, which is similar, comparable or equivalent to §

1542 of the California Civil Code.  Plaintiffs and each Settlement Class member may hereafter

discover facts other than or different from those which he, she or it knows or believes to be true

with respect to the claims which are the subject matter of this paragraph, but each Plaintiff and

each Settlement Class member hereby expressly waives and fully, finally and forever settles and

releases, upon the Settlement Agreement becoming final, any known or unknown, suspected or

unsuspected, contingent or non-contingent claim that would otherwise fall within the definition

of Released Claims, whether or not concealed or hidden, without regard to the subsequent

discovery or existence of such different or additional facts.  Plaintiffs and each Settlement Class

member also hereby expressly waives and fully, finally and forever settles and releases any and

all claims it may have against any Released Party under § 17200, et seq., of the California Business and Professions Code, or any similar, comparable or equivalent provision of the law of any other state or territory of the United States or other jurisdiction or principle of common law, which claims are hereby expressly incorporated into the definition of Released Claims. The releases set forth above shall not release any claims arising in the ordinary course of business among Plaintiffs, Settlement Class members and the Released Parties concerning product liability, breach of warranty or contract (other than breach of warranty or contract based in whole or in part on any conduct challenged in the Actions), and/or personal or bodily injury, and/or any claims for costs of providing medical care for individuals allegedly injured by fluticasone propionate nasal spray products.

21.     Plaintiffs and all members of the Settlement Class, the successors and assigns of any of them, and anyone claiming through or on behalf of any of them, whether or not they execute and deliver a proof of claim, are hereby permanently enjoined from commencing, instituting, causing to be instituted, assisting in instituting or permitting to be instituted on his, her or its behalf, whether directly, derivatively, representatively or in any other capacity, any proceeding in any state or federal court, in or before any administrative agency, or any other proceeding or otherwise alleging or asserting against the Released Parties, individually or collectively, any of the Released Claims in this Final Order and Judgment. The releases herein given by the Released Parties shall be and remain in effect as full and complete releases of the claims set forth in the Actions, notwithstanding the later discovery or existence of any such additional or different facts relative hereto or the later discovery of any such additional or different claims that would fall within the scope of the release provided in this Final Order and Judgment, as if such facts or claims had been known at the time of this release.

22.     Plaintiffs, their counsel, and Claims Administrator will ensure that each claims form contains a copy of the releases set forth in paragraphs 11(a) through (c) of the Settlement Agreement.  Each member of the Settlement Class or its authorized representative shall sign a claim form that contains a copy of the of the release set forth in paragraphs 11(a) through (c) of the Settlement Agreement as a precondition to receiving any portion of the Settlement Fund. The releases set forth above shall be binding and effective as to all Settlement Class members and each Settlement Class member shall be permanently barred and enjoined from asserting any Released Claims as defined herein.

23.     The Settlement is not and shall not be deemed or construed to be an admission, adjudication or evidence of any violation of any statute or law or of any liability or wrongdoing by Defendant or any Released Party or of the truth of any of the claims or allegations alleged in the Actions.  The Settlement Agreement, including its exhibits, and any and all negotiations, documents and discussions associated with it, shall be without prejudice to the rights of any party, shall not be deemed or construed to be an admission or evidence of any violation of any statute or law or of any liability or wrongdoing by Defendant, or of the truth of any of the claims or allegations contained in the complaints in the Actions or any other pleading or document, and evidence thereof shall not be discoverable or used directly or indirectly, in any way, whether in the Actions or in any other action or proceeding, except in connection with a dispute under this Settlement or an action in which this Settlement or the releases contained therein is asserted as a defense.

24.     All claims in the Actions against GSK are hereby dismissed with prejudice and in their entirety, on the merits, and without costs.  This Court shall retain jurisdiction as outlined above in paragraph 19 over the enforcement of the Settlement and Settlement Agreement.

25.    The Settlement Agreement shall be binding upon, and inure to the benefit of, the successors and assigns of the parties and to the Released Parties.  Without limiting the generality of the foregoing, each and every covenant of and agreement in the Settlement Agreement by the Plaintiffs and their counsel shall be binding on each member of the Settlement Class.

26.    Any data or other information provided by Settlement Class members in connection with the submission of claims will be held in strict confidence, available only to the Administrator, class counsel, and experts or consultants acting on behalf of the Settlement Class, and Defendant, Defendant's counsel, and experts or consultants acting on behalf of Defendant. In no event will a Settlement Class member's data or information be made publicly available, except as provided for herein or upon Court Order for good cause shown.

27.    The Court has reviewed Class Counsel's petition for an award of attorneys' fees and reimbursement of expenses.  The Court determines that an attorneys' fee of 33 1/3% of the initial $35 million Settlement Fund (or $11,655,000), plus 33 1/3% of any sums that may become part of the Settlement Fund after the calculation provided for in the Plan of Allocation with respect to SHPs, and the reimbursement of $1,848,720.15 in expenses, is fair, reasonable, and adequate and that Settlement Class Counsel should be paid said amounts from the Settlement Fund.

28.    Each of the five (5) named Plaintiffs are hereby awarded incentive payments as follows: $10,000 each to Medical Mutual of Ohio, the AFL Plan, the IBEW Plan, Painters District Council, and $5,000 to Andrea Kehoe for their efforts in representing the Settlement Class, which is in addition to whatever monies these plaintiffs will receive from the Class Settlement Fund pursuant to the Plan of Allocation and the method of distribution approved by the Court.  The Court finds these awards to be fair and reasonable.

29.     Plaintiffs shall file, not later than February 1, 2014, an accounting for distribution of the disbursement of the Settlement Fund remaining after the payment of claims administration costs and fees, and incentive payments and attorneys' fees and reimbursement of expenses provided in paragraphs 29 and 30 above.  The amounts to be paid pursuant to paragraphs 29 and 30 shall be paid from the Class Settlement Fund.

30.     The Court hereby directs that this judgment of dismissal be entered by the clerk forthwith pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.  There is no just reason for delay in the entry of this Final Order and Judgment and immediate entry by the Clerk of the Court is expressly directed.  The direction of the entry of final judgment pursuant to Rule 54(b) is appropriate and proper because this judgment fully and finally adjudicates the claims of the Plaintiffs and the Settlement Class against Defendants in the Actions, allows consummation of the Settlement, and will expedite the distribution of the Settlement proceeds to Class members.

BY THE COURT:

6/19/2013                                    s/Anita B. Brody

Dated:_____        _____

                                             Anita B. Brody, Judge

# Exhibit 1

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE FLONASE ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>Indirect Purchaser Actions | CIVIL ACTION<br><br>No. 08-3301<br><br>**Hon. Anita B. Brody** |
| MEDICAL MUTUAL OF OHIO, on behalf of itself and all others similarly situated,<br><br>      Plaintiff,<br><br>   v.<br><br>SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE plc,<br><br>      Defendant. | CIVIL ACTION<br><br>NO. 12-4212<br><br>**Hon. Anita B. Brody** |

**EXHIBIT 1 TO FINAL ORDER AND JUDGMENT
EXCLUSION FROM SETTLEMENT CLASS**

1. James O. Guleke II, No. 5 Randolph Place, P.O. Box 684091, Austin, Texas 78768